1   IRELL & MANELLA LLP
    Jeffrey M. Reisner (State Bar No. 143715)
2   jreisner@irell.com
    Michael H. Strub, Jr. (State Bar No. 153828)
3   mstrub@irell.com
    Kerri A. Lyman (State Bar No. 241615)
4   klyman@irell.com
    840 Newport Center Drive, Suite 400
5   Newport Beach, California  92660
    Telephone:  (949) 760-5196
6   Telecopier:  (949) 760-5200

7   [Proposed] Reorganization Counsel for the
    Debtors and Debtors-in-Possession

8
                    UNITED STATES BANKRUPTCY COURT
9
                    CENTRAL DISTRICT OF CALIFORNIA
10
                         LOS ANGELES DIVISION
11

12  In re                                    Case No. 10-bk-42779-RN
                                             [Motion Pending for Joint Administration With
13                                           Case No. 2:10-bk-42784-RN]

14  ☒  EMAK WORLDWIDE, INC., a Delaware      Chapter 11 Proceeding
    corporation,
15                                           **DECLARATION OF TERESA L.**
    ☒  EMAK WORLDWIDE SERVICE CORP., a       **TORMEY IN SUPPORT OF FIRST DAY**
16  Delaware corporation,                    **MOTIONS**

17                                           [Identical Motion Filed in Related Case]

18              **DECLARATION OF TERESA L. TORMEY**

19          I, Teresa L. Tormey, declare as follows:

20          1.      I am the Corporate Secretary of EMAK Worldwide, Inc. ("EMAK") and EMAK

21  Worldwide Service Corp. ("EMAK Service" and, collectively, the "Debtors").  I was employed

22  by the Debtors, most recently Chief Administrative Officer (following a promotion from

23  Executive Vice President in 2006 and from Senior Vice President in 2004), General Counsel and

24  Corporate Secretary from November 1, 2002 until March 31, 2010, and, since that time, continue

25  to serve EMAK, pursuant to a consulting agreement, as its chief in-house counsel and Corporate

26  Secretary.  I also hold positions of Corporate Secretary and Director with each of EMAK's

27  wholly-owned subsidiaries.  Prior to joining the Debtors, I was a partner in the law firm of

28

2280129.8 01

1  Oppenheimer Wolff & Donnelly LLP specializing in corporate and securities law as well as

2  mergers & acquisitions.

3        2.      I hold a Bachelor's degree in Economics from UC Davis and a JD (Cum Laude)

4  from Pepperdine University School of Law.  During my employment with the Debtors, my

5  responsibilities included overseeing the centralized corporate departments of EMAK and its

6  wholly-owned subsidiaries, including business affairs, human resources, information technology,

7  internal audit, investor relations and office administration.  I have general knowledge of the

8  Debtors' books and records, and I am familiar with their financial and operational affairs.

9        3.      In order to enable the Debtors to minimize the adverse effects on their businesses

10  from the commencement of these chapter 11 cases, the Debtors have requested various types of

11  relief in "first-day" applications and motions (collectively, the "First Day Motions").  The First

12  Day Motions seek relief aimed at, among other things, maintaining the Debtors' existing cash

13  management system, sustaining employee confidence, and facilitating a restructuring of its debts.

14  All of the First Day Motions are crucial to the success of the Debtors' chapter 11 cases.

15        4.      I submit this declaration in support of the First Day Motions.  Any capitalized

16  term not expressly defined herein shall have the meaning ascribed to that term in the relevant

17  First Day Motion.  In addition to the personal knowledge that I have acquired while working

18  with the Debtors, I also have knowledge of, and familiarity with, the Debtors' books and records,

19  and financial and operational affairs.  Except as otherwise indicated, all statements in this

20  Declaration are based upon my personal knowledge, my review of the Debtors' books and

21  records, and other relevant documents, and other information prepared or collected by the

22  Debtors' employees, or upon my opinion based upon my experience with the Debtors' operations

23  and financial condition and those of the troubled companies.  In making the statements herein,

24  based upon the foregoing, I have relied in part upon others to accurately record, prepare, and

25  collect any such documentation and other information.  If I were called upon to testify, I could

26  and would testify competently to the facts set forth herein.  I am authorized to submit this

27  declaration.

28

2280129.8 01

5.    Part I of this declaration describes the Debtors' businesses and the circumstances surrounding the commencement of these chapter 11 cases.  Part II sets forth the relevant facts in support of the First Day Motions filed by the Debtors concurrently herewith.

**PART I.**

**BACKGROUND**

6.    On August 5, 2010 (the "Petition Date"), the Debtors filed their voluntary chapter 11 petitions in this Court for relief under title 11 of the United States Code (the "Bankruptcy Code").

**A.    The Debtors' Business**

7.    EMAK, through its wholly-owned subsidiaries, is in the business of providing marketing services and promotional products.  EMAK Service is the corporate "back-office" for EMAK, providing centralized services to EMAK and all of its subsidiaries.

8.    EMAK was formed in 1983 as Marketing Equities in New York City.  In 1991, Marketing Equities was renamed Equity Marketing.  In 1993, Equity Marketing opened an office in Hong Kong, and in 1994, relocated headquarters from New York to Los Angeles.

9.    In 1994, EMAK went public and its stock traded on NASDAQ under the symbol EMAK.  In 2004, Equity Marketing changed its name to EMAK Worldwide, Inc.  EMAK's common shares traded on NASDAQ from 1994 until April 14, 2008, when trading was suspended.  On June 17, 2008, EMAK was delisted.  EMAK subsequently deregistered with the Securities and Exchange Commission ending its status as a reporting public company, although its common shares continue to trade on the pink sheets.

10.    EMAK is the parent company of a number of entities (the "EMAK Subsidiaries" and, collectively with EMAK and EMAK Service, the "Companies") which provide strategic planning and research, consumer insight development, entertainment marketing, design and manufacturing of custom promotional products, marketing for children, event marketing, shopper marketing and environmental branding.  The Companies' businesses are divided into two primary sectors – marketing services and promotional products.  The promotional products business includes planning and implementing promotional programs using licensed popular characters

from studios such as Warner Bros. and Universal. The Companies also design and arrange for

the manufacturing of a variety of items, such as figurines and plush toys, for their clients'

campaigns. In 2007, 2008 and 2009, the promotional products business accounted for the

majority of the Companies' sales, with long-time customer Burger King Corporation accounting

for approximately half of the Companies' revenue. The Companies also provide marketing

services, which include event and collaborative marketing, as well as retail and environmental

design services.

11.    EMAK's subsidiaries specialize in various areas of marketing services and

promotional products as follows:

- Equity Marketing, Inc. is a Los Angeles based company that leverages
  entertainment properties to build brand value for its clients, providing
  entertainment marketing and promotion custom premiums. Equity Marketing,
  Inc. designs and contracts for the manufacture of promotional products that
  are used as free premiums or sold in conjunction with the purchase of other
  items at a retailer or quick service restaurant. These promotional products are
  used for marketing purposes by the companies sponsoring the promotions and
  the licensors of the entertainment properties. Until cancelling its contract in
  2009, Burger King Corporation was essentially the only client of Equity
  Marketing, Inc. and the largest client of the Companies on an aggregate basis.
- Logistix Marketing, Inc. and Logistix Inc. also develop promotional products
  and programs with a focus on marketing to family-focused brands. Logistix
  Marketing, Inc. and Logistix Inc. specialize in family insight, promotional
  marketing, 2-D and 3-D premium design and production, licensing
  consultancy and consumer products.
- Upshot, Inc. is a Chicago-based agency that provides clients with non-
  traditional marketing services by challenging customer indifference. Upshot,
  Inc. provides integrated marketing services to its clients, including strategic

1                  planning and research, promotion, event, collaborative marketing, retail and

2                  environmental design.

3           &bull;  Neighbor, Inc. also offers full-service, strategic marketing services.  Neighbor,

4                  Inc. focuses its marketing services on environmental branding, community

5                  building, movements and experiences.

6       12.    The Companies' blue-chip clients have included Kellogg, Kohl's, Kraft, Macy's,

7  Procter & Gamble and Safeway, among others.

8       13.    EMAK Service was formed in 2004.  EMAK Service provides corporate and

9  support services to the Companies.  EMAK Service has no independent operations or source of

10  income other than funds received in connection with the services provided to the EMAK

11  Subsidiaries.

12  **B.     The Debtors' Corporate Structure**

13       14.    EMAK is a Delaware corporation based in Los Angeles, California.  EMAK's

14  headquarters are located at 6330 San Vicente Blvd., Los Angeles, California.  EMAK has two

15  classes of stock: common shares and the Series AA Preferred Stock.  EMAK has issued and

16  outstanding 7,243,018 shares of common stock.  EMAK has issued and outstanding 25,000

17  shares of Series AA Preferred Stock, all held by Crown EMAK Partners, LLC ("Crown").

18       15.    EMAK Service is a Delaware corporation and a wholly-owned subsidiary of

19  EMAK.  EMAK Service's headquarters are located at 6330 San Vicente Blvd., Los Angeles,

20  California.  As noted above, EMAK Service provides corporate and support services to the

21  Companies.  EMAK Service has no independent operations or source of income other than funds

22  received in connection with the services provided to the Companies.

23       16.    EMAK has a number of other direct and indirect wholly-owned subsidiaries,

24  which are reflected on the Organizational Chart attached hereto as <u>Exhibit A</u>.  EMAK owns

25  100% of the following entities:

26           &bull;  Corinthian Marketing, Inc., a Delaware corporation which is no longer active.

27           &bull;  Equity Marketing, Inc., a Delaware corporation, which provides promotional

28                  products as discussed above.

- Logistix Marketing Inc. (f/k/a SCI Promotion, Inc.), a Delaware corporation, which provides promotional products as discussed above.

- Logistix, Inc., a Delaware corporation, which provides promotional products as discussed above.

- Upshot, Inc., a Delaware corporation, which provides marketing services as discussed above.

- EMAK Europe Holdings, Limited, a United Kingdom company with two subsidiaries, Megaprint Group, Ltd., a United Kingdom Company and Logistix Limited, a United Kingdom Company. Megaprint Group, Ltd. also has two subsidiaries, Megapomotions B.V., a Dutch Company and Logistix Marketing GmbH (f/k/a Megapromotions GmbH), a German Company. These entities are no longer operating and three of the entities are now in liquidation proceedings in Europe.

- Johnson Grossfield, Inc., a Delaware corporation which is no longer active.

- Logistix Retail, Inc. (f/k/a Pop Rocket, Inc.), a Delaware corporation which is no longer active.

- Equity Marketing Hong Kong, Ltd., a Delaware corporation with four subsidiaries, EMAK Asia Holding Company Limited, a Hong Kong company, EMAK China Limited, a Hong Kong company and EMAK Hong Kong Limited, a Hong Kong company ("EMAK-HK") and Pine Wisdom Limited, a Hong Kong company. These entities provide manufacturing support services to the Companies for the production of promotional products, such as figurines and plush toys, by the Companies' contract manufacturers in China.

- Neighbor, Inc., a Delaware corporation, which provides marketing services as discussed above.

## C.    Financial Condition

17.    As of December 31, 2009, the Companies' consolidated un-audited financial reports indicated approximately $41.3 million in total assets, including approximately $13.0

1  million in cash and short-term investments, $11.4 million in accounts receivable, $.48 million in

2  prepaid expenses, $3.0 million in inventory, $5.0 in fixed assets, and $9.0 million in intangibles

3  and other assets. The Companies' un-audited financial reports further indicate, as of December

4  31, 2009, approximately $26.0 million in liabilities, including $7.5 million in accounts payable.

5      18.    The Companies reported an adjusted EBITDA loss before charges and non-cash

6  expenses of $1.8 million for the first quarter of 2010, compared with adjusted EBITDA of

7  $114,000 in the first quarter of 2009. In addition, operating expenses were 20% higher than the

8  first quarter of 2009 due primarily to increased legal fees.

9      19.    As of June 9, 2010, the Companies had $7.6 million in cash, including $2 million

10  of restricted cash securing EMAK's letter of credit obligations under real estate leases. At that

11  time, EMAK had outstanding legal fees and expenses of $2.4 million, leaving unrestricted cash

12  of $3.2 million.

13      20.    As discussed in greater detail below, on July 19, 2010, the Delaware Chancery

14  Court entered an order requiring EMAK to pay a judgment of $2.5 million within five business

15  days. This judgment represented approximately 87% of the Companies' available, unrestricted

16  cash.

17  **D.**    **Events Leading to the Debtors' Bankruptcy Filing**

18      21.    A number of factors have contributed to the Debtors' current financial crisis.

19  <div align="center">**Declines in Revenue**</div>

20      22.    One critical factor leading to the Debtors' current financial position is the decline

21  in revenues from the largest customer of the Companies' promotional products business, which

22  have accounted for approximately 50% of the Companies' revenue in the last several years. The

23  Companies' promotional products business is conducted through Equity Marketing, Inc., Logistix

24  Marketing, Inc. and Logistix, Inc. These entities design and contract for the manufacture of

25  promotional products that are used as free premiums or sold in conjunction with the purchase of

26  other items at a retailer or quick service restaurant. These products are used for marketing

27  purposes by the companies sponsoring the promotions and the licensors of the entertainment

28  properties. Until 2009, Equity Marketing, Inc.'s primary and the Companies' largest client was

1  Burger King Corporation (including its franchise purchasing cooperative Restaurant Services,

2  Inc. and various distribution companies), a company with whom Equity Marketing, Inc. had a

3  twenty-five year relationship. However, in September 2009, Burger King terminated its

4  relationship with Equity Marketing, Inc. Equity Marketing, Inc. continued to provide transitional

5  services to Burger King through May 2010. Burger King accounted for approximately 54%,

6  53% and 51% of the Companies' total revenues for the years ended December 31, 2007, 2008

7  and 2009, respectively, and the loss of this client had a significant impact on the Companies'

8  finances. Equity Marketing, Inc., EMAK Service and EMAK-HK have made significant staffing

9  reductions to compensate for the wind down of the Companies' work for Burger King.

10       23.    In addition to the decline in revenues generated by Equity Marketing, Inc., the

11  Companies also closed their European based operations in February 2009. The Companies'

12  European operations, which were run through EMAK Europe Holdings and its subsidiaries, were

13  engaged in the production and supply of promotional products as well as other marketing and

14  advertising materials in printed or other forms. Logistix Limited, a marketing services agency,

15  focused primarily on assisting consumer packaged goods companies in their efforts to market to

16  children between the ages of seven and fourteen by developing and executing premium-based

17  promotions and by providing marketing consulting services. However, the need for such services

18  in Europe has declined in recent years in response to regulatory pressures on marketing to

19  children (primarily restrictions on the television advertisement of unhealthy foods). Three of the

20  Companies' European subsidiaries are now in liquidation proceedings in Europe –

21  Megapromotions B.V., Logistix Marketing GmbH and Logistix Limited.

22       24.    The Companies' agency services are provided by the Upshot, Inc. and Neighbor,

23  Inc. These entities provide integrated marketing services to their clients, including strategic

24  planning and research, promotion, event, collaborative marketing, retail and environmental

25  design. In the first quarter of 2010, the Companies' revenues from agency services decreased 16

26  percent as compared to the first quarter of 2009. This decrease was the result of lower revenues

27  at Upshot, Inc. due, at least in part, to the loss of client Miller Brewing Company following

28

2280129.8 01

1    Miller's merger with Coors.  Shortly after losing Miller, however, Upshot, Inc. gained two new

2    clients in the beer and spirits category – Corona and Wild Turkey.

3           25.    As a result of the foregoing, beginning in 2009, the Companies began the process

4    of implementing a decentralizing and restructuring plan, which included reducing their

5    workforces to compensate for the loss of the Burger King business.  In addition to a decrease in

6    revenues, these changes have resulted in restructuring expenses of $2.3 million in the first quarter

7    of 2010, including $1.7 million related to employee termination costs for senior management and

8    corporate staff as part of its restructuring and decentralization plan, and $0.6 million related to

9    other employee departures due to the wind down of the Burger King business.  The Companies'

10   remaining workforce reductions will continue through the end of 2010.

11                                    **Pending Litigation**

12          26.    EMAK is involved in a number of litigations pending in California and Delaware.

13   The majority these proceedings concern an individual named Donald A. Kurz ("Kurz"), the

14   former CEO of EMAK.  Kurz resigned as CEO of EMAK in May 2005, at which time he was

15   replaced by James L. Holbrook, Jr., the current CEO.  In 2009, Kurz began a campaign to gain

16   control of EMAK.

17          27.    In September 2009, Kurz and his affiliates filed an action against EMAK in the

18   Los Angeles County Superior Court captioned *Take Back EMAK, LLC, et a. v. Robeck et al.* (the

19   "CA Action") asserting derivative and non-derivative claims for breach of fiduciary duty, gross

20   mismanagement, and unlawful, unfair and fraudulent business practices against EMAK and

21   certain current and former directors of EMAK and seeking in excess of $300 million in damages.

22   In June 2010, plaintiffs filed a first amended complaint, which eliminated non-derivative claims,

23   named additional defendants, eliminated all original plaintiffs other than Robert J. Farina, added

24   Gryphon Promotions, Inc. as a plaintiff and seeks damages in excess of $100 million.  On June

25   20, 2010, the California Superior Court sustained the demurrers filed by EMAK and the

26   individual director defendants to the first amended complaint but allowed the plaintiffs ten days

27   leave to amend their complaint.  An amended complaint was filed on July 30, 2010.

28

1    28.    In October 2009, Kurz and his affiliates filed an action against EMAK in the

2  Delaware Chancery Court captioned *Kurz, et al. v. Holbrook, et al.*, (the "DE Action") seeking

3  relief concerning a proposed transaction by which the shares of Series AA Stock (which are

4  owned by Crown) that did not vote with the Common Stock for the election of directors would

5  be exchanged for shares of a new preferred stock of the Company that were equivalent to the

6  shares of Series AA Stock, except that they would vote with the holders of Common Stock for

7  the election of directors (the "Exchange Transaction").  The Exchange Transaction was rescinded

8  on December 3, 2009.  The complaint in the DE Action was subsequently amended to assert that

9  (i) Kurz and his affiliated group Take Back EMAK, LLC ("TBE") had elected new directors to

10  the Board of EMAK and (ii) actions taken by Crown to amend the EMAK's Bylaws were invalid.

11    29.    On February 9, 2010, the Delaware Court of Chancery ruled that TBE had

12  successfully elected their slate of directors, and that the purported actions taken by Crown were

13  legally invalid.  EMAK appealed and on April 21, 2010, the Delaware Supreme Court ruled that

14  TBE had not successfully elected its slate of directors.  However, during the ten-week period in

15  which the board of directors purportedly elected by TBE (the "TBE Board"), the TBE Board took

16  numerous actions including: (i) electing Kurz as EMAK's president; (iii) forming a Litigation and

17  Structural Review Committee to manage the pending litigation; and (iii) forming a Personnel

18  Review Committee to, among other things, (a) determine Kurz's compensation and (b)

19  investigate whether Holbrook should be terminated for cause.  While in control of EMAK, the

20  TBE Board contracted with numerous service providers, such as investment bankers, a public

21  relations company and a research consultant, on the Companies' behalf.  These expenses totaled

22  approximately $800,000 in the first quarter of 2010.

23    30.    On February 24, 2010 (as amended on May 3, 2010), counsel for the plaintiffs in

24  the DE Action filed an interim fee application requesting $2.85 million in contingent attorneys

25  fees and expenses to litigate claims in the DE Action based upon the "significant benefits" of

26  their services to EMAK and its shareholders.  EMAK vigorously opposed the fee application.

27  On July 19, 2010, the Delaware Court of Chancery issued an order awarding counsel to the

28  plaintiffs $2.5 million within five business days.

1    31.    Following the DE Action, in May 2010, EMAK filed an action against Kurz, TBE

2  and Peter Boutros ("Boutros") in Los Angeles County Superior Court captioned *EMAK*

3  *Worldwide, Inc. v. Kurz, et al.* (the "Boutros Action") alleging claims for breach of contract,

4  intentional interference with contract, conspiracy to interfere with contract and negligent

5  interference with contract arising out of the purported sale of restricted securities of EMAK by

6  Boutros to Kurz.  The transaction between Boutros and Kurz, which resulted in TBE purportedly

7  achieving a slight majority in its efforts to unseat EMAK's directors, was held invalid by the

8  Delaware Supreme Court in the DE Action.

9    32.    On July 21, 2010, Kurz filed an action against EMAK in the Delaware Chancery

10  Court seeking advancement of attorneys' fees and indemnification as a director of EMAK in

11  connection with the Boutros Action (the "Advancement Action").  The Advancement Action also

12  seeks advancement of fees and indemnification in connection with the Advancement Action

13  itself, as well as advancement of fees and indemnification in connection with counterclaims filed

14  by EMAK in the DE Action.

15    33.    In addition to the litigation with Kurz, in January 2010, Wells Fargo Securities,

16  LLC (as successor to Barrington Associates) ("Wells Fargo") commenced an arbitration action

17  against EMAK alleging that a $1 million contingent fee was owed to Wells Fargo in connection

18  with the Exchange Transaction.  EMAK has vigorously defended this action.

19    34.    Finally, on July 15, 2010, EMAK was served with a writ of summons filed in The

20  Netherlands on behalf of a former employee of EMAK's Dutch subsidiary Megapromotions

21  B.V., which was placed in bankruptcy liquidation in February 2009 (the "Employment Action").

22  The Employment Action asserts claims for in excess of 500,000 Euros consisting of contractual

23  severance relating to an employment agreement terminated by the bankruptcy trustee of

24  Megapromotions B.V., as well employee expenses, contractual bonuses and overdue pension

25  contributions.  The Employment Action alleges that EMAK is obligated as the guarantor of

26  Megapromotions B.V. despite the intervening bankruptcy liquidation and actions of the trustee.

27    35.    Legal fees directly related to these lawsuits and consent solicitation totaled more

28  than $2.3 million in 2009 and $3.3 million in the first six months of 2010, and they continue to

1    mount.  Prolonged litigation has had a material adverse effect on EMAK's financial condition

2    and results of operations.  Most critically, on July 19, 2010, the Delaware Chancery Court

3    entered an order requiring EMAK to pay a judgment of $2.5 million within five business days.

4    As noted above, this judgment represented approximately 87% of the Companies' available,

5    unrestricted cash.

## II.

### FIRST DAY MOTIONS AND APPLICATIONS

8        36.    I believe that an important element in achieving a successful result for creditors

9    through this bankruptcy proceeding is the approval of the first day motions submitted

10    concurrently herewith.  The factual background and support for each of these first day pleadings

11    is set forth in detail each of the first day motions, which I have reviewed and authorized, and is

12    discussed below.  To the extent that any factual background is contained in the motions and not

13    contained herein, such factual background is adopted herein by this reference.

14    **A.    Motion For An Order Limiting Notice Of Certain Matters Requiring Notice To**

15            **Creditors Pursuant To Rules 2002 And 9007 Of The Federal Rules Of Bankruptcy**

16            **Procedure ("Motion Limiting Notice")**

17        37.    The Debtors have hundreds of creditors and shareholders.  The Debtors believe

18    the mailing of notices of all matters to hundreds of parties would be impractical and would

19    impose an enormous administrative and financial burden upon the estates.  In addition, service of

20    notice of all pleadings and other documents to all entities would delay the provision of notice in

21    each particular instance, thereby hampering the granting of relief that may be advantageous to the

22    Debtors' estates.

23        38.    Additionally, the Debtors do not believe that any party will be prejudiced by the

24    proposed limitation on notice procedures since any party-in-interest that desires to receive notice

25    of all matters in this case may, by submitting a written request for special notice to counsel for

26    the Debtors, receive such notice.

27        39.    Accordingly, the Debtors believe that that the relief requested in the Motion

28    Limiting Notice is in the best interests of the Court, the estate, and all parties in interest.

**B.**      <u>Motion for Order Under 11 U.S.C. §§ 105, 345, 363 and 364: (A) Authorizing (I)</u>

<u>Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business</u>

<u>Forms, and (III) Continued Use of Existing Cash Management System; (B)</u>

<u>Authorizing Certain Intercompany Transactions; (C) Excusing the 11 U.S.C. §</u>

<u>345(b) Deposit and Investment Guidelines; and (D) Providing Other Related Relief</u>

<u>Cash Management System (the "Cash Management Motion")</u>

     40.      EMAK and its wholly-owned subsidiaries (the "EMAK Subsidiaries" and, collectively with EMAK and EMAK Service, the "Companies") utilize a centralized cash management system (the "Cash Management System") involving deposit and disbursement accounts that are attached to a concentration account and master funding account at Bank of America. The Companies have utilized a cash management system similar to the existing system for at least the last six years. A chart showing the Companies' bank accounts utilized in the Cash Management System (the "Bank Accounts") is attached to the Cash Management Motion as Exhibit A.

     41.      The Cash Management System consists of several bank accounts that are used to concentrate cash from the Companies' businesses. All cash receipts generated by the Companies' operations (including the EMAK Subsidiaries) are initially deposited into a lockbox with Bank of America.[1] All funds deposited in the lockbox are automatically swept into a higher-tier "concentration" account at Bank of America on a daily or other period basis (the "Concentration Account"). In addition, certain clients of the EMAK Subsidiaries make deposits by wire transfer directly into the Concentration Account.

     42.      Funds are then transferred from the Concentration Account to a master funding account in the name of EMAK Service (the "EMAK Account") and then to three special purpose disbursement accounts held by EMAK Service and Equity Marketing Inc. (the "Disbursement Accounts"). The disbursement account held by Equity Marketing Inc. is a flex spending account used to reimburse employees for various qualified expenses (such as medical expenses). The two disbursement accounts held by EMAK Service are a payroll account and the Companies' general

---

[1] The Companies previously utilized a second lockbox that is now closed.

1  checking account.  The Disbursement Accounts are funded out of the EMAK Account.  The

2  EMAK Account and Disbursement Accounts are "zero balance accounts" ("ZBAs") which

3  contain funds that are transferred to the accounts via periodic transfers initiated by management.

4  The majority of the Companies' vendors are paid by check.  However, EMAK Service also has a

5  holding account that it uses to make wire transfers.  The Companies generally use wire transfers

6  to pay legal fees and move funds to EMAK's Hong Kong subsidiaries as appropriate.

7       43.     The structure of the Companies' prepetition Cash Management System creates a

8  two-way transfer route in which all deposits are "up streamed" from the lockbox to the

9  Concentration Account, and disbursements for operating expenses are "down streamed" to the

10  Disbursement Accounts.  Ultimately, all money received from the Companies' operations makes

11  its way to the Concentration Account, then either goes to the Disbursement Accounts to pay the

12  Companies' operating expenses or is held in the Concentration Account.

13       44.     In addition to the foregoing accounts, the Debtors have two additional accounts at

14  Bank of America which are not set forth on Exhibit A to the Cash Management Motion.  One is a

15  savings account holding approximately $1.2 million in unrestricted cash.  The second is a

16  restricted account holding $2 million in cash which EMAK pledged as collateral for a letter of

17  credit issued by Bank of America on behalf of EMAK's subsidiary Upshot, Inc.[2]

18       45.     Certain expenses are paid by EMAK on behalf of all of the Companies including:

19  (i) insurance premiums (including liability, health care, and others); and (ii) corporate overhead

20  (including services related to payroll and accounting, legal affairs, human resources, and

21  expenses related to corporate headquarters).  The Companies allocate the cost of these expenses

22  according to allocation formulas based on estimate usage – allocated time, space, etc.  Although

23  this method is subjective, the Debtors believe that it is the most appropriate method for allocating

24  truly shared resources.  The Companies have used this allocation system, which has been updated

25  and refined from time to time to accommodate changes in the business of the Companies and to

26  improve accuracy, for approximately 5 years.

27      [2] Upshot, Inc. is a wholly-owned subsidiary of EMAK located in Chicago that has approximately
28  170 employees.  Bank of America posted a letter of credit as security for Upshot, Inc.'s lease of office space in Chicago.

46.    Corporate costs are segregated into four categories: (1) direct charges, (2) direct allocations, (3) indirect allocations, and (4) unallocated corporate costs.

- Direct charges include rent, rental equipment, taxes, and licensing and are booked directly to the applicable Company.

- Direct allocations are centralized costs allocated to each of the Companies based on service or usage and are calculated based on allocation standards which are updated annually based on actual/forecast expenses.  For example, each of the Companies occupying space in the office space in Los Angeles is allocated its proportionate share of the facility cost based on the estimated square footage occupied.

- Indirect allocations are costs that are not directly allocated to one of the Companies including, for example, legal services for corporate issues.  Indirect costs are allocated to each of the Companies based on a weighted average calculation of net sales, net assets and average worldwide headcount.

- Unallocated corporate costs include, among other things, the Companies' executive department, finance department and board related expenses.

47.    Although the Debtors' and their non-debtor affiliates' monies are commingled by virtue of the Cash Management System, records are maintained by the Debtors that allocate, reconcile and keep track of all deposits, disbursements, and intercompany transfers and accounts.  Thus, the Debtors can readily determine which Companies' expenses were paid with which Companies' cash.

**The Debtors Should Be Granted Authority to Maintain The Bank Accounts**

48.    In the Cash Management Motion, the Debtors seeks a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened.  If enforced in the Debtors' cases, this requirement would cause enormous disruption in the Companies' businesses and would impair the Debtors' efforts to reorganize.  Thus, the Debtors seek authorization to maintain and continue to utilize the Bank Accounts.  The Debtors will not pay, and each of the banks where the Bank Accounts are maintained have been directed

1   not to pay, any debts incurred by the Debtors before the Petition Date other than as specifically

2   authorized by this Court.  Debts incurred by the Debtors' non-debtor affiliates will not be

3   impacted.

4       **The Debtors Should Be Granted Authority to Use Existing Business Forms and Checks**

5       49.    The Debtors also request authority to continue to use all correspondence and

6   business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well

7   as all checks existing immediately before the Petition Date, without reference to their status as

8   debtors in possession.  Parties doing business with the Debtors undoubtedly will be aware of the

9   Debtors' status as chapter 11 debtors in possession.  Changing correspondence and business

10  forms would be unnecessary and burdensome to the Debtors' estates, as well as expensive and

11  disruptive to the Debtors' business operations.

12      50.    In addition, the Debtors should be granted relief from the U.S. Trustee Guidelines

13  to the extent they require that the Debtors make all disbursements by check.  Considering the

14  complexity of the Debtors' operations, it is necessary for the Debtors to conduct some

15  transactions by wire transfer as well as pre-authorized ACH debit.  To deny the Debtors the

16  opportunity to conduct wire transfers would unnecessarily disrupt the Companies' business

17  operations.

18      **Continuation of the Integrated Cash Management Is in the Best Interests**

19                  **of the Debtors' Estate and Creditors**

20      51.    The basic structure of the Cash Management System described herein has been

21  utilized by the Companies for approximately six years and constitutes the Debtors' ordinary,

22  usual and essential business practices.

23      52.    Given the corporate and financial structure of the Companies, it would be difficult

24  for the Companies to establish an entirely new system of accounts and a new cash management

25  system for each separate legal entity.  For example, if the Debtors were required to open separate

26  accounts as debtors in possession and rearrange their cash management system, it would

27  necessitate opening numerous bank accounts with attendant delays in the Companies' ability to

28  operate their businesses while pursuing these arrangements.  The immediate needs that will be

1    met through maintenance of the cash management system include meeting the payroll obligations

2    of the EMAK Subsidiaries. Thus, under the circumstances, maintenance of the Debtors' Cash

3    Management System is not only essential, it is also in the best interests of the Debtors' respective

4    estates and creditors. The Debtors will continue to maintain strict records with respect to all

5    transfers of cash, so that all transactions can be readily ascertained, traced and recorded properly

6    on the balance sheet. Furthermore, preserving the "business as usual" atmosphere and avoiding

7    the unnecessary distractions that inevitably would be associated with any substantial disruption

8    in the Companies' cash management system obviously will facilitate the Debtors' reorganization

9    efforts.

10    53.    There will be no negative impact on the creditors of the Debtors if the pre-petition

11    consolidated Cash Management System is continued because: (i) the Debtors receive income

12    only from the operations of the EMAK Subsidiaries; and (ii) the cash received by the Debtors

13    from the EMAK Subsidiaries is utilized to pay the ongoing obligations of such subsidiaries,

14    thereby allowing continued operation of the business of the Companies. EMAK has no

15    independent source of cash since it has no operations of its own, and is not directly entitled to the

16    cash generated from the EMAK Subsidiaries, except though enforcement of inter-company loans

17    or through receipt of dividend income. EMAK Service similarly has no other source of income

18    as its sole function is to provide services to the EMAK Subsidiaries. Accordingly, creditors of

19    the Debtors will benefit from the continued use of the cash management system through the

20    preservation and enhancement in the value of EMAK's 100% stock ownership interests in the

21    EMAK Subsidiaries, resulting from their continued operations and viability as going concerns.

22    Without the ability to fund the EMAK Subsidiaries' on-going operations, the Debtors will have

23    no source of income and no ability to pay creditors.

24    54.    All of the Bank Accounts are maintained at federally insured institutions.

25    55.    Continuing the Cash Management System without interruption is important to the

26    success of these chapter 11 cases. The Cash Management System is a complex mechanism

27    whereby the Companies are able to transfer their revenues toward the payment of their

28    operational expenses and without which the Debtors' reorganization would fail.

2280129.8 01

56.     In the ordinary course of business, the Debtors occasionally require additional funds to meet their current obligations, and such obligations may be satisfied pursuant to intercompany loans. If postpetition intercompany claims between the Debtors and their non-debtor affiliates are accorded superpriority status, each entity will continue to bear the ultimate repayment responsibility, thereby maximizing the protection afforded by the cash management system to each entities' creditors.

57.     The Debtors do not maintain any non-cash investments and they transact their business through cash, check and wire transfers.

58.     Strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in these chapter 11 cases. The Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of section 345 of the Bankruptcy Code. On occasion, the Debtors will have funds accumulated in their depository accounts and their Disbursement Accounts that exceed the limits provided in section 345, and therefore necessitate a waiver of section 345(b). If granted a waiver, the Debtors will not be required to incur the significant administrative difficulties and expenses relating to opening new accounts to ensure that all of its funds are fully insured strictly in accordance with the restrictions established by Bankruptcy Code section 345, but yet the risks will be minimal.

59.     In light of the potential amount of funds which may flow through the estates, the regular deposits and sweeps into the operating and payroll accounts, and the minimal or zero balances of the Disbursement Accounts, it would be imprudent for the Debtors to be forced to incur the expense of obtaining a bond given the safeguards embedded in the Cash Management System regarding the preservation and safeguard of the funds therein.

60.     Accordingly, the Debtors believe that that the relief requested in the Motion Limiting Notice is in the best interests of the Court, the estate, and all parties in interest.

**C.**  **Debtors' Emergency Motion For Order (A) Prohibiting Utilities From Altering,**
**Refusing, Or Discontinuing Service; And (B) Deeming Utilities Adequate Assured Of**
**Future Performance Pursuant To 11 U.S.C. § 366 (the "Utility Motion")**

61.    The Debtors receive essential services from the Utility Companies.  In the ordinary course of business, the Debtors use telecommunications and other services provided by the Utility Companies.  The continued and uninterrupted utility service is essential to the Debtors' ability to sustain their operations during these chapter 11 cases.  Any interruption of utility service would disrupt the Debtors' business operations.  Prior to the Petition Date, the Debtors generally paid the Utility Companies' bills consistently and on a regular basis.  The Debtors estimate that their average monthly payments to their Utility Companies aggregates approximately $22,000 per month.

62.    To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to make a cash deposit to each Utility Company in the amount equal to one month's average historical invoice amount within twenty (20) days after the entry of an Order granting this Motion, for the purpose of providing each Utility Company with adequate assurance of payment of its post-petition date services to the Debtors.

**D.**  **Debtors' Emergency Motion For Order Authorizing Payment And Honoring Of**
**Prepetition Payroll Obligations (the "Wage Motion")**

**The Debtors' Employees**

63.    In 2009, the Companies began the process of implementing a decentralizing and restructuring plan, which included reducing their workforces to compensate for the loss of business at certain of the EMAK Subsidiaries.  As a result of this restructuring, the Debtors' workforce was reduced from approximately thirty-five employees to six current employees.

64.    EMAK has no employees.  EMAK Service employs six (6) full-time salaried employees (the "Employees").[3]  The Employees provide services to the Debtors and the EMAK

---

[3] Several of EMAK Service's former employees continue to provide critical services to the Debtors pursuant to consulting agreements.  These agreements provide for the payment of an hourly fee to the former employees for the services they provide post-termination, as well as for the payment of severance amounts.  Concurrently herewith the Debtors have filed a motion to continue to perform under certain of these agreements in the ordinary course of business.

2280129.8 01

1  Subsidiaries. James L. Holbrook, Jr. is the CEO and Treasurer of EMAK Service. The other

2  five employees include two in finance (controller and accounts receivable), one in IT, one in

3  administration and one managing the Companies' Hong Kong operations.[4]

4        65.    Unless the Debtors can promptly assure their Employees that they will meet their

5  employee-related obligations on schedule, employee morale will rapidly deteriorate, leading to

6  the potential resignations of the Debtors' Employees. Due to the small number of employees

7  remaining at the Debtors, the loss of even one of these individuals could create significant

8  difficulties for the Debtors. Simply put, without the continued services of the Debtors'

9  Employees, the Companies likely would suffer substantial loss of value in their operations.

10                      **The EMAK Subsidiaries' Employees**

11        66.    In addition to its own employees, EMAK Service also handles payroll for the

12  EMAK Subsidiaries' employees (the "Subsidiary Employees") in connection with the

13  management services that it provides to the EMAK Subsidiaries in the ordinary course of its

14  business. There are approximately one-hundred ninety-five employees at the EMAK

15  Subsidiaries. Payroll for the EMAK Subsidiaries is approximately $602,500 per bi-monthly

16  period. EMAK Service made the last prepetition payroll distribution on behalf of the EMAK

17  Subsidiaries on July 30, 2010 (for the pay period of 7/16 through 7/31) and the next payroll

18  distribution is scheduled to occur on August 13, 2010 (for the period of 8/1 through 8/15).

19        67.    The Companies are an integrated enterprise utilizing a centralized cash

20  management system (the "Cash Management System"). The structure of the Companies'

21  prepetition Cash Management System creates a two-way transfer route in which all deposits are

22  "up streamed" to a single bank account held by EMAK Service, and disbursements for the

23  Companies' operating expenses are "down streamed" to special purpose disbursement accounts

24  held by EMAK Service and Equity Marketing Inc. (a subsidiary of EMAK) as necessary to pay

25  expenses. One of these special purpose accounts is a payroll account.

26

27  _____

28      [4] Each of the Employees is a party to a prepetition agreement that provides for severance payments
    upon the employee's termination. The Debtors are not seeking to assume these agreements at this time.

1    68.    The EMAK Subsidiaries provide funds to EMAK Service to cover all payroll

2    costs. If EMAK Service is not authorized to continue to meet the payroll obligations of the

3    EMAK Subsidiaries in the ordinary course (all from funds provided by the EMAK Subsidiaries),

4    the non-debtor subsidiaries' operations will be significantly disrupted to the great detriment of the

5    Debtors' creditors and shareholders.

6    <center>**The Prepetition Compensation Claims**</center>

7    69.    As of the Petition Date, all or substantially all of the Debtors' Employees were

8    owed monies on account of (i) wages or salaries, (ii) other accrued compensation, including paid

9    time off ("PTO") earned before the Petition Date, but not scheduled to be paid (or utilized in the

10    form of vacation time) until the postpetition period, and/or (iii) outstanding prepetition claims

11    relating to reimbursable business expenses (collectively, the "Prepetition Compensation

12    Claims"). The most significant of the Prepetition Compensation Claims are as follows:

13    70.    Employee Payroll. The Debtors make payroll distributions in the aggregate

14    amount of approximately $40,500 on a bi-monthly basis. The Debtors pay payroll in arrears.

15    The Debtors made the last prepetition payroll distribution on July 30, 2010 (for the pay period of

16    7/16 through 7/31). Accordingly, as of the Petition Date, the Debtors owed the Employees

17    wages and salary for five (5) days of work. The Debtors' next payroll distribution is scheduled to

18    occur on August 13, 2010 (for the period of 8/1 through 8/15). As of the Petition Date, the

19    Debtors estimate that the outstanding liability for unpaid prepetition payroll is approximately

20    $18,649.27. None of the Employees' unpaid wages exceed the cap set forth in section 507 of the

21    Bankruptcy Code.

22    71.    The prepetition compensation amounts include compensation to one insider, Mr.

23    Holbrook, but no payments will be made to Mr. Holbrook until such time as his post-petition

24    compensation is authorized to be paid pursuant to the U.S. Trustee Guidelines.

25    72.    Employee Business Expenses and Reimbursement. Some of the Debtors'

26    Employees incur various business expenses that, consistent with the Debtors' ordinary practices,

27    are reimbursable by the Debtors. The Debtors require that, to be reimbursed for business

28    expenses, employees must submit expense reports, together with appropriate supporting

1  documentation. Based upon prior activity levels, the Debtors estimate that the total amount of

2  unreimbursed business expenses, as of the Petition Date, will not exceed $1,500.

3       73.  <u>Vacation and Sick Leave</u>. The Debtors maintain a PTO program (the "PTO

4  Program") that includes vacation and sick benefits for each employee. PTO is payable for time

5  off from scheduled work for vacation or due to an illness or injury. All regular, full-time

6  employees who are classified as non-exempt and exempt are eligible to begin accruing PTO.

7       74.  PTO is credited to each eligible employee's PTO account on a bi-monthly basis,

8  consistent with the payroll period. Hours earned for each employee's PTO account are based on

9  hours for which the employee is paid for each pay period. PTO is not earned for overtime hours

10 and is not accrued during unpaid leave of absence.

11      75.  As of the June 30, 2010, the Debtors estimate that the outstanding liability for

12 accrued and unpaid PTO is $38,000.

13                  **Employee Benefits Plans and Programs**

14      76.  EMAK is a party to a variety of medical, dental, vision, and life insurance plans.

15 As discussed above, the Debtors are part of an integrated enterprise of companies. As part of the

16 services that the Debtors provide to the EMAK Subsidiaries, these plans cover not only the

17 Debtors' Employees, but also the Subsidiary Employees. The EMAK Subsidiaries reimburse the

18 Debtors for the cost of these programs using the allocation system set forth in the Cash

19 Management Motion. Generally, the cost of the employee benefit plans and programs is

20 allocated to each of the Companies on the basis of the number of employees participating in each

21 program.[5]  As of the Petition Date, the Debtors estimate the outstanding liability relating to the

22 employee benefits plans and programs was $122,728 (the majority of which is allocable to the

23 Subsidiary Employees and which is paid by the EMAK Subsidiaries pursuant to the allocation

24 system set forth in the Cash Management Motion).

25      77.  The Debtors seek authority to continue the prepetition benefits plans and

26 programs and to honor all prepetition benefit obligations in the ordinary course of business.

27

28     [5] As noted above, the EMAK Subsidiaries have approximately 195 employees and EMAK Service has only 6.

78.    <u>Medical and Dental Insurance</u>.  The Companies offer their employees two options for medical and dental insurance – a HMO or PPO plan with United Healthcare or HMO or PPO with Pacificare (California).  Under each option, and in most cases, the Companies pay approximately 75% of the premiums.  As of the Petition Date, approximately 179 Companies' employees were participating in one of the foregoing medical or dental insurance plans.

79.    The Companies also offer supplemental health benefits to certain eligible employees through Exec-u-Care.  As of the Petition Date, approximately 6 of the Companies' employees were participating in the foregoing plan.

80.    <u>Vision Insurance</u>.  The Companies offer their employees vision insurance with EyeMed.  In most cases, the Companies pay approximately 75% of the premiums.  As of the Petition Date, approximately 134 of the Companies' employees were participating in the vision insurance plan.

81.    <u>Life, Accidental Death and Dismemberment</u>.  The Companies provide eligible employees with a policy for life insurance and accidental death and dismemberment in the amount of $100,000 through The Harford.  The Companies pay one hundred percent 100% of the premium for this insurance, and provide eligible employees with the option to purchase additional insurance at their own expense.  The Companies also provide eligible employees with a policy for long-term disability insurance through The Harford in the amount of 66.66% of the employee's base salary.  As of the Petition Date, approximately 194 of the Companies' employees qualified to receive life insurance benefits.

82.    <u>Flex Spending</u>.  The Companies provide eligible employees with a flexible spending account program administered by WageWorks/Creative Benefits.  A flexible spending account  allows an employee to set aside a portion of his or her earnings to pay for qualified expenses, including medical expenses.  As of the Petition Date, approximately 63 of the Companies' employees were participating in the flexible spending account program.

83.    <u>Retirement Benefits Plan</u>.  The Companies also offer eligible employees the opportunity to participate in a 401(k) Savings and Retirement Plan (the "401(k) Plan").  EMAK is the trustee of the 401(k) Plan.  The Companies make matching contributions of 50% of the

1  employee's salary to a total of 8% of their salary.  The Companies' contribution vests over a

2  period of four years.  Approximately 122 of the Companies' employees participate in the 401(k)

3  Plan.

4        84.      As of the Petition Date, the Companies estimate the outstanding liability with

5  respect to the 401(k) Plan is $54,783.

6        85.      <u>Workers' Compensation Benefits</u>.  As required by statute, the Debtors provide a

7  workers' compensation benefit program for income protection, medical services, and

8  rehabilitation services to employees with job-related injuries and illnesses (the "WC Insurance").

9  The WC Insurance is provided through third-party insurers.  The Debtors estimate that the

10  outstanding liability relating to the WC Insurance total approximately $35,000.

11        86.      The Debtors have sufficient cash reserves to pay the Prepetition Compensation

12  Claims to all of the Debtors' Employees on an ongoing basis and in the ordinary course of

13  business.  The Debtors also have sufficient cash available to fund the payroll and employee

14  benefit obligations of the EMAK Subsidiaries in the ordinary course of business make such

15  payments.  The EMAK Subsidiaries have, and will continue to, provide funds to EMAK Service

16  to cover all payroll costs and employee benefit obligations.

17        87.      The Debtors believe that their failure to honor their Employees' Prepetition

18  Compensation Claims in the ordinary course of business, would create great concern and

19  discontent among the Debtors' Employees, and therefore, would undermine their ability to retain

20  those employees.  The Debtors also believe that, without the ability to meet their payroll and

21  employee benefit obligations of the Subsidiary Employees, the non-debtor subsidiaries will be

22  unable to continue operations to the great detriment of the Debtors' creditors and shareholders.

23  By contrast, authorizing the Debtors to continue to meet the payroll and employee benefit

24  obligations of the EMAK Subsidiaries will have a direct beneficial impact on the creditors and

25  shareholders of EMAK, since EMAK owns 100% of the EMAK Subsidiaries.

26

27

28

**E.**   **Debtors' Emergency Motion For Order Authorizing Debtors To Perform**

**Consulting Agreements With Teresa Tormey, Roy Dar, Michael Sanders And**

**Duane Johnson In The Ordinary Course (the "Ordinary Course Motion")**

**The Consultants**

88.   <u>Ms. Tormey</u>.  I am currently the Corporate Secretary of EMAK and Corporate

Secretary and Director of EMAK Service.  I had been employed by the Debtors, most recently as

Chief Administrative Officer (following a promotion from Executive Vice President in 2006 and

from Senior Vice President in 2004), General Counsel and Corporate Secretary from November

1, 2002 until March 31, 2010.  Since that time, I continued to serve EMAK as its chief in-house

counsel and Corporate Secretary.  I also hold positions of Corporate Secretary and Director with

each of the EMAK Subsidiaries.

89.   During my employment with the Debtors, my responsibilities included overseeing

the centralized corporate departments of the Companies, including business affairs, human

resources, information technology, internal audit, investor relations and office administration.

Specifically, I provided legal consultation to human resources with respect to all employment

related matters, managed routine transactional matters and provided assistance to the EMAK

Subsidiaries on contractual, regulatory and operational issues, as well as vendor/supplier

disputes.  I also established contract guidelines for newly acquired business, provided diligence

on existing contracts, established and conformed policies and procedures, and provided counsel

on integration issues to the Debtors and their non-debtor affiliates.

90.   <u>Mr. Dar</u>.  Prior to March 31, 2010, Mr. Dar was the Senior Vice President,

Controller and Principal Accounting Officer of EMAK.  Mr. Dar had been employed by the

Debtors since 1998, holding multiple titles.  Mr. Dar began serving as EMAK's Controller in

March 1999.

91.   During his employment with the Debtors, Mr. Dar's responsibilities included

overseeing accounting functions, financial reporting and tax compliance and planning.  Due to

the Companies' centralized management system, Mr. Dar provided these services on behalf of

both EMAK and the EMAK Subsidiaries.  Among other things, Mr. Dar handled the analysis and

1    reconciliation of all general ledger accounts on behalf of all of the Companies, analysis of project

2    P&L compared to budget, and handled the reconciliation of intercompany balances. Mr. Dar also

3    provided audit support for balance sheet and income statements, managed audits and prepared

4    state, local and federal tax and other regulatory filings.

5        92.    Mr. Sanders. Prior to March 31, 2010, Mr. Sanders was the Chief Financial

6    Officer of EMAK. Mr. Sanders had been employed by the Debtors since 2002, originally

7    serving as a Senior Director Finance.

8        93.    During his employment with the Debtors, Mr. Sanders' responsibilities included

9    overseeing the day-to-day "goings on" in the Companies' finance and accounting departments as

10   well as overseeing the development of business strategy and financial forecasting for the EMAK

11   Subsidiaries. Due to the Companies' centralized management system, Mr. Sanders provided

12   services on behalf of both EMAK and the EMAK Subsidiaries. Among other things, Mr.

13   Sanders managed the Companies' treasury functions, bank compliance and collections, including

14   analysis of clients' credit worthiness and negotiating letters of credit on behalf of the Companies

15   as appropriate. Mr. Sanders also oversaw the Companies' centralized cash management system,

16   which included analysis of the Companies' payroll registers, entries, accruals, cash

17   reconciliations, flex spending, vacation accruals and tax withholding.

18       94.    Mr. Johnson. Prior to March 31, 2010, Mr. Johnson was the Senior Vice-

19   President, Human Resources of EMAK. Mr. Johnson had been employed by the Debtors since

20   2004. Mr. Johnson provided consulting services to the Debtors prior to his employment with the

21   Debtors.

22       95.    During his employment with the Debtors, Mr. Johnson  was responsible for

23   human resources management, including management of the Debtors' decentralization process

24   commenced in the latter part of 2009 and continuing through 2010.

25                              **The Restructuring Plan**

26       96.    In 2009, the Companies began the process of implementing a decentralizing and

27   restructuring plan, which included reducing their workforces to compensate for the loss of

28   business at certain of the EMAK Subsidiaries. A driving force behind this restructuring plan was

1    the decline in revenues from the largest customer of the Companies' promotional products

2    business, which accounted for approximately 50% of the Companies' revenue in the last several

3    years.[6]

4          97.      Under the Companies' new operating structure, rather than a centralized

5    management, each of the Companies would have dedicated staff to perform "back office" and

6    administrative functions including human resource, IT, business affairs (including legal support),

7    and finance and accounting. As a result of this restructuring, the Debtors' workforce was reduced

8    from approximately thirty-five employees to six current full-time employees (not including the

9    Consultants) located in Los Angeles. As of the Petition Date, EMAK had no employees. EMAK

10    Service employs six (6) full-time salaried employees including James L. Holbrook, Jr. (the CEO

11    and Treasurer), two employees in the finance department (controller and accounts receivable),

12    one in IT, one in administration and one managing the Companies' Hong Kong operations. The

13    ultimate goal of the restructuring was to eliminate all of the Debtors' employees (other than the

14    CEO) and close the Debtors' headquarters in Los Angeles office.

15          98.      The Debtors' employees were informed of the restructuring plan in late 2009.

16    Each employee received a letter, which provided such employee's anticipated termination date

17    (which ranged from January to June 2010) and the severance payment that such employee was

18    entitled to receive. The proposed severance payments ranged from three months to a year of the

19    employee's salary, to be paid semi-month installments per the Debtors' normal payroll schedule.

20    In order to qualify for the severance, the employees were obligated to remain with the Debtors

21    through the termination date specified in the letter each employee received.

22

23

24       [6] The Companies' promotional products business is conducted through Equity Marketing, Inc.,

25    Logistix Marketing, Inc. and Logistix, Inc. These entities design and contract for the manufacture of
promotional products that are used as free premiums or sold in conjunction with the purchase of other items

26    at a retailer or quick service restaurant. Until 2009, Equity Marketing, Inc.'s essentially only and the
Companies' largest client was Burger King Corporation (including its franchise purchasing cooperative

27    Restaurant Services, Inc. and various distribution companies), a company with whom Equity Marketing,
Inc. had a twenty-five year relationship. Equity Marketing, Inc. continued to provide transitional services

28    to Burger King through May 2010. Burger King accounted for approximately 54%, 53% and 51% of the
Companies' total revenues for the years ended December 31, 2007, 2008 and 2009.

1     99.    In connection with the restructuring plan, EMAK's board of directors approved

2 the termination of EMAK's senior corporate management.  The Consultants were terminated as

3 of March 31, 2010.

## The Agreements

5     100.    Each of the Consultants was party to an employment agreement with the Debtors

6 that provided that, upon termination of the Consultants, they would be entitled to the following:

7       • Payment of base salary plus benefits for one year (Section 4(ii)(B)(1));

8       • Payment of COBRA premiums for one year (Section 4(ii)(B)(2));

9       • Payment of Target Bonus for 2010 (Section 4(ii)(B)(3)).

10 A copy of my employment agreement, as amended, is attached to the Ordinary Course Motion as

11 Exhibit A.  A copy of Mr. Dar's employment agreement, as amended, is attached to the Ordinary

12 Course Motion Exhibit B.  A copy of Mr. Sanders' employment agreement, as amended, is

13 attached to the Ordinary Course Motion as Exhibit C.  A copy of Mr. Johnson's employment

14 agreement, as amended, is attached to the Ordinary Course Motion as Exhibit D.

15     101.    Notwithstanding their termination, however, the Debtors needed the Consultants

16 to continue to provide services while the Companies transitioned certain services from the parent

17 level to the subsidiary level.  On March 31, 2010, EMAK and each of the Consultants entered

18 into a General Release (the "Agreements").  A copy of my agreement is attached to the Ordinary

19 Course Motion as Exhibit E.  A copy of the agreement with Mr. Dar is attached to the Ordinary

20 Course Motion as Exhibit F.  A copy of the agreement with Mr. Sanders is attached to the

21 Ordinary Course Motion as Exhibit G.  A copy of the agreement with Mr. Johnson is attached to

22 the Ordinary Course Motion as Exhibit H.  The Agreements provide that the Consultants will

23 continue to provide services to the Debtors post-termination at a set hourly fee through March

24 11, 2011 and that the Consultants would receive the severance payments to which they were

25 entitled pursuant to their employment agreements.

26     102.    Following is a brief description of the terms of each of the Consultants'

27 agreements:

28

103.    <u>Ms. Tormey</u>.  Pursuant to the Agreements, I am entitled to severance in the aggregate gross amount of $504,660, which was the equivalent of twelve months of her pre-termination compensation (including bonus).  The bonus portion of my severance in the amount of $122,500 was paid in April 2010 pursuant to the Agreements.  The compensation payment of the severance payments is to be made in equal semi-month installments of $16,340 per the Debtors' normal payroll schedule.  I began receiving these severance payments immediately upon her termination on March 31, 2010, and, as of the Petition Date had been paid a total of $243,220 in severance (leaving a balance of $261,440).  In addition to the foregoing severance payments, EMAK agreed to pay me a monthly retainer of $32,000 ($400 per hour for 80 hours of work per month) for consulting services from April 1, 2010 through September 30, 2010.  Beginning on October 1, 2010, EMAK agreed to pay me $400 per hour for services on an as-needed basis through March 31, 2011.

104.    I am continuing to provide legal services to the Debtors in connection with various pending litigations and other corporate matters.  I spent approximately 115 hours in June and 120 hours in July providing services to the Debtors.

105.    <u>Mr. Dar</u>.  Pursuant to the Agreements, Mr. Dar is entitled to severance in the aggregate gross amount of $287,400, which was the equivalent of twelve months of his pre-termination compensation (including bonus).  The bonus portion of Mr. Dar's severance in the amount of $63,000 was paid in April 2010 pursuant to the Agreements.  The compensation portion of the severance payments is to be made in equal semi-month installments of $9,350 per the Debtors' normal payroll schedule.  Mr. Dar began receiving these severance payments immediately upon his termination on March 31, 2010, and, as of the Petition Date had been paid a total of $137,800 in severance (leaving a balance of $149,600).  In addition to the foregoing severance payments, EMAK agreed to pay Mr. Dar a monthly retainer of $10,000 ($250 per hour for 40 hours) for consulting services from April 1, 2010 through June 30, 2010.  Beginning on July 1, 2010, EMAK agreed to pay Mr. Dar $250 per hour for services on an as-needed basis through March 31, 2011.

106.    Since March 31, 2010, Mr. Dar continues to provide services to the Companies on an as-needed basis as the Companies work to decentralize and transfer the services previously handled by Mr. Dar to the subsidiary level.  Mr. Dar spent approximately 40 hours in June and 41 hours in July providing services to the Debtors.

107.    <u>Mr. Johnson</u>.  Pursuant to the Agreements, Mr. Johnson is entitled to severance in the aggregate gross amount of $306,900, which was the equivalent of twelve months of his pre-termination compensation (including bonus).  The bonus portion of Mr. Johnson's severance in the amount of $67,500 was paid in April 2010 pursuant to the Agreements.  The compensation portion of the severance payments is to be made in equal semi-month installments of $9,975 per the Debtors' normal payroll schedule.  Mr. Johnson began receiving these severance payments immediately upon his termination on March 31, 2010, and, as of the Petition Date had been paid a total of $147,300 in severance (leaving a balance of $159,600).  In addition to the foregoing severance payments, EMAK agreed to pay Mr. Johnson a monthly retainer of $6,250 ($250 per hour for 25 hours) for consulting services from April 1, 2010 through June 30, 2010.  Beginning on July 1, 2010, EMAK agreed to pay Mr. Johnson $250 per hour for services on an as-needed basis through March 31, 2011.

108.    Since March 31, 2010, Mr. Johnson continues to provide human resources services in connection with the decentralization process.  Mr. Johnson spent approximately 40 hours in June and 31 hours in July providing services to the Debtors.

109.    <u>Mr. Sanders</u>.  Pursuant to the Agreements, Mr. Sanders is entitled to severance in the aggregate gross amount of $339,400, which was the equivalent of twelve months of his pre-termination compensation (including bonus).  The bonus portion of Mr. Sanders' severance in the amount of $75,000 was paid in April 2010 pursuant to the Agreements.  The compensation portion of the severance payments is to be made in equal semi-month installments of $11,016.67 per the Debtors' normal payroll schedule.  Mr. Sanders began receiving these severance payments immediately upon his termination on March 31, 2010, and, as of the Petition Date had been paid a total of $163,133.36 in severance (leaving a balance of $176,266.64).  In addition to the foregoing severance payments, EMAK agreed to pay Mr. Sanders a monthly retainer of

1   $7,500 ($300 per hour for 25 hours) for consulting services from April 1, 2010 through June 30,

2   2010. Beginning on July 1, 2010, EMAK agreed to pay Mr. Sanders $300 per hour for services

3   on an as-needed basis through March 31, 2011.

4         110.    Since March 31, 2010, Mr. Sanders continues to provide services to the

5   Companies on an as-needed basis as the Companies work to decentralize and transfer the

6   services previously handled by Mr. Sanders to the subsidiary level. Mr. Sanders spent

7   approximately 25 hours in June, 20 hours in July and 15 hours in August (pre-petition) providing

8   services to the Debtors.

9                   **The Need for the Consultants' Services**

10        111.    The Debtors' require on-going services from the Consultants in order to operate

11   their businesses and facilitate their reorganization. The Debtors have only six current employees

12   left to manage their operations as well as provide services to the EMAK Subsidiaries. With the

13   exception of Mr. Holbrook, none of the Debtors' remaining employees are management and none

14   provide the same services that are provided by the Consultants. All of the Consultants were

15   formerly members of the Debtors' senior management and therefore are the most knowledgeable

16   individuals regarding the Debtors.

17        112.    Each of the Consultants has informed the Debtors that, absent assurances that his

18   or her bi-monthly severance payments and consulting fees (including past due amounts) will

19   continue be made, that such consultant is unwilling to provide further services to the Debtors.

20   The Consultants have further informed the Debtors that they rely on the bi-monthly severance

21   payments for income and, if such payments are not made, will need to obtain alternative sources

22   of income.

23        113.    Given the critical nature of the services provided by the Consultants and the small

24   number of employees remaining at the Debtors, the Debtors believe that the loss of any of the

25   Consultants would be devastating to the Debtors' ability to successfully reorganize. If the

26   Ordinary Course Motion is denied, the Debtors will be forced to employ replacement employees

27   and/or a financial advisor – likely at a significant expense to the Debtors' estates.

28

1       114.   All of the Consultants were formerly members of the Debtors' senior management

2  and therefore are the most knowledgeable individuals regarding the Debtors. For example, Mr.

3  Dar has worked for the Debtors for more than ten years and is the person most familiar with the

4  details of the Debtors' accounting books and records. Mr. Sanders was formerly the Debtors'

5  CFO and handled all of the Debtors' financial reporting, forecasting and treasury functions.

6  Their entrenched knowledge will be vital in complying with the reporting requirements of the

7  United States Trustee, as well as developing a feasible plan of reorganization. I have been with

8  the Debtors for eight years, handles all corporate legal matters for the Debtors and the EMAK

9  Subsidiaries, and been managing the numerous litigations currently pending against the Debtors

10  since their inception. My knowledge will be particularly helpful in determining the best way to

11  resolve these litigations. Further, I am the principal liaison between counsel and the Debtors in

12  this proceeding; and is the officer authorized by the Debtors to execute and deliver all documents

13  required and to appear in this proceeding. Mr. Johnson has been responsible for managing the

14  Debtors' decentralization process commenced in the latter part of 2009 and continuing through

15  2010. Given the critical nature of the services provided by the Consultants and the small number

16  of employees remaining at the Debtors, the Debtors believe that the loss of any of the

17  Consultants would be devastating to the Debtors' ability to successfully reorganize.

18       115.   If the Consultants are no longer willing to provide services to the Debtors, the

19  Debtors will have to employ other individuals or professionals (such as a financial advisor) to

20  handle these tasks. In addition to such individuals' lack of knowledge about the Debtors'

21  infrastructure, employing such individuals will be difficult given the Companies' on-going plan

22  to restructure and decentralize the Companies, which means that any individual hired by the

23  Debtors at this time faces the likelihood that the position could be terminated at any time.

24

25      I declare under penalty of perjury that the foregoing is true and correct.

26      Executed this 9th day of August, 2010, at Marina del Rey, California.

27

28                    Teresa L. Tormey



EMAK Worldwide, Inc.
Organizational Chart
October 2009

Entities with an asterik (*) commenced
voluntary liquidation in February 2009.

Exhibit ____4____
Page ____33____