DAVID L. NEALE (State Bar No. 141225)
RON BENDER (SBN 143364)
IRV M. GROSS (SBN 53659)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dln@lnbyb.com, rb@lnbyb.com,
img@lnbyb.com

Counsel for Bouchard, Margules & Friedlander, P.A.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>☒ EMAK WORLDWIDE, INC., a Delaware corporation,<br><br>☒ EMAK WORLDWIDE SERVICE CORP., a Delaware corporation,<br><br>               Debtors and Debtors-in-Possession. | Case No. 2:10-bk-42779-RN<br>[Motion Pending for Joint Administration with Case No. 2:10-bk-42784-RN]<br><br>Chapter 11<br><br>DECLARATION OF JOEL FRIEDLANDER IN RESPONSE TO FIRST DAY MOTIONS FILED BY DEBTORS<br><br>DATE:  August 12, 2010<br>TIME:   11:00 a.m.<br>PLACE:  Courtroom 1645<br>              255 E. Temple St.<br>              Los Angeles, CA |

Joel Friedlander hereby declares as follows:

1.    I am a partner in the law firm of Bouchard, Margules & Friedlander, P.A. ("BMF").  BMF is counsel to shareholder plaintiffs of EMAK Worldwide, Inc. ("EMAK") in a shareholder derivative action pending in the Court of Chancery of the State of Delaware styled *Donald A. Kurz and Sems Diversified Value, LP v. James K. Holbrook, Jr. et al.*, Civil Action

No. 5019-VCL (the "Delaware Action"). BMF is the largest unsecured creditor of EMAK, by virtue of a $2.5 million fee award (the "Fee Award") issued by Vice Chancellor Laster of the Delaware Court of Chancery pursuant to an Order entered on July 29, 2010 (attached hereto as Exhibit A). The Order required EMAK to pay the Fee Award on August 5, 2010, the day EMAK filed its bankruptcy petition.

2.      I make this Declaration in response to the "first-day" applications and motions filed by EMAK. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

<u>The Flawed Rationale for the Bankruptcy Petitions</u>

3.      On Monday, August 9, 2010, EMAK issued a press release stating that "[t]he voluntary bankruptcy petitions result from protracted litigation at the EMAK corporate level and an interim award from Chancery Court of Delaware against EMAK for which it was not permitted to immediately appeal." The press release further states that "EMAK intends to seek reversal of the interim award and to permanently resolve the litigation that has disrupted the holding company for some time." A copy of the press release is attached hereto as Exhibit B.

4.      EMAK's publicly stated rationale for the bankruptcy is misleading in two important respects. <u>First</u>, the Delaware Action is an action to *recover for EMAK* millions of dollars of legal fees, including a significant portion of the approximately $5.2 million that EMAK has already paid to defendants' counsel in the Delaware Action, plus the $2.5 million Fee Award. <u>Second</u>, EMAK turned down the opportunity to immediately appeal the Fee Award. Consequently, EMAK will likely never have the opportunity to appeal it.

5.      The Delaware Action is a shareholder derivative action in which the plaintiffs allege that in the Fall of 2009, the present directors of EMAK and certain former directors breached their fiduciary duties to EMAK and its common stockholders, aided and abetted by

PRINTED ON
RECYCLED PAPER

EMAK's preferred stockholder, Crown EMAK Partners, LLC ("Crown").  In particular, the plaintiffs allege that the director defendants and Crown conspired to grant Crown the power to cast 28% of the voting power in the election of directors (the "Exchange Transaction") and conspired to adopt a bylaw amendment that purported to give Crown the power to appoint a majority of the Board (the "Bylaw Amendment").  Plaintiffs allege that the Exchange Transaction and the Bylaw Amendment were two components of an inequitable scheme by which EMAK's Chief Executive Officer, James Holbrook, the other director defendants and Crown sought to prevent the shareholders from removing Holbrook and other incumbent directors in a consent solicitation.  After an intensive period of litigation, the defendants rescinded the Exchange Transaction on the literal eve of a preliminary injunction hearing, and the plaintiffs established after trial and on appeal that the purported Bylaw Amendment was invalid under Delaware law.

6.    The only remaining phase of the Delaware Action would be a trial in which plaintiffs would seek to establish that the director defendants and Crown are required to pay back to EMAK millions of dollars in legal fees that EMAK has incurred relating to the rescinded Exchange Transaction and the invalidated Bylaw Amendment.

7.    On multiple occasions, Vice Chancellor Laster has made clear that the director defendants and Crown may be liable for legal expenses incurred by EMAK, including the cost of the Fee Award to BMF.   When Crown moved to dismiss following rescission of the Exchange Transaction, the Vice Chancellor rebuffed the motion, stating:

> [O]ne of the company's main points throughout this has been that Mr. Kurz has forced them to incur massive legal fees because of what was called an egregious and unfounded complaint…. If I believe and I find at trial that there has been a loyalty violation or a good faith violation, you know, there's a potential for a damages award.  And I don't see why an alleged aider and abettor could not be jointly and severally liable for that type of damages order.

(12/4/09 Tr. at 24-25) (attached hereto as Exhibit C).  In his post-trial ruling following the

contested corporate election, the Vice Chancellor stated:

> I do not rule out the possibility that if EMAK is ordered to pay a fee award based
> on the rescission of the Exchange Transaction, and if the defendants are later held
> liable for breaches of the duty of loyalty, then the amount of the fee award might
> be factored into the judgment against the defendants to ensure that the corporation
> is made whole.  EMAK therefore might not bear any of the cost of the plaintiffs'
> efforts to challenge the aborted Exchange Transaction.

(2/9/10 Op. at 77-78) (attached hereto as Exhibit D).  When scheduling a hearing on BMF's

application for an interim fee award, the Vice Chancellor stated:

> For purposes of moving forward with the liability phase of this litigation, it will
> be helpful to have quantified the fee award so the parties can address concretely
> whether the amount should be incorporated in the calculation of damages suffered
> by the Company.

(3/2/10 Op. at 1) (attached hereto as Exhibit E).

8.      On July 19, 2010, Vice Chancellor Laster determined that BMF was entitled to a

fee award of $2.5 relating to the rescission of the Exchange Transaction and the invalidation of

the Bylaw Amendment.  The Court made clear that EMAK Chief Executive Officer James

Holbrook and Crown were potentially liable for all of EMAK's legal expenses relating to the

Exchange Transaction, due to potential findings of a breach of the duty of loyalty and aiding and

abetting:

> Here, the claims were clearly meritorious when filed.   There were
> substantial claims for breach of fiduciary duty challenged in the exchange
> transaction….   It was a plain example of conduct that's actionable as a
> straightforward duty of loyalty violation.
>       I haven't yet made detailed factual findings whether, in fact, there were
> breaches of loyalty….
>       …
>       But I will say this, because it does influence my fee application greatly.  *I
> think there is substantial and credible evidence that Mr. Holbrook breached his
> duty of loyalty in connection with the exchange transaction.  I think there is
> substantial and credible evidence that Mr. Holbrook misled the board and/or
> withheld material information in connection with the events leading up to the
> exchange transaction.*

…

… And there is substantial evidence – and again, I have not had to make findings on this, but since the defendants have tried to portray this fee dispute as if it happened on a pristine record in which their clients did nothing wrong and Mr. Kurz was entirely to blame, I think it important that those assertions be corrected.

…

What's clear from the record is that Holbrook was working this angle [with Crown] from long before. And there is powerful evidence that Holbrook's primary reasons for doing so were his desire to keep his job.

And as I've said before, I also questioned whether the board got full information from Holbrook about the events leading up to the Burger King transaction.

…

… ***This action was meritorious when mooted. This was a case, again, where there were substantial loyalty issues***….

... What is suggested by the e-mail record, however, at least Mr. Holbrook's side of it …, is that [Mr. Ackerman of Crown] was deeply aware of the conflicts on the board, deeply aware of Mr. Holbrook's insecurities, and used them to his advantage.

So all of this to say that I think it's highly likely that I would have enjoined the exchange transaction.

…

… ***The disclosures were false and misleading***. When you compared the disclosures to what was written in the briefs and when you compared the disclosures to what was in the e-mails, there was absolutely no way that they could be squared.

…

… This was a strong challenge brought to a transaction where there was, as I've already discussed, real evidence of loyalty breaches; and rescinding the transaction fundamentally changed the corporate governance landscape.

(7/19/10 Tr. at 79, 80, 85-86, 90-91, 92, 96, 107) (attached hereto as Exhibit F) (emphasis added).

9. The Court of Chancery determined that $2.1 million of the $2.5 million Fee Award was attributable to the rescission of the Exchange Transaction and the correction of false disclosures relating thereto. (*Id.* at 106-07)

10. Immediately upon the Vice Chancellor's ruling, EMAK's counsel asked if EMAK could immediately appeal it pursuant to Court of Chancery Rule 54(b). (*Id.* at 108) The Vice

Chancellor suggested that he had "no objection to it being certified as a Rule 54(b)" if the parties so agreed, and EMAK posting bond during the pendency of appeal. (*Id.* at 110).

11.     The following day, I sent EMAK's counsel a proposed Order that would allow EMAK to immediately appeal the Vice Chancellor's ruling pursuant to Rule 54(b).  A copy of my email to EMAK's counsel is attached hereto as Exhibit G.

12.     EMAK did not accept BMF's invitation to immediately appeal the Vice Chancellor's ruling.  Instead, EMAK argued that the Fee Award was not immediately appealable and therefore should not be immediately payable.

13.     In a letter opinion issued on July 29, 2010 (attached hereto as Exhibit H), the Vice Chancellor rejected EMAK's argument.  That same day, the Vice Chancellor entered the Order requiring payment of $2.5 million to BMF within five business days.  The time for reargument of the Fee Award has lapsed.

14.     Consequently, if the Delaware Action were permitted to proceed, there would first be a trial adjudicating whether Holbrook, Crown and the other defendants are liable for breach of the duty of loyalty (or aiding and abetting such a breach) and adjudicating the extent of their monetary liability to EMAK for legal fees relating to the Exchange Transaction and the Bylaw Amendment.  By virtue of EMAK's own actions, there can be no appellate review of the $2.5 million Fee Award to BMF except as part of any appeal from the post-trial final order.

15.     Given their exposure to personal liability, EMAK's insiders and Crown are highly motivated to make sure they never have the opportunity to appeal the Fee Award.  The individual defendants and Crown would first be confronted with decisions about whether to keep incurring costs defending breach of duty of loyalty claims for which Vice Chancellor Laster is the fact-finder.  If any of the defendants are found liable for breach of the duty of loyalty, they would have to decide whether to incur greater costs in appealing that decision.  If Holbrook and/or other

defendants are found liable for breach of the duty of loyalty in connection with the Exchange Transaction, EMAK would be owed millions of dollars by such defendants to recoup the Fee Award and other legal fees. Any appeal of the Fee Award would be by such defendants, not EMAK.

<u>The Persons Now Seeking to be Paid by EMAK</u>

16.     EMAK is seeking permission to pay, among others, EMAK consultants/former employees Teresa Tormey, Roy Dar, Michael Sanders, and Duane Johnson. As discussed above, in the Delaware Action, plaintiffs presented evidence of how Holbrook and the Board had improperly caused EMAK to expend millions of dollars in legal fees in order to defeat an election contest. Plaintiffs also presented evidence of how Holbrook had caused EMAK to pay hundreds of thousands of dollars in unwarranted bonuses and severance benefits to Tormey, Dar, Sanders and Johnson in order to buy their loyalty and votes during the control contest.

17.     Vice Chancellor Laster took note of that evidence when deciding that BMF was entitled to be paid promptly:

> For its part, EMAK has not hesitated to pay its own counsel and Crown's counsel over $5 million to litigate against the plaintiffs. EMAK has also paid significant bonuses to senior management during this corporate control dispute, including to individuals whose loyalty to the corporation has been called into question by the considerable evidentiary record developed by the plaintiffs.

(Ex. H at 4)

18.     Earlier this year, the Personnel Review Committee of EMAK's Board of Directors oversaw an investigation of whether Holbrook could be terminated for cause under his employment agreement. A leading California employment law firm undertook the investigation and concluded that Holbrook was subject to termination for cause on six separate grounds. As stated in their report (attached hereto as Exhibit I without exhibits), one of those grounds was Holbrook's failure "to timely inform the Board of the fracture in his relationship with Burger

King and the deteriorating business relationship with Burger King and the enterprise-threatening result to EMAK that fracture and deterioration portended." (Ex. I at 4) As noted above, Vice Chancellor Laster similarly "questioned whether the board got full information from Holbrook about the events leading up to the Burger King transaction." (Ex. F at 91) Burger King reportedly contributed in excess of 50% of EMAK's total revenues in 2007, 2008, and 2009, which revenue stream is now lost due to Burger King's termination of its relationship with EMAK in September 2009. (Tormey Decl. ¶ 22)

19.    On March 25, 2010, Holbrook filed an affidavit in the Delaware Action (attached hereto as Exhibit I without exhibits) in which he stated that EMAK management had "a process for replacing EMAK's bank line, and plan on continuing to follow that process." (Ex. J ¶ 6) On June 9, 2010, EMAK issued a press release (attached hereto as Exhibit K) stating that EMAK's "credit facility expired in April 2010," that EMAK had cash and cash equivalents of $10.1 as of March 31, 2010, and that "EMAK has sufficient liquidity on-hand." (Ex. K at 4) Tormey's Declaration states that as of June 9, 2010, "the Companies had $7.6 million in cash" and "outstanding legal fees and expenses of $2.4 million[.]" (Tormey Decl. ¶ 19) Holbrook and the consultants apparently allowed the credit facility to expire, continued to pay millions of dollars of legal fees to defense counsel, and failed to accrue for BMF's fee application.

EMAK's Largest Listed Creditors

20.    Apart from BMF, EMAK lists eight unsecured creditors with claims in excess of $100,000. One of those claimants is the City of Los Angeles. Three of the claimants are consultants Sanders, Johnson and Dar. The other four claimants are law firms who have represented either EMAK, Holbrook, or Crown in the Delaware Action.

21.    The largest of the claimants is Ropes & Gray LLP, counsel to Holbrook and former counsel to EMAK, which is reportedly owed $411,027.52. EMAK's petition makes no

PRINTED ON

RECYCLED PAPER

mention of EMAK's potential claim for professional malpractice against Ropes & Gray LLP, for its role in drafting and implementing the Exchange Transaction and advising the Board respecting the Exchange Transaction. The corporate partner from Ropes & Gray LLP testified in the Delaware Action that (i) he was not admitted to practice law in Delaware, (ii) he had not consulted with Delaware counsel, (iii) he had never previously advised a board of directors respecting a transaction that impacted voting rights in the midst of an election contest, (iv) he was unfamiliar with a leading precedent under Delaware law about director fiduciary duties during an election contest (*Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 561 (Del. Ch. 1988)), and (v) he was vacationing in Turkey the day he advised the EMAK Board respecting the Exchange Transaction and had not closely read an email from a director challenging the legality of the Exchange Transaction under *Blasius*. (Austin Dep. of 11/14/09, at pp. 16-26) (attached hereto as Exhibit L).

22.    The next two-largest listed creditors are law firms that represent Crown. On December 3, 2009, EMAK's Board of Directors purported to authorize the reimbursement of Crown's legal fees relating to the Exchange Transaction even though only three of the six directors present voted in favor of the resolution, less than the majority required by Section 141(b) of the Delaware General Corporation Law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of August, 2010, in Wilmington, Delaware.

JOEL FRIEDLANDER

# EXHIBIT A



## GRANTED

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DONALD A. KURZ and SEMS DIVERSIFIED VALUE, LP,    )
)
    Plaintiffs,    )
)
    v.    )
)
JAMES L. HOLBROOK, JR., *et al.*,    )
)
    Defendants.    )
)
—————————————————    )
)
JAMES L. HOLBROOK, JR., *et al.*,    )
)
    Counterclaim-Plaintiffs,    )
)
    v.    )
)
DONALD A. KURZ and SEMS DIVERSIFIED VALUE, LP,    )
)
    Counterclaim-Defendants,    )   C.A. No. 5019-VCL
)
    and    )
)
JAMES L. HOLBROOK, JR., *et al.*,    )
)
    Third Party Plaintiffs,    )
    v.    )
)
TAKE BACK EMAK, LLC,    )
)
    Third Party Defendants,    )
)
—————————————————    )
)
CROWN EMAK PARTNERS, LLC,    )
)
    Counterclaim and Third-Party Plaintiff,    )
)
    v.    )
)
DONALD A. KURZ, *et al.*,    )
)
    Counterclaim and Third-Party Defendants.    )

### ORDER

IT IS HEREBY ORDERED, this __day of July, 2010, for the reasons stated on the record

during the hearing held on July 19, 2010, that Plaintiffs' amended interim fee application is

{BMF-W0204415.2}

GRANTED.  EMAK Worldwide, Inc. shall pay to Bouchard Margules & Friedlander, P.A.,

counsel for plaintiffs, the sum of $2,500,000 no later than five business days from the date of

entry of this Order.


                                                   _____

                                                   J. Travis Laster

                                                   Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | J Travis Laster |
| **File & Serve Transaction ID:** | 32267453 |
| **Current Date:** | Jul 29, 2010 |
| **Case Number:** | 5019-VCL |
| **Case Name:** | Kurz, Donald A vs James L Holbrook Jr |

/s/ **Judge J Travis Laster**

# EXHIBIT B



**Contact:**
Jim Holbrook
Chief Executive Officer
EMAK Worldwide, Inc.
(323) 932-4068

# EMAK Worldwide Files Voluntary Chapter 11 Petition for Relief from Legal Fees

### *All EMAK Agencies to Continue Operations*

LOS ANGELES, August 9, 2010 – EMAK Worldwide, Inc. (EMAK.PK) announced today that the parent company and its administrative subsidiary, EMAK Worldwide Service Corp., filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code for itself in the U.S. Bankruptcy Court for the Central District of California. All other EMAK operating subsidiaries are excluded from these voluntary petitions, including its Equity Marketing, Logistix, Neighbor and Upshot agencies and operations in Asia. Operations of these subsidiaries are expected to continue uninterrupted.

The voluntary bankruptcy petitions result from protracted litigation at the EMAK corporate level and an interim award from the Chancery Court of Delaware against EMAK for which it was not permitted to immediately appeal. EMAK concluded that its stakeholders would be better served by commencing a bankruptcy proceeding than reducing its cash assets through payment of the interim award.

Chapter 11 will enable the Company to resolve this interim award and additional issues resulting from the protracted shareholder and related litigation at the corporate level. This action will also provide sufficient operating funds to fund post-petition operating expenses, and to meet ongoing obligations to employees, customers and suppliers with less disruption.

"All of our agencies and non-corporate subsidiaries will continue business in the ordinary course and without interruption. We have a problem at the holding company which has absolutely no connection to our agencies' day-to-day operations," said Jim Holbrook, EMAK's Chief Executive Officer. "The actions we announced today will allow us to resolve these issues in an organized manner and to put them behind us. We want to reassure our clients that we will continue to serve their needs during this period, and we appreciate the support of our many loyal vendors, customers and employees."

-more-

*EMAK Worldwide, Inc.*
*Page 2*

EMAK intends to seek reversal of the interim award and to permanently resolve the litigation that has disrupted the holding company for some time. The Company believes it has reasonable grounds for an appeal, and was previously successful in achieving a reversal by the Delaware Supreme Court of other decisions rendered by the Chancery Court in the same case.

During its bankruptcy proceedings, EMAK will be represented by Jeffrey Reisner and Kerri Lyman of Irell & Manella LLP in Newport Beach, California. Press inquiries should be directed to Kerri Lyman at (949) 760-0991.

### About EMAK Worldwide, Inc.

EMAK Worldwide, Inc. is a family of marketing services agencies including Equity Marketing, Logistix, Neighbor and Upshot. Its agencies are experts in "consumer activation" by offering strategy-based marketing programs that directly impact consumer behavior. The agencies provide strategic planning and research, consumer insight development, entertainment marketing, design and manufacturing of custom promotional products, kids marketing, event marketing, shopper marketing and environmental branding. The Company's blue-chip clients include Kellogg, Kohl's, Kraft, Macy's, Procter & Gamble, Jamba Juice and Safeway, among others. More information about EMAK Worldwide is available on the Company's website at www.emak.com.

*Some of the statements in this release constitute forward-looking statements within the meaning of the United States Private Securities Litigation Reform Act of 1995, including, without limitation, certain statements regarding the reorganization of the Company's business and finances to resolve its liquidity and operational results, expectations to emerge from Chapter 11 proceedings, the sufficiency of liquidity to be provided by the Company's restructuring plan, anticipated authorizations being requested of the Bankruptcy Court and expectations as to the ability to make post-petition payments. Words such as "will", "expects", "believes" and similar expressions are used to identify these forward-looking statements. Forward-looking statements are not historical, but are based on current expectations, estimates and projections concerning future developments and their potential effects upon the Company and its subsidiaries. These statements are only predictions and as such are not guarantees of future performance and involve risks, uncertainties and assumptions that are difficult to predict and actual results may differ materially from those projected. Factors that could cause actual results to differ materially from those projected in such forward-looking statements include, without limitation: (i) the ability of the Company to continue as a going concern; (ii) the Company's ability to obtain court approval with respect to motions in the Chapter 11 proceedings; (iii) the ability of the Company and its subsidiaries to prosecute, develop and consummate one or more plans of reorganization with respect to the Chapter 11 proceedings; (iv) the effects of the Company's Chapter 11 filing on the Company and the interests of various creditors, equity holders and other constituents; (v) Bankruptcy Court rulings in the Chapter 11 cases and the outcome of the proceedings in general; (vi) the length of time the Company will operate under the Chapter 11 proceedings; (vii) risks associated with third party motions in the Chapter 11 proceedings, which may interfere with the Company's ability to develop and consummate one or more plans of reorganization; (viii) the potential adverse effects of the Chapter 11 proceedings on the Company's liquidity or results of operations; (ix) the ability to execute the Company's business and restructuring plan; (x) management of cash resources; (xi) increased consulting and legal costs related to the bankruptcy case; (xii) the Company's ability to maintain contracts that are critical to its operation, to obtain and maintain normal terms with customers, suppliers and service providers and to retain key executives, managers and employees; (xiii) the assumptions upon which the Company's projected financial information was based necessarily involve judgments with respect to, among other things, future economic and competitive conditions and financial market conditions, which are difficult to predict accurately and many of which are beyond the Company's control; and (xiv) the impact of current economic conditions on the Company's ability to implement its restructuring plan. The Company does not intend, and is under no obligation, to update any particular forward-looking statements, whether as a result of new information, future events or otherwise.*

# # #

# EXHIBIT C

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DONALD A. KURZ and SEMS          :
DIVERSIFIED VALUE, LP,           :
                                 :
            Plaintiffs,          :
                                 :
       vs.                       :   Civil Action
                                 :   No. 5019-VCL
JAMES L. HOLBROOK, JR.,          :
STEPHEN P. ROBECK, HOWARD D.     :
BLAND, JEFFREY S. DEUTSCHMAN,    :
JORDAN H. REDNOR, EMAK           :
WORLDWIDE, INC., a Delaware      :
corporation, and CROWN EMAK      :
PARTNERS, LLC, a Delaware        :
limited liability company,       :
                                 :
            Defendants.          :

                    - - -

                     Chancery Courtroom No. 12B
                     New Castle County Courthouse
                     Wilmington, Delaware
                     Friday, December 4, 2009
                     10:00 a.m.


BEFORE:  HON. TRAVIS J. LASTER, Vice Chancellor.



                    - - -


                ORAL ARGUMENT

                    - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
              CHANCERY COURT REPORTERS
         500 North King Street - Suite 11400
            Wilmington, Delaware 19801-3759
                   (302) 255-0525

2

```
 1   APPEARANCES:

 2           JOEL FRIEDLANDER, ESQ.
             ANDRE G. BOUCHARD, ESQ.
 3           DAVID J. MARGULES, ESQ.
             SEAN M. BRENNECKE, ESQ.
 4           JAMES J. MERKINS, JR., ESQ.
             Bouchard Margules & Friedlander, P.A.
 5              For Plaintiffs

 6           KENNETH J. NACHBAR, ESQ.
             CHRISTINE D. HAYNES, ESQ.
 7           SHANNON E. GERMAN, ESQ.
             Morris, Nichols, Arsht & Tunnell LLP
 8              For Defendants James L. Holbrook, Jr.,
                Stephen P. Robeck, Howard D. Bland,
 9              Jeffrey S. Deutschman,
                Jordan H. Rednor, and
10              EMAK Worldwide, Inc.

11           STEPHEN E. JENKINS, ESQ.
             ANDREW D. CORDO, ESQ.
12           Ashby & Geddes
                For Defendant Crown EMAK Partners, LLC
13
                         -  -  -
14

15

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

24

1  thing.

2                  MR. JENKINS:  If I could --

3                  THE COURT:  Sure.  Give me your

4  reaction.  I'm telling you my thoughts, and I'm doing

5  it in large part so you know where I am and you have

6  the opportunity to say, you know, "Laster, that's the

7  craziest thing I ever heard."

8                  MR. JENKINS:  If I said that, I would

9  say, "Respectfully, Your Honor."

10                 Your Honor, as to the damages aspect,

11 there is no damages claim here.

12                 THE COURT:  There is.  There's a claim

13 for other relief.  It's clear -- everyone has been

14 telling me all along.  In fact, one of the company's

15 main points throughout this has been that Mr. Kurz has

16 forced them to incur massive legal fees because of

17 what was called an egregious and unfounded complaint.

18 So the whole theory of this has been that this proxy

19 solicitation effort has damaged -- not the proxy

20 solicitation -- but the exchange transaction has

21 damaged the company and it's had to spend money.

22                 If I believe and I find at trial that

23 there has been a loyalty violation or a good faith

24 violation, you know, there's a potential for a damages

CHANCERY COURT REPORTERS

25

1   award. And I don't see why an alleged aider and

2   abettor could not be jointly and severally liable for

3   that type of damages order. That's not my task for

4   today. But theoretically, what's the problem with

5   that?

6                MR. JENKINS: If I might continue,

7   Your Honor, there are several problems. That would be

8   a derivative claim, obviously. It would be a

9   stockholder derivative claim that has not -- if he

10   said the company has been damaged and I am suing for

11   the damage to the company, that is a stockholder

12   derivative claim. He has not pled nor sought to bring

13   a stockholder derivative claim because, in a proxy

14   fight, that's not what you do.

15                 He said this claim is for "I am being

16   damaged. My proxy fight is being damaged. I can't

17   pursue my proxy fight because the exchange transaction

18   blocks my consent solicitation." That is the nature

19   of this claim.

20                 If he has been damaged by it, that is

21   an individual cause of action and doesn't go to the

22   damages, if any, to the company. He would have --

23                THE COURT: That's a fair point. I

24   follow you. I follow you. That is a fair point.

# EXHIBIT D

EFiled: Feb 9 2010 5:00PM EST
Transaction ID 29535579
Case No. 5019-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DONALD A. KURZ and SEMS DIVERSIFIED VALUE, )
LP,                                         )
                                            )
            Plaintiffs,                     )
                                            )
      v.                                    )
                                            )
JAMES L. HOLBROOK, JR., *et al.*,           )
                                            )
            Defendants.                     )
                                            )
_____     )
                                            )
JAMES L. HOLBROOK, JR., *et al.*,           )
                                            )
            Counterclaim Plaintiffs,        )
                                            )
      v.                                    )
                                            )
DONALD A. KURZ and SEMS DIVERSIFIED VALUE, )
LP,                                         )
                                            )     C.A. No. 5019-VCL
            Counterclaim Defendants,        )
                                            )
and                                         )
                                            )
JAMES L. HOLBROOK, JR., *et al.*,           )
                                            )
            Third-Party Plaintiffs,         )
      v.                                    )
                                            )
TAKE BACK EMAK, LLC,                        )
                                            )
            Third-Party Defendants,         )
_____     )
                                            )
CROWN EMAK PARTNERS, LLC,                   )
                                            )
            Counterclaim and Third-Party Plaintiff, )
                                            )
      v.                                    )
                                            )
DONALD A. KURZ, *et al.*,                   )
                                            )
            Counterclaim and Third-Party    )
            Defendants.                     )

OPINION

Date Submitted: February 4, 2010
Date Decided: February 9, 2010

Andre G. Bouchard, Esquire, David J. Margules, Esquire, Joel Friedlander, Esquire, Sean M. Brennecke, Esquire, BOUCHARD MARGULES & FREIDLANDER, P.A., Wilmington, Delaware, *Attorneys for Plaintiffs Donald A. Kurz, Sems Diversified Value, LP, Lloyd M. Sems, Philip S. Kleweno, Michael Konig and Take Back EMAK, LLC.*

Stephen E. Jenkins, Esquire, Catherine A. Gaul, Esquire, Andrew D. Cordo, Esquire, Peter Faben, Esquire, ASHBY & GEDDES, Wilmington, Delaware; Steven K. Talley, Esquire, GIBSON, DUNN & CRUTCHER LLP, Denver, Colorado; Jeremy W. Stamelman, Esquire, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California, *Attorneys for Defendant and Counterclaim and Third Party Plaintiff Crown EMAK Partners, LLC and Defendants Jeffery Deutschman and Jason Ackerman.*

William O. LaMotte, III, Esquire, Kenneth J. Nachbar, Esquire, Christine D. Haynes, Esquire, Shannon E. German, Esquire, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Thad A. Davis, Esquire, Ropes & Gray LLP, San Francisco, California, *Attorneys for Defendants EMAK Worldwide, Inc. and James L. Holbrook, Jr.*

Collins J. Seitz, Jr., Esquire, Bradley Aronstam, Esquire, CONNOLLY, BOVE, LODGE & HUTZ LLP, Wilmington, Delaware, *Attorneys for Defendants Stephen P. Robeck, Howard D. Bland and Jordan H. Rednor.*

**LASTER, Vice Chancellor.**

that a reasonable EMAK stockholder would have viewed it as material that plaintiffs likely would seek reimbursement of their consent solicitation expenses if they were successful.

I find the defendants' argument unpersuasive. The disclosures and omissions defendants attack were made in the midst of the contested consent solicitation that will determine the leadership and direction of a troubled, delisted, and deregistered company. Neither side approached the consent solicitation process with the rigor called for by Rule 14A. The competing consent materials amount to a series of fight letters, without the underlying floor of information that a Rule 14A solicitation statement provides. Neither side pulled any punches in describing their opponents or the dire consequences that allegedly would result if they prevailed. Both sides spoke of the significant costs imposed on EMAK by the battle for control. Shareholders were certainly aware of these costs. The defendants for their own part did not see fit to disclose their own arrangements with counsel or whether the corporation was paying.

I am also influenced by a series of other factors. First, plaintiffs' counsel was engaged on a contingent basis to challenge the Exchange Transaction. Any fee application will not depend on the outcome of the TBE Consent Solicitation. Second, under *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del. 1980), plaintiffs' counsel can apply for a fee award regardless of whether they were hired on contingency. Contingent risk is but one factor in determining the amount of the award. *Id.* at 149. Third, the amount of any fee is not within the plaintiffs' control. It is rather up to the Court. Fourth, I do not rule out the possibility that if EMAK is ordered to pay a fee

award based on the rescission of the Exchange Transaction, and if the defendants are later held liable for breaches of the duty of loyalty, then the amount of the fee award might be factored into the judgment against the defendants to ensure that the corporation is made whole. EMAK therefore might not bear any of the cost of the plaintiffs' efforts to challenge the aborted Exchange Transaction.

For all of these reasons, I do not believe that disclosure of the plaintiffs' contingent fee arrangement or the possibility of fee reimbursement would have significantly altered the total mix of information. I decline to invalidate the TBE Consents on the basis of any alleged disclosure violation.

## III.    CONCLUSION

I hold that the Crown Consents were ineffective because the Bylaw Amendments conflict with the DGCL and are therefore void. I hold that the TBE Consents validly effected corporate action. The Board consists of Deutschman, Ackerman, Kurz, Kleweno, Konig, and Sems. I have entered a partial final judgment to this effect pursuant to Rule 54(b).

78

# EXHIBIT E

**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

J. TRAVIS LASTER
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

March 2, 2010

Joel Friedlander, Esquire
Bouchard Margules & Friedlander
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801

Stephen E. Jenkins, Esquire
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Lisa A. Schmidt, Esquire
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Collins J. Seitz, Jr., Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

RE:   Kurz, *et al.* v. Holbrook, *et al.*, C.A. No. 5019-VCL

Dear Counsel:

I will defer considering plaintiffs' application for an interim award of fees and expenses until after the Delaware Supreme Court rules in the now-pending appeal from my Rule 54(b) Order dated February 9, 2010. Defined terms are used as in my opinion of the same date.

Although interim fee applications are disfavored, this case offers the rare situation where one is appropriate. The facts surrounding the mooting of the application for injunctive and other equitable relief against the Exchange Transaction have been established and are not subject to revision. The benefits from mooting that transaction can be evaluated. The appropriate amount of a fee award based on those benefits can be determined. *See Louisiana State Employees' Retirement Sys. v. Citrix Sys., Inc.*, 2001 WL 1131364, at *4 (Del. Ch. Dec. 19, 2001) (granting interim fee award). For purposes of moving forward with the liability phase of this litigation, it will be helpful to have quantified the fee award so the parties can address concretely whether the amount should be incorporated in the calculation of damages suffered by the Company.

March 2, 2010
Page 2 of 3

That said, the interim fee petition does not need to be litigated immediately, while the appeal is pending. Doing so would require me to contemplate procedural issues that I may never need to address.

Assume, for example, that the current board remains in place and takes no position on the fee application. Is notice to stockholders required? Plaintiffs say no, pointing out that companies frequently agree not to take a position on a fee award up to a given amount. They do so, however, in the context of negotiated settlements when notice is provided to stockholders, who then have an opportunity to object. Here, the Company's decision not to contest the plaintiffs' fee application more closely resembles the voluntary payment of a fee in connection with a mootness dismissal, where notice to stockholders and an opportunity to object would be required. *See In re Advanced Mammography Sys, Inc. S'holders Litig.*, 1996 WL 633409 (Del. Ch. Oct. 30, 1996) (Allen, C.).

Answering the notice issue raises a related question. Plaintiffs have made a cogent argument why Crown should be fully incentivized and able to oppose the fee application, which they say obviates the need for notice. At the present time, I am not convinced that the presence of one potential objector necessarily displaces a mechanism designed to allow multiple stockholders to object.

Now assume that the Delaware Supreme Court reverses my decision such that the current board is unseated. At that point, I expect the Company would oppose the fee application. Under those circumstances, I do not believe that notice to stockholders would be required, and I would not have to consider either permutation of the notice issue. Moreover, the Company would save the cost of sending out notice. Crown also would save costs. Under the plaintiffs' proposal, Crown would have to expend its own resources to oppose the fee application. Yet it is possible that the Company may undertake the job.

Nothing about the schedule for the damages portion of this case necessitates a ruling on the interim fee application prior to the issuance of the Delaware Supreme Court's decision on appeal. I do not want this matter to drag, but I do not see any reason for expedition. Because considering the interim fee application after the Delaware Supreme Court's decision will avoid potentially unnecessary expenditures of judicial and party resources, it is the course I adopt. After the Delaware Supreme Court rules, the parties will be in a position to determine how they will align on the interim fee application, to consider whether notice is required, and to negotiate an appropriate stipulation or seek my assistance.

March 2, 2010
Page 3 of 3

Very truly yours,

*/s/ J. Travis Laster*

J. Travis Laster
Vice Chancellor

JTL/krw

# EXHIBIT F

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DONALD A. KURZ and SEMS            :
DIVERSIFIED VALUE, LP,             :
                                   :
        Plaintiffs,                :
                                   :
        v.                         :
                                   :
JAMES L. HOLBROOK, JR., et al.,    :
                                   :
        Defendants.                :     Civil Action
------------------------------------:     No. 5019-VCL
JAMES L. HOLBROOK, JR., et al.,    :
                                   :
        Counterclaim Plaintiffs,   :
                                   :
        v.                         :
                                   :
DONALD A. KURZ and SEMS            :
DIVERSIFIED VALUE, LP,             :
                                   :
        Counterclaim Defendants,   :
                                   :
        and                        :
                                   :
JAMES L. HOLBROOK, JR., et al.,    :
                                   :
        Third-Party Plaintiffs,    :
                                   :
        v.                         :
                                   :
TAKE BACK EMAK, LLC,               :
                                   :
        Third-Party Defendants.    :
------------------------------------:
                          ORAL ARGUMENT
-------------------------------------------------------------
                 CHANCERY COURT REPORTERS
                New Castle County Courthouse
            500 North King Street - Suite 11400
                Wilmington, Delaware  19801
                      (302) 255-0524

2

CROWN EMAK PARTNERS, LLC,                    :
                                             :
Counterclaim/Third Party Plaintiff,          :
                                             :
        v.                                   :
                                             :
DONALD A. KURZ, et al.,                      :
                                             :
Counterclaim/Third Party Defendants.  :

                        - - -

                        Chancery Courtroom 12C
                        New Castle County Courthouse
                        500 North King Street
                        Wilmington, Delaware
                        Monday, July 19, 2010
                        10:00 a.m.

                        - - -

BEFORE:    HON. J. TRAVIS LASTER, Vice Chancellor

                        - - -

APPEARANCES:

        JOEL FRIEDLANDER, ESQ.
        ANDRE G. BOUCHARD, ESQ.
        Bouchard Margules & Friedlander, P.A.
            for Donald A. Kurz, Sems Diversified Value, LP

        KENNETH J. NACHBAR, ESQ.
        SHANNON E. GERMAN, ESQ.
        Morris Nichols Arsht & Tunnell, LLP
            for EMAK Worldwide, Inc.

ALSO PRESENT:

        BRADLEY R. ARONSTAM, ESQ.
        Connolly Bove Lodge & Hutz, LLP

        CATHERINE A. GAUL, ESQ.
        Ashby & Geddes, P.A.

(A recess was taken.)

THE COURT:  All right.  Thank you for giving me a moment to collect my thoughts.  I have thought about whether to write on this fee petition because it's a fairly interesting one, but I think I'm just going to go ahead and give you my ruling orally.

To avoid the suspense, I am going to grant the fee petition, and the all-in award that I will award is 2.5 million.  So you can now sit back and listen, knowing that, and either listen for all the reasons that I got right, or for the other side, all the issues that I get wrong.

The first question is, why am I awarding an interim fee in this case, given that interim legal fees are discouraged.  Well, to reiterate the ruling I made by letter dated March 2nd, 2010, this is the type of case where I think it's appropriate to consider an interim award.

As to the exchange transaction, the facts surrounding the mooting of that application for injunctive and other equitable relief were established at that point.  They were not subject to revision.  The benefits from that act would be assessed as of that date,

and I do assess them as of that date.

It's effectively a separate phase of the case.
And so as I noted then and as I still believe, what
happened after that doesn't change the benefit conferred
as of that time.  Indeed, had it made sense to do so, and
I didn't think it did because everyone was so busy
litigating the various issues in this dispute, one could
have had a fee application right then.

And I analogize the knocking out of the exchange
transaction similar to when someone knocks out a
defensive measure, like a termination fee or an option
lockout.  You don't know when that fee or defense is
knocked out whether, in fact, somebody is going to come
in and bid higher, but the fact that you knock it out
creates a benefit.  It opens up a process that may not
previously have been opened up.  It creates the
opportunity.  That's the benefit.  And I'll describe that
more later.

And this type of knocking out a defense to create
the benefit is precisely analogous to what happened in
Ceridian and Yahoo.

Now, dissimilarly, I feel that it's appropriate to
grant an interim fee based on the Crown consent

solicitation and the board size reduction.  The issue

there is that there has been a final order entered and

affirmed in part, the pertinent part.  You also have --

and that isn't going to be set aside now.  It's something

that we can look at and, therefore, is appropriate to

address.

Also, the disclosures in connection with the

underlying consent solicitation, that information was put

out.  I can assess it.  It's done.  Nothing more is going

to happen.

So while one might, in the grand sense, prefer not

to entertain interim fee applications, when there is

something discrete like this that can be addressed on a

limited basis and is not subject to being upset later, I

think it's helpful to do so, rather than to put things

off until who knows when.

For the exchange transaction, the key question is

should a fee be awarded on a mootness doctrine.  The

mootness doctrine has three elements:  first, an

ascertainable class has to have received a substantial

benefit; second, there has to be a causal connection

between the litigation and the benefit; and third, the

litigation has to have been meritorious when filed.

There are many cases that stand for that.  One is
the Dover Historical Society versus City of Dover.  It's
a Delaware Supreme Court case.  One could also cite
Tandycrafts or the Vanguard decision.

The whole premise of mootness doctrine is designed
to insure that even without a favorable education by a
Court, plaintiffs' counsel gets compensated for
beneficial results.  The idea is to prevent frustration
of remedial policy of rewarding professional compensation
by allowing the defendants to get rid of the litigation.

Here, the claims were clearly meritorious when
filed.  There were substantial claims for breach of
fiduciary duty challenged in the exchange transaction.
The conduct was actionable under Mercier versus
Inter-Tel, the other unified standard.  It was actionable
in my view under Schnell versus Chris-Craft.  It was a
plain example of conduct that's actionable as a
straightforward duty of loyalty valuation.

I haven't yet made detailed factual findings
regarding whether, in fact, there were breaches of
loyalty.  I haven't had to address that on the merits
because the rescission of the exchange transaction mooted
the need for me to issue a preliminary injunction

decision.

I also didn't go that route in the 225 trial.  It
was a one-day affair where a number of the individuals
who potentially could have faced personal liability from
an adverse duty of loyalty finding did not appear and did
not testify.  Hence, I didn't feel that I should reach
duty of loyalty issues with potential personal liability
implications unless it was absolutely necessary.

That's because any findings that I made in that
trial likely would have had res judicata and collateral
estoppel effects for the claims.  And so, believing that
I had an independent legal basis to adjudicate the 225
action, I didn't reach and did not make any duty of
loyalty issues.

But I will say this, because it does influence my
fee application greatly.  I think there is substantial
and credible evidence that Mr. Holbrook breached his duty
of loyalty in connection with the exchange transaction.
I think there is substantial and credible evidence that
Mr. Holbrook misled the board and/or withheld material
information in connection with the events leading up to
the exchange transaction.

This litigation did not suddenly spring forth with

the dropping of the Take Back EMAK's consent.  It
actually had its roots in a dispute that went much
further back, over control of the corporation.
Mr. Holbrook succeeded Mr. Kurz as CEO.

        And while it has never been my job and still is
not my job to determine whether Mr. Kurz's tenure was
more successful or Mr. Holbrook's tenure was more
successful, that's always been for the board; and who the
board is, is up to the stockholders.  One can say as an
outside observer that there were at least external
indications that Mr. Holbrook's tenure was less than
satisfactory.  He presided over an approximately 90
percent drop in the value of the stock, and there were
other problems as well.

        And again, by pointing out those things, I don't
mean to suggest that Mr. Kurz's tenure was particularly
exemplary.  I don't express any view on it one way or the
other.  But what I do mean is that by mid-2008, it was
not surprising that Mr. Kurz became interested in
reacquiring EMAK with the help of a financial sponsor,
because at that time, the company's trading price was
down 90 percent.

        It's not surprising, in connection with that

effort, Mr. Kurz filed a Schedule 13(d) that stated that he was considering a potential acquisition and also would seek management and board changes.

It's clear from the record that Mr. Holbrook regarded this 13(d) group as a threat, because in November of 2008, he wrote to EMAK's advisors that he planned to contact Ackerman to ask to support the implementation of the staggered board, and he stated the reasons bluntly. "We want to move to a staggered board in order to avoid a proxy slate by Don."

All right. Now, move forward to April 2009, when EMAK lost its second biggest client, MillerCoors. At that point, Mr. Kurz sent a letter to the board informing them that he no longer believed any third-party transaction was viable. But equally importantly, at that point in time, he took on Mr. Holbrook and incumbent management.

He offered a pointed and detailed critique of how they, in his view, "have literally run the company into the ground." And he pointed out that he had personally lost 16 million in value as the company devolved over the three and a half years of Mr. Holbrook's tenure, from a NASDAQ-listed issuer trading at approximately $11 per

share at the time Kurz resigned as CEO to a "deregistered 21-cent bid illiquid pink sheet traded stock."

Kurz also said if the board chose not to execute his proposal, he would seek to remove all the common shareholder representatives on the board. He also threatened to sue the directors for breach of fiduciary duty. So there is no question that as of early 2009, Kurz had emerged as a major threat to Holbrook.

Meanwhile, a gentleman named Mr. Ackerman was applying pressure of his own. He, too, had grown frustrated with his investment in EMAK and wanted out. And he personally attended a December 2008 board meeting and delivered the message that he wanted par redemption of Crown's preferred stock. And as Mr. Holbrook later memorialized the conversation, Mr. Ackerman's message to the board and management was, "the current situation is unacceptable to me."

And for the next eight months, until approximately September 2009, Mr. Ackerman consistently demanded that EMAK take out Crown for the full $25 million face amount of the Series AA preferred stock. As Holbrook testified in this action, Mr. Ackerman told him that he doesn't take haircuts; he gives them. And his position was, Get

me out for par.

Now, the problem Crown faced was that the Series
AA preferred carried relatively limited rights.  It paid
no dividends, had no fixed maturity date or put right,
had no right of redemption in the absence of the change
of control, no right to a liquidation preference in the
absence of dissolution, no right to vote with the common
in the election of directors, no class voting rights of
the type typically found in preferred stock.  Another
thing is it doesn't have a veto right on a merger.

So the board at that point could have leveraged up
by pursuing an Avatex transaction to completely moot the
preferred, but instead, without the legal ability to
pursue anything meaningful, what Ackerman and Crown did
was to resort to threats against EMAK, including against
Mr. Holbrook.

And there was testimony throughout this case,
including by Mr. Austin, the outside advisor to
Mr. Holbrook and the board, that Crown has consistently
stated that they think the directors had particular
duties to Crown.  They have consistently proposed a zone
of insolvency analysis.  Mr. Deutschman has on numerous
occasions during board meetings said, The company used to

be worth more.  Now it's less.  Somehow, it's your fault,
and I will sue you if you continue on the path of not
letting me get paid.

So Crown's core pitch all throughout 2009 was
legal action.  It wasn't what the defendants now say,
this inevitable concept of voting with the common to
amend the bylaws.  What Crown instead was advocating is
the same thing Crown's counsel advocated to me at the
scheduling conference; namely, that Crown had a special
claim against the directors; that it was owed duties; and
that it was prepared to enforce those duties.

Now, as I pointed out, the conference -- and I
think that had EMAK had Delaware counsel of the caliber
that it eventually retained involved, they would have
recognized that this threat was relatively empty.

In other words, in the aftermath of Trenwick,
Gheewalla, Equity-Linked, and Trados, Crown simply didn't
have that type of leverage.  Even more recently in LC
Capital, Vice Chancellor Strine confirmed this view of
the law.

But rather than pushing back against Crown, what
happened was Mr. Holbrook found himself caught between
Mr. Ackerman and Mr. Kurz.  And there is substantial

86

evidence -- and again, I have not had to make findings on

this, but since the defendants have tried to portray this

fee dispute as if it happened on a pristine record in

which their clients did nothing wrong and Mr. Kurz was

entirely to blame, I think it important that those

assertions be corrected.

As early as a May 5th, 2009 e-mail, Mr. Holbrook

was writing things like headline number one:  "I am

scared of Don Kurz and Peter Ackerman and legal action.

I do not know what to do:  sell now, sell later, build

the business, milk, squeeze the business."  And then

later in his e-mail, "I need assurance about personal

coverage, as does management team and probably the

directors."  That was in an e-mail to Robeck.

In the weeks after this rather desperate-sounding

May 5th e-mail, Holbrook came to support a proposal that

Ackerman had floated with Kurz in April.  This was the

split the baby concept in which EMAK would be divided

into its two constituents' businesses:  the services

business with the Upshot subsidiary and its products

business.  Crown would receive Upshot.  Holbrook would be

CEO of Upshot.  Kurz and the common would receive the

products business.  And at the time, the idea was that

Crown would receive a note for approximately 8 million.

Now, on May 20th, Holbrook proposed this split the baby option to the board, and indicated that management would begin analyzing it and two other alternatives. On June 18, he provided a quick update on the split the baby plan and also provided it to Ackerman.

Now, what seems at least a strong inference from the record, as described to date, is that by the middle of 2009, Holbrook saw Ackerman as his potential benefactor. And the idea that Holbrook would try to align with Ackerman makes sense because at the time, Kurz was calling for his head. The two men also personally disliked each other.

Ackerman, in contrast to Kurz, hadn't attacked Holbrook in a letter to the full board, and Ackerman also was a significant financial player who could help out Holbrook. And also, if the EMAK baby was split, Ackerman would own Upshot, and that's where Holbrook hoped to go.

So what you see after July in the record is Holbrook pushing the split the baby option. He does so in a July 21 e-mail. He does so -- let's see. I guess the July 21 e-mail is really the signature e-mail on that. All right.

But then the split the baby proposal hit a bump in the road, because in August 2009, the board decided that instead of proposing the split the baby with the note that had been previously contemplated, they would simply propose to Crown a straight-up exchange of Upshot for the preferred stock and warrants held by Crown.

Deutschman and Crown's counsel told EMAK's counsel that Ackerman was outraged by this idea. From Ackerman's standpoint, the gist of it was that before Kurz became a director, he had committed to support the $8 million note for Crown, and Crown felt that Kurz had tried to retrade that deal.

What you see in the record following that is Holbrook siding with Ackerman and Crown. So in an e-mail to Robeck, the chairman of the board, and Austin, he criticized the board's revised split the baby proposal, the exclusion of Deutschman from the discussion. He also e-mailed what's best described as an emotional 12-point missive to Rednor in which he attacked Kurz and lobbied for Ackerman.

In one of the signature paragraphs from that e-mail, here's what Holbrook writes: "Why we didn't originally figure out a way to give him," Ackerman, "25

million, configured in whatever creative way; i.e.,
Upshot for 20 million, 2 million in cash, 3 million in
warrants or some structure, and let him win is beyond me.
Instead, we decided to teach him a lesson and show him
what his preferred is really worth.  I think we've poked
the bear with the stick.  With creative packaging, we
could have gotten out of this thing more easily."

Now, on August 17th, Holbrook proposed his own
preferred resolution to Crown.  Under this resolution, he
proposed to give Crown 60 percent of the common stock of
EMAK, a percentage more than twice the size of the 28
percent yielded by the Series AA's contractual conversion
rate.  There was some dispute at the board level over why
Mr. Holbrook would have done this apparently without
board authorization.

Then we come to the Burger King events.  What
happened there was in early August, Mr. Kurz got word
that Burger King was actively considering using EMAK's
competitor as its sole source and that Holbrook had a bad
relationship with Burger King.  Kurz advised the
independent directors on the board of this, but
unfortunately, they interpreted Kurz's information as a
play for Holbrook's job.  Now, that is the type of

business judgment that it's not in my place to

second-guess.

In September, however, Burger King terminated

EMAK's contract, and regrettably proved Kurz right.  At

this point, though, rather than trying to consider what

to do about this revelation, the primary action that

Austin and Holbrook took was to attack Kurz.  What

Holbrook also did at this point was to enlist Crown as

his ally.  And in particular, at a September meeting with

Crown, Holbrook essentially cut a deal with Crown

whereby, according to his e-mail, he and Ackerman became

partners.

During this same time period, Kurz was making

louder noises about a proxy contest and what eventually

grew into the exchange transaction, although the

defendants now say that it didn't happen until after Kurz

announced his proxy consent solicitation and the consent

was delivered.

What's clear from the record is that Holbrook was

working this angle from long before.  And there is

powerful evidence that Holbrook's primary reasons for

doing so were his desire to keep his job.

And as I've said before, I also questioned whether

the board got full information from Holbrook about the events leading up to the Burger King transaction.  And it's quite unclear to me whether they had had full information about the Burger King transaction, whether they might have done something differently.

So this leads us to what happened in the exchange transaction.  The exchange transaction converted Crown's preferred from something that didn't vote in the election of directors into a new security that had 28 percent of the voting power in the election of directors.  It also provided Crown with rights to veto mergers, eliminating one of the ways that the company could have attempted to address the Crown situation.  And it also, as the plaintiffs have pointed out, expanded the triggers by which Crown could get its liquidation preference effectively to include an insurgent proxy solicitation by Kurz.

Now, as I've said, all of this leads me to conclude that this action wasn't simply meritorious when filed.  This action was meritorious when mooted.  This was a case, again, where there were substantial loyalty issues.  And I have not heard Mr. Holbrook testify.  Perhaps he has wonderful and credible explanations for

all this.

I have not heard Mr. Ackerman testify. It's clear to me that he was bargaining on behalf of Crown, which he has a legitimate right to do. What is suggested by the e-mail record, however, at least Mr. Holbrook's side of it and Mr. Austin's side of it, is that he was deeply aware of the conflicts on the board, deeply aware of Mr. Holbrook's insecurities, and used them to his advantage.

So all of this to say that I think it's highly likely that I would have enjoined the exchange transaction. I think it's simply not accurate for the defendants to come in and essentially make a no harm, no foul argument.

What the mooting of the exchange transaction did was change the factual terrain on which any consent solicitation was based. It effectively changed the factual universe in which the election contest was run.

Prior to the mooting of the exchange transaction, a consent solicitation was effectively, if not mathematically, impossible, at least realistically unobtainable. In fact, whatever the higher phrasing in Selectica, you only get an injunction if you can possibly

never win or whatever the magic language is, this would
even meet that.

The idea that because Kurz eventually lost is
essentially a no win, no benefit argument, and that's
just -- that's the flip side of no harm, no foul.  It's
also a variant of the post hoc ergo propter hoc theory,
which we don't follow in Delaware.  And the whole idea
that this was inevitable, I just don't buy it.

As somebody who read all the factual record in
connection with preparing for a preliminary injunction
hearing, and perhaps I am as naive as the plaintiffs, but
it certainly wasn't clear to me that when stockholders
understood the types of machinations that went on here,
that they would inevitably side with the defendants.
That's ultimately their choice, but it certainly wasn't
clear to me.  And I suggest that given the closeness of
the result, it probably wasn't clear to anybody.

And I also think, as Mr. Deutschman testified,
part of the reasons why they did the Crown consent was
because they were worried that Kurz might win.  So the
idea that this was all inevitable, it's some time of
Calvinist predestination concept that I just don't cotton
to at all.

And it also is Calvinist in the sense that it suggests that because Mr. Kurz is a bad guy, he couldn't want -- what you have is a company that was in serious trouble, had undergone a disastrous period in its history, and stockholders were entitled to make a decision whether to hang that on the heads of incumbent management and seek a change, or whether to stick with incumbent management for the path out of the wilderness.

I think it was far from inevitable that things turned out as they did. And certainly, judging it based on the mooting of the exchange transaction, one can't reach that conclusion.

So for those reasons, I think that the exchange transaction mooting was a direct and obvious benefit to all stockholders. And I say "all stockholders" because what it presented was the opportunity to change the direction of the company.

There is the suggestion made that this wasn't a benefit to the stockholders who voted against Kurz. Well, they had the right to vote against Kurz. They had the right to vote for Kurz in a free election. Generally, in the western world, particularly in this country, we think free elections are a good thing,

whether its politically or in the corporate con it text.

Likewise, as to the preferred, while the preferred may have had their own motivations, that doesn't mitigate the concept that the corporation as a whole benefitted from the free election. Now, the benefit is still there whether or not it was one that the preferred themselves would have sought.

And this same logic applies to the Crown consent. I asked Mr. Friedlander whether he could make the same argument, and I think he's right. The fact that they were out there challenging the Crown consent was a key part of what made the election contest viable. And the fact that both were adjudicated simultaneously doesn't change the fact that you needed to get the Crown consent invalidated to have the free election and the potential for a different outcome.

I also agree with Mr. Friedlander that one of the benefits of invalidating the Crown consent and invalidating the original exchange transaction was to give the board a window in which it could act, if it wanted to, to address the Crown threat.

Whether the board did everything it could in that window is a question for another day. It certainly did

something in that it got this standstill.  Had it not had
that ten-day window, that opportunity, it couldn't have
done that.  And had the incumbents remained in power,
they could have done other things, which we could have
litigated but at least the board had the opportunity to
deploy its board power.

Finally, I do think the disclosures are a benefit
here.  The disclosures were false and misleading.  When
you compared the disclosures to what was written in the
briefs and when you compared the disclosures to what was
in the e-mails, there was absolutely no way that they
could be squared.

What the defendants had which was going to be a
legitimate question was a total mix argument because
their argument was that the plaintiffs were putting out
information of their own.  And so the two sides were
balanced and, Laster, why do you get involved when both
sides are bludgeoning each other?

But the idea that the consent solicitation
materials that were put out for the ratification
statement are accurate is just not one that I can agree
with.  And I think that had I been forced to write on
that and square up those issues, that is exactly the

outcome that I would have reached.

All right.  So for all these reasons, I think that there is a basis for a fee award.  The question that I have to do now is evaluate the benefit.  Some amount of fee is appropriate.  The question is how much.  Several things are relevant to that, in my mind, as background.

The first is that the defendant spent 5.2 million litigating the same actions, and they did so without any contingency risk.  When you've got two sides litigating the same dispute, what one side incurs is at least relevant to the reasonableness of fees.

Obviously, you have to take into account multiple parts.  Obviously, you have to take into account that the defendants and plaintiffs are differently situated.  But it at least gives you a sense of what the universe is, what the -- perhaps what the solar system is, in terms of where a fee award can come out.

But other than that, I'm faced with two radically disparate acts.  The plaintiffs say 2.8 million, which I think is at the upper end of reasonableness, but it's at least within the range; but against that, I have defendants who say zero.  And zero is not a viable response.

Before I go into the Sugarland factors, I do want
to address a couple tangential or secondary arguments
that were put through just to make sure I have covered
everything just in case this goes further. I guess I
shouldn't call them tangential or secondary because they
are essential to the defendant's "no money at all"
position.

The first is I should limit any size of my fee
award based on the cash held by the company. I agree
with Chancellor Allen in the Thorpe v. CERBCO decision
that there are situations where one would want to take
that into account. But I think, as Chancellor Allen
suggested in Thorpe v. CERBCO, the time when you would do
that would be a time when the defendants have largely
prevailed.

Here, the defendants didn't largely prevail. They
won on what I think was a difficult interpretation of a
stock restriction. I think it could have gone either
way. I think there are reasonable arguments either way.
I obviously reached one decision. The Supreme Court
reached another, as is their power as the higher Court.
Otherwise, the plaintiffs won. And the plaintiffs won
not only on the Rule 54(b) decision, but they won

completely on the mooting of the exchange transaction.
So I don't think that this is a situation where it calls
for some type of direct limitation based on size.

I have taken the company's available cash into
account, but to the extent the company is already willing
to pay its non-contingently retained lawyers 5.2 million
and proposes to make the cash arguments after that
payment goes out, I think the company has largely given
up any argument that it might have that a fee in the
range of what the plaintiffs suggest is excessive.

In other words, if you're willing to pay out 5.2
million of your diminishing cash stake, you've given up
the equity to claim that 2.8ish is too much.  But that
doesn't mean that in some future case somebody couldn't
take into account the types of factors that Mr. Nachbar
cites.

The other argument that I want to make sure that
I've touched on is this idea that there was no benefit to
the preferred.  As I've already tried to suggest, the
preferred is part of the entity.  The entity and all its
stockholders were benefitted by this action.  All of the
people who voted in the control contest were benefitted
by this action.  The fact that the preferred did not

bargain for a right to vote in the election of directors doesn't give it the opportunity to say, Oh, no, we were harmed, not helped.

The election itself is a good. The election itself, free and unaffected by a 28 percent thumb on the scales, was a good. And so that benefits all stockholders, and it is not problematic in my view to have the corporation pay the fee award as a collective action mechanism for the stockholders.

Third, the argument was made that Mr. Kurz shouldn't be able to recover his fees as a proxy contestant, analogizing to Mentor Graphics and other case law. The reason that we don't let bidders get fees is because bidders have a contrary incentive. In other words, they're trying to get the company for the least possible.

And so even though the bidder may impose some collective benefit in the same sense or similar sense to what Kurz imposed; i.e., providing a free and fair election, the fact that the bidder is doing it as a means to getting the company for a lower price is what has caused our Courts to say that they cannot invoke the corporate benefit doctrine.

Now, the defendants would analogize those cases to
Mr. Kurz by saying what he wanted was to become CEO.  I
have rejected that argument.  I reject it again.
Mr. Kurz was the largest common holder of this company.
Mr. Kurz wanted to become CEO in my view because he
thought the company was broken; and he thought, as a
co-founder of the company, he was best situated to fix
it.

He was not seeking to become CEO because he wanted
to get paid.  Yes, I believe he thought he should get
paid for his work.  I don't think he wanted to work for
free, but his purposes in pursuing this proxy contest and
his reasons for voting were those that aligned him with
all of the stockholders in his capacity as the largest
holder.  So he is not someone to whom the Mentor Graphics
lines of cases applies.

And then, finally, the argument that I should
limit or deny fees because the claims here were frivolous
or inequitable, primarily based on the Boutros shares
issue and the conflict issues, I don't agree with that.
I think the Boutros shares issue was fairly litigable.

I think the conflict issues, as I tried to explain
in my conversation with Mr. Nachbar, those arise out of

the odd situation that we're dealing with corporate claims and we have a change in control over the corporation. So all of a sudden, people who used to be on the outside are on the inside.

And I think conflict rules, while they are certainly important and need to be respected, they also need to be applied with an understanding of the realities of what happens when a new group of lawyers comes in who had been representing the outsiders, or the old group of lawyers comes out.

I didn't reach any of the disqualification motions. I guess there was only one filed, but even if there was one filed against Mr. Nachbar, he didn't bring it to a head, but I wouldn't be moved by any of the disqualifications motions in this case.

I think this was a case where you had very good lawyers, some of whom were temporarily out of favor because of my decision. And different lawyers were in, and then you had another changing of the guard because of the reversal on the Boutros issue, and that's all it was. It wasn't an excuse to try to use conflicts for litigation advantage, which is something that Info Technology precludes regardless.

All right.  So now I get to the five Sugarland
factors and how I get to 2.5 million.  I'm going to start
with the difficulty of the litigation.

This case did involve complex and novel issues of
Delaware law, including questions of first impression and
matters of Delaware public policy.  It was not a routine
deal injunction case.

It was not a case where somebody filed and the
nature of the transaction made it likely that there would
be a settlement.  I think that the relationships between
the parties made settlement unlikely.  I think the
complexity of the legal issues made settlement unlikely.

There was a shifting factual landscape in this
case brought on by the ratification solicitation.
Counsel had to not only deal with legal issues, but learn
the complex history of Kurz's involvement, Crown's
investment.  There were multiple factual threads.  What
was going on in 2008 and 2009 was a mess because you had
essentially negotiations happening on multiple fronts.

To litigate this, there was a tightly packed
deposition schedule.  There is no question, it's the type
of thing that should support a fee.  The depositions
taken were many, and while not overly numerous, they were

sufficient to do the job.  So I have no problem finding that this was a difficult litigation.

Standing and ability of counsel.  The Bouchard firm is well known to the Court.  It's small, it's efficient, it's experienced, but I think those are the attributes that allowed them to pull this off.  I think to do a case like this, you were best-served by having a small trial team with experienced people that know the law and are willing to do the work.  This is not a case where you can throw ten associates at it and be efficient.  So I think that that factor is certainly met.  And I take into account that they were opposed by five rather significant law firms.

The efforts of counsel and the time spent.  Plaintiffs' counsel put in 1,587 hours of attorney time.  I credit that figure.  This isn't the type of inflated hourly figure that you see when you get a fee application filed by 12 different law firms from the traditional plaintiffs' bar who all they did was file a complaint, serve a discovery request, and sit around for confirmatory discovery.

This is hours that were spread over a relatively narrow period of time, and they are the toughest kind of

hours because they're the hours for expedited cases.
Everybody in this room knows that 50 hours makes a big
difference, whether it's the difference between 200 and
250, between 250 and 300, or north of 300.

Also, I take into account that given the size of
the firm at least for a particular period of time as
Mr. Friedlander points out in November, they were fully
committed to this litigation.

The next factor is the contingent nature of the
fee. There are contingent cases and there are contingent
cases. It is a different level of contingency risk when
you hold a diversified portfolio of litigation that you
essentially just file and hold onto and see what hits.
That inventory model is contingent in the same sense that
holding a portfolio of the S&P 500 takes on market risk.
It doesn't take on case-specific all-in contingent fee
risk.

That's what these guys did here, Bouchard
Margules. They went all-in on a concentrated bet, where
they invested a material amount of their firm's resources
to get an outcome. So this is a case where I think the
contingency risk is enhanced.

Results achieved. As I've already said, I think

they largely got everything or most of what they wanted.
Certainly, in the exchange transaction, they got
everything they wanted.

So now how do I price that?  The defense figure of
5.2 shows 2.8 isn't out of whack or off the charts.  The
Globis Capital, Minneapolis v. Ceridian, and Yahoo cases
have been cited to me as comparables, where benefits
generated large awards.  All of those were settlements.
Here, I think there wasn't a settlement.  Here, I think
there was a lot more work.  Here, there was a lot won.

So as I look through this, I think an appropriate
award solely for the invalidation and rescission of the
exchange transaction is 1.7 million.

I am pricing these things separately because I
think that there may be different arguments for the
degree to which they could be included in damages later.
And I'm not making any conclusion on that, obviously.
The Chancellor has moved in that direction with Berger v.
Pubco.  Because I think these could be differently
situated, I'm not doing a single all-in award.  I'm
pricing these phases separately.

But the exchange transaction, I think a reasonable
fee award, given the comparables, given the amount of

work, given the benefits conferred, is 1.7 million.

For knocking out the Crown consent, I think a reasonable amount is 400,000. And I say that because, essentially, although it was a victory, what it really did was delay the Crown strategy until the annual meeting. So it's similar to a deal injunction, and so I draw on that type of precedent by analogy.

Third, the disclosures, again, I think these were meaningful disclosures that corrected what were false and misleading solicitation materials. And so I think an additional 400,000 is appropriate for the disclosures.

So all-in, that gets me to 2.5 million. When I cross-check with hourly rates, it is well within the range of what this Court has passed on in the past as a quantum meruit cross-check.

And finally, as a public policy matter, I do think this is the type of litigation that Delaware needs to reward. This isn't pro forma litigation. This was a strong challenge brought to a transaction where there was, as I've already discussed, real evidence of loyalty breaches; and rescinding the transaction fundamentally changed the corporate governance landscape.

And all this only happened because Bouchard

Margules was willing to assume the risk and go all-in for
at least a period of a month where they dropped
everything and did nothing else, but I think in terms of
a significant commitment for a longer period.

So as a result, I grant a fee award of 2.5
million.  It will be paid within five days of the entry
of an order.

Mr. Friedlander, I ask that you submit a simple
one or two sentence ordered today, upon notice to
Mr. Nachbar, and I'll enter it.

MR. NACHBAR:  Your Honor, I have a procedural
question.  Is there going to be a Rule 54(b)
certification, or is this an order that the company is
required to pay without any right of appeal?

THE COURT:  Well, it's interesting you raise that
because I actually want to hear from you guys on that.  I
thought about it coming in.  I thought about whether I
should certify it.  And the short answer is, I don't
know.  And I haven't had a chance to research it.

So if you all could each give me a little
submission, maybe talk about it, if you agree that it's a
54(b) order, I'm happy to certify it as a 54(b) order;
but I don't have a view off the top of my head as to

whether it should be.

MR. FRIEDLANDER: I apologize for not having briefed it. We did put it in a reply brief. We requested 54(b), so maybe we have agreement.

MR. NACHBAR: I don't think we object to that. We would object, obviously, to any order that required us to pay a significant amount of money like this without having any opportunity to appeal. So I think our view would be either it's an award that doesn't need to be paid until the case is finally adjudicated, which would seem to be contrary to the whole idea of an interim fee award --

THE COURT: Correct.

MR. NACHBAR: -- or there should be a 54(b) certification. And then we can post a bond, if the client chooses to do that, and take our chances on appeal.

THE COURT: Mr. Friedlander?

MR. FRIEDLANDER: I was just going to say, a 54(b) and a stay pending appeal are two completely different things. So a 54(b) I think makes sense, because it's an interim fee award, and also because of the business risk of the company. And we've already been assuming it for

eight or nine months.  Otherwise, I don't know when it would be finally decided.

As for -- I think we should just follow the rules about whether they don't have to pay or can post a bond, in terms of that.  I have to go back and check, but usually for a monetary award, it would have to be bonded.

THE COURT:  Why don't you all talk about that.  I do see the rationale for requiring some security, you know, one could envision either in the form of a bond or in the form of some escrow or something like that.  But why don't you talk about all that in the first instance.

As I said, I think it's clear to me from my experience in CNX Gas, this is not going to be an interlocutory order that I certify.  Because while CNX Gas was turned down, this has none of the factors that I think made CNX Gas worth certifying.

But I do think I have no objection to it being certified as a Rule 54(b).  And certainly, if the parties agree to it, why don't you all just talk about the bond issue or escrow or something on that, and then I will get it done.  All right?

MR. FRIEDLANDER:  Thank you, Your Honor.

MR. NACHBAR:  Thank you, Your Honor.

THE COURT:  Thank you, everyone, for your time today.  I appreciate it, and let me know what needs to be done going forward.

We stand in recess.

(Court adjourned at 12:34 p.m.)

## CERTIFICATE

I, JEANNE CAHILL, Official Court Reporter of the
Court of Chancery, State of Delaware, do hereby certify
that the foregoing pages numbered 1 through 112 contain a
true and correct transcript of the proceedings as
stenographically reported by me at the hearing in the
above cause before the Vice Chancellor in the Court of
Chancery of the State of Delaware, on the date therein
indicated.

IN WITNESS WHEREOF, I have hereunto set my hand
this 21st day of July, 2010.


/s/ Jeanne Cahill
_____
Jeanne Cahill, RDR, CRR
Official Court Reporter
of the Chancery Court
State of Delaware


Certification No. 160-PS
Expiration:  Permanent Status

# EXHIBIT G

## Joel Friedlander

| | |
|---|---|
| **From:** | Joel Friedlander |
| **Sent:** | Tuesday, July 20, 2010 2:23 PM |
| **To:** | Nachbar, Kenneth; 'sgerman@MNAT.com' |
| **Cc:** | Andre Bouchard |
| **Subject:** | EMAK -- proposed Order |

**Attachments:** 07-20-10 Partial Judgment (W0204415).DOC

Ken,

Is this form acceptable?


Joel Friedlander
Bouchard Margules & Friedlander, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
Telephone: (302) 573-3502
Facsimile: (302) 573-3501
Mobile:    (302) 593-3007
jfriedlander@bmf-law.com

--------------------------------------------------------------------

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR
PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE
INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIIED
THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

--------------------------------------------------------------------

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DONALD A. KURZ and SEMS DIVERSIFIED VALUE, LP,　　　)

　　　　　　　Plaintiffs,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
JAMES L. HOLBROOK, JR., *et al.*,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　　　　　　　　　)

JAMES L. HOLBROOK, JR., *et al.*,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Counterclaim-Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
DONALD A. KURZ and SEMS DIVERSIFIED VALUE, LP,　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Counterclaim-Defendants,　　　　　　　)　C.A. No. 5019-VCL
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　and　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
JAMES L. HOLBROOK, JR., *et al.*,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Third Party Plaintiffs,　　　　　　　)
　　v.　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
TAKE BACK EMAK, LLC,　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Third Party Defendants,　　　　　　　)

CROWN EMAK PARTNERS, LLC,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Counterclaim and Third-Party Plaintiff,　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
DONALD A. KURZ, *et al.*,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Counterclaim and Third-Party Defendants.　)

## PARTIAL FINAL JUDGMENT PURSUANT TO RULE 54(B)

IT IS HEREBY ORDERED, this __ day of July, 2010, for the reasons stated on the record

during the hearing held on July 19, 2010, that:

{BMF-W0204415.}

1.      Plaintiffs' amended interim fee application is GRANTED.  EMAK Worldwide,

Inc. shall pay to Bouchard Margules & Friedlander, P.A., counsel for plaintiffs, the sum of

$2,500,000 on or before July 26, 2010.

2.      There is no just reason for the delay of a final judgment implementing this ruling,

and partial final judgment is hereby directed to be entered on this matter pursuant to Rule 54(b).


J. Travis Laster
Vice Chancellor

# EXHIBIT H

**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

J. TRAVIS LASTER
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

July 29, 2010

Joel Friedlander, Esquire
Bouchard Margules & Friedlander
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801

Kenneth J. Nachbar, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1647
Wilmington, DE 19899-1647

RE:   Kurz, *et al.* v. Holbrook, *et al.*, C.A. No. 5019-VCL

Dear Counsel:

In a bench ruling on July 19, 2010, I granted the plaintiffs' application for an interim award of fees and expenses to be paid by EMAK Worldwide, Inc. ("EMAK" or the "Company"). EMAK has taken issue with the form of order. According to EMAK, this Court cannot direct payment of an interim fee award unless the order is certified as a partial final judgment pursuant to Rule 54(b). EMAK protests that it would be "contrary to basic notions of justice" to issue such an order "without any right of EMAK to be heard on appeal prior to the payment." Letter from EMAK's Counsel dated July 26, 2006 at 1 [*hereinafter* Letter].

As the United States Supreme Court has observed, the power to award fees, including interim fees, "is part of the original authority of the chancellor to do equity in a particular situation." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 393 (1970) (quoting *Sprague v. Taconic Nat'l Bank*, 307 U.S. 161, 166 (1939)); *see id.* at 389 (noting a finding of liability under Section 14A of the Securities Exchange Act of 1934 would mean that "petitioners would have been entitled to an interim award of litigation expenses and reasonable attorneys' fees"). A court might grant an interim award of attorneys' fees for many reasons. Fees can be a consequence for bad faith litigation tactics. *See Beck v. Atl. Coast PLC*, 868 A.2d 840, 850-51 (Del. Ch. 2005) (holding that a court may shift attorney's fees "where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs"). Interim awards are commonly used to address discovery conduct. *See* Ch. Ct. R. 37. An interim award can be granted under Rule 11. *See* Ch. Ct. R. 11(c)(2). It can be imposed as a contempt sanction. *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *29 (Del. Ch. Jan. 29, 2010) ("An

July 29, 2010
Page 2 of 5

award of counsel fees is also a proper consideration [as a sanction for civil contempt]."). Various statutes contemplate interim fee awards. *See, e.g., Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (interpreting fee-shifting provision in Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, as authorizing an interim fee award); *Hanrahan v. Hampton*, 446 U.S. 754, 757-58 (1980) (per curiam) (same). As here, an interim award could compensate counsel for conferring a corporate benefit. *See, e.g., La. State Emps. Ret. Sys. v. Citrix Sys., Inc.*, 2001 WL 1131364, at *4 (Del. Ch. Sept. 17, 2001).

But whatever the underlying reason, an interim order awarding fees does not hang in suspension until the entry of a final judgment. A trial court has inherent power to enforce its orders and direct timely payment. *See Forsythe v. CIBC Emp. Private Equity Fund (U.S.) I, L.P.*, 2006 WL 846007, at *2 (Del. Ch. Mar. 22, 2006) ("This court . . . retains inherent authority to enforce its decisions, even in the absence of specific authorization by rule."); *see also Cebenka v. Upjohn Co.*, 559 A.2d 1219, 1225 (Del. 1989) ("[The trial court] has inherent power to enforce its own orders which are issued pursuant to valid authority.") (internal quotations omitted).

For interim fee awards, the Delaware Supreme Court has recognized this power implicitly. In *Minna v. Energy Coal S.p.A.*, 984 A.2d 1210 (Del. 2009), the Delaware Supreme Court affirmed the Court of Chancery's entry of a default judgment as a consequence for the plaintiffs' failure to pay more than $700,000 in attorneys' fees awarded to the defendants as a discovery sanction. *Id.* at 1212, 1214. There was no suggestion in *Minna* that the Court of Chancery lacked authority to require payment of the fee award prior to the entry of a final judgment, or that the Court of Chancery only could create a presently enforceable order by entering a partial final judgment pursuant to Rule 54(b).

Nor does the effectiveness of an order requiring the payment of an interim fee award depend on a party having an immediate right to appeal. If it did, then interim fee awards could not be enforced, because there generally is no basis to appeal from an interim fee award.

> An interim award of attorney's fees may not be immediately appealed as a final judgment because the award lacks the requisite finality. Nor is an interim award appealable as a collateral order, unless it can be shown to be unreviewable on appeal from the final judgment. Similarly, such an award may not be certified for immediate appeal under 28 U.S.C. § 1292(b), because the award does not materially advance the litigation.

10 *Moore's Federal Practice* § 54.158 (3d ed. 1997 & supp. 2010) (footnote omitted).

July 29, 2010
Page 3 of 5

> An interim fee award also generally cannot be certified pursuant to Rule 54(b):

> Rule 54(b) does not give district judges carte blanche to make interlocutory orders final and therefore appealable. It merely empowers them to make appealable orders that finally dispose of a separate claim or separate party. ... Ordinarily an award of attorney's fees in a case that has not been completed is merely an interim award of fees, and an interim award of fees is interlocutory and non-appealable unless the award is made in circumstances in which the party against whom the award is made will not be able to get his money back if he prevails at the end of the case and the award is vacated then. Apart from this exception, an interim award of fees cannot be thought the final disposition of a separate claim, and therefore Rule 54(b) cannot be used to make the award appealable.

*Estate of Drayton v. Nelson*, 53 F.3d 165, 167 (7th Cir. 1994) (Posner, J.) (citations omitted).[1]

Although our courts have not considered the precise question raised by this case, the Delaware Supreme Court has held that an interim fee award under 19 *Del. C.* § 2350(f) is interlocutory. *Playtex Prods., Inc. v. Roland*, 841 A.2d 308, 2004 WL 220332, at *1 (Del. Feb. 2, 2004) (ORDER). "Section 2350(f) provides, in part, that the Superior Court may allow a reasonable fee to claimant's attorney for services on appeal from an Industrial Accident Board decision." *Id.* n.2. In *Playtex*, the Superior Court remanded the underlying cases to the Industrial Accident Board for further proceedings, and thus the fee award for the appeal was an interim award. *See id.* The appellant argued that the fee award was not interlocutory because the award was severable and could be enforced against the appellant as a separate judgment. *Id.* The Supreme Court rejected this view, stating that although the award "becomes a fixed entitlement as of the date of the order, the order itself is interlocutory. . . ." *Id.*

The Delaware Supreme Court similarly rejected an appeal from an interim fee award in *Pollard v. The Placers, Inc.*, 692 A.2d 879 (Del. 1997). There, the appellant

---

[1] *Accord Cleveland Hair Clinic, Inc. v. Puig*, 104 F.3d 123, 126 (7th Cir. 1997) (Easterbrook, J.) (rejecting principle that "any order requiring immediate payment also is immediately appealable" in favor of rule that "immediate appeal is proper only if there is reason to be concerned that payment would be irreversible because the prevailing party will be unable or unwilling to repay if the award is ultimately altered"); *see, e.g., In re: Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 156-59 (3d Cir. 2005) (holding that interim fee award was not appealable final order nor appealable collateral order); *Petties v. District of Columbia*, 227 F.3d 469, 472-73 (D.C. Cir. 2000) (same); *Shipes v. Trinity Indus., Inc.*, 883 F.2d 339, 341-44 (5th Cir. 1989) (same).

July 29, 2010
Page 4 of 5

sought to certify the award for interlocutory appeal. The Supreme Court held that the
interim award did not meet the requirements of Rule 42. *Id.* at 881. The Supreme Court
further noted that "apart from the application of Rule 42, an aggrieved party has the
assurance that an unappealable interlocutory order is preserved for review upon the entry
of a final judgment." *Id.* By statute, the "failure to appeal from an interlocutory order,
judgment or decree of the Court of Chancery or Superior Court shall not bar a party from
making any objection to such interlocutory order, judgment or decree on appeal from the
final order, judgment or decree." 10 *Del. C.* § 144. The *Pollard* Court relied on this
statute as further support for its decision not to entertain a separate appeal from the
interim fee award. 692 A.2d at 881.

The Delaware Supreme Court's holdings in *Playtex* and *Pollard* comport with its
strong policy against piecemeal appeals. As then Vice Chancellor, now Chief Justice
Steele observed, "[t]here can be no mystery about the relative weight the Supreme Court
places on its policy against piecemeal appeals and of avoiding judicial inefficiency in the
Court below." *Emerald P'rs v. Berlin*, 1996 WL 361510, at \*3 (Del. Ch. June 25, 1996);
*accord In re Tri-Star Pictures, Inc. Litig.*, 1989 WL 112740, at \*1 (Del. Ch. Sept. 26,
1989) (noting Delaware's "long established policy against piecemeal appeals"); *see, e.g.,
In re CNX Gas Corp. S'holders Litig.*, 2010 WL 2690402 (Del. July 8, 2010) (ORDER)
(declining to accept interlocutory appeal to address standard of review for controlling
stockholder's unilateral two-step freeze-out because "[t]he issues raised in this
application should be addressed after the entry of a final judgment").

Additionally, EMAK's notion of a "right . . . to be heard on appeal prior to the
payment," Letter at 1, conflicts with the general rule that filing an appeal does not
automatically stay the judgment of the trial court. *E.g., Sannini v. Casscells*, 401 A.2d
927, 929 (Del. 1979) (citing Del. Const. Art. IV, § 24). Assuming hypothetically that the
interim fee award could be entered as a partial final judgment, EMAK would not be
entitled automatically to an appeal prior to payment. Absent a stay pending appeal,
EMAK would be required to comply with the order.

Applied to the current case, these authorities establish that EMAK can be directed
to pay the interim fee award now, that an immediate right of appeal is neither required
nor warranted, and that the fee award can be reviewed on appeal from the final order in
the case and recovered at that time if altered or set aside. There has been no suggestion
that plaintiffs' counsel cannot repay the award if it is later modified. For its part, EMAK
has not hesitated to pay its own counsel and Crown's counsel over $5 million to litigate
against the plaintiffs. EMAK also has paid significant bonuses to senior management
during this corporate control dispute, including to individuals whose loyalty to the
corporation has been called into question by the considerable evidentiary record
developed by the plaintiffs.

July 29, 2010
Page 5 of 5

Consequently, I have entered an order requiring EMAK to pay the interim fee award within five days. I decline to certify the order as a partial final judgment pursuant to Rule 54(b).

Very truly yours,

*/s/ J. Travis Laster*

J. Travis Laster
Vice Chancellor

JTL/krw

# EXHIBIT I

**Fox, Wang & Morgan P.C.**

# Memo

**To:** EMAK Personnel Review Committee

**From:** Fox, Wang & Morgan P.C

**Date:** 3/23/2010

**Re:** Termination of Jim Holbrook

---

On February 9, 2010, the EMAK Personnel Review Committee ("Committee") engaged Fox, Wang & Morgan P.C. to undertake an investigation relating to the conduct of EMAK CEO Jim Holbrook. Specifically, the Committee asked whether grounds existed to terminate Mr. Holbrook for "cause" pursuant to Paragraph 4(c) of his Employment Agreement (see **Attachment 1**). Based on information we have gathered as a result of our investigation into this matter, we have concluded that the Board has six distinct grounds to terminate Mr. Holbrook for cause were it the Board's decision to do so.

Attached is a summary of our analysis of the substantive facts, which we have previously discussed in detail with the Committee and later with the full EMAK Board of Directors.

## I.    SUMMARY OF CONCLUSIONS

1.  EMAK may terminate Mr. Holbrook for "cause" as a result of both disparaging and improper statements and animosity Mr. Holbrook exhibited towards EMAK's primary customer Burger King, and which conduct reflected adversely on EMAK.

2.  EMAK may terminate Mr. Holbrook for "cause" based on his false statements to an EMAK Board member constituting both unethical behavior and conduct reflecting adversely on EMAK.

3.  EMAK may terminate Mr. Holbrook for "cause" for "grossly negligent" conduct in orchestrating a stock exchange transaction in violation of Delaware law and without adequate inquiry into the legality of his actions and which failure to inquire benefitted him personally to attempt to stop his personal nemesis Don Kurz from gaining control of EMAK's Board.

1

4. EMAK may terminate Mr. Holbrook for "cause" for "gross negligence" in failing to timely inform the Board of the fracture in his relationship with Burger King and the deteriorating business relationship with Burger King and the enterprise-threatening result to EMAK that fracture and deterioration portended.

5. EMAK may terminate Mr. Holbrook for "cause" for "gross negligence" in failing to appropriately maintain EMAK's relationship with Burger King, even though Burger King accounted for over half of EMAK's revenues.

6. EMAK may terminate Mr. Holbrook for "cause" for "gross negligence" due to his failure to offer to resign as CEO for the benefit of EMAK shareholders and employees at a time his resignation could have maintained EMAK's relationship with Burger King.

## II.    INVESTIGATOR BACKGROUNDS

Fox, Wang & Morgan P.C. is a law firm established January 1, 2010. The practice is made up of the former Employment Law practice group of the Palo Alto office of Manatt, Phelps & Phillips LLP, an AmLaw 200 firm.

John C. Fox is an attorney specializing in employment law full-time throughout his 33 year legal career. Mr. Fox previously chaired the Employment and Labor practice at Fenwick & West LLP, and thereafter the Employment Practice at Manatt, Phelps & Phillips LLP. Mr. Fox also teaches employment law to practitioners, from Continuing Legal Education courses to public seminars that non-profit seminar companies sponsor. Mr. Fox's practice includes providing counsel and litigating on behalf of clients ranging from high-tech startup companies to Fortune 10 corporations on all aspects of employment law, including "cause/good reason" issues, typically in the context of executive employment contracts. In 2005, Mr. Fox was the California Employment Law Expert Witness offering testimony on behalf of the Board of Directors of The Walt Disney Company in the shareholder derivative lawsuit challenging Disney's estimated $140 million severance package paid to its former President Michael Ovitz.

Jay J. Wang has practiced as an attorney since 2000, including specializing in employment law full-time since 2003. Mr. Wang was previously an associate with Fisher & Phillips LLP, a national firm specializing solely in labor and employment law, before joining Manatt, Phelps & Phillips LLP in November 2005. Mr. Wang is a frequent speaker on employment law issues for the Santa Clara County Bar Association, and currently serves as Chairman of the Labor and Employment Law section of the Santa Clara County Bar Association. Mr. Wang has participated in numerous investigations regarding cause/no cause termination decisions.

Alexa L. Morgan has practiced since 2004, and has specialized in employment law full-time since 2007. Prior to joining Manatt, Ms. Morgan was an associate with

Gibson, Dunn & Crutcher LLP, an AmLaw 100 international firm.  Ms. Morgan has also participated in investigations related to cause/no cause termination decisions.

## III.    SUMMARY OF INFORMATION

### Available Documents and Information

We had the unusual advantage in this investigation to instant access to many hundreds of pages of well organized documents developed in part in prior litigation involving EMAK and Mr. Holbrook's conduct and gathered in part from EMAK senior executives and Members of its Board.  We also interviewed various individuals identified in this report.  However, two individuals, Brian Carter and Kevin Whitaker, refused to fully cooperate in this investigation after expressing fear of retaliation from Mr. Holbrook.   This concern arose not only as to Mr. Whitaker's remaining employment at EMAK, but both men expressed concern that Mr. Holbrook would withhold bonus and severance payments EMAK had promised them.  Also, Mr. Holbrook declined to cooperate with this investigation upon the instructions of his lawyers.  In addition, we consciously chose not to interview any witnesses at Burger King for fear of injecting ourselves into an already highly fragile business relationship some senior EMAK managers believe EMAK might yet still be able to salvage.

### Holbrook Employment Agreement

Of interest to this investigation is the Employment Agreement between Mr. Holbrook and EMAK related to Mr. Holbrook's employment as Chief Executive Officer. Mr. Holbrook signed the Agreement on or about November 9, 2005.  Paragraph 4(c) of Mr. Holbrook's Employment Agreement reads in relevant part as follows:

"The employment of the Executive under this Agreement may be terminated by the Company upon written notice from the Board that Cause exists for termination.  For the purposes of this Agreement, the term "Cause" shall mean that, in the opinion of the Board, the Executive has (i) refused or failed to perform, to the reasonable satisfaction of the Board, any duties assigned to the Executive by the Board (consistent with his Chief Executive officer position) or contemplated or obligated under this Agreement, provided that such refusal or failure is not curable or cured within ten (10) days after written notice thereof from the Company specifying such refusal or failure in reasonable detail, (ii) committed a breach of the terms of this Agreement or any other legal obligation to the Company, provided that such breach is not curable or cured within ten (10) days after written notice thereof from the Company specifying such breach in reasonable detail, (iii) failed to perform any of the Executive's obligations under the Confidentiality Agreement, (iv) demonstrated gross negligence or willful misconduct in the execution of the Executive's duties, (v) been convicted of or pleaded nolo contendere to a felony or other serious crime, (vi) repeatedly and intemperately used alcohol or drugs in a manner that interferes with the

performance of Executive's duties, (vii) engaged in business practices or personal conduct which, in the reasonable opinion of the Board, are unethical or reflect adversely on the Company, (viii) misappropriated assets of the Company; (ix) been repeatedly absent from work during normal business hours for reasons other than disability, appropriate vacation, or sick time; or (x) improperly used any former employer's trade secrets.

For the purposes of this Section, no act or failure to act on Executive's part shall be considered "willful" unless it is done, or omitted to be done, by him in bad faith or without reasonable belief that his action or omission was in the best interests of the Company. Any act or failure to act by Executive that is either based upon authority given pursuant to a resolution duly adopted by the Board, or based upon the advice of counsel for the Company, and that does not violate law or Executive's fiduciary obligations to the Company shall be presumed to be done, or omitted to be done, in good faith and in the best interests of the Company."

Based on the foregoing terms, we believe Mr. Holbrook has violated sections (iv) and (vii) of Paragraph 4(c) by demonstrating "gross negligence" and "willful misconduct", and has engaged in business practices and personal conduct that was "unethical" and in some cases reflected "adversely" on EMAK.

### Mr. Holbrook Engaged in Business Practices which Reflect Adversely on EMAK

As Mr. Holbrook's agreement provides, "cause" for termination exists if Mr. Holbrook engaged in business practices or personal conduct, which in the reasonable opinion of the Board, are "unethical" or "reflect adversely" on EMAK. There are two distinct situations in which Mr. Holbrook engaged in conduct that "reflected adversely" on EMAK, one of which also manifested Mr. Holbrook's unethical behavior. Too, a recurring theme is that Mr. Holbrook's inappropriate conduct often occurs when his self-interest is at stake and he engages in self-interested decision-making at the expense of his overriding obligations to EMAK and its Shareholders.

### A. Inappropriate Behavior Towards EMAK's Largest Customer

First, during his tenure as CEO, Mr. Holbrook disparaged representatives of Burger King, EMAK's largest customer and the source of approximately 55% of all of EMAK's revenues. Rather than attempt to resolve any issues between Burger King and EMAK, Mr. Holbrook dismissed Burger King's concerns and refusal to work with him as a personality flaw of Burger King marketing representatives.

Beginning in late 2007, with the departure of two EMAK employees that served as the contact representatives for the Burger King account, Burger King became unhappy with Mr. Holbrook and his efforts directed towards Burger King. Yet, as early

as March 28, 2008, Mr. Holbrook noted in a written communication that Burger King was acting "irrationally" and that Burger King was "out to get" EMAK. In other words, rather than to work with Burger King to maintain relations with EMAK's most important customer, Mr. Holbrook reacted defensively to Burger King's disenchantment with him, attacked the customer and accused it of wrongdoing and of engaging in a vendetta.

This animosity on the part of Mr. Holbrook did not go unnoticed at Burger King. As a result of his attitude toward Burger King, it was well known in the industry that Burger King was actively considering terminating its 25 year relationship with EMAK, was shopping its business to other competitors of EMAK and was offering an open competition to service it's business. [1] In visits to Burger King in April 2008 and March 2009, Mr. Holbrook's attitude and conduct prompted Burger King management to inform EMAK employees, such as Brian Carter, EMAK's co-head of the Production business, that EMAK had "hired the wrong guy."

Indeed, in the aftermath of the loss of the Burger King account, Mr. Holbrook's response was to send a letter to Burger King dated December 10, 2009 (see **Attachment 2**) in which he again attacked the customer by accusing Burger King's former Chief Marketing Officer (Russ Klein) of unethical conduct in terminating EMAK. Rather than attempt to win back Burger King with conciliation, as one would expect in seeking to calm a customer which did not like the CEO of one of its vendors and his inability to interact with its senior managers, Mr. Holbrook instead attacked and disparaged one of Burger King's senior managers. Such behavior and conduct not only notes an inability on the part of Mr. Holbrook to extend cooperative support to EMAK customers, but left an impression that adversely affected EMAK because of its "We can do no wrong" and "holier than thou" attitude.

## B. Fraudulent Misrepresentations to EMAK Board Member

Another independent example of unethical or improper personal conduct that both reflects poorly on EMAK and was unethical behavior is Mr. Holbrook's surprising misrepresentations to EMAK Board Member Mr. Phil Kleweno during the course of Fox, Wang & Morgan P.C.'s investigation. Lying, and lying on so many fronts to an EMAK Board member, is inappropriate and unethical behavior reflecting poorly on EMAK and subjecting Mr. Holbrook to termination for "cause".

---

[1] Brian Carter advised both Mr. Kurz and the EMAK Board that Mr. Holbrook and third parties knew no later than March 2009 of the strained relations between Burger King and EMAK, and that Burger King would most likely sever its agreement with EMAK. Mr. Carter's notification to Mr. Holbrook included rumors that other competitors of EMAK were looking to pitch their business to Burger King. Furthermore, this investigation included an interview of Leeton Lee, a former EMAK employee and current Vice-President of Business Affairs for STR, Inc., a vendor that supplies market testing services to Burger King. Mr. Lee was the initial source who informed Mr. Kurz of the soured relationship between Burger King and Mr. Holbrook in August 2009. Mr. Lee, speaking on behalf of himself only, and not in his capacity at STR, Inc., stated that it was well known in the industry approximately a year prior to the August 2009 EMAK Board meeting that Burger King was accepting bids from EMAK competitors for EMAK business.

On Wednesday, February 17, 2010, John Fox and Jay Wang initiated contact with Mr. Holbrook seeking to question him regarding matters related to the Burger King account as part of their investigation. Rather than respond to any questioning, Mr. Holbrook insisted that Fox, Wang & Morgan permit two of his personal lawyers to attend the interview and to coach him and to object to questions. Mr. Holbrook also insisted to impasse that Fox, Wang & Morgan supply him in writing and in advance of the interview with the very questions Fox, Wang & Morgan wished him to answer.

Mr. Fox explained to Mr. Holbrook that while he was not legally entitled to receive questions beforehand or have his counsel present as part of an internal investigation, Mr. Fox would nonetheless extend "professional courtesy" to both Mr. Holbrook and his two lawyers and permit them to attend his interview. Specifically, Mr. Fox repeatedly told Mr. Holbrook his lawyers could attend the interview so long as they did not attempt to influence it by either communicating with Mr. Holbrook while Mr. Fox was interviewing him or to object to questions in the way of a deposition.[2]

Despite his refusal to respond to questioning, Mr. Holbrook proceeded to send a communication to Phil Kieweno (see **Attachment 3**), an EMAK Board member, in which Mr. Holbrook simply repeatedly misrepresented to Mr. Kieweno many material facts discussed during the call. Such fraudulent misrepresentations regarding an investigation in which Mr. Holbrook is obligated to participate as an EMAK employee violates section (vii) of Paragraph 4(c) of his Employment Agreement. The following is a list of material facts Mr. Holbrook misrepresented to Mr. Kieweno to forestall the Committee's interview of his handling of the Burger King account:

1.  Mr. Holbrook's statement that he did not know who Mr. Fox or Mr. Wang were, despite Mr. Kieweno's prior voicemail instructing him to speak to Mr. Fox, Mr. Fox's explanation to Mr. Holbrook while on the phone and Mr. Holbrook's previous Google search concerning Mr. Fox;

2.  Mr. Holbrook's statement to Mr. Kieweno that Mr. Fox had forbidden him (Mr. Holbrook) to bring his lawyers to the interview, even though Mr. Fox had specifically repeatedly explained to Mr. Holbrook on the call that while he had no legal right for counsel to be present, Mr. Fox would extend professional courtesy to Mr. Holbrook and his two lawyers

---

[2] EMAK is a Delaware corporation and Mr. Holbrook's Employment Agreement is governed by California law. Accordingly, please see *Boulware v. Battaglia*, 344 F. Supp. 889 (D. Del. 1972) [no Constitutional right to counsel in non-criminal matters]; see also *Los Angeles Police Protective League v. Gates*, 579 F. Supp. 36 (C.D. Cal. 1984) [no right to counsel present during internal investigation involving potential criminal activity in absence of criminal proceedings]. Moreover, employees are required to cooperate in an investigation or be subject to disciplinary action. *Hingsbergen v. State Personnel Board*, 240 Cal. App.2d 914, 920-921 (1966) [affirming portion of Personnel Board's decision finding that former employee's refusal to answer questions except on conditions advised by his counsel was sufficient ground for termination].

● Page 6

to permit them to attend with the proviso that they not interfere with the interview.

3.  Mr. Holbrook's statement that he did not know who retained Fox, Wang & Morgan P.C., despite Mr. Kleweno's voicemail to Mr. Holbrook so advising and Mr. Fox's statement to Mr. Holbrook that the Personnel Review Committee had retained Fox, Wang & Morgan P.C. to undertake an investigation of his conduct;

4.  Mr. Holbrook's representation that Mr. Fox indicated he would inform the Board that Mr. Holbrook "will never be cooperative" if he did not respond to questioning despite the fact no such statement was ever made;

5.  Mr. Holbrook's assertion that he was being accused of criminal conduct and that his refusal to respond to questioning would result in a report to the Committee that Mr. Holbrook had committed some crime, even though the phrase "criminal" or "crime" was never mentioned nor ever broached on the call with Mr. Holbrook;

6.  Mr. Holbrook's statement to Mr. Kleweno that he would have to walk out of business obligations to respond to questioning, contrary to precisely the opposite information he supplied Messrs. Fox and Wang, who asked Mr. Holbrook when it would be convenient to speak and not interfere with his business activities and who set "time-calls" with Mr. Holbrook at the precise times Mr. Holbrook suggested were available to him free from client obligations; and

7.  Mr. Holbrook's extremely poor judgment to involve EMAK clients in his dispute with the Personnel Review Committee undertaking its investigation of his handling of the Burger King account. Specifically, Mr. Holbrook took Mr. Fox's call in Dallas on the evening of Wednesday February 17, as scheduled, but at a time Mr. Holbrook was sitting with EMAK clients (unbeknownst to Mssrs. Fox and Wang, even after Mr. Fox began the call by asking Mr. Holbrook "Is this still a good time to talk as we discussed earlier today"?). Eventually, Mr. Holbrook revealed the presence of the clients listening to his (Mr. Holbrook's) half of the conversation in Dallas by suddenly and ruefully offering in jest to go forward at that time with the interview if he were to put his cell phone on "speakerphone" and "let

the clients sitting here with me hear how you are destroying the company."[3]

### Mr. Holbrook Committed "Gross Negligence"

EMAK may also terminate Mr. Holbrook for "cause" pursuant to section (iv) of Paragraph 4(c) of his Employment Agreement because Mr. Holbrook engaged in "gross negligence" and "willful misconduct."

Under California law, the term "gross negligence" generally describes intentional acts so unreasonable and so dangerous that the actor knows, or should know, it is highly probable that serious harm will result. *Coit v. Western Union Tel. Co.*, 130 Cal. 657, 664-665 (1900) ['"Gross negligence' is the entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there is an entire indifference to the interest and welfare of others"]. In describing the mental state of the actor in finding intentional or willful conduct, the California Court of Appeal held that there is an "absence of any care on the part of a person having a duty to perform to avoid inflicting an injury to the person or property rights of another." *Helme v. Great Western Milling Co.*, 43 Cal. App. 415, 420-421 (1919). In other words, the individual must act recklessly or wantonly, or fail to act to avoid doing such injury. *Id.*

There are four unique instances where Mr. Holbrook's conduct rises to the level of "gross negligence" within the meaning of his Employment Agreement and subjecting him to termination for "cause".

A. Failing to Timely Inform the Board of Deterioration of Relationship with EMAK's Largest Customer

By failing to keep the Board of Directors informed as to the status of EMAK's deteriorating relationship with Burger King, which represented approximately 55% of EMAK's total revenue, Mr. Holbrook committed "gross negligence" in failing to provide the Board of Directors an opportunity to repair the Burger King relationship.

As early as 2007 Mr. Holbrook knew that Burger King was unhappy with EMAK and was considering terminating its relationship with EMAK. In late 2007, Jon Banks

---

[3] We have not recommended that the Committee could find "cause" at this time to terminate Mr. Holbrook because of Mr. Holbrook's refusal to sit for interview as his duty of loyalty would otherwise compel. While Mr. Holbrook's refusal to cooperate with the Committee could be grounds to terminate with "cause", Mr. Holbrook's Employment Agreement contains several procedural prerequisites the Committee has not yet satisfied with respect to Mr. Holbrook's disloyalty, however contumacious, behavior. Specifically, Section (i) of Paragraph 4(c) of Mr. Holbrook's Employment Agreement notes that cause exists for termination upon Mr. Holbrook's failure perform duties the Board assigns to Mr. Holbrook, provided such refusal or failure is not curable or cured within ten (10) days of written notice thereof. As EMAK has not yet provided written notice to Mr. Holbrook requiring him to comply with the investigation, Mr. Holbrook is not yet in breach of his Employment Agreement. However, once EMAK's Board were to provide such written notice, and if Mr. Holbrook were to continue to refuse to participate in the investigation for a period of at least 10 days, the Committee would have another basis to find "cause" to terminate Mr. Holbrook.

and Kim Thompson, EMAK employees who were Burger King's primary contacts at EMAK, left the company to form their own marketing agency. Instead of working with Burger King to support Mr. Banks and Ms. Thompson, Mr. Holbrook engaged in conduct that resulted in Burger King's animosity towards Mr. Holbrook and his business practices. In his December 10, 2009 letter to the Burger King Audit Committee, Mr. Holbrook conceded he knew that Burger King was unhappy with him as early as 2007. However, at no time did Mr. Holbrook advise EMAK's Board of Directors about the relationship problem festering and growing at Burger King so an attempt could be made to repair this vital quarter-century relationship.

The aforementioned concession is not the only evidence that Mr. Holbrook was aware of Burger King's longstanding dissatisfaction even while still failing to inform the EMAK Board in any way about it. Both Brian Carter and Kevin Whitaker reported that several sources in the industry noted problems between Burger King and EMAK approximately 12-15 months prior to August 2009 (as early as June –August 2008). In fact, Mr. Carter noted at the EMAK Board meeting on August 15, 2009 that he informed Mr. Holbrook of the potential loss of the Burger King business after hearing from sources in the industry of EMAK's tenuous position. Those communications Mr. Carter is known to have relayed include information from a competing marketing agency, Wunderman, and Burger King's own statements to Mr. Carter regarding its dissatisfaction with Mr. Holbrook. Not only does Mr. Carter's information at the Board meeting support the fact Mr. Holbrook knew of the Burger King situation, but Jordan Rednor's e-mail communication of August 21, 2009 (see **Attachment 4**) confirmed that Mr. Holbrook admitted to the Board that Mr. Holbrook knew about Burger King issues for months before Mr. Kurz also discovered the rift and brought the matter to the Board's attention. Finally, Mr. Holbrook's own September 7, 2009 communication (see **Attachment 5**) to the EMAK Board admitted that the risk of EMAK losing Burger King's business "is real, and has been real since Jon and Kim's departures" [in 2007].

Yet, despite all these warnings, and Mr. Holbrook's own knowledge of the deteriorating situation, at no point did Mr. Holbrook inform the EMAK Board, let alone seek the EMAK Board's advice or counsel. At no point did Mr. Holbrook provide notice to the EMAK Board so that EMAK could prepare to respond to Burger King's concerns, or manage business at EMAK in anticipation of such revenue loss. In fact, EMAK's Board did not become aware of concerns with the Burger King account until after Mr. Kurz brought them up following a conversation he had on August 4, 2009 with Leeton Lee, an employee of a Burger King vendor that supplies market testing services to Burger King. It would appear that Mr. Holbrook's attempts to keep the Burger King situation secret was for no other purpose than to hide his mismanagement of the account.[4]

---

[4] Don Kurz' notes regarding the August 15, 2009 Board meeting and subsequent discussions regarding the Burger King account evidence that Burger King informed Mr. Carter and Mr. Whitaker that the deteriorating relationship was due to their dissatisfaction with Mr. Holbrook personally, rather than any other EMAK issue.

B. <u>Failing to Appropriately Maintain EMAK's Relationship with
Burger King even though Burger King Accounted for Over Half of
EMAK's Revenue</u>

Separate and distinct from Mr. Holbrook's failure to inform the Board of
EMAK's issues with Burger King, Mr. Holbrook committed "gross negligence" in his
efforts to keep the Burger King business.

The documentary evidence clearly establishes that Burger King was
dissatisfied with Mr. Holbrook. Mr. Holbrook admits as much in his December 10,
2009 letter to Burger King, and Mr. Carter and Mr. Whitaker's reports to the Board
confirm Burger King's sentiment towards Mr. Holbrook. Howard Bland, a Board
member supportive of Mr. Holbrook, also advised Mr. Kurz on August 17, 2009 that
Mr. Holbrook had a bad relationship with Burger King. Yet, Mr. Holbrook did nothing
to remedy Burger King's concerns regarding him. Mr. Holbrook knew the issue was
about him and his poor relationship with Burger King's senior management and former
EMAK personnel, yet he intentionally did nothing to cure his defects in the eyes of
Burger King.

In fact, the evidence is that Mr. Holbrook's alleged efforts to work with Burger
King merely resulted in Burger King confiding to EMAK employees that EMAK had
"hired the wrong guy." Mr. Kurz's notes of conversations (see **Attachment 6**) he had
with Mr. Carter and Mr. Whitaker establish that the only solution Mr. Holbrook offered
in response to Burger King's concerns was to focus on offering Burger King lower
rates in an effort to improve the relationship. However, given the evidence that clearly
establishes Mr. Holbrook knew he was the issue, Mr. Holbrook intentionally did not act
on the true issue, even though he knew such avoidance would permanently damage
Burger King's relationship with EMAK.

Mr. Holbrook knew that his efforts, or lack thereof, would result in serious harm
and injury to EMAK because he knew he was the issue with the Burger King account,
yet did nothing to address Burger King's concerns either by removing himself from the
account or addressing whatever issues Burger King had with his service. By failing to
address the very issue Burger King had with EMAK, Mr. Holbrook's intentional inaction
appears to have played a major role in EMAK's loss of the Burger King account.
Indeed, evidence of the half-hearted effort Mr. Holbrook mounted to save the Burger
King business, even after he was aware that business was in jeopardy, is that he
visited Burger King in Miami on only four occasions in 2008 and 2009 (before the loss
of the business in the Fall of 2009). Indeed, the frequency of his previously (quarterly)
trips decreased markedly as his relationship with Burger King soured in 2007 and
2008. Rather than drawing the customer closer, Mr. Holbrook stayed away and
distanced himself from Burger King, eventually leading to a 9 month hiatus in visits to
Burger King at the critical period of time between August of 2007 and March of 2008
and at a time he was representing to the Board that he traveled "quarterly" to Miami.

### C. Failing to Offer His Resignation as CEO to Save the Burger King Account for the Benefit of EMAK Shareholders and Employees

Finally, once Mr. Holbrook knew that his standing with Burger King was untenable, Mr. Holbrook committed "gross negligence" by failing to offer his resignation to the Board of Directors for the benefit of EMAK shareholders and employees. Upon realizing that his continuing presence at the helm of EMAK would result in the loss of 55% of EMAK's business, Mr. Holbrook should have offered his resignation. His intentional failure to do so directly resulted in the loss of 55% of EMAK's total revenue, which Mr. Holbrook knew or should have known would occur should he continue to preside over EMAK.

Mr. Holbrook knew that Burger King disapproved of him and disliked him. On March 25, 2008 Mr. Holbrook sent an e-mail noting that Burger King's Vice-President of Marketing was "out to get" EMAK. In 2008 Peter Ackerman allegedly told Mr. Holbrook to prepare for the loss of Burger King as a customer. Mr. Carter and Mr. Whitaker confirmed during the August 15, 2009 Board call that Burger King had bad will towards Mr. Holbrook personally. Mr. Holbrook's December 10, 2009 letter to Burger King relates several incidents where Burger King expressed animus towards Mr. Holbrook.

Yet, Mr. Holbrook provided no solution or resolution to the situation to the benefit of EMAK. Given that Burger King did not wish to continue a business relationship with Mr. Holbrook personally, Mr. Holbrook should have attempted to save EMAK's position with Burger King by offering to resign his position and eliminate the source of discontent. Instead, Mr. Holbrook never even informed the EMAK Board of Directors of the long brewing problem with Burger King, let alone offer his resignation to the EMAK Board in the best interests of the Corporation, its shareholders and employees. Again, Mr. Holbrook chose the course which personally benefitted him the most, even if not the best interests of the corporation.

### D. Orchestrating a Stock Exchange Transaction Without Due Care and for his Own Benefit Rather than the Benefit of EMAK Shareholders and Employees

Mr. Holbrook's attempt to execute a stock exchange transaction that benefitted Crown EMAK Partners, LLC ("Crown") and himself constituted both "gross negligence" based on his entire indifference to and mishandling of the "exchange transaction" and "willful misconduct" (based on his desire to further his own personal interests to maintain his position at EMAK, to the detriment of EMAK's common shareholders and employees.)

In April and September 2009, Don Kurz, EMAK's largest common stockholder, called for the termination of Mr. Holbrook. This effort resulted in shareholders who owned a sizable portion of the common stock filing a stockholder action and pursuing a consent solicitation to remove and replace Mr. Holbrook, among others.

Realizing there could be sufficient votes among the common shareholders to oust him as CEO, Mr. Holbrook entered into negotiations with Crown to convert the Series AA Preferred Stock Crown held to Series B Preferred Stock. As Series B Preferred Stock, Crown would be able to vote with holders of common stock in the election of Directors, and the Series B Preferred Stock made certain alterations to the "change of control" provisions in the Series AA Preferred Stock.

The effect of the stock exchange was to grant Crown a 28% voting block in the election of Directors. The documentary evidence suggests Mr. Holbrook's conduct was motivated by his own personal aspirations to fend off the consent solicitation shareholders representing over a third of the common stock sought to enact.

For example, on September 7, 2009, Mr. Holbrook wrote, "What Peter wants to do is to be able to not let Don get control of the board . . . So we could do something like he proposed, or something simple like giving him voting rights in return for a standstill." Subsequently, on September 24th (see **Attachment 7**), Mr. Holbrook further wrote, "I suspect that Don's group may buy shares after any BKC announcement, assuming the price drop." As a result of this concern, a mere two hours later, Mr. Holbrook drafted a press release for EMAK to issue in which EMAK notes that it has provided full voting rights to CROWN (see **Attachment 8**). These communications clearly establish that Mr. Holbrook's intent in permitting the stock exchange was to stymie Mr. Kurz's efforts to terminate him as CEO.

Any assertion that Mr. Holbrook's intent was not motivated by his desire to retain his position is unsupported by the evidence. The claimed justification for the exchange transaction was to allegedly "better align the interests of Crown and the common stockholders." Despite this representation, the exchange transaction did not align the economic interests of the common stock and Crown, since Crown still possessed a $25 million redemption right and far-out-of-the-money warrants and conversion rights.

Regardless of his intent, Mr. Holbrook's orchestration of the stock exchange also constituted "gross negligence" based on his failure to adequately discharge his duties to determine the lawfulness of the stock exchange. Specifically, after being put on specific written notice (see **Attachment 9**) that the stock exchange would violate Delaware law, Mr. Holbrook failed to give due attention to verify the legality of the transaction. Rather, upon reading the written communication challenging the transaction as violative of Delaware law and citing to a case decision (*Blasius*) represented to be directly on point, Mr. Holbrook did not even discuss this concern with counsel. Rather, Mr. Holbrook delegated the matter to corporate counsel and did not follow-up in any way with counsel to become satisfied as to how the stock exchange would avoid the strictures of the *Blasius* decision. This was at best a complete indifference and inattention to an important duty (an "Ostrich head in the sand" approach to the matter) in which Mr. Holbrook "looked away" at a critical time as to a critical issue of great interest and with much potential for financial and operating harm to EMAK and while furthering his self-interest to remain in charge. At worst, Mr.

Holbrook's decision making was willful misconduct trying to rush through an illegal conversion to "feather his nest" and thwart his nemesis, Mr. Kurz.

As such, Mr. Holbrook engaged in "gross negligence" and/or "willful misconduct" by failing to giving due care to either become familiar with the *Blasius* decision or to at least demand an explanation of counsel as to how his legal research and advice squared with the *Blasius* decision. On such an important issue, the CEO is not at liberty to simply delegate the entire matter and shed responsibility entirely while casting a "blind eye" to matters of such great significance to the corporation.

## IV.    CONCLUSION

Based on the foregoing, Fox, Wang & Morgan P.C. respectfully submits that "cause" exists to terminate Jim Holbrook from his position of EMAK Chief Executive Officer.  Should you have any further questions or comments, please do not hesitate to contact us.

J.C.F.

J.J.W.

A.L.M.

## Attachments

Attachment 1: Jim Holbrook Employment Agreement

Attachment 2: 12-10-09 Letter to Burger King from Jim Holbrook

Attachment 3: 2-17-10 E-mail from Jim Holbrook to Phil Kleweno

Attachment 4: 8-21-09 E-mail from Jordan Rednor

Attachment 5: 9-7-09 E-mail from Jim Holbrook to Board

Attachment 6: Don Kurz' notes of conversations

Attachment 7: 9-24-09 E-mail from Jim Holbrook to Board

Attachment 8: 9-24-09 E-mail from Jim Holbrook to Board re: draft Press Release

Attachment 9: Written notice of violation of Delaware Law

# EXHIBIT J

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

DONALD A. KURZ and SEMS DIVERSIFIED VALUE, LP, )

    Plaintiffs, )

   )

  v. )

   )

JAMES L. HOLBROOK, JR., *et al.*, )

    Defendants. )

   )

JAMES L. HOLBROOK, JR., *et al.*, )

    Counterclaim-Plaintiffs, )

   )

  v. )

   )

DONALD A. KURZ and SEMS DIVERSIFIED VALUE, LP, )

    Counterclaim-Defendants, ) C.A. No. 5019-VCL

and )

   )

JAMES L. HOLBROOK, JR., *et al.*, )

    Third Party Plaintiffs, )

  v. )

   )

TAKE BACK EMAK, LLC, )

    Third Party Defendants, )

   )

CROWN EMAK PARTNERS, LLC, )

    Counterclaim and Third-Party Plaintiff, )

   )

  v. )

   )

DONALD A. KURZ, *et al.*, )

    Counterclaim and Third-Party
    Defendants. )

CROWN EMAK PARTNERS, LLC,        )
                                     )
           Plaintiff,         )
                                     )
    v.                        )
                                     )   C.A. No. 5275-VCL
EMAK WORLDWIDE, INC.,           )
                                     )
          Defendant.      )
                                     )

## AFFIDAVIT OF JAMES L. HOLBROOK, JR.

STATE OF _MO_      )
                   } ss.
COUNTY OF _StLouis_  )

James L. Holbrook, Jr., being duly sworn, deposes and says:

1.    I submit this supplemental affidavit in further support of the Motion by Crown EMAK Partners, LLC, Jeffrey S. Deutschman and James L. Holbrook, Jr. to Enforce and Modify the Status Quo Order (the "Motion"). Specifically, I submit this supplemental affidavit to advise the Court of a number of actions taken by Mr. Kurz and TBE's director designees following the March 17, 2010 filing of the Motion.

2.    On March 17, 2010, I executed an initial affidavit in support of the Motion and re-executed the same affidavit again on March 18, 2010 to correct an inadvertent notary error (the "Initial Affidavit"). *See* Exhibit A hereto. The Initial Affidavit was submitted to the Court on March 18, 2010 and I reaffirm my belief concerning the truth of the matters set forth and referenced therein.

3.    The Motion and my Initial Affidavit were precipitated by the actions of Mr. Kurz and certain of the other TBE director designees in asserting -- or attempting to assert -- operational control of EMAK under the umbrella of three board committees (*i.e.*,

2

the Personnel Review Committee, the Litigation and Structural Review Committee, and the Strategic Planning Committee (collectively, the "Committees")). These actions have increased in intensity and degree following the filing of the Motion last week as set forth below.

4.     First, our CFO was informed by Mr. Kurz on Monday of this week that he and the other members of the Strategic Planning Committee were "exploring a potential financing transaction, including a way to replace the bank line" and that a nondisclosure agreement had been executed with an outside party in connection therewith. As a result, Mr. Kurz requested a series of confidential financial information. *See* Exhibit B hereto.

5.     My management team and I were not involved in this process, had no prior knowledge that such an arrangement was being explored, and do not know the undisclosed counterparty to (or terms of) the nondisclosure agreement apparently entered into by Mr. Kurz on behalf of EMAK. Nor are we aware of which entities or institutions Mr. Kurz has reached out to on behalf of the Company. Indeed, Mr. Kurz specifically informed the CFO that Strategic Planning "Committee is not seeking the involvement of management at this point in exploring this potential transaction." *Id.*

6.     As explained in my March 23, 2010 email (Exhibit B hereto), we already have a process for replacing EMAK's bank line, and plan on continuing to follow that process. Mr. Kurz's conduct has undermined management's ability to effectively negotiate with potential lenders and created the unnecessary risk that two different factions of the Company (*i.e.*, management and members of the Strategic Planning

3

Committee) will be undertaking inconsistent financing negotiations with the same
institution.

      7.     Second, the lack of management involvement (and transparency)
concerning actions of Mr. Kurz and the Committees have prevented the Company from
releasing its audited financial statements to its shareholders and the market. Specifically,
the Company's auditors cannot sign-off as to EMAK's financial statements absent
management representation letters from me and others certifying that management is
informed as to the operations of the Company and know of no problems relating thereto.
Given how management and I have been shut out of the Committees' processes and
actions, we are unable to provide the requisite representations thus blocking the
conclusion of the final audit. The Litigation and Structural Review Committee has
moreover refused my request to issue a press release announcing the Company's
unaudited 2009 financial statements, which we have done in previous years. *See* Exhibit
C hereto.

      8.     Third and relatedly, Mr. Kurz has attempted to condition the payment of
bonuses to management and employees upon the sign-off of by the Company's auditors
as to EMAK's financial statements. *See* Exhibit D hereto. As explained by our General
Counsel, "bonuses are (and always have been) paid based upon calculations derived from
the company's internal financial statements rather than the audited results . . . ." Exhibit
E hereto. And as confirmed by our controller, "EMAK has historically paid bonuses
prior to receiving the formal audit opinion. Bonuses have generally been paid around
March 15, which is after the auditors complete fieldwork, but before they issue their

<p align="center">4</p>

opinion (historically the audit opinion is issued on March 31)." Exhibit F hereto. My
management team and I believe that this is further retaliation for management's support
of the Crown consent. In short, EMAK is a service business and I believe that Mr. Kurz
is doing lasting damage to our relationships with our employees.

      9.    Fourth, Mr. Kurz has continued his efforts to persuade members of my
management team (during business hours and under the guise of his role as Chairman) to
revoke their consents in favor of the Crown bylaw amendments. Those efforts have been
perceived by such employees to be intimidating and harassing. By way of example, and
in addition to the testimony on this point in the separate affidavits submitted by Ms.
Tormey and Mr. Sanders, Mr. Kurz requested a meeting with Brian Kristofek on March 9
in Chicago to discuss Mr. Kurz's business plans for the Company. Instead, it's my
understanding that the two had a brief conversation about Mr. Kurz's business plans and
that Mr. Kurz spent the vast majority of their meeting trying to get Mr. Kristofek to
revoke his votes in favor of the Crown consents.

      10.    Fifth, management has been presented with a series of undated resolutions
and other requests by the Committees and its members requesting payment or
reimbursement for various engagements and expenses -- totaling more than $300,000 --
that management and I have been entirely excluded from. By way of example:

> • The day the Motion was filed, Mr. Kurz provided our CFO with
> resolutions of the Strategic Planning Committee and Litigation and
> Structural Review Committee requesting payment for a "confidential"
> study of EMAK's product business, a "confidential" study of an
> unspecified merger candidate, and a retention fee for engagement of a
> public relations firm. *See* Exhibit G hereto. Neither I nor my
> management team was included in any aspect of these engagements or the
> decisions preceding them.

5

- Mr. Kurz also submitted $1,566.29 worth of expenses in connection with the above requests as part of "his Delaware Court Expense report." *Id.* But Mr. Kurz is not an officer of the Company and management has not been provided any backup or explanation justifying his entitlement to payment or any details of such expense.

- On Monday of this week, the CFO was presented with an invoice for expenses "associated with executive compensation consulting advice, including" a "[r]eport on competitive compensation levels and design for the CEO of EMAK and recommendations for the compensation structure going forward." *See* Exhibit H hereto. As noted by the CFO, such studies have historically been arranged by our Human Resources department. *See id.*

- On Tuesday, Mr. Kurz sent our CFO and Controller emails attaching undated resolutions of the Strategic Planning Committee and the Litigation and Structural Review Committee for a number of the above expenses as well as numerous others including, among others, payment to companies controlled by Mr. Kurz and Mr. Konig, as well as TBE's various law firms. *See* Exhibits I & J hereto. Specifically, these resolutions direct the payment of $24,491.72 to Insight Creative Solutions, Inc. -- a company owned or controlled by Mr. Kurz -- for "confidential" consulting services preformed by Mr. Kurz and related expenses incurred by Mr. Kurz. *See id.* They also direct the payment of $14,887.70 to The MAK Organization -- a company owned or controlled by Mr. Konig -- for "confidential" consulting services preformed by Mr. Konig and related expenses incurred by Mr. Konig. *See id.* Messrs. Kurz and Konig directed that all such payments be made by close of business yesterday (*i.e.*, before the hearing on the present motion) without any explanation for the urgency. *See id.*

11.    Sixth, my management team continues to be beset by inquiries and expedited requests for information from the Personnel Review Committee in the name of "ensur[ing] a smooth transition." *See, e.g.*, Exhibit K hereto. As explained in the Motion (at ¶ 37), management has already created and put into effect a comprehensive transition plan (specifically, a "Transition Matrix") that details the transfer of duties and necessary tasks to be completed prior to the exit of the affected managers. The Transaction Matrix

6

was created at my direction in September 2009 and the transition plan has been presented to the Board and has been proceeding under my supervision by the management team at all times since.

12.    The Committee's refusal to include or consult with me concerning these requests raises serious questions as to the true motivations behind these inquires. But even assuming the bona fides of the purported "smooth transition" justification, it is my responsibility as CEO to determine how best to transition the duties of my management team and the Committee's actions in proceeding on a disjointed and uncoordinated path is both frustratingly inefficient and distracting to management and therefore harmful to the Company. It is also a material diminution of my responsibilities and a violation of my employment agreement.

13.    Seventh, on Monday Mr. Kurz sent a six-page letter on EMAK letterhead to the Company's shareholders urging them to "to protect their investment in EMAK by NOT responding to the Crown solicitation and by signing, dating and returning the enclosed White Consent Revocation card." Exhibit L hereto. This letter was signed by Mr. Kurz as "Chairman of the Board" and purports to trumpet, among other things, the supposed announcement of "strategic plans to derive value" by the "Current Board." *Id.* It appears that a significant portion of this "strategic plan" is actually cost savings from a plan developed by current management. While I am not a member of the Board, I am troubled by Mr. Kurz's attempt to use the Company's name and machinery in furtherance of his Personnel control fight with Crown.

7

14.     Finally, the notion that I unilaterally or clandestinely executed amended employment agreements with the departing executives on September 9, 2009 is inaccurate, as is the statement of Mr. Kurz in his March 24, 2010 affidavit that "[d]uring my tenure [as a director of EMAK since June 2009] I was never aware of amendments to the employment agreements of the senior executives." 3/24/10 Kurz Aff. 2.

15.     The Board discussed certain changes to the executive employment agreements at the June 9, 2009 Board meeting, with Mr. Kurz in attendance. Negotiations concerning the employment agreements continued throughout the summer of 2009. The most significant change was to treat any termination as a termination in connection with a change of control. This change was approved by Board at their September 9, 2009 meeting where the directors – including Mr. Kurz -- unanimously resolved that "any termination of [the effected executives] would constitute a termination pursuant to a 'Change of Control' under their employment contracts." Exhibit M hereto. The significance of this change is that it increased the severance payment period from six to 12 months.

16.     I was confronted by Mr. Sems at the February 25, 2010 meeting of the Board regarding changes made to the management contracts, and I recounted the history of the changes. Mr. Kurz acknowledged that the board had indeed discussed and approved the changes.

17.     Importantly, Mr. Kurz's and the TBE consent, if effective, resulted in a "change of control" under the original agreements. *See* 3/24/10 Sems Aff., at Exhibit D,

8

§ 4(g)(vi).  Thus, Mr. Kurz's own actions, if ultimately deemed effective, would render the amendment that he approved -- and now says he did not -- of no consequence.

18.    I hereby affirm that the matters contained herein as they relate to my acts and deeds are true to the best of my knowledge, information and belief, and insofar as they relate to the acts and deeds of any other person are believed by me to be true.

James D. Holbrook, Jr.

SWORN TO AND SUBSCRIBED before me this _25th_ day of March, 2010

THOMAS T. WHITMIRE
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: June 01, 2012
Commission Number: 08568107

Notary Public

9

# EXHIBIT K



**At EMAK Worldwide, Inc.:**

**Media and investor inquiries:**
Jim Holbrook
Chief Executive Officer
(323) 932-4068

## EMAK Worldwide Reports Results for First Quarter of 2010

**LOS ANGELES, June 9, 2010** – EMAK Worldwide, Inc. (OTC: EMAK), a leading marketing services firm, today announced its financial results for the first quarter ended March 31, 2010.

### First Quarter 2010 Highlights

- The Company reported an adjusted EBITDA loss before charges and non-cash expenses of $1.8 million, compared with adjusted EBITDA of $114,000 in the year-ago quarter.
- Revenues of $25.5 million were seven percent lower than the year-ago quarter, primarily due to a large promotional products program in the first quarter of 2009 that was not repeated in 2010 and client transition at the Upshot agency.
- Operating expenses before charges of $7.7 million were 20 percent higher than the year ago quarter due to increased legal fees and incremental expenses incurred by the "Take Back EMAK" Board while they had temporary control of the Company.
- Legal fees relating to shareholder lawsuits and the "Take Back EMAK" consent solicitation totaled $1.9 million in the quarter, compared with legal fees of $138,000 recognized in the year-ago quarter.
- Embedded in EMAK's results are incremental expenses of approximately $800,000 related to numerous service providers, such as investment bankers, public relations and other consultants, who were engaged by the "Take Back EMAK" Board.
- Net loss from continuing operations before charges was $2.5 million, compared with a net loss of $694,000 in the year-ago quarter.
- At quarter end, EMAK reported $10.1 million in cash and cash equivalents and no debt.

"While the first quarter is seasonally our smallest, had we not had the dramatic rise in non-operating expenses, we would have reported a break even quarter on an adjusted basis," said Jim

*-more-*

*EMAK Worldwide, Inc.*
*Page 2*

Holbrook, EMAK's Chief Executive Officer. "Our first quarter results reflect a relatively stable operating environment for EMAK with a reduction in our overall cost structure hidden behind the impact of substantial legal fees related to 'Take Back EMAK' and additional expenses incurred by their Board members.

"We took restructuring charges totaling $2.3 million in the quarter for reductions in staff related to our restructuring and decentralization plan and also the wind down of our Burger King business."

Due to the Company's closure of its operations in Europe in 2009, results presented in this news release reflect European operations as discontinued operations for all periods and, unless stated otherwise, all financial results reflect continuing operations only.

The following table presents reconciliation of net loss from continuing operations to EBITDA for the quarters ended March 31, 2009 and 2010. Management views EBITDA before charges and non-cash expenses as the best indicator of the Company's recent performance.

EBITDA, before charges and non-cash expenses, is calculated as follows:
(In thousands of dollars)

| | Three Months Ended March 31, (Unaudited) | |
|---|---|---|
| | 2009 | 2010 |
| Net loss from continuing operations | $    (704) | $    (4,746) |
| Interest expense, net | 20 | 19 |
| Provision for income taxes | 59 | 6 |
| Depreciation | 434 | 478 |
| EBITDA | (191) | (4,243) |
| Charges: | | |
| Restructuring charge | 10 | 2,261 |
| Non-cash expenses: | | |
| Amortization of restricted stock | 295 | 145 |
| EBITDA, before charge and non-cash expenses | $    114 | $    (1,837) |

Net loss from continuing operations, before charge, is calculated as follows:
(In thousands of dollars)

| | Three Months Ended March 31, (Unaudited) | |
|---|---|---|
| | 2009 | 2010 |
| Net loss from continuing operations | $    (704) | $    (4,746) |
| Charge: | | |
| Restructuring charge | 10 | 2,261 |
| Net loss from continuing operations before charge | $    (694) | $    (2,485) |

EMAK Worldwide, Inc.
Page 3

## Agency Services

EMAK's Agency Services businesses include its Upshot and Neighbor agencies, including the interactive group Emerge Digital. In the first quarter of 2010, Agency Services revenues decreased 16 percent versus the year-ago quarter, reflecting stable revenues at Neighbor offset by lower revenues at Upshot as it transitioned out of work for MillerCoors to Corona and Wild Turkey. Both Neighbor and Upshot won new business from high profile accounts in the first quarter, and related client work will ramp up later in the year. Emerge's contributions are on target with expectations.

Gross profit dollars of $2.1 million decreased $0.5 million, or 18 percent, in the first quarter, reflecting the lower level of revenues. Fluctuations in low-margin, direct-cost billings make comparisons of the gross profit percentages difficult. Thus, management views the overall gross profit dollars, rather than the percentage, to be a more meaningful measure of performance in this segment.

## Promotional Products

In the first quarter of 2010, Promotional Products revenues were two percent lower. Higher revenues at Equity Marketing were offset by lower revenues at the Logistix agency due to the timing of large promotional programs when compared to the prior year. Additionally, Logistix had a large promotional products program in the first quarter of 2009 that was not repeated in 2010. Gross profit margin of 17 percent was stable with the prior-year period.

The Equity Marketing agency is transitioning out of work for its largest client and will report residual revenue and margins in the second quarter of 2010. The agency has made significant staffing reductions in line with the transition out of work for Burger King. The remaining staff is pursuing new business opportunities in the higher-margin design end of promotional products.

## Restructuring

EMAK recorded a restructuring charge of $2.3 million in the first quarter of 2010, including $1.7 million related to employee termination costs for senior management and corporate staff as part of its restructuring and decentralization plan, and $0.6 million related to other employee departures due to the wind down of the Burger King business. The Company's remaining workforce reductions will continue through the end of 2010.

-more-

*EMAK Worldwide, Inc.*
*Page 4*

## Litigation and Incremental Board Expenses

EMAK is involved in ongoing litigation primarily related to "Take Back EMAK" and its attempt to gain control of the Company. Legal fees directly related to their lawsuits and consent solicitation totaled $1.9 million in the first quarter of 2010, and they continue to mount. Prolonged litigation could have a material adverse effect on EMAK's financial condition and results of operations.

Additionally, while in temporary control of EMAK beginning February 9, 2010, the dissident Board contracted with numerous service providers, such as investment bankers, a public relations company and a research consultant, on EMAK's behalf. These expenses totaled approximately $800,000 in the first quarter of 2010.

## Balance Sheet and Financial Condition

The balance of cash and cash equivalents at March 31, 2010 was $10.1 million, a decrease of $2.9 million versus the end of last year. The Company had no debt at the end of either period.

The Company used $2.8 million of cash from operations in the first quarter of 2010, versus generating $1.1 million in the year-ago quarter.

Working capital was $5.4 million and the current ratio was 1.3, versus working capital of $9.7 million and a current ratio of 1.5 at the end of 2009. The decline in working capital was due largely to an increase in legal fees and also restructuring costs.

EMAK has sufficient liquidity on-hand, and aside from letters of credit, it has not borrowed against its credit facility in more than two years. As its credit facility expired in April 2010, the Company is exploring new banking relationships.

EMAK Worldwide, Inc.
Page 5

## First Quarter 2010 Results at a Glance

**Results from continuing operations**
(In thousands of dollars)

| | 2009 | % of revenues | | 2010 | % of revenues | | % change |
|---|---|---|---|---|---|---|---|
| | | | **Three Months Ended March 31,** | | | | |
| | | | **(Unaudited)** | | | | |
| **Revenues by segment:** | | | | | | | |
| Agency services | $ 8,578 | 31.4% | | $ 7,173 | 28.1% | | -16.4% |
| Promotional products | 18,730 | 68.6% | | 18,321 | 71.9% | | -2.2% |
| | 27,308 | 100.0% | | 25,495 | 100.0% | | -6.6% |
| **Gross profit by segment:** | | | | | | | |
| Agency services gross profit | 2,529 | 29.5% | (a) | 2,063 | 28.8% | (a) | -18.4% |
| Promotional products gross profit | 3,331 | 17.8% | (a) | 3,193 | 17.4% | (a) | -4.1% |
| | 5,860 | 21.5% | | 5,256 | 20.6% | | -10.3% |
| **Salaries, wages, benefits and S,G&A** | 6,435 | 23.6% | | 7,746 | 30.4% | | 20.4% |
| **Restructuring charge** | 10 | | | 2,261 | | | |
| **Operating loss from continuing operations** | (585) | -2.1% | | (4,751) | -18.6% | | 712.1% |
| **Net loss from continuing operations** | (704) | -2.6% | | (4,746) | -18.6% | | 574.1% |
| **Income (loss) from discontinued operations** | 4,452 | 16.3% | | (36) | -0.1% | | -100.8% |
| **Net income (loss)** | 3,748 | 13.7% | | (4,782) | -18.8% | | -227.6% |
| **Non-GAAP financial highlights** | | | | | | | |
| Operating loss from continuing operations before charges (b) | (575) | -2.1% | | (2,490) | -9.8% | | 333.0% |
| Net loss from continuing operations before charges | (694) | -2.5% | | (2,485) | -9.7% | | 258.1% |
| EBITDA | (191) | -0.7% | | (4,243) | -16.6% | | 2121.5% |
| EBITDA before charges and non-cash expenses | 114 | 0.4% | | (1,837) | -7.2% | | -1711.4% |

(a) Percentage of segment revenues

(b) Operating loss from continuing operations before charges excludes restructuring costs of $2.3 million in the first quarter
of 2010, and excludes restructuring costs of $10,000 in the first quarter of 2009.

### First Quarter 2010 Financial Summary

Revenues for the first quarter were $25.5 million, a seven percent decrease from the $27.3 million posted in the year-ago period.  Higher revenues at the Company's Equity Marketing agency and stable revenues at Neighbor were offset by lower revenues at Logistix and Upshot.

Gross profit margin for the first quarter of 2010 was 20.6 percent compared to 21.5 percent in the year-ago quarter and reflected slight decreases in both segments.

Operating expenses before charges increased 20.4 percent, or $1.3 million, to $7.7 million, compared to $6.4 million in the first quarter of 2009.  The increase was due primarily to the aforementioned rise in legal fees and incremental non-operating expenses.  Overall cost improvements, such as EMAK's lower SG&A and occupancy costs, are masked by the uptick.

-more-

*EMAK Worldwide, Inc.*
*Page 6*

In the first quarter of 2010, operating expenses include $2.7 million in legal fees and related non-operating expenses, and $145,000 in non-cash expense related to grants of restricted stock. By comparison, operating expenses included approximately $369,000 and $295,000, respectively, in the same period in 2009.

The first quarter net loss from continuing operations before charges was $2.5 million compared with net loss of $694,000 in the same period of the previous year.

### Outlook for 2010

"We are optimistic about our Logistix, Neighbor and Upshot businesses, and our agency services businesses are poised for growth," commented Holbrook. "Obviously we are disappointed to lose our client Burger King. In the third quarter 2010, we are forecasting that our total revenues will be reduced by approximately 39 percent due to the wind down of this client. We have, however, taken all the necessary actions to reduce Equity Marketing's staff in line with the level of business. EMAK's four corporate officers who left the Company as of March 31 were instrumental in leading both the corporate and agency reorganization initiatives to re-align our operations. Thanks to their carefully crafted plan, we will emerge from the transition smaller but with higher margins and better prospects for long-term growth."

### About EMAK Worldwide, Inc.

EMAK Worldwide, Inc. is the parent company of a family of marketing services agencies including Equity Marketing, Logistix, Neighbor and Upshot. Its agencies are experts in "consumer activation" by offering strategy-based marketing programs that directly impact consumer behavior. The agencies provide strategic planning and research, consumer insight development, entertainment marketing, design and manufacturing of custom promotional products, kids marketing, event marketing, shopper marketing and environmental branding. The Company's blue-chip clients include Kellogg, Kohl's, Kraft, Macy's, Procter & Gamble and Safeway, among others. Headquartered in Los Angeles, EMAK has offices in Chicago and Hong Kong. More information about EMAK Worldwide is available on the Company's website at www.emak.com.

*Certain expectations and projections regarding the future performance of EMAK Worldwide, Inc. discussed in this news release are forward-looking and are made under the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These expectations and projections are based on currently available competitive, financial and economic data along with the Company's operating plans and are subject to future events and uncertainties. Management cautions the reader that the following factors, among others, could cause the Company's actual consolidated results of operations and financial position in 2010 and thereafter to differ significantly from those expressed in forward-looking statements: the Company's dependence on a single customer; the significant quarter-to-quarter variability in the Company's revenues and net income; the Company's dependence on the popularity of licensed entertainment properties and the ability to license, develop and market new products; the Company's dependence on foreign manufacturers; the Company's need for additional working capital; the negative results of litigation, governmental proceedings or environmental matters; and the potential negative impact of past or future acquisitions. The Company undertakes no obligation to publicly release the results of any revisions to forward-looking statements, which may be made to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. The risks highlighted herein should not be assumed to be the only items that could affect the future performance of the Company.*

*EMAK Worldwide, Inc.*
*Page 7*

**EMAK Worldwide, Inc.**

Condensed Consolidated Statements of Income

(In thousands, except share and per share data)

| | Three Months Ended March 31, (Unaudited) | |
|---|---|---|
| | 2009 | 2010 |
| Revenues | $ 27,308 | $ 25,495 |
| Cost of sales | 21,448 | 20,239 |
| Gross profit | 5,860 | 5,256 |
| Operating expenses: | | |
| Salaries, wages and benefits | 3,481 | 3,092 |
| Selling, general and administrative | 2,954 | 4,654 |
| Restructuring charge | 10 | 2,261 |
| Total operating expenses | 6,445 | 10,007 |
| Loss from operations | (585) | (4,751) |
| Interest expense, net | (20) | (19) |
| Other income (expense) | (40) | 30 |
| Loss from continuing operations before provision for income taxes | (645) | (4,740) |
| Provision for income taxes | 59 | 6 |
| Loss from continuing operations | (704) | (4,746) |
| Discontinued operations | | |
| Income (loss) from discontinued operations | 4,452 | (36) |
| Income tax provision | -- | -- |
| Income (loss) from discontinued operations | 4,452 | (36) |
| Net income (loss) | 3,748 | (4,782) |
| | | |
| Basic loss per share | | |
| Loss from continuing operations | (0.11) | (0.67) |
| Income (loss) from discontinued operations | 0.68 | (0.01) |
| Income (loss) per share | $ 0.57 | $ (0.68) |
| Weighted average shares outstanding | 6,588,261 | 7,074,296 |
| | | |
| Diluted income (loss) per share | | |
| Loss from continuing operations | (0.11) | (0.67) |
| Income (loss) from discontinued operations | 0.68 | (0.01) |
| Income (loss) per share | $ 0.57 | $ (0.68) |
| Weighted average shares outstanding | 6,588,261 | 7,074,296 |

*EMAK Worldwide, Inc.*
*Page 8*

**EMAK Worldwide, Inc.**
Condensed Consolidated Balance Sheets
(In thousands)

| ASSETS | | December 31, 2009 (Unaudited) | | March 31, 2010 (Unaudited) |
|---|---|---|---|---|
| Cash and cash equivalents | $ | 13,022 | $ | 10,148 |
| Accounts receivable, net | | 11,395 | | 11,939 |
| Inventories | | 3,044 | | 2,704 |
| Prepaid expenses and other current assets | | 480 | | 469 |
| CURRENT ASSETS | | 27,941 | | 25,260 |
| Fixed assets, net | | 5,073 | | 4,641 |
| Intangible assets, net | | 8,245 | | 8,245 |
| Other assets | | 85 | | 98 |
| TOTAL ASSETS | $ | 41,344 | $ | 38,244 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | |
|---|---|---|---|---|
| Short-term debt | $ | -- | $ | -- |
| Accounts payable | | 8,275 | | 8,201 |
| Accrued liabilities | | 9,997 | | 11,666 |
| CURRENT LIABILITIES | | 18,272 | | 19,867 |
| Long-term liabilities | | 5,261 | | 5,211 |
| TOTAL LIABILITIES | | 23,533 | | 25,078 |
| | | | | |
| Redeemable preferred stock | | 19,041 | | 19,041 |
| Common stock | | -- | | -- |
| Additional paid-in capital | | 37,041 | | 37,184 |
| Accumulated deficit | | (20,630) | | (25,412) |
| Accumulated other comprehensive income | | 28 | | 22 |
| Less: | | | | |
| Treasury stock | | (17,669) | | (17,669) |
| TOTAL STOCKHOLDERS' EQUITY | | 17,811 | | 13,166 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ | 41,344 | $ | 38,244 |

-more-

*EMAK Worldwide, Inc.*
*Page 9*

**EMAK Worldwide, Inc.**
Condensed Consolidated Statements of Cash Flows
(In thousands)

|  | Three Months Ended March 31, (Unaudited) | |
|  | 2009 | 2010 |
|---|---|---|
| CASH FLOWS FROM CONTINUING OPERATIONS: | | |
| Net income (loss) | $ 3,748 | $ (4,782) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities from continuing operations: | | |
| Income (loss) from discontinued operations | (4,452) | 36 |
| Depreciation and amortization | 434 | 478 |
| Amortization of restricted stock | 295 | 145 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 3,423 | (544) |
| Inventories | (1,806) | 340 |
| Prepaid expenses and other current assets | 296 | 12 |
| Other assets | - | (14) |
| Accounts payable | (985) | (110) |
| Accrued liabilities | 30 | 1,669 |
| Long-term liabilities | 81 | (51) |
| Net cash provided by (used in) operating activities from continuing operations | 1,064 | (2,821) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of fixed assets | (90) | (46) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Purchases of restricted stock units via restricted stock buy back | - | (2) |
| Cash flows provided by (used for) continuing operations | 974 | (2,869) |
| Cash flows of discontinued operations: | | |
| Operating cash flows | (352) | - |
| Increase (decrease) in cash | 622 | (2,869) |
| Effects of exchange rates on cash and cash equivalents | (102) | (5) |
| CASH AND CASH EQUIVALENTS, beginning of period | 6,155 | 13,022 |
| CASH AND CASH EQUIVALENTS, end of period | $ 6,675 | $ 10,148 |

# # #

# EXHIBIT L

Christopher Austin                                      November 13, 2009

---

**1**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
C.A. No. 5019-VCL
- - - - - - - - - - - - - - - - - - - - - - -x
DONALD A. KURZ and SEMS DIVERSIFIED VALUE, LP,

                Plaintiffs,
        -against-
JAMES L. HOLBROOK, JR., STEPHEN P. ROBECK, HOWARD
D. BLAND, JEFFREY S. DEUTSCHMAN, JORDAN H. REDNOR,
EMAK WORLDWIDE, INC., a Delaware corporation, and
CROWN EMAK PARTNERS, LLC., a Delaware limited
liability company,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - -x


        DEPOSITION OF CHRISTOPHER AUSTIN
                New York, New York
            Friday, November 13, 2009


REPORTED BY:
DANIELLE GRANT
JOB NO. 305262

---

**3**

1
2   A P P E A R A N C E S :
3   BOUCHARD MARGULES & FRIEDLANDER
    Attorneys for the Plaintiffs
4   222 Delaware Avenue
    Suite 1400
5   Wilmington, Delaware 19801
    BY:  JOEL FRIEDLANDER, ESQ., of Counsel
6        jfriedlander@bmf-law.com
         302.573.3502
7
    MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
8   Attorneys for all Director Defendants & EMAK
    1201 North Market Street
9   P.O. Box 1347
    Wilmington, Delaware 19899-1347
10  BY:  WILLIAM O. LaMOTTE, III, ESQ., of Counsel
         WLAMOTTE@MNAT.COM
11       302.351.9286
12       - and -
13  ROPES & GRAY, LLC
    Attorneys for all Director Defendants & EMAK
14  One Embarcadero Center
    Suite 2200
15  San Francisco, California 94111-3711
    BY:  THAD A. DAVIS, ESQ., of Counsel
16       thad.david@ropesgray.com
         415.315.6300
17
    ASHBY & GEDDES
18  Attorneys for Crown EMAK Partners
    500 Delaware Avenue
19  Wilmington, Delaware 19899
    BY:  NOT PRESENT
20       acordo@ashby-geddes.com
         302.654.1888
21
    ALSO PRESENT:
22
23
24
25

---

**2**

 1
 2
 3
 4
 5
 6
 7
 8
 9
10              November 13, 2009
11              1:08 p.m.
12
13
14
15
16
17      Deposition of CHRISTOPHER AUSTIN, held
18  at the offices of Ropes and Gray, LLP, 1211 Avenue
19  of the Americas, New York, New York pursuant to
20  Notice before DANIELLE GRANT, a Shorthand Reporter
21  and Notary Public of the State of New York.
22
23
24
25

---

**4**

 1                    C. Austin
 2      C H R I S T O P H E R    A U S T I N, called as
 3          a witness, having been first duly sworn by
 4          Danielle Grant, a Notary Public within and
 5          for the State of New York, was examined and
 6          testified as follows:
 7      DIRECT EXAMINATION BY
 8      MR. FRIEDLANDER:
 9          Q   Good afternoon, Mr. Austin.  I'm
10      Joel Friedlander.  I represent the plaintiffs in
11      this action.
12              Have you ever been deposed before?
13          A   Yes, I have.
14          Q   What were the occasions?
15          A   I have been deposed on two
16      occasions.  One was a business matter ten years
17      ago for a deal I worked on; and most recently,
18      last summer in connection with my divorce.
19          Q   As you probably know, the court
20      reporter is taking down my questions, your
21      answers.  It's important you don't start your
22      answer until I finish my question.  I, in turn,
23      will try to begin my question until you've
24      finished your answer so we can have a clean
25      transcript.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Christopher Austin                                              November 13, 2009

13

1              C. Austin
2    transaction, their reasonable business judgment
3    was in the best interest of the common
4    stockholders. But again, unfortunately, I don't
5    have a transcript of the call. Sometimes --
6    that's my best recollection. Hopefully, somebody
7    else recalls the same thing.
8        Q    So for now, that's the entirety of
9    your recollection?
10       A    Yes.
11       Q    Let me show you some notes and see
12   if it jogs your memory about anything else.
13   These are notes that Mr. Deutshchman took of the
14   meeting, this is JD-22. If I can direct your
15   attention, do you see where it says, "Best
16   interest of the company and all its stockholders,
17   and and and all is underlined?
18       A    Yes.
19       Q    Does that refresh your recollection
20   about your advice of whose interest should be
21   considered?
22       A    No, it does not.
23       Q    I believe you testified --
24       A    I should say you ask if it refreshes
25   my recollection? I should say I don't recall

14

1              C. Austin
2    anything differently than what I said to you.
3        Q    Okay. Do you see in his notes, duty
4    of loyalty acting on self-interest, don't think
5    so. Does that refresh your recollection about
6    anything you might have said? Or did say?
7        A    No, I don't have a recollection
8    about that.
9        Q    What did you do to inform yourself
10   about whether the business judgment rule would
11   apply to this transaction?
12       A    To this transaction specifically?
13       Q    Yes.
14       A    I basically thought the business
15   judgment rule applied. And I have an -- I
16   understand and I have been on many occasions
17   reviewed the case law with respect to the
18   business judgment rule and so I relied upon that
19   knowledge.
20       Q    Did you consult with anybody prior
21   to the meeting about the board's fiduciary,
22   director's fiduciary duties in the context of
23   this transaction?
24       A    I did discuss it on multiple
25   occasions with Tracy Tormey, general counsel, and

15

1              C. Austin
2    with Steve Talley.
3        Q    And what time frame are you talking
4    about?
5        A    I think we had a discussion -- I
6    think we had a discussion in the time frame
7    leading up the day or two before the meeting.
8        Q    That weekend, so this meeting was a
9    Monday morning?
10       A    Correct.
11       Q    What did you tell Mr. Talley? Tell
12   me what was said in that conversation with
13   Mr. Talley.
14       A    It wasn't an extensive conversation.
15   I think we both agreed that we thought that the
16   business judgment rule applied and it was more a
17   matter of a discussion among lawyers saying --
18   talking about the transaction and the -- he gave
19   me the context of some of the mechanics of the
20   transaction. Then we discussed the fact that I
21   would talk to the board about their fiduciary
22   duty and that was about it.
23       Q    How about your conversation with
24   Ms. Tormey?
25           MR. LAMOTTE: Objection.

16

1              C. Austin
2           MR. DAVIS: What time frame?
3           MR. FRIEDLANDER: The is the weekend
4    before this meeting. I have so many
5    e-mails about this time frame, so.
6           MR. LAMOTTE: Withdrawn.
7        A    She was part of the same
8    conversation with Mr. Talley, so it was the same
9    conversation.
10       Q    Same conversation?
11       A    Yes.
12       Q    You got an e-mail from Mr. Kurz,
13   correct, or a couple of e-mails the day before
14   the meeting?
15       A    I got at least one e-mail from
16   Mr. Kurz, I think at 11:30 p.m. the day before
17   the meeting.
18       Q    Were you up?
19       A    I was actually in Europe at the time
20   and on vacation. And so his e-mail came in at
21   about 9 a.m. my time, so I saw his e-mail
22   probably ten minutes before the meeting.
23       Q    Okay. So let me just...
24           (Document, Bates stamped EMK0002381
25           to 82 was marked as Austin Exhibit



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Christopher Austin                                      November 13, 2009

---

17

1        C. Austin
2        No. 1 for identification, as of
3        this date.)
4        (Document, Bates stamped EMK0008903
5        to 20 was marked as Austin Exhibit
6        No. 2 for identification, as of
7        this date.)
8        Q   Is this the e-mail you were just
9   talking about that you saw ten minutes before the
10  meeting?
11       A   Yes.
12       Q   If I can understand the chronology,
13  he sends it 11:00 p.m. That's about?
14       A   Ten hours ahead, so that was 9 a.m.
15       Q   It was 9 a.m. And the meeting was
16  at 8:30 a.m.?
17       A   Pacific time, so it was 6:30 p.m.
18  Turkey time.
19       Q   So you were out all day and didn't
20  get back to your e-mail until just before the
21  meeting?
22       A   Right.
23       Q   Was that the first you were aware of
24  the e-mail? Had anyone contacted you to say
25  there was an e-mail here?

---

18

1        C. Austin
2        A   I don't recall. I don't recall.
3   Just to clarify, I do have a Blackberry, so I may
4   have seen there was an e-mail that came in, but I
5   didn't review it in any detail until shortly
6   before the meeting.
7        Q   If you see under the heading on the
8   second page, it talks about the violation
9   Blasius. In violation of duty, Kurz asks, "has
10  the board engaged Delaware counsel to advise it,"
11  and it continues on, it says "I spoke to the
12  other partner of one of the major Delaware firms,
13  who said it is not legal under Delaware law."
14  Did --
15       MR. LAMOTTE: Just so the record is
16  straight, you were reading accurately up
17  until the last sentence.
18       MR. FRIEDLANDER: I was skipping
19  some words, but actually, I'm just trying
20  to direct the witness.
21       MR. LAMOTTE: Trying to orient the
22  witness?
23       MR. FRIEDLANDER: Orient the witness
24  to the document that's in front of him,
25  of which he can read it in its entirety.

---

19

1        C. Austin
2   BY MR. FRIEDLANDER:
3        Q   Did you have a chance before the
4   meeting or during the meeting to take into
5   account and talk to anyone or think about the
6   fact that Mr. Kurz was saying that Delaware
7   counsel advised him the transaction was not
8   permissible under Delaware law?
9        MR. LAMOTTE: Objection; compound.
10       A   Let's take it one step at a time,
11  could you rephrase?
12       Q   Either immediately before the
13  meeting or during the meeting, did you have a
14  chance to reflect upon or consider that
15  information from Mr. Kurz?
16       A   I did have a chance to consider it.
17       Q   Did you talk to anybody about it?
18       A   I did not.
19       Q   What did you think about when you
20  read that?
21       MR. LAMOTTE: Objection.
22       A   I considered the fact that Mr. Kurz
23  had, in multiple e-mails and letters over the
24  course of the previous year, told us his view and
25  stated his counsel's view that the board was

---

20

1        C. Austin
2   breaching it's fiduciary duty of care. In each
3   of those cases I had the opportunity to discuss
4   with other lawyers within Ropes and Gray, who are
5   well aware of Delaware law and to review some
6   Delaware cases and conclude, in each of those
7   instances, I was very comfortable with the
8   board's exercise of its duty of care, and frankly
9   considered it another instance of that same kind
10  of hyperbole from him.
11       Q   Who are the attorneys that you consulted
12  with at Ropes and Gray on earlier occasions about
13  the fiduciary duties of the EMAK directors?
14       MR. DAVIS: Before, Mr. Kurz was in
15  the privilege.
16       Q   Say since the beginning of June
17  2009.
18       A   No, I haven't. Other than
19  Mr. Davis, who's working with me on this, at
20  various times we've discussed that. At some
21  point, along the way I discussed with Joel
22  Friedman various points having to do with
23  Delaware law, but I don't recall specifically
24  fiduciary duty. And any prior conversations I
25  had happened before June '09.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Christopher Austin                                    November 13, 2009

---

21

1                C. Austin
2        Q   Is anyone within Ropes and Gray
3   admitted to the Delaware Bar?
4        A   I don't know.
5        Q   There is a heading of violation of
6   Blasius, where it says, "Directors have a duty
7   not to interfere with the stockholder franchise.
8   Skipping a couple of sentences, "Directors should
9   ask if there is some compelling justification to
10  defeat the right of the common stockholder to
11  change the board."
12           Did you reflect on that statement
13  by Mr. Kurz?
14       A   At that time?
15       Q   Yes.
16       A   Frankly, I didn't until I reviewed
17  the documents in connection with preparing for
18  the litigation, hadn't connected his heading
19  violation of Blasius with his other discussion.
20       Q   So the Blasius doctrine, is that
21  something you are familiar with?
22       A   I am now.
23       Q   Were you familiar with it as of
24  October 19th, 2009?
25       A   No, I was not.

---

22

1                C. Austin
2        Q   Do you make efforts to keep up with
3   Delaware case law?
4        A   Yes, I do.
5        Q   How is it if you keep up with
6   Delaware case law that you were not familiar with
7   the Blasius doctrine?
8            MR. LAMOTTE: Objection;
9        argumentative.
10       A   There is a lot of Delaware case law
11  and I keep up with, in particular, things having
12  to do with mergers and acquisitions, which I'm
13  involved with on a regular basis, board's
14  fiduciary duties and -- in general. And that was
15  not something that I had -- I should say seen or
16  internalized, and if I did see it, I didn't
17  recall it.
18       Q   Had you ever, during the course of
19  your career, advised the board on a matter that
20  involved a transaction that would impact the
21  voting rights of stockholders in the midst of a
22  control contest? I'm looking for a yes or no.
23           MR. LAMOTTE: Objection.
24           MR. DAVIS: You're not asking him
25       about any particular advice?

---

23

1                C. Austin
2        Q   No. Just have you ever given
3   advice?
4            MR. LAMOTTE: Objection.
5        A   No, I have not.
6        Q   Had you consulted any case law about
7   the -- would there be any case law particular on
8   the change of control provision -- whether change
9   of definition of change of control provision in a
10  security?
11           MR. LAMOTTE: Objection; vague as to
12       time.
13       Q   In 2009, you can look at this
14  transaction, did you look at the law on that
15  subject?
16       A   I don't recall reading any cases in
17  connection with that. I do recall in connection
18  with more general legal research about the duties
19  of directors, having done research about what
20  constitutes a change of control in terms of when
21  a transaction would kick in and they'd have
22  Revlon duties and when it would get to the point
23  where a minority -- at what point a minority
24  investment could be deemed to be a change in
25  control, so I have some familiarity with that.

---

24

1                C. Austin
2        Q   Had you heard of the case, San
3   Antonio Fire and Police Pension Fund versus
4   Amylan, A-M-Y-L-A-N, Pharmaceuticals issued by
5   the Court of Chancery on May 12th, 2009?
6        A   I certainly didn't read it in
7   detail.
8        Q   Had you heard of it?
9        A   I don't recall precisely. I think,
10  if you tell me -- it may be I don't know the name
11  of it, but it may have gotten an update or seen
12  an update about it.
13       Q   Had you heard it was a case about a
14  change in control provision in a debt
15  instruments, an indenture in a credit agreement?
16           MR. LAMOTTE: Objection. If you
17       have the case, perhaps you should put it
18       in front of him rather than have your
19       characterization of it.
20       Q   You're free to look at this copy of
21  it.
22       A   I can't tell from looking at this.
23  I certainly did not read the case, unless you
24  want me to take time to.
25       Q   No.

---



Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

Christopher Austin                                      November 13, 2009

---

**25**

1                C. Austin
2        A  No.
3        Q  Specifically, whether you'd heard of
4   the name of the case or not, had you heard within
5   the last several months there is a -- Court
6   Chancery issued a decision talking about how
7   outside counsel should be sure to bring to the
8   attention of directors provisions and debt
9   instruments that would impact the voting rights
10  of stockholders?
11       MR. LAMOTTE:  I object to this line
12  of questioning.  This witness is not here
13  as an expert.  You can ask him, it seems
14  to me, legitimately, what he did, what he
15  said in connection with his
16  representation of the board.  But to get
17  into this kind of inquiry is
18  inappropriate, irrelevant.
19       MR. FRIEDLANDER:  I don't think it
20  is because there is a question -- I don't
21  want to get argumentative about it, but
22  there is a question whether the board
23  could rely on his advice and upon his
24  expertise in the area.
25       MR. LAMOTTE:  That's not -- if you

---

**26**

1                C. Austin
2   want to find out what the board knew
3   about his background, that's one thing.
4   Finding out what he thinks is his
5   background is another, it's just totally
6   irrelevant.
7        Q  So in the course of your work as a
8   lawyer in 2009, do you recall hearing about a
9   decision of the Court Chancery saying that
10  outside counsel should highlight the provisions
11  in debt agreements that affect the voting rights
12  of stockholders?
13       A  No, I don't recall hearing about
14  that.
15       Q  Had you ever discussed with anyone
16  in the fall of 2009 whether it made sense to
17  consult with Delaware counsel on the unfolding
18  situation at EMAK?
19       MR. LAMOTTE:  Object to the form of
20  the question.
21       A  No, I don't believe there was a
22  discussion about consulting Delaware counsel in
23  the fall of 2009.
24       Q  Or the summer?
25       A  Anytime after June 2009.

---

**27**

1                C. Austin
2        Q  Can you explain to me the
3   significance of the changes and the change of
4   control provision as it related to Mr. Kurz?
5        A  You're asking me to express a legal
6   conclusion as to what that change did.
7        Q  I said this is the subject you
8   discussed with Mr. Talley, correct?
9        A  That's correct.
10       Q  That's a subject you discussed with
11  people at EMAK; is that correct?
12       A  Yes.
13       Q  And can you explain what you ever
14  said to anyone about the import of the change of
15  control provision as it relates to Mr. Kurz?
16       MR. LAMOTTE:  Object to the form of
17  the question.
18       A  Can you re-read the question,
19  please?
20       (The requested portion of the
21  record was read back.)
22       A  I did have discussions about that
23  provision with various people including
24  Mr. Talley and Ms. Tormey.
25       Q  Tell me what you discussed with

---

**28**

1                C. Austin
2   Mr. Talley about it.
3        A  I discussed Mr. Talley's view that
4   the provision, the change in the provision was
5   meant to be, in his mind, a clarifying change.
6   And our -- we discussed how the provision should
7   be read before the change, and agreed that it was
8   an ambiguous provision.  And that we, I think
9   disagreed about what it actually meant, so we
10  talked about that for a while.  And then talked
11  about their view and how we could complete the
12  transaction as a first step in connection with
13  restructuring the preferred.  And that this was
14  something that they thought was a clarifying
15  change, but they wanted to get dealt with in this
16  certificate of designation.
17       Q  Was that a series of conversations
18  or one conversation you had with Mr. Talley on
19  that subject?
20       A  I don't recall.  There could have
21  been e-mails back and forth as well, because
22  during this time a fair amount of correspondence
23  was e-mail exchanging drafts.  We started back in
24  the first week of October with a conversation, a
25  decision to proceed with this transaction as

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.944.9454
Facsimile: 212.557.5972

Suite 4715
One Penn Plaza
New York, NY 10119
www.esquiresolutions.com

| | |
|---|---|
| In re EMAK WORLDWIDE, INC.<br>In re EMAK WORLDWIDE SERVICE CORP.<br><div align="right">Debtor(s).</div> | CHAPTER  11<br>CASE NO 2:10-bk-42779-RN<br>Jointly Administered with<br>Case No. 2:10-bk-42784-RN |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067

A true and correct copy of the foregoing document described as **DECLARATION OF JOEL FRIEDLANDER IN RESPONSE TO FIRST DAY MOTIONS FILED BY DEBTORS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 11, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

   * Ron Bender    rb@lnbrb.com
   * Russell Clementson    russell.clementson@usdoj.gov
   * John-patrick M Fritz    jpf@lnbrb.com
   * Irving M Gross    img@lnbrb.com, angela@lnbrb.com
   * Kerri A Lyman    klyman@irell.com
   * Jeffrey M. Reisner    jreisner@irell.com
   * United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

<div align="right">☐  Service information continued on attached page</div>

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On  **August 11, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
Jeffrey M. Reisner, Esq.
Michael H. Strub, Jr., Esq.
Kerri A. Lyman, Esq.
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA  92660-6324

**AND SEE ATTACHED SERVICE LIST**    ☒    Service information continued on attached page

(PROOF OF SERVICE CONTINUED ON FOLLOWING PAGE

1

1

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for

each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 11, 2010**  I

2

served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing

to such service method), by facsimile transmission and/or email as follows.   Listing the judge here

3

constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after

the document is filed.

4

**VIA EMAIL**

5

Jeffrey M. Reisner, Esq.

at: jreisner@irell.com

6

Michael H. Strub, Jr., Esq.

7

at: mstrub@irell.com

8

Kerri A. Lyman, Esq.

at: klyman@irell.com

9

**AND SEE ATTACHED SERVICE LIST**

10

**VIA ATTORNEY MESSENGER DELIVERY**

11

Hon. Richard Neiter

U.S. Bankruptcy Court

12

255 E. Temple Street, Ctrm 1645

Los Angeles, CA  90012                    ☒   Service information continued on attached page

13

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true

14

and correct

15

| **August 11, 2010** | Angela Antonio | /s/ Angela Antonio |
| Date | Type Name | Signature |

16

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                    **F9013-3.1**

17

18

19

20

21

22

23

24

25

26

27

28

2

**SERVED VIA OVERNIGHT-MAIL:**

1

2    Bouchard Margules & Friedlander
     Attn: J. Friedlander, Esq.
3    222 Delaware Ave, Suite 1400
     Wilmington, DE 19801

4    Ropes & Gray LLP
     Attn Thad Davis, Esq.
5    Three Embarcadero Center
     San Francisco, CA 94111-4006
6
     Ashby & Geddes
7    Attn Steve Jenkins, Esq.
     500 Delaware Avenue
8    Wilmington, DE 19801-1490

9    Gibson,Dunn & Crutcher LLP
     Attn Steve Talley, Esq.
     1801 California Street, Suite 4200
10   Denver, CO 80202-2694

11   SANDERS, MICHAEL
     1281 Keats Street
12   Manhattan Beach, CA 90266-6811

13   JOHNSON, DUANE
     3166 Butler Ave
14   Los Angeles, CA 90066-1302

15   Morris Nichols Arsht & Tunnell
     Attn Ken Nachbar
16   1201 N. Market Street
     Wilmington, DE 19901-1147
17
     DAR, ROY
18   6470 Gaynor Avenue
     Van Nuys, CA 91406-6434
19
     LATHAM & WATKINS
20   Attn: Russ Sauer, Esq.
     355 South Grand Avenue
21   Los Angeles CA 90071-1560

22   Russell Clementson, Esq.
     c/o Office of the U.S. Trustee
     725 S. Figueroa Street, Suite 2600
23   Los Angeles, CA 90017-5413

24   David Hurst, Esq.
     Young, Conaway, et al
25   The Brandywine Bldg.
     1000 West Street, 17th Floor
26   Wilmington, DE 19801-1053

27   **Request for Special Notice**
     John C. Kirkland, Esq.
28   Luce Forward Hamilton, et al
     601 So. Figueroa St., Suite 3900
     Los Angeles, CA 90017-5728

1

2

MONACOS, CHRISTIE
426 E. Marigold St.,
Altadena, CA 91001-1908

3

4

Carillo Foster LLC
Attn Authorized Agent
PO Box 8259
Pasadena, CA 91109

5

6

KLEIN, MUI
9424 Steele Street
Rosemead, CA 91770-1502

7

8

9

JH Cohn LLP
Attn JH Cohn
4 Becker Farm Road, #302
Roseland, NJ 07068-1780

10

11

City of Los Angeles
Attn Authorized Agent
File 57065
Los Angeles, CA 90074-7065

12

13

ROBERTS, MARTHA
15650 Meadow Dr
Canyon Country, CA 91387-4440

14

15

Francisco, Ellen
17522 Grayland Ave
Artesia, CA 90701-4023

16

17

Steven J Vallen
18666 Ravenwood Drive
Saratoga, CA 95070-5652

18

19

Jose Figueroa
529 S. El Molino Ave., Unit 8
Pasadena, CA 91101-4208

20

21

Patrick Hanrahan
1783 Rose Villa
Pasadena, CA 91106-3565

22

23

Connolly Bove Lodge
Attn: C.J. Seitz, Esq.
1007 North Orange St
Wilimington, DE 19801-1239

24

25

26

Secured Creditor
Bank of America
Attn: Hermann Schutterie, VP or
Authorized Agent
1000 W. Temple Street, 7th Fl
Los Angeles, CA 90012-1514

27

28

**SERVED VIA E-MAIL**

| | |
|---|---|
| Bouchard Margules & Friedlander<br>Attn: J. Friedlander, Esq. | jfriedlander@bmf-law.com |
| Ropes & Gray LLP<br>Attn Thad Davis, Esq. | thad.davis@ropesgray.com |
| Ashby & Geddes<br>Attn Steve Jenkins, Esq. | sjenkins@ashby-geddes.com |
| Gibson,Dunn & Crutcher LLP<br>Attn Steve Talley, Esq. | stalley@gibsondunn.com |
| SANDERS, MICHAEL | mike.sanders@emak.com |
| JOHNSON, DUANE | duane.johnson@emak.com |
| Morris Nichols Arsht & Tunnell<br>Attn Ken Nachbar | knachbar@mnat.com |
| DAR, ROY | roy.dar@emak.com |
| LATHAM & WATKINS<br>Attn: Russ Sauer, Esq. | russ.sauer@lw.com |
| MONACOS, CHRISTIE | cpm085@hotmail.com |
| KLEIN, MUI | mui.klein@emak.com |
| JH Cohn LLP<br>Attn JH Cohn | mnunis@JHCohn.com |
| ROBERTS, MARTHA | Martha.roberts1@gmail.com |
| Francisco, Ellen | ellen.francisco@emak.com |
| Steven J Vallen | numbermonkey@comcast.net |
| Jose Figueroa | jose.figueroa@emak.com |
| Patrick Hanrahan | patrickhanrahan@gmail.com |
| Connolly Bove Lodge<br>Attn: C.J. Seitz, Esq. | CSeitzJr@cblh.com |
| Russell Clementson, Esq.<br>c/o Office of the U.S. Trustee | russell.clementson@usdoj.gov |
| David Hurst, Esq.<br>Young, Conaway, et al | dhurst@ycst.com |
| **Request for Special Notice**<br>John C. Kirkland, Esq.<br>Luce Forward Hamilton, et al | jkirkland@luce.com |