DAVID L. NEALE (SBN 141225)
RON BENDER (SBN 143364)
IRV M. GROSS (SBN 53659)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dln@lnbyb.com, rb@lnbyb.com,
img@lnbyb.com

Counsel for Bouchard Margules & Friedlander, P.A.

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>☒ EMAK WORLDWIDE, INC., a Delaware corporation,<br><br>☒ EMAK WORLDWIDE SERVICE CORP., a Delaware corporation,<br><br>　　　　　　　Debtors and Debtors-in-Possession. | Case No. 2:10-bk-42779-RN<br>[Motion Pending for Joint Administration with Case No. 2:10-bk-42784-RN]<br><br>Chapter 11<br><br>OBJECTION OF BOUCHARD, MARGULES & FRIEDLANDER, P.A. TO: (1) DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTORS TO PERFORM CONSULTING AGREEMENTS WITH TERESA TORMEY, ROY DAR, MICHAEL SANDERS AND DUANE JOHNSON IN THE ORDINARY COURSE; AND (2) DEBTORS' EMERGENCY MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 345, 363 AND 364: (A) AUTHORIZING (i) MAINTENANCE OF EXISTING BANK ACCOUNTS, (ii) CONTINUED USE OF EXISTING BUSINESS FORMS, AND (iii) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM; (B) AUTHORIZING CERTAIN INTERCOMPANY TRANSACTIONS; (C) EXCUSING THE 11 U.S.C. § 345(b) DEPOSIT AND INVESTMENT GUIDELINES<br><br>DATE:　August 12, 2010<br>TIME:　11:00 a.m.<br>PLACE:　Courtroom 1645<br>　　　　　255 E. Temple St.<br>　　　　　Los Angeles, CA |

TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY JUDGE:

Bouchard Margules & Friedlander, P.A. ("BMF"), the largest general unsecured creditor in the above-captioned bankruptcy case, hereby submits its opposition (the "Opposition") to Debtors' Emergency Motion for Order Authorizing Debtors to Perform Consulting Agreements with Teresa Tormey, Roy Dar, Michael Sanders and Duane Johnson in the Ordinary Course (the "Consulting Motion") [docket entry no. 9] and Debtors' Emergency Motion for Order Under 11 U.S.C. §§ 105, 345, 363 and 364: (A) Authorizing (i) Maintenance of Existing Bank Accounts, (ii) Continued Use of Existing Business Forms, and (iii) Continued Use of Existing Cash Management System; (B) Authorizing Certain Intercompany Transactions; (C) Excusing the 11 U.S.C. §345(b) Deposit and Investment Guidelines; and (D) Providing Other Related Relief (the "Cash Management Motion" and collectively with the Consulting Motion, the "Motions") [docket entry no. 7].[1]

# I.
## STATEMENT OF RELEVANT FACTS[2]

A.  **The Shareholder Derivative Action**

1.  BMF is counsel to shareholder plaintiffs of EMAK Worldwide, Inc. ("EMAK") in a shareholder derivative action pending in the Court of Chancery of the State of Delaware styled *Donald A. Kurz and Sems Diversified Value, LP v. James K. Holbrook, Jr. et al.*, Civil Action No. 5019-VCL (the "Delaware Action"). BMF is the largest unsecured creditor of EMAK, by virtue of a $2.5 million fee award (the "Fee Award") issued by Vice Chancellor Laster of the Delaware Court of Chancery pursuant to an Order entered on July 29, 2010 (attached to the Friedlander Declaration as Exhibit A). The Order required EMAK to pay the Fee Award on

---

[1] Unless otherwise noted, defined capitalized terms in the Opposition have the same meaning as in the Debtors' First Day Motions.
[2] The factual statements herein are supported by the Declaration of Joel Friedlander in Response to First Day Motions Filed by the Debtor (the "Friedlander Declaration") [docket entry no. 19] filed by BMF.

August 5, 2010, the day EMAK filed its bankruptcy petition. The Court granted BMF the Fee Award because it had litigated the Delaware Action on an entirely contingent basis (investing almost 1,600 attorney hours and approximately $140,000 in out-of-pocket expenses) and achieved significant benefits for the shareholders of EMAK, described below.

2.  On Monday, August 9, 2010, EMAK issued a press release stating that "[t]he voluntary bankruptcy petitions result from protracted litigation at the EMAK corporate level and an interim award from Chancery Court of Delaware against EMAK for which it was not permitted to immediately appeal." The press release further states that "EMAK intends to seek reversal of the interim award and to permanently resolve the litigation that has disrupted the holding company for some time." A copy of the press release is attached to the Friedlander Declaration as Exhibit B.

3.  EMAK's publicly stated rationale for the bankruptcy is misleading in two important respects. <u>First</u>, the Delaware Action is an action to *recover for EMAK* millions of dollars of legal fees, including a significant portion of the approximately $5.2 million that EMAK has already paid to defendants' counsel in the Delaware Action, plus the $2.5 million Fee Award. <u>Second</u>, EMAK turned down the opportunity to immediately appeal the Fee Award. Consequently, EMAK will likely never have the opportunity to appeal it.

4.  The Delaware Action is a shareholder derivative action in which the plaintiffs allege that in the Fall of 2009, the present directors of EMAK and certain former directors breached their fiduciary duties to EMAK and its common stockholders, aided and abetted by EMAK's preferred stockholder, Crown EMAK Partners, LLC ("Crown"). In particular, the plaintiffs allege that the director defendants and Crown conspired to grant Crown the power to cast 28% of the voting power in the election of directors (the "Exchange Transaction") and conspired to adopt a bylaw amendment that purported to give Crown the power to appoint a

majority of the Board (the "Bylaw Amendment"). Plaintiffs allege that the Exchange Transaction and the Bylaw Amendment were two components of an inequitable scheme by which EMAK's Chief Executive Officer, James Holbrook, the other director defendants and Crown sought to prevent the shareholders from removing Holbrook and other incumbent directors in a consent solicitation. After an intensive period of litigation, the defendants rescinded the Exchange Transaction on the literal eve of a preliminary injunction hearing, and the plaintiffs established after trial and on appeal to the Delaware Supreme Court that the purported Bylaw Amendment was invalid under Delaware law. No further appellate rights exist with respect to either of these events.

5. The only remaining phase of the Delaware Action would be a trial in which plaintiffs would seek to establish that the director defendants and Crown are required to pay back to EMAK millions of dollars in legal fees that EMAK has incurred in attempting to defend the rescinded Exchange Transaction and the invalidated Bylaw Amendment.

6. On multiple occasions, Vice Chancellor Laster has made clear that the director defendants and Crown may be liable for legal expenses incurred by EMAK, including the cost of the Fee Award to BMF. When Crown moved to dismiss following rescission of the Exchange Transaction, the Vice Chancellor rebuffed the motion, stating:

> [O]ne of the company's main points throughout this has been that Mr. Kurz has forced them to incur massive legal fees because of what was called an egregious and unfounded complaint.... If I believe and I find at trial that there has been a loyalty violation or a good faith violation, you know, there's a potential for a damages award. And I don't see why an alleged aider and abettor could not be jointly and severally liable for that type of damages order.

(12/4/09 Tr. at 24-25) (attached to the Friedlander Declaration as Exhibit C). In his post-trial ruling following the contested corporate election, the Vice Chancellor stated:

> I do not rule out the possibility that if EMAK is ordered to pay a fee award based on the rescission of the Exchange Transaction, and if the defendants are later held

-4-

liable for breaches of the duty of loyalty, then the amount of the fee award might be factored into the judgment against the defendants to ensure that the corporation is made whole. EMAK therefore might not bear any of the cost of the plaintiffs' efforts to challenge the aborted Exchange Transaction.

(2/9/10 Op. at 77-78) (attached to the Friedlander Declaration as Exhibit D). When scheduling a hearing on BMF's application for an interim fee award, the Vice Chancellor stated:

> For purposes of moving forward with the liability phase of this litigation, it will be helpful to have quantified the fee award so the parties can address concretely whether the amount should be incorporated in the calculation of damages suffered by the Company.

(3/2/10 Op. at 1) (attached to the Friedlander Declaration as Exhibit E).

7. On July 19, 2010, Vice Chancellor Laster determined that BMF was entitled to a fee award of $2.5 million relating to the rescission of the Exchange Transaction and the invalidation of the Bylaw Amendment. The Court made clear that EMAK Chief Executive Officer James Holbrook and Crown were potentially liable for all of EMAK's legal expenses relating to the Exchange Transaction, due to potential findings of a breach of the duty of loyalty and aiding and abetting:

> Here, the claims were clearly meritorious when filed. There were substantial claims for breach of fiduciary duty challenged in the exchange transaction.... It was a plain example of conduct that's actionable as a straightforward duty of loyalty violation.
> I haven't yet made detailed factual findings whether, in fact, there were breaches of loyalty....
> ...
> But I will say this, because it does influence my fee application greatly. *I think there is substantial and credible evidence that Mr. Holbrook breached his duty of loyalty in connection with the exchange transaction. I think there is substantial and credible evidence that Mr. Holbrook misled the board and/or withheld material information in connection with the events leading up to the exchange transaction.*
> ...
> ... And there is substantial evidence – and again, I have not had to make findings on this, but since the defendants have tried to portray this fee dispute as if it happened on a pristine record in which their clients did nothing wrong and Mr. Kurz was entirely to blame, I think it important that those assertions be corrected.
> ...

-5-

> What's clear from the record is that Holbrook was working this angle [with Crown] from long before. And there is powerful evidence that Holbrook's primary reasons for doing so were his desire to keep his job.
> And as I've said before, I also questioned whether the board got full information from Holbrook about the events leading up to the Burger King transaction.
>
> ...
> ... ***This action was meritorious when mooted. This was a case, again, where there were substantial loyalty issues....***
> ... What is suggested by the e-mail record, however, at least Mr. Holbrook's side of it ..., is that [Mr. Ackerman of Crown] was deeply aware of the conflicts on the board, deeply aware of Mr. Holbrook's insecurities, and used them to his advantage.
> So all of this to say that I think it's highly likely that I would have enjoined the exchange transaction.
>
> ...
> ... ***The disclosures were false and misleading.*** When you compared the disclosures to what was written in the briefs and when you compared the disclosures to what was in the e-mails, there was absolutely no way that they could be squared.
>
> ...
> ... This was a strong challenge brought to a transaction where there was, as I've already discussed, real evidence of loyalty breaches; and rescinding the transaction fundamentally changed the corporate governance landscape.

(7/19/10 Tr. at 79, 80, 85-86, 90-91, 92, 96, 107) (attached to the Friedlander Declaration as Exhibit F) (emphasis added).

8.  The Court of Chancery determined that $2.1 million of the $2.5 million Fee Award was attributable to the rescission of the Exchange Transaction and the correction of false disclosures relating thereto. (*Id.* at 106-07)

9.  Immediately upon the Vice Chancellor's ruling, EMAK's counsel asked if EMAK could immediately appeal it pursuant to Court of Chancery Rule 54(b). (*Id.* at 108) The Vice Chancellor suggested that he had "no objection to it being certified as a Rule 54(b)" if the parties so agreed, and EMAK posting bond during the pendency of appeal. (*Id.* at 110).

-6-

10. EMAK decided not to immediately appeal the Vice Chancellor's ruling. Instead, EMAK argued that the Fee Award was not immediately appealable and therefore should not be immediately payable.

11. In a letter opinion issued on July 29, 2010 (attached to the Friedlander Declaration as Exhibit H), the Vice Chancellor rejected EMAK's argument. That same day, the Vice Chancellor entered the Order requiring payment of $2.5 million to BMF within five business days. The time for reargument of the Fee Award has lapsed.

12. Consequently, if the Delaware Action were permitted to proceed, there would first be a trial adjudicating whether Holbrook, Crown and the other defendants are liable for breach of the duty of loyalty (or aiding and abetting such a breach) and adjudicating the extent of their monetary liability to EMAK for legal fees relating to the Exchange Transaction and the Bylaw Amendment. By virtue of EMAK's own actions, there can be no appellate review of the $2.5 million Fee Award to BMF except as part of any appeal from the post-trial final order.

13. Given their exposure to personal liability, EMAK's insiders and Crown are highly motivated to make sure they never have the opportunity to appeal the Fee Award. The individual defendants and Crown would first be confronted with decisions about whether to keep incurring costs defending breach of duty of loyalty claims for which Vice Chancellor Laster is the fact-finder. If any of the defendants are found liable for breach of the duty of loyalty, they would have to decide whether to incur greater costs in appealing that decision. If Holbrook and/or other defendants are found liable for breach of the duty of loyalty in connection with the Exchange Transaction, EMAK would be owed millions of dollars by such defendants to recoup the Fee

Award and other legal fees, and any appeal of the Fee Award would be by such defendants, not EMAK.[3]

### B. The Persons Now Seeking to Be Paid by EMAK

14. EMAK is seeking permission to pay, among others, EMAK consultants/former employees Teresa Tormey, Roy Dar, Michael Sanders, and Duane Johnson. As discussed above, in the Delaware Action, plaintiffs presented evidence of how Holbrook and the Board had improperly caused EMAK to expend millions of dollars in legal fees in order to defeat an election contest. Plaintiffs also presented evidence of how Holbrook had caused EMAK to pay hundreds of thousands of dollars in unwarranted bonuses and severance benefits to Tormey, Dar, Sanders and Johnson in order to buy their loyalty and votes during the control contest.

15. Vice Chancellor Laster took note of that evidence when deciding that BMF was entitled to be paid promptly:

> For its part, EMAK has not hesitated to pay its own counsel and Crown's counsel over $5 million to litigate against the plaintiffs. EMAK has also paid significant bonuses to senior management during this corporate control dispute, including to individuals whose loyalty to the corporation has been called into question by the considerable evidentiary record developed by the plaintiffs.

(Ex. H at 4)

16. Earlier this year, the Personnel Review Committee of EMAK's Board of Directors oversaw an investigation of whether Holbrook could be terminated for cause under his employment agreement. A leading California employment law firm undertook the investigation and concluded that Holbrook was subject to termination for cause on six separate grounds. As stated in their report (attached to the Friedlander Declaration as Exhibit I without exhibits), one of those grounds was Holbrook's failure "to timely inform the Board of the fracture in his

---

[3] It is beyond the scope of this Opposition to address the many issues concerning the administration of these cases, and whether it is appropriate to leave current management in control of the Debtors as debtors-in-possession. BMF reserves all of its rights and claims in this regard, and will take such action as may be appropriate to bring these issues to the Court for adjudication.

Case 2:10-bk-42779-RN    Doc 26    Filed 08/12/10    Entered 08/12/10 09:36:29    Desc
Main Document    Page 9 of 19

relationship with Burger King and the deteriorating business relationship with Burger King and the enterprise-threatening result to EMAK that fracture and deterioration portended." (Ex. I at 4) As noted above, Vice Chancellor Laster similarly "questioned whether the board got full information from Holbrook about the events leading up to the Burger King transaction." (Ex. F at 91) Burger King reportedly contributed in excess of 50% of EMAK's total revenues in 2007, 2008, and 2009, which revenue stream is now lost due to Burger King's termination of its relationship with EMAK in September 2009. (Tormey Decl. ¶ 22)

17. On March 25, 2010, Holbrook filed an affidavit in the Delaware Action (attached to the Friedlander Declaration as Exhibit I without exhibits) in which he stated that EMAK management had "a process for replacing EMAK's bank line, and plan on continuing to follow that process." (Ex. J ¶ 6) On June 9, 2010, EMAK issued a press release (attached to the Friedlander Declaration as Exhibit K) stating that EMAK's "credit facility expired in April 2010," that EMAK had cash and cash equivalents of $10.1 as of March 31, 2010, and that "EMAK has sufficient liquidity on-hand." (Ex. K at 4) Tormey's Declaration states that as of June 9, 2010, "the Companies had $7.6 million in cash" and "outstanding legal fees and expenses of $2.4 million[.]" (Tormey Decl. ¶ 19) Holbrook and the consultants apparently allowed the credit facility to expire, continued to pay millions of dollars of legal fees to defense counsel, and failed to accrue for BMF's fee application, which they had known about since February 2010.

C. **EMAK's Largest Listed Creditors**

18. Apart from BMF, EMAK lists eight unsecured creditors with claims in excess of $100,000. One of those claimants is the City of Los Angeles. Three of the claimants are consultants Sanders, Johnson and Dar. The other four claimants are law firms who have represented either EMAK, Holbrook, or Crown in the Delaware Action.

19. The largest of the claimants is Ropes & Gray LLP, counsel to Holbrook and former counsel to EMAK, which is reportedly owed $411,027.52. EMAK's petition makes no mention of EMAK's potential claim for professional malpractice against Ropes & Gray LLP, for its role in drafting and implementing the Exchange Transaction and advising the Board respecting the Exchange Transaction. The corporate partner from Ropes & Gray LLP testified in the Delaware Action that (i) he was not admitted to practice law in Delaware, (ii) he had not consulted with Delaware counsel, (iii) he had never previously advised a board of directors respecting a transaction that impacted voting rights in the midst of an election contest, (iv) he was unfamiliar with a leading precedent under Delaware law about director fiduciary duties during an election contest (*Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 561 (Del. Ch. 1988)), and (v) he was vacationing in Turkey the day he advised the EMAK Board respecting the Exchange Transaction and had not closely read an email from a director challenging the legality of the Exchange Transaction under *Blasius*. (Austin Dep. of 11/14/09, at pp. 16-26) (attached to the Friedlander Declaration as Exhibit L).

20. The next two-largest listed creditors are law firms that represent Crown. On December 3, 2009, EMAK's Board of Directors purported to authorize the reimbursement of Crown's legal fees relating to the Exchange Transaction even though only three of the six directors present voted in favor of the resolution, less than the majority required by Section 141(b) of the Delaware General Corporation Law.

## II.
## OBJECTION TO CONSULTING MOTION

The Court should deny the Consulting Motion because it is unfounded, contrary to the best interest of the estates, and fraught with self-dealing. The four individuals that the Debtors seek to pay – Tormey, Dar, Sanders, and Johnson – are the Debtors' former officers and insiders

who received "significant bonuses" during a control contest in which they cast decisive votes and "whose loyalty to the corporation has been called into question by the considerable evidentiary record developed by the plaintiffs." See Friedlander Declaration, Exhibit H at 4.

Here, the Debtors propose that the Bankruptcy Court now authorize, in what is purported to be in the best interest of the estates, these same persons to receive severance payments as well as monthly consulting fees. In all instances, the payments are for part-time work, but the awards to these former insiders are still quite handsome. If the Consulting Motion is granted, Tormey will receive monthly severance payments of $32,680.00 plus monthly consulting fees of $32,000.00, for a total of $64,680.00 per month for 80 hours of work, or basically half-days.[4] Dar will receive monthly severance payments of $18,700.00 plus monthly consulting fees of $10,000.00, for a total of $28,700.00 per month for 40 hours of work, or approximately one full week per month. Johnson will receive monthly severance payments of $19,950.00 plus monthly consulting fees of $6,250.00, for a total of $26,200.00 per month for 25 hours of work, or approximately three full days per month. Sanders will receive monthly severance payments of $22,033.34 plus monthly consulting fees of $7,500.00, for a total of $29,533.34 per month for 25 hours of work, or approximately three full days per month. In all, the proposed payments to these "consultants" total almost $150,000 per month.

As is the case with all of the First Day Motions, the Debtors are less than specific and clear about the services these individuals will perform or why they are necessary. What are their roles? What tasks will they undertake? Why are their services only part time, and why is their compensation so expensive for part-time work? The "evidence" offered by the Debtors in regard to the Consulting Motion is thin, to say the least. Although the Debtors rely upon the "necessity of payment" doctrine, Consulting Motion, pp. 15-16, and the broad equitable powers of the

---

[4] A typical work month of eight hours per day, five days a week, for four weeks would be 160 hours per month.

Bankruptcy Court under 11 U.S.C. § 105(a), Id., nowhere do the Debtors explain why these payments are necessary to retain these individuals, what alternatives there are available to the Debtors to find qualified part-time personnel who would not saddle the estates with the hefty severance payments proposed to be made, or what specific services these consultants are to be rendering *__to the Debtors__*. The Debtors blur the distinctions in each of their First Day Motions between the Debtors in these bankruptcy cases and the non-Debtor affiliates who are not subject to creditor's or this Court's scrutiny. While these consultants may perform "vital" functions for the non-Debtor subsidiaries, there is no clear explanation of their roles on behalf of the Debtors themselves, or why these bankruptcy estates should be saddled with these administrative claims.

Simply put, the compensation is far too high for the work to be performed, and it shows that the compensation is a thinly veiled disguise to pay insiders prepetition claims for prepetition severance agreements based on employment contracts terminated prepetition. Instead of properly classifying the severance claims as general unsecured prepetition debt[5], the insiders have arranged to be paid as administrative priority claimants under the guise of postpetition consulting agreements. While this arrangement is certainly in the best interest of these former insiders, it is not in the best interest of the Debtors' estates. The court should not approve such schemes.

The court should deny the Consulting Motion and require these former insiders to be employed and compensated under 11 U.S.C. §§ 327, 328, 330, and/or 331, or at the very least file insider compensation forms with the Office of the United States Trustee to allow parties in interest an opportunity to review the terms of these contracts in detail, object (if appropriate) and

---

[5] The severance payments that are proposed to be paid to the consultants would be entitled to priority under 11 U.S.C. § 504(a)(4), if at all, only to the extent of $10,950 *in total* for each employee. Here, the *monthly* severance payments proposed by the Debtors to be made to each of the consultants exceeds the amount each consultant would be entitled to receive, if such claims were otherwise appropriate, as a legitimate priority claim under the Bankrutpcy Code.

have a hearing. The Debtors have asserted that the proposed payments to the former insiders are in the ordinary course of business, but the factual record shows otherwise. The ordinary course of the Debtors' business was to operate with 35 employees and pay compensation to its management in due course. However, in the first six months of 2010, the Debtors undertook a course outside the ordinary in terminating all but six employees, terminating management, paying management hefty severance compensation, and undertaking a corporate restructuring. To say the least, the Debtors are not operating in an ordinary course, and this proposed compensation requires court approval with due process far more substantial than a 48-hour emergency motion.

In addition to the concerns expressed above, in the Consulting Motion, the Debtors cite to case law recognizing the importance of a stable employee base as a valuable asset contributing to going-concern value, aiding rehabilitation, and contributing to the success of a reorganization. Here, however, in light of the Court of Chancery's observations of breach of fiduciary duty as part of a $2.5 million judgment in a shareholder derivative suit, it would appear that these individuals may not be assets but rather liabilities for the estates. Even if their participation in the Debtors' operations is necessary (which cannot be determined from the Consulting Motion), it cannot merit such a high price. Therefore, the Consulting Motion should be denied.

### III.
### OBJECTION TO CASH MANAGEMENT MOTION

The court should deny the Debtors' request to maintain the cash management system because the system imprudently permits the Debtors cash assets to flow in and out of the estates and be commingled with non-estate assets without any reliable assurance of accounting for estate property. As described by the Debtors, the cash management system consists of nine bank accounts held by three entities (Bank of America, EMAK Service, and Equity Marking, Inc.),

only one of which is a debtor in these cases. The bank accounts accept, commingle, and disburse cash from several of the Debtors' subsidiaries, including transferring funds outside United States jurisdiction to a subsidiary in Hong Kong. The cash – some of which might be the Debtors' and some of which might not – is used to pay the expenses of the Debtors' subsidiaries based on estimated allocations, which the Debtors admit are subjective. It is unclear what cash belongs to the Debtors, much less which of these two debtors it might belong to, and what cash belongs to which subsidiary. It is also unclear when, how, and how much the Debtors are paid, whether it is from dividends, intercompany loans, or another method. Worse yet, the motion seeks to grant blanket super-priority claims for intercompany, postpetition loans to non-debtor affiliates in violation of the due process provided by 11 U.S.C. § 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure as a matter of course.

There is a fundamental lack of transparency where numerous corporate entities share bank accounts, commingle funds, pay expenses based on allocation estimates, and make each other intercompany loans as a matter of course. This lack of transparency does not safeguard estate assets, which is fundamental to the Bankruptcy Code's protection of creditors' rights. The problem here is worsened because the Debtors are in bankruptcy but their subsidiaries are not, and the cash management system is a bridge between the two worlds. The Debtors have stated in their pleadings that the "Companies [i.e., the Debtors together with their subsidiaries] are an integrated enterprise using a centralized cash management system." Cash Management Motion, p. 2. The Debtors can use the cash management system and their bankruptcies to protect assets from creditors at their choosing, then use the non-debtor entities and the cash management system to transfer assets out of the estate and beyond the scrutiny of the court and the United States Trustee.

The entire cash management system is largely for the benefit of the subsidiaries at the expense of the Debtors' estates. There is little benefit to the Debtors in maintaining this system, except for the tangential benefit that profitable subsidiaries could result in profits to the Debtors, though exactly how remains unexplained. In contrast, the detriment to the Debtors' estates is palpable as the cash management system allows the Debtors to give super-priority liens to its subsidiaries while draining assets out of the estates to those subsidiaries. Therefore, the court should deny the Cash Management Motion because it is not in the best interest of the estates.

If, however, the court allows the Debtors to maintain the cash management system, then the Debtors should be required to produce far more information, including (i) a complete accounting of assets in and out of all the Companies that use the cash management system, (ii) a detailed budget of revenues and expenses for the Companies that use the cash management system, (iii) a detailed accounting of all expenses for the Companies that use the cash management system, and (iv) full transparency of all books and records of the Companies that use the cash management system.[6]

///

///

///

///

---

[6] The supplemental declaration of Ms. Tormey does not address these concerns at all. The focus of Ms. Tormey's supplemental declaration is on the *consolidated* operations of the Debtors *and* the non-Debtor affiliates, and there is the suggestion that, because the consolidated enterprise will be profitable on an accrual basis (i.e., on the basis of post-petition EBITDA), somehow the Debtors are a net beneficiary of the cash management system. This mixes apples and oranges however. The chart attached as Exhibit A to the supplemental Tormey declaration does not reflect how the cash management system ultimately affects the Debtors' cash position at the end of the period. Ms. Tormey states that the Debtors currently hold $2.6 million in unrestricted cash (which would be enough to pay the claim that precipitated this bankruptcy filing in full), Supplemental Tormey Declaration, p. 3, and then proceeds to describe a monthly accrual-based forecast. How much cash remains in the Debtors as a result of the maintenance of the cash management system? Like most of the other details regarding the Debtors' operations and interactions with its subsidiaries, this question is never answered.

## IV.
## CONCLUSION

BMF respectfully requests that the Court deny the Motions for the reasons explained above. BMF further requests that the Court order such other relief as the Court deems proper.

Dated: August 12, 2010                    Bouchard, Margules & Friedlander, P.A.

                                          By:  /s/ David L. Neale
                                               David L. Neale
                                               Ron Bender
                                               Irving M. Gross
                                               LEVENE, NEALE, BENDER,
                                               YOO & BRILL L.L.P.
                                               Attorneys for Bouchard, Margules &
                                               Friedlander, P.A.

| In re EMAK WORLDWIDE, INC.<br>In re EMAK WORLDWIDE SERVICE CORP.<br>Debtor(s). | CHAPTER 11<br>CASE NO 2:10-bk-42779-RN<br>Jointly Administered with<br>Case No. 2:10-bk-42784-RN |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as OBJECTION OF BOUCHARD, MARGULES & FRIEDLANDER, P.A. TO: (1) DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTORS TO PERFORM CONSULTING AGREEMENTS WITH TERESA TORMEY, ROY DAR, MICHAEL SANDERS AND DUANE JOHNSON IN THE ORDINARY COURSE; AND (2) DEBTORS' EMERGENCY MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 345, 363 AND 364: (A) AUTHORIZING (i) MAINTENANCE OF EXISTING BANK ACCOUNTS, (ii) CONTINUED USE OF EXISTING BUSINESS FORMS, AND (iii) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM; (B) AUTHORIZING CERTAIN INTERCOMPANY TRANSACTIONS; (C) EXCUSING THE 11 U.S.C. § 345(b) DEPOSIT AND INVESTMENT GUIDELINES will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 12, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Ron Bender   rb@lnbrb.com
- Russell Clementson   russell.clementson@usdoj.gov
- Daniel Denny   ddenny@gibsondunn.com
- John-patrick M Fritz   jpf@lnbrb.com
- Irving M Gross   img@lnbrb.com, angela@lnbrb.com
- Kerri A Lyman   klyman@irell.com
- David L. Neale   dln@lnbrb.com
- Jeffrey M. Reisner   jreisner@irell.com
- United States Trustee (LA)   ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **August 12, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
Jeffrey M. Reisner, Esq.
Michael H. Strub, Jr., Esq.
Kerri A. Lyman, Esq.
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324

☐ Service information continued on attached page

1

1

2

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 12, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**VIA EMAIL**
Jeffrey M. Reisner, Esq.
at: jreisner@irell.com

Michael H. Strub, Jr., Esq.
at: mstrub@irell.com

Kerri A. Lyman, Esq.
at: klyman@irell.com

**AND SEE ATTACHED SERVICE LIST**

**VIA ATTORNEY MESSENGER DELIVERY**
Hon. Richard Neiter
U.S. Bankruptcy Court
255 E. Temple Street, Ctrm 1645
Los Angeles, CA 90012            ☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

| **August 12, 2010** | Jason Klassi | /s/ Jason Klassi |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                           F9013-3.1

2

jreisner@irell.com; mstrub@irell.com; klyman@irell.com; jfriedlander@bmf-law.com; thad.davis@ropesgray.com; sjenkins@ashby-geddes.com; stalley@gibsondunn.com; mike.sanders@emak.com; duane.johnson@emak.com; knachbar@mnat.com; roy.dar@emak.com; russ.sauer@lw.com; cpm085@hotmail.com; mui.klein@emak.com; mnunis@JHCohn.com; Martha.roberts1@gmail.com; ellen.francisco@emak.com; numbermonkey@comcast.net; jose.figueroa@emak.com; patrickhanrahan@gmail.com; CSeitzJr@cblh.com; russell.clementson@usdoj.gov; dhurst@ycst.com; jkirkland@luce.com;