1 | IRELL & MANELLA LLP
Jeffrey M. Reisner (State Bar No. 143715)
2 | jreisner@irell.com
Michael H. Strub, Jr. (State Bar No. 153828)
3 | mstrub@irell.com
Kerri A. Lyman (State Bar No. 241615)
4 | klyman@irell.com
840 Newport Center Drive, Suite 400
5 | Newport Beach, California  92660
Telephone:  (949) 760-0991
6 | Telecopier:  (949) 760-5200

7 | [Proposed] Reorganization Counsel for the
Debtors and Debtors-in-Possession

8 |

UNITED STATES BANKRUPTCY COURT

9 |

CENTRAL DISTRICT OF CALIFORNIA

10 |

LOS ANGELES DIVISION

11 |

| In re | Case No. 10-bk-42779-RN |
|---|---|
| | Jointly Administered With<br>Case No. 2:10-bk-42784-RN |
| ☒ EMAK WORLDWIDE, INC., a Delaware corporation, | Chapter 11 Proceeding |
| ☒ EMAK WORLDWIDE SERVICE CORP., a Delaware corporation, | **DEBTORS' CHAPTER 11 STATUS REPORT; DECLARATION OF TERESA L. TORMEY IN SUPPORT THEREOF** |
| Debtors. | Status Conference:<br>Date:    September 16, 2010<br>Time:    10:00 a.m.<br>Place:   Courtroom 1645<br>         255 East Temple Street<br>         Los Angeles, CA 90012 |

21 | **TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY**

22 | **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES-**

23 | **IN-INTEREST:**

24 |          On August 5, 2010 (the "Petition Date"), EMAK Worldwide, Inc. ("EMAK") and EMAK

25 | Worldwide Service Corp. ("EMAK Service" and, collectively with EMAK, the "Debtors"), the

26 | debtors and debtors-in-possession herein, filed voluntary petitions under chapter 11 of Title 11 of

27 | the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "Bankruptcy Code").  The

28 | Debtors' cases are being jointly administered by this Court as Case No. 10-bk-42779-RN.  The

2297193.5 03

1  Debtors hereby submit this Case Status Report and the Declaration of Teresa L. Tormey (the

2  "Tormey Declaration") pursuant to this Court's Order.

3  **A.    The Debtors**

4          1.    The Debtors' Businesses

5          EMAK, through its wholly-owned subsidiaries, is in the business of providing marketing

6  services and promotional products.  EMAK Service is a wholly-owned subsidiary of EMAK.

7  EMAK Service is the corporate "back-office" for EMAK, providing centralized services to

8  EMAK and all of its subsidiaries.

9          EMAK is the parent company of a number of entities (the "EMAK Subsidiaries" and,

10 collectively with EMAK and EMAK Service, the "Companies") which provide strategic planning

11 and research, consumer insight development, entertainment marketing, design and manufacturing

12 of custom promotional products, marketing for children, event marketing, shopper marketing and

13 environmental branding.  The Companies' businesses are divided into two primary sectors –

14 marketing services and promotional products.  The promotional products business includes

15 planning and implementing promotional programs using licensed popular characters from studios

16 such as Warner Bros. and Universal.  The Companies also design and arrange for the

17 manufacturing of a variety of items, such as figurines and plush toys, for their clients' campaigns.

18 In 2007, 2008 and 2009, the promotional products business accounted for the majority of the

19 Companies' sales, with long-time customer Burger King Corporation accounting for

20 approximately half of the Companies' revenue.  The Companies also provide marketing services,

21 which include event and collaborative marketing, as well as retail and environmental design

22 services.

23         The Companies' blue-chip clients include Procter & Gamble, Kraft, Kohls, Safeway,

24 Disney, and Jamba Juice, among others.

25         2.    The Debtors' Corporate Structure

26         EMAK has a number of direct and indirect wholly-owned subsidiaries, which are

27 reflected on the Organizational Chart attached to the Tormey Declaration as Exhibit A.  EMAK

28 owns 100% of the following entities:

2297193.5 03

- Equity Marketing, Inc., a Delaware corporation, which provides promotional products.
- Logistix Marketing Inc. (f/k/a SCI Promotion, Inc.), a Delaware corporation, which provides promotional products.
- Logistix, Inc., a Delaware corporation, which provides promotional products.
- Equity Marketing Hong Kong, Ltd., a Delaware corporation with four subsidiaries, EMAK Asia Holding Company Limited, a Hong Kong company, EMAK China Limited, a Hong Kong company and EMAK Hong Kong Limited, a Hong Kong company and Pine Wisdom Limited, a Hong Kong company.  These entities provide manufacturing support services to the Companies for the production of promotional products, such as figurines and plush toys, by the Companies' contract manufacturers in China.
- Upshot, Inc., a Delaware corporation, which provides marketing services.
- Neighbor, Inc., a Delaware corporation, which provides marketing services.
- EMAK Europe Holdings, Limited, a United Kingdom company with two subsidiaries, Megaprint Group, Ltd., a United Kingdom Company and Logistix Limited, a United Kingdom Company.  Megaprint Group, Ltd. also has two subsidiaries, Megapomotions B.V., a Dutch Company and Logistix Marketing GmbH (f/k/a Megapromotions GmbH), a German Company. These entities are no longer operating and three of the entities are now in liquidation proceedings in Europe.
- Corinthian Marketing, Inc., a Delaware corporation, which is no longer active.
- Logistix Retail, Inc. (f/k/a Pop Rocket, Inc.), a Delaware corporation, which is no longer active.
- Johnson Grossfield, Inc., a Delaware corporation, which is no longer active.

3.    Debtors' Principal Assets and Liabilities

EMAK's principal assets consist of its interests in its wholly-owned subsidiaries (set forth above).  EMAK's principal liabilities are former employee obligations arising from a

1 | decentralization and restructuring of the Companies' operations and legal fees relating to on-going

2 | litigations.

3 |      EMAK Service is a wholly-owned subsidiary of EMAK.  EMAK Service's principal asset

4 | is cash received from the Companies.  EMAK Service's principal liabilities are current and former

5 | employee obligations.

6 | **B.      The Chapter 11 Cases**

7 |      1.      <u>Major Events Leading to the Debtors' Chapter 11 Filings</u>

8 |      A number of factors have contributed to the Debtors' current financial crisis, including

9 | the following:

10 |      a.      Declines in Revenue.

11 |      One factor leading to the Debtors' current financial position is the decline in revenues

12 | from the Companies' promotional products business, which had accounted for approximately

13 | 50% of the Companies' revenue in the last several years.  The Companies' promotional products

14 | business is conducted through Equity Marketing, Inc., Logistix Marketing, Inc. and Logistix, Inc.

15 | The products business industry has been generally declining for several years.  Until 2009,

16 | Equity Marketing, Inc.'s primary and the Companies' largest client was Burger King Corporation

17 | (including its franchise purchasing cooperative Restaurant Services, Inc. and various distribution

18 | companies), a company with whom Equity Marketing, Inc. had a twenty-five year relationship.

19 | However, in September 2009, Burger King terminated its relationship with Equity Marketing,

20 | Inc., although Equity Marketing, Inc. continued to provide transitional services to Burger King

21 | through May 2010.

22 |      In addition to the decline in revenues generated by Equity Marketing, Inc., the

23 | Companies also closed their European based operations in February 2009.  The Companies'

24 | European operations, which were run through EMAK Europe Holdings and its subsidiaries, were

25 | engaged in the production and supply of promotional products as well as other marketing and

26 | advertising materials in printed or other forms.  However, the need for such services in Europe

27 | declined dramatically in recent years in response to regulatory pressures on marketing to children

28 | (primarily restrictions on the television advertisement of unhealthy foods).  Three of the

1   Companies' European subsidiaries are now in liquidation proceedings in Europe –

2   Megapromotions B.V., Logistix Marketing GmbH and Logistix Limited.

3       The Companies' agency services are provided by Upshot, Inc. and Neighbor, Inc.   In the

4   first quarter of 2010, the Companies' revenues from agency services decreased 16 percent as

5   compared to the first quarter of 2009.  This decrease was the result of lower revenues at Upshot,

6   Inc. due, at least in part, to the loss of client Miller Brewing Company following Miller's merger

7   with Coors.  Shortly after losing Miller, however, Upshot, Inc. gained two new clients in the beer

8   and spirits category – Corona and Wild Turkey.

9       As a result of the foregoing business declines and EMAK's strategy to transition from

10  product services to marketing services, beginning in 2009, the Companies implemented a

11  decentralization and restructuring plan, which included reducing their workforces to compensate

12  for the loss of the "product" business revenue.  These changes resulted in expenses of $2.3

13  million in the first quarter of 2010, including $1.7 million related to employee termination costs

14  for corporate staff and management, and $0.6 million related to other employee departures due to

15  the loss of product business.  The Companies have determined that the short term expenses

16  arising from implementing this decentralization and restructuring plan will be more than offset

17  by future efficiencies and cost reductions.  The Companies' remaining workforce reductions

18  under this plan will continue through the end of 2010.

19              b.      Pending Litigations.

20      EMAK is involved in a number of litigation matters (the "Pending Litigations"), the

21  majority of which concern an individual named Donald A. Kurz ("Kurz"), the former CEO of

22  EMAK.  Kurz ceased his role as CEO of EMAK in May 2005.  Following an extensive search,

23  during which time EMAK's Chairman Stephen P. Robeck served as interim CEO, James L.

24  Holbrook, Jr. ("Holbrook") became CEO of EMAK in November 2005.  Kurz also resigned as a

25  member of the EMAK Board of Directors in August 2005.  In 2009, Kurz renewed his efforts to

26  regain control of EMAK (although he had been reappointed to the EMAK Board of Directors in

27  June 2009, following several invitations to rejoin, in an effort by EMAK to amicably resolve

28

2297193.5 03

1    differing views over the direction of EMAK). Kurz's prior efforts to gain control of EMAK from

2    2005 through 2008 were unsuccessful, as was the 2009 campaign.

3                                (1)    *The CA Action.*

4            In September 2009, Kurz and his affiliates filed an action against EMAK in the Los

5    Angeles County Superior Court captioned *Take Back EMAK, LLC, et a. v. Robeck et al.* (the "CA

6    Action") asserting derivative and non-derivative claims for breach of fiduciary duty, gross

7    mismanagement, and unlawful, unfair and fraudulent business practices against EMAK and

8    certain current and former directors of EMAK and seeking in excess of $300 million in damages.

9    In June 2010, plaintiffs filed a first amended complaint, which eliminated non-derivative claims,

10   named additional defendants, eliminated all original plaintiffs other than Robert J. Farina, added

11   Gryphon Promotions, Inc. as a plaintiff and seeks damages in excess of $100 million. On June 20,

12   2010, the California Superior Court sustained the demurrers filed by EMAK and the individual

13   director defendants to the first amended complaint but allowed the plaintiffs ten days leave to

14   amend their complaint. An amended complaint was filed on July 30, 2010, six days prior to the

15   Petition Date.

16                               (2)    *The DE Action and TBE Consent Solicitation.*

17           In October 2009, Kurz and his affiliates filed an action against EMAK in the Delaware

18   Chancery Court captioned *Kurz, et al. v. Holbrook, et al.* (the "DE Action", and together with the

19   CA Action, the "Derivative Litigation") seeking relief concerning an October 19, 2009 transaction

20   by which the outstanding shares of Series AA Stock held by Crown EMAK Partners LLC

21   ("Crown") that did not vote with the common stock for the election of directors were exchanged

22   for shares of a new preferred stock that did vote with the holders of common stock for the election

23   of directors (the "Exchange Transaction").

24           The basis for challenging the Exchange Transaction was that approximately one week prior

25   to the EMAK Board of Directors' final approval of the transaction on October 19, 2009, Take

26   Back EMAK, LLC ("TBE") had delivered a written consent for its one (1) share of common stock

27   seeking the removal of three (3) directors elected by the common shareholders and the election of

28   a TBE nominated slate of three (3) directors (the "TBE Consent Solicitation"), thus commencing a

1  sixty (60) day consent solicitation process under EMAK's bylaws.  While the EMAK Board of

2  Directors had been advised by counsel in approving the Exchange Transaction, which had been

3  under negotiation for many weeks, the DE Action asserted that the wrong level of "scrutiny" had

4  been applied due to the pending TBE Consent Solicitation (i.e., it was asserted that the EMAK

5  Board of Directors used the "business judgment" standard rather than the higher "compelling

6  justification" standard applied to board actions infringing on stockholder franchise rights).  With

7  the Exchange Transaction in place, the TBE Consent Solicitation would most certainly have

8  failed, as it did not have the support of Crown, which held 28% of the voting power.

9        Despite ratification of the Exchange Transaction by both a majority of common stock and a

10  greater than 60% supermajority of EMAK's voting securities, the plaintiffs in the DE Action

11  continued to pursue their challenge, unconvinced that the stockholders did not support their

12  position.  Faced with mounting legal costs and significant distraction to management's efforts to

13  focus on the decentralization and restructuring plans that were being implemented, the Exchange

14  Transaction was rescinded by mutual agreement of the EMAK Board of Directors and Crown on

15  December 3, 2009, leaving it to the common stockholders to determine whether the TBE Consent

16  Solicitation would succeed or fail.

17        From October 12, 2009 to December 21, 2009, and during the pendency of the DE Action,

18  the TBE Consent Solicitation continued.  When it became apparent that EMAK's stockholders did

19  not support the DE Plaintiffs, Kurz purchased the non-transferable shares of a former EMAK

20  employee, Peter Boutros, in order to obtain the requisite number of votes.  On February 9, 2010,

21  the Delaware Court of Chancery ruled that TBE had successfully elected their slate of directors.

22  EMAK appealed and on April 21, 2010, the Delaware Supreme Court ruled that TBE had not

23  successfully elected its slate of directors because its purchase of non-transferable shares was

24  improper, and such shares could not be voted in favor of the new slate.  EMAK incurred

25  substantial legal fees in connection with litigation pursued in the DE Action to successfully

26  challenge the results of the TBE Consent Solicitation.  Even though Kurz and his affiliates went

27  into the TBE Consent Solicitation owning nearly 40% of EMAK's common stock, they could not

28  (lawfully) get holders of an additional 10% of the common stock to support their slate.

1    Notwithstanding the eventual ruling of the Delaware Supreme Court against TBE, during

2  the ten-week period in which the board of directors purportedly elected by TBE (the "TBE

3  Board") were in control, the TBE Board took numerous actions including: (i) electing Kurz as

4  EMAK's president; (iii) forming a Litigation and Structural Review Committee to manage the

5  pending litigation; and (iii) forming a Personnel Review Committee to, among other things, (a)

6  determine Kurz's compensation and (b) investigate whether Holbrook should be terminated for

7  cause.  While in control of EMAK, the TBE Board contracted with numerous service providers,

8  such as investment bankers, a public relations company and a research consultant, on the

9  Companies' behalf.  This included the retention of (i) Luce, Forward, Hamilton & Scripps, which

10  had previously served as counsel to the plaintiffs in the DE Action, as corporate counsel, (ii)

11  Bouchard, Margules & Friedlander, which previously served as counsel to the plaintiffs in the DE

12  Action, as Delaware litigation counsel, and (iii) Richards, Layton & Finger as Delaware corporate

13  counsel.  These expenses totaled approximately $800,000 in the first quarter of 2010.

14    On February 24, 2010 (as amended on May 3, 2010), counsel for the plaintiffs in the DE

15  Action filed an interim fee application requesting $2.85 million (constituting 87% of EMAK's

16  remaining available cash and more than 50% of the current market capitalization of EMAK's

17  common stock) in contingent attorneys fees and expenses to litigate claims in the DE Action based

18  upon the "significant benefits" of their services to EMAK and its shareholders, primarily in

19  "forcing" the rescission of the Exchange Transaction.  EMAK vigorously opposed the fee

20  application.

21    On July 19, 2010, the Delaware Court of Chancery that originally upheld the stock

22  purchase later disapproved by the Delaware Supreme Court issued an order awarding interim fees

23  to the plaintiffs' counsel (Bouchard, Margules & Friedlander) of $2.5 million to be paid within

24  five business days, with no immediate right of appeal granted to EMAK.

25    The Debtors contend that the Derivative Litigation has *not benefited* the holders of

26  EMAK's common stock.  Instead, those holders are indisputably worse off now than they would

27  have been had the DE Action never been brought, because the preferred stockholder now has the

28  unilateral right to designate two-thirds of EMAK's board members.  Had plaintiffs allowed the

1    Exchange Transaction to stand, the preferred stock would have controlled only 28% of the voting

2    power for the election of EMAK directors, but been assured of <u>no</u> board seats.

3         The Debtors further contend that the Derivative Litigation was never for the benefit of all

4    of the holders of EMAK's common stock; rather, the contest for control was waged to benefit the

5    former CEO and his affiliates at the expense of EMAK and its other stockholders (both common

6    and preferred). Indeed, upon gaining temporary control of EMAK, Kurz and his slate immediately

7    installed Kurz as President and paid more than $100,000 in consulting fees to Kurz and his

8    affiliates, including one of the other TBE nominees.

9         If the Exchange Transaction had gone forward, Crown's preferred stock would have lost

10   the important right to elect two directors to EMAK's Board of Directors and, in exchange for the

11   surrender of that right, would have voted with the common for the election of all directors. Had

12   the Exchange Transaction occurred, Crown would have had nearly 2.77 million votes, and Kurz

13   and his group would have had 2.77 million votes. The remaining stockholders – including three

14   other large stockholders whose sole interest was in seeing EMAK succeed financially – would

15   have decided the fate of EMAK. In other words, a majority of all shares (common and preferred)

16   would have controlled the direction of EMAK. <u>In the view of the EMAK Board of Directors that</u>

17   <u>approved the Exchange Transaction, this was a result that leveled the playing field and permitted</u>

18   <u>all stockholders an appropriate voice in EMAK's future.</u>

19        In response to the DE Litigation and Kurz's continued efforts to control EMAK, Crown

20   and other common stockholders constituting a 60% supermajority acted to amend EMAK's

21   Bylaws to reduce the size of the Board to three members as of EMAK's June 10, 2010 Annual

22   Meeting, two of whom are elected by Crown (although Crown agreed for one year to elect at least

23   one director who is independent of it and of EMAK). Thus, the holders of EMAK's common

24   stock are in a *worse* position than they were in before the DE Action began from a voting power

25   perspective.

26              (3)    *The Costs of the Derivative Litigation.*

27        Legal fees directly related to the Derivative Litigation totaled more than $2.3 million in

28   2009 and $3.3 million in the first six months of 2010, and they continue to mount. In addition to

2297193.5 03                                        - 9 -

1  the July 2010 $2.5 million fee award in the DE Action, the Debtors estimate that continuation of

2  the Derivative Litigation through the second half of 2010 would result in an additional $2.0

3  million in legal fees, bringing the cumulative legal fees for the Derivative Litigation as of

4  December 31, 2010 to $10.1 million.  Prolonged litigation has had a material adverse effect on

5  EMAK's financial condition and results of operations.  Continued litigation can only be expected

6  to result in the liquidation of the Debtors.

7                                   (4)      *Other Litigation.*

8            In addition to the Derivative Litigation, EMAK is a party to other litigation, which the

9  Debtors view as ordinary course litigation.  In May 2010, EMAK filed an action against Kurz,

10  TBE and Peter Boutros ("Boutros") in Los Angeles County Superior Court captioned *EMAK*

11  *Worldwide, Inc. v. Kurz, et al.* (the "Boutros Action") alleging claims for breach of contract,

12  intentional interference with contract, conspiracy to interfere with contract and negligent

13  interference with contract arising out of the purported sale of restricted securities of EMAK by

14  Boutros to Kurz.  As indicated above, the transaction between Boutros and Kurz, which resulted in

15  TBE purportedly achieving a slight majority in its efforts to unseat EMAK's directors, was held

16  invalid by the Delaware Supreme Court in the DE Action.  While tangentially related to the

17  Derivative Litigation, the Debtors view the Boutros Action as routine enforcement of EMAK's

18  contract rights.

19            On July 21, 2010, Kurz filed an action against EMAK in the Delaware Chancery Court

20  seeking advancement of attorneys' fees and indemnification as a director of EMAK in connection

21  with the Boutros Action (the "Advancement Action").  The Advancement Action also seeks

22  advancement of fees and indemnification in connection with the Advancement Action itself, as

23  well as advancement of fees and indemnification in connection with counterclaims filed by

24  EMAK in the DE Action.

25            In January 2010, Wells Fargo Securities, LLC (as successor to Barrington Associates)

26  ("Wells Fargo") commenced an arbitration action against EMAK alleging that a $1 million

27  contingent fee was owed to Wells Fargo in connection with the Exchange Transaction.  Wells

28  Fargo originally was engaged by EMAK following an unsolicited indication of interest in the

1    Companies from Marlin Capital in June 2008 sponsored by Kurz.  EMAK has vigorously

2    defended this action.

3          Finally, on July 15, 2010, EMAK was served with a writ of summons filed in The

4    Netherlands on behalf of a former employee of EMAK's Dutch subsidiary Megapromotions B.V.,

5    which was placed in bankruptcy liquidation in February 2009 (the "Employment Action").  The

6    Employment Action asserts claims for in excess of 500,000 Euros consisting of contractual

7    severance relating to an employment agreement terminated by the bankruptcy trustee of

8    Megapromotions B.V., as well employee expenses, contractual bonuses and overdue pension

9    contributions.  The Employment Action alleges that EMAK is obligated as the guarantor of

10   Megapromotions B.V. despite the intervening bankruptcy liquidation and actions of the trustee.

11   EMAK intends to vigorously defend this action.

12          2.      What the Debtors Hope to Accomplish in these Chapter 11 Cases

13          Since the beginning of their Chapter 11 cases, the Debtors have focused on complying with

14   various deadlines set by the U.S. Trustee, filing their Schedules and Statements of Financial

15   Affairs, and filing a motion to establish a bar date.  All of the deadlines have been met without

16   extension.  The Debtors are currently evaluating their operations and completing their

17   decentralization plan, and intend to continue to transition their operations into the more profitable

18   marketing services business.   The Debtors also hope to resolve the claims affecting them and to

19   propose and confirm a plan of reorganization that will allow emergence from Chapter 11 with a

20   practical claims paying mechanism.  To that end, the Debtors have attempted to establish a

21   dialogue with several of their principal claimants.

22          3.      Principal Disputes or Problems Likely to be Encountered During These

23                  Cases and How Debtors Recommend Such Disputes Will be Resolved

24          The commencement of the bankruptcy case has provided the Debtors with a breathing spell

25   from the various litigations that were placing a strain on the Debtors' finances.  The Debtors intend

26   to continue to reach out to the other parties to these litigations in an effort to resolve these matters

27   as expeditiously as possible, preferably through settlement or mediation rather than continued

28   litigation.

1        4.    <u>Compliance with the Duties set forth in Sections 521 and 1107 of the</u>

2        <u>Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007</u>

3        The Debtors have timely complied with the requirements set forth in sections 521 and

4    1107 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure,

5    including filing their Schedules and Statements of Financial Affairs on August 19, 2010.  The

6    Debtors have also timely complied with all requirements imposed by the Office of the United

7    States Trustee.

8        5.    <u>The Debtors are Not Small Businesses</u>

9        The Debtors are not small businesses within the meaning of section 101(51B) of the

10   Bankruptcy Code.

11       6.    <u>These Chapter 11 Cases are Not Single Asset Real Estate Cases</u>

12       The Debtors' Chapter 11 cases are not single asset real estate cases within the meaning of

13   section 101(51B) of the Bankruptcy Code.

14   **C.    Professionals Retained or to be Retained by the Estates**

15       On August 24, 2010, the Debtors filed their Application to Employ Irell & Manella LLP as

16   reorganization counsel.  Additionally, EMAK has filed or anticipate shortly filing applications to

17   employ the following as special litigation counsel, all of which represented EMAK prior to the

18   Petition Date:

19       • Latham & Watkins, a California law firm, represents EMAK in connection with the

20         Derivative Litigations and the Boutros Action.

21       • Morris Nichols Arsht & Tunnell, a Delaware law firm, represents EMAK in

22         connection with the DE Action.

23       • Gallo and Associates, a California law firm, represents EMAK in connection with

24         the arbitration involving Wells Fargo.

25       • Loyens & Loeff N.V., a Dutch law firm, represents EMAK in connection with the

26         Employment Action.

27       The Debtors also expect to file an application to employ J.H. Cohn LLP, an accounting

28   firm, to assist the Debtors in preparing financial statements.

1    The Debtors anticipate that the monthly cost of professional fees and costs, excluding the

2    fees and costs payable to Irell & Manella that will be funded from the $1.1 million retainer paid by

3    the Debtors pre-petition, will be, on average, approximately $125,000 if the Pending Litigations

4    are resolved consensually through mediation or otherwise and at least $333,000 per month if the

5    Pending Litigations are completely reactivated.

6    **D.    Projected Income and Expenses for the First Six Months of this Case**

7    Attached to the Tormey Declaration as <u>Exhibit B</u> is a budget showing projected income,

8    expenses and cash flow for the first five months of these Chapter 11 cases, from August 2010 to

9    December 2010 on a month by month basis (the "<u>Budget</u>") (the same as previously filed by the

10   Debtors on August 19, 2010 [Docket No. 38]), as well as a comparative historical statement of

11   actual income, expenses and cash flow for the twelve months preceding the Petition Date (August

12   2009 to July 2010) on a month by month basis.  The Companies' actual cash flow for August

13   2010, as had been projected by the Debtors in the Budget as originally filed on August 19, 2010,

14   was $1.8 million (net of the Debtors' operating expenses), and includes approximately $700,000 of

15   cash received prior to the Petition Date.

16   The Debtors are unable to provide a six-month budget at this time due to the fact that the

17   Debtors have not yet prepared a budget for fiscal 2011.  The Debtors anticipate that a January

18   2011 budget, which is currently being prepared for presentation to the Debtors' Board of Directors

19   at its quarterly meeting scheduled for September 28, 2010, can be made available to the Court no

20   later than October 1, 2010.  It is not anticipated that the Debtors' January 2011 income, expenses

21   and cash flow will vary materially the historical amounts, with the exceptions of the decrease

22   in Products Segment revenues and the extraordinary legal fees incurred in the prior year period.

23   **E.    The Debtors' Intent to Use Cash Collateral**

24   The Debtors do not intend to use any cash collateral.

25   **F.    Proposed Deadlines for the Filing of Claims, Objections to Claims, and a Plan and**

26   **Disclosure Statement**

27   On September 1, 2010, the Debtor served and filed with this Court their Motion for Order

28   Establishing a Bar Date for Filing Claims.  By the Motion, the Debtors are requesting that the

1  Court establish a date sixty (60) days following service of the notice as the last day to file claims

2  against the Debtors' estates.

3      The Debtors currently anticipate filing a plan and disclosure statement within 180 days

4  after the commencement of these Chapter 11 cases.

5  **G.    Payments or Other Issues Related to Adequately Protecting the Providers of Utilities.**

6      On August 9, 2010, the Debtors filed the Emergency Motion for Order (A) Prohibiting

7  Utilities from Altering, Refusing, or Discontinuing Service; and (B) Deeming Utilities Adequate

8  Assured of Future Performance Pursuant to 11 U.S.C. § 366.  In the motion, the Debtors proposed

9  making a cash deposit to each utility company in the amount equal to one month's average

10  historical invoice amount, within twenty (20) days after the entry of an Order granting the motion,

11  for the purpose of providing each utility company with adequate assurance of payment of its post-

12  petition date services to the Debtors.  On August 19, 2010, the Bankruptcy Court entered its order

13  granting the motion.

14      The Debtors have now provided deposits to all of the utility companies in the required

15  amounts.

16  **H.    Debtors' Unexpired Leases and Executory Contracts and Debtors' Intentions**

17      The Debtors currently are analyzing their unexpired leases and executory contracts and

18  considering their options.  The lease for the Debtors' office space in Los Angeles will expire on

19  December 31, 2010 without extension.  In connection with the Debtors' decentralization and

20  restructuring plan implemented in 2009, it is anticipated that any corporate personnel remaining

21  after December 31, 2010 will be absorbed into office space occupied by the Debtors' operating

22

23  ///

24

25  ///

26

27  ///

28

2297193.5 03

- 14 -

1  subsidiaries in Santa Monica, California and Chicago, Illinois, absent a suitable extension of the

2  current leased space.

3

4  DATED: September 2, 2010                    IRELL & MANELLA LLP

5

6                                             By: _Kerri A. Lyman_

7                                                 Jeffrey M. Reisner
                                                   Kerri A. Lyman
8                                                 [Proposed] Reorganization Counsel for Debtor
                                                   and Debtor-in-Possession
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2297193.5 03                              - 15 -

1    **DECLARATION OF TERESA L. TORMEY**

2    I, Teresa L. Tormey, declare as follows:

3    1.    I am the Corporate Secretary of EMAK Worldwide, Inc. ("EMAK") and EMAK

4    Worldwide Service Corp. ("EMAK Service" and, collectively, the "Debtors"). I was employed by

5    the Debtors, most recently, Chief Administrative Officer (following a promotion from Executive

6    Vice President in 2006 and from Senior Vice President in 2004), General Counsel and Corporate

7    Secretary from November 1, 2002 until March 31, 2010, and, since that time, continue to serve

8    EMAK, pursuant to a consulting agreement, as its chief in-house counsel and Corporate Secretary.

9    I also hold positions of Corporate Secretary and Director with each of EMAK's wholly-owned

10    subsidiaries. Prior to joining the Debtors, I was a partner in the law firm of Oppenheimer Wolff &

11    Donnelly LLP specializing in corporate and securities law as well as mergers & acquisitions.

12    2.    I hold a Bachelor's degree in Economics from UC Davis and a JD (Cum Laude)

13    from Pepperdine University School of Law. During my employment with the Debtors, my

14    responsibilities included overseeing the centralized corporate departments of EMAK and its

15    wholly-owned subsidiaries, including business affairs, human resources, information technology,

16    internal audit, investor relations and office administration. Since March 31, 2010, I have

17    continued to provide services to the Debtors as a consultant. I have general knowledge of the

18    Debtors' books and records, and I am familiar with their financial and operational affairs.

19    3.    I submit this declaration in support of the Debtors' Chapter 11 Status Report (the

20    "Status Report"). Any capitalized term not expressly defined herein shall have the meaning

21    ascribed to that term in the Status Report. In addition to the personal knowledge that I have

22    acquired while working with the Debtors, I also have knowledge of, and familiarity with, the

23    Debtors' books and records, and financial and operational affairs. Except as otherwise indicated,

24    all statements in this Declaration are based upon my personal knowledge, my review of the

25    Debtors' books and records, and other relevant documents, and other information prepared or

26    collected by the Debtors' employees, or upon my opinion based upon my experience with the

27    Debtors' operations and financial condition and those of the troubled companies. In making the

28    statements herein, based upon the foregoing, I have relied in part upon others to accurately record,

2297193.5 03

1    prepare, and collect any such documentation and other information.  If I were called upon to

2    testify, I could and would testify competently to the facts set forth herein.  I am authorized to

3    submit this declaration.

4    **A.    The Debtors**

5                                  The Debtors' Businesses

6           4.      EMAK, through its wholly-owned subsidiaries, is in the business of providing

7    marketing services and promotional products.  EMAK Service is a wholly-owned subsidiary of

8    EMAK.  EMAK Service is the corporate "back-office" for EMAK, providing centralized services

9    to EMAK and all of its subsidiaries.

10          5.      EMAK is the parent company of a number of entities (the "EMAK Subsidiaries"

11   and, collectively with EMAK and EMAK Service, the "Companies") which provide strategic

12   planning and research, consumer insight development, entertainment marketing, design and

13   manufacturing of custom promotional products, marketing for children, event marketing, shopper

14   marketing and environmental branding.  The Companies' businesses are divided into two primary

15   sectors – marketing services and promotional products.  The promotional products business

16   includes planning and implementing promotional programs using licensed popular characters from

17   studios such as Warner Bros. and Universal.  The Companies also design and arrange for the

18   manufacturing of a variety of items, such as figurines and plush toys, for their clients' campaigns.

19   In 2007, 2008 and 2009, the promotional products business accounted for the majority of the

20   Companies' sales, with long-time customer Burger King Corporation accounting for

21   approximately half of the Companies' revenue.  The Companies also provide marketing services,

22   which include event and collaborative marketing, as well as retail and environmental design

23   services.

24          6.      The Companies' blue-chip clients include Procter & Gamble, Kraft, Kohls,

25   Safeway, Disney and Jamba Juice, among others.

26                                The Debtors' Corporate Structure

27          7.      EMAK has a number of direct and indirect wholly-owned subsidiaries, which are

28   reflected on the Organizational Chart attached hereto as Exhibit A.  EMAK owns 100% of the

2297193.5 03                                              - 17 -

following entities:

- Equity Marketing, Inc., a Delaware corporation, which provides promotional products.

- Logistix Marketing Inc. (f/k/a SCI Promotion, Inc.), a Delaware corporation, which provides promotional products.

- Logistix, Inc., a Delaware corporation, which provides promotional products.

- Equity Marketing Hong Kong, Ltd., a Delaware corporation with four subsidiaries, EMAK Asia Holding Company Limited, a Hong Kong company, EMAK China Limited, a Hong Kong company and EMAK Hong Kong Limited, a Hong Kong company and Pine Wisdom Limited, a Hong Kong company. These entities provide manufacturing support services to the Companies for the production of promotional products, such as figurines and plush toys, by the Companies' contract manufacturers in China.

- Upshot, Inc., a Delaware corporation, which provides marketing services.

- Neighbor, Inc., a Delaware corporation, which provides marketing services.

- EMAK Europe Holdings, Limited, a United Kingdom company with two subsidiaries, Megaprint Group, Ltd., a United Kingdom Company and Logistix Limited, a United Kingdom Company. Megaprint Group, Ltd. also has two subsidiaries, Megapomotions B.V., a Dutch Company and Logistix Marketing GmbH (f/k/a Megapromotions GmbH), a German Company. These entities are no longer operating and three of the entities are now in liquidation proceedings in Europe.

- Corinthian Marketing, Inc., a Delaware corporation, which is no longer active.

- Logistix Retail, Inc. (f/k/a Pop Rocket, Inc.), a Delaware corporation, which is no longer active.

- Johnson Grossfield, Inc., a Delaware corporation, which is no longer active.

2297193.5 03

1                          <u>Debtors' Principal Assets and Liabilities</u>

2          8.      EMAK's principal assets consist of its interests in its wholly-owned subsidiaries

3    (set forth above).  EMAK's principal liabilities are former employee obligations arising from a

4    decentralization and restructuring of the Companies' operations and legal fees relating to on-going

5    litigations.

6          9.      EMAK Service is a wholly-owned subsidiary of EMAK.  EMAK Service's

7    principal asset is cash received from the Companies.  EMAK Service's principal liabilities are

8    current and former employee obligations.

9    **B.      The Chapter 11 Cases**

10                      <u>Major Events Leading to the Debtors' Chapter 11 Filings</u>

11         10.     A number of factors have contributed to the Debtors' current financial crisis,

12   including the following:

13         11.     <u>Declines in Revenue</u>.  One factor leading to the Debtors' current financial position

14   is the decline in revenues from the Companies' promotional products business, which had

15   accounted for approximately 50% of the Companies' revenue in the last several years.  The

16   Companies' promotional products business is conducted through Equity Marketing, Inc., Logistix

17   Marketing, Inc. and Logistix, Inc.  The products business industry has been generally declining for

18   several years.  Until 2009, Equity Marketing, Inc.'s primary and the Companies' largest client was

19   Burger King Corporation (including its franchise purchasing cooperative Restaurant Services, Inc.

20   and various distribution companies), a company with whom Equity Marketing, Inc. had a twenty-

21   five year relationship.  However, in September 2009, Burger King terminated its relationship with

22   Equity Marketing, Inc., although Equity Marketing, Inc. continued to provide transitional services

23   to Burger King through May 2010.

24         12.     In addition to the decline in revenues generated by Equity Marketing, Inc., the

25   Companies also closed their European based operations in February 2009.  The Companies'

26   European operations, which were run through EMAK Europe Holdings and its subsidiaries, were

27   engaged in the production and supply of promotional products as well as other marketing and

28   advertising materials in printed or other forms.  However, the need for such services in Europe

2297193.5 03                                - 19 -

1   declined dramatically in recent years in response to regulatory pressures on marketing to children

2   (primarily restrictions on the television advertisement of unhealthy foods).  Three of the

3   Companies' European subsidiaries are now in liquidation proceedings in Europe –

4   Megapromotions B.V., Logistix Marketing GmbH and Logistix Limited.

5        13.   The Companies' agency services are provided by Upshot, Inc. and Neighbor, Inc.

6   In the first quarter of 2010, the Companies' revenues from agency services decreased 16 percent as

7   compared to the first quarter of 2009.  This decrease was the result of lower revenues at Upshot,

8   Inc. due, at least in part, to the loss of client Miller Brewing Company following Miller's merger

9   with Coors.  Shortly after losing Miller, however, Upshot, Inc. gained two new clients in the beer

10  and spirits category – Corona and Wild Turkey.

11       14.   As a result of the foregoing business declines and EMAK's strategy to transition

12  from product services to marketing services, beginning in 2009, the Companies implemented a

13  decentralization and restructuring plan, which included reducing their workforces to compensate

14  for the loss of the "product" business revenue.  These changes resulted in expenses of $2.3 million

15  in the first quarter of 2010, including $1.7 million related to employee termination costs for

16  corporate staff and management, and $0.6 million related to other employee departures due to the

17  loss of product business.  The Companies have determined that the short term expenses arising

18  from implementing this decentralization and restructuring plan will be more than offset by future

19  efficiencies and cost reductions.  The Companies' remaining workforce reductions under this plan

20  will continue through the end of 2010.

21       15.   Pending Litigations.  EMAK is involved in a number of litigation matters (the

22  "Pending Litigations"), the majority of which concern an individual named Donald A. Kurz

23  ("Kurz"), ceased his role as CEO of EMAK.  Following an extensive search, during which time

24  EMAK's Chairman Stephen P. Robeck served as interim CEO, James L. Holbrook, Jr.

25  ("Holbrook") became CEO of EMAK in November 2005.  Kurz also resigned as a member of the

26  EMAK Board of Directors in August 2005.  In 2009, Kurz renewed his efforts to regain control of

27  EMAK (although he had been reappointed to the EMAK Board of Directors in June 2009,

28  following several invitations to rejoin, in an effort by EMAK to amicably resolve differing views

1   over the direction of EMAK). Kurz's prior efforts to gain control of EMAK from 2005 through

2   2008 were unsuccessful, as was the 2009 campaign.

3                                 The CA Action

4        16.    In September 2009, Kurz and his affiliates filed an action against EMAK in the Los

5   Angeles County Superior Court captioned *Take Back EMAK, LLC, et a. v. Robeck et al.* (the "CA

6   Action") asserting derivative and non-derivative claims for breach of fiduciary duty, gross

7   mismanagement, and unlawful, unfair and fraudulent business practices against EMAK and

8   certain current and former directors of EMAK and seeking in excess of $300 million in damages.

9   In June 2010, plaintiffs filed a first amended complaint, which eliminated non-derivative claims,

10   named additional defendants, eliminated all original plaintiffs other than Robert J. Farina, added

11   Gryphon Promotions, Inc. as a plaintiff and seeks damages in excess of $100 million. On June 20,

12   2010, the California Superior Court sustained the demurrers filed by EMAK and the individual

13   director defendants to the first amended complaint but allowed the plaintiffs ten days leave to

14   amend their complaint. An amended complaint was filed on July 30, 2010, six days prior to the

15   Petition Date.

16                The DE Action and TBE Consent Solicitation.

17        17.    In October 2009, Kurz and his affiliates filed an action against EMAK in the

18   Delaware Chancery Court captioned *Kurz, et al. v. Holbrook, et al.*, (the "DE Action", and

19   together with the CA Action, the "Derivative Litigation") seeking relief concerning an October 19,

20   2009 transaction by which the outstanding shares of Series AA Stock held by Crown EMAK

21   Partners LLC ("Crown") that did not vote with the common stock for the election of directors were

22   exchanged for shares of a new preferred stock that did vote with the holders of common stock for

23   the election of directors (the "Exchange Transaction").

24        18.    The basis for challenging the Exchange Transaction was that approximately one

25   week prior to the EMAK Board of Directors' final approval of the transaction on October 19,

26   2009, Take Back EMAK, LLC ("TBE") had delivered a written consent for its one (1) share of

27   common stock seeking the removal of three (3) directors elected by the common shareholders and

28   the election of a TBE nominated slate of three (3) directors (the "TBE Consent Solicitation"), thus

2297193.5 03

1    commencing a sixty (60) day consent solicitation process under EMAK's bylaws.  While the

2    EMAK Board of Directors had been advised by counsel in approving the Exchange Transaction,

3    which had been under negotiation for many weeks, the DE Action asserted that the wrong level of

4    "scrutiny" had been applied due to the pending TBE Consent Solicitation (i.e., it was asserted that

5    the EMAK Board of Directors used the "business judgment" standard rather than the higher

6    "compelling justification" standard applied to board actions infringing on stockholder franchise

7    rights).  With the Exchange Transaction in place, the TBE Consent Solicitation would most

8    certainly have failed, as it did not have the support of Crown, which held 28% of the voting

9    power.

10           19.     Despite ratification of the Exchange Transaction by both a majority of EMAK's

11    common stock and a greater than 60% supermajority of EMAK's voting securities, the plaintiffs in

12    the DE Action continued to pursue their challenge, unconvinced that the stockholders did not

13    support their position.  Faced with mounting legal costs and significant distraction to

14    management's efforts to focus on the decentralization and restructuring plans that were being

15    implemented, the Exchange Transaction was rescinded by mutual agreement of the EMAK Board

16    of Directors and Crown on December 3, 2009, leaving it to the Common stockholders to

17    determine whether the TBE Consent Solicitation would succeed or fail.

18           20.     From October 12, 2009 to December 21, 2009, and during the pendency of the DE

19    Action, the TBE Consent Solicitation continued.  When it became apparent that EMAK's

20    stockholders did not support the DE Plaintiffs, Kurz purchased the non-transferable shares of a

21    former EMAK employee, Peter Boutros, in order to obtain the requisite number of votes.  On

22    February 9, 2010, the Delaware Court of Chancery ruled that TBE had successfully elected their

23    slate of directors.  EMAK appealed and on April 21, 2010, the Delaware Supreme Court ruled that

24    TBE had not successfully elected its slate of directors because its purchase of non-transferable

25    shares was improper, and such shares could not be voted in favor of the new slate.  EMAK

26    incurred substantial legal fees in connection with litigation pursued in the DE Action to

27    successfully challenge the results of the TBE Consent Solicitation.  Even though Kurz and his

28    affiliates went into the TBE Consent Solicitation owning nearly 40% of EMAK's common stock,

2297193.5 03

1  they could not (lawfully) get holders of an additional 10% of the common stock to support their

2  slate.

3        21.    Notwithstanding the eventual ruling of the Delaware Supreme Court against TBE,

4  during the ten-week period in which the board of directors purportedly elected by TBE (the "TBE

5  Board") were in control, the TBE Board took numerous actions including: (i) electing Kurz as

6  EMAK's president; (iii) forming a Litigation and Structural Review Committee to manage the

7  pending litigation; and (iii) forming a Personnel Review Committee to, among other things, (a)

8  determine Kurz's compensation and (b) investigate whether Holbrook should be terminated for

9  cause.  While in control of EMAK, the TBE Board contracted with numerous service providers,

10  such as investment bankers, a public relations company and a research consultant, on the

11  Companies' behalf.  This included the retention of (i) Luce, Forward, Hamilton & Scripps, which

12  had previously served as counsel to the plaintiffs in the DE Action, as corporate counsel, (ii)

13  Bouchard, Margules & Friedlander, which previously served as counsel to the plaintiffs in the DE

14  Action, as Delaware litigation counsel, and (iii) Richards, Layton & Finger as Delaware corporate

15  counsel.  These expenses totaled approximately $800,000 in the first quarter of 2010.

16        22.    On February 24, 2010 (as amended on May 3, 2010), counsel for the plaintiffs in

17  the DE Action filed an interim fee application requesting $2.85 million (constituting 87% of

18  EMAK's remaining available cash and more than 50% of the current market capitalization of

19  EMAK's common stock) in contingent attorneys fees and expenses to litigate claims in the DE

20  Action based upon the "significant benefits" of their services to EMAK and its shareholders,

21  primarily in "forcing" the rescission of the Exchange Transaction.  EMAK vigorously opposed the

22  fee application.

23        23.    On July 19, 2010, the Delaware Court of Chancery that originally upheld the stock

24  purchase later disapproved by the Delaware Supreme Court issued an order awarding interim fees

25  to the plaintiffs' counsel (Bouchard, Margules & Friedlander) of $2.5 million to be paid within

26  five business days, with no immediate right of appeal granted to EMAK.

27        24.    The Debtors contend that the Derivative Litigation has *not benefited* the holders of

28  EMAK's common stock.  Instead, those holders are indisputably worse off now than they would

1   have been had the DE Action never been brought, because the preferred stockholder now has the

2   unilateral right to designate two-thirds of EMAK's board members. Had plaintiffs allowed the

3   Exchange Transaction to stand, the preferred stock would have controlled only 28% of the voting

4   power for the election of EMAK directors, but been assured of <u>no</u> board seats.

5        25.    The Debtors further contend that the Derivative Litigation was never for the benefit

6   of all of the holders of EMAK's common stock; rather, the contest for control was waged to

7   benefit the former CEO and his affiliates at the expense of EMAK and its other stockholders (both

8   common and preferred). Indeed, upon gaining temporary control of EMAK, Kurz and his slate

9   immediately installed Kurz as President and paid more than $100,000 in consulting fees to Kurz

10   and his affiliates, including one of the other TBE nominees.

11        26.    If the Exchange Transaction had gone forward, Crown's preferred stock would have

12   lost the important right to elect two directors to EMAK's Board of Directors and, in exchange for

13   the surrender of that right, would have voted with the common for the election of all directors.

14   Had the Exchange Transaction occurred, Crown would have had nearly 2.77 million votes, and

15   Kurz and his group would have had 2.77 million votes. The remaining stockholders – including

16   three other large stockholders whose sole interest was in seeing EMAK succeed financially –

17   would have decided the fate of EMAK. In other words, a majority of all shares (common and

18   preferred) would have controlled the direction of EMAK. <u>In the view of the EMAK Board of</u>

19   <u>Directors that approved the Exchange Transaction, this was a result that leveled the playing field</u>

20   <u>and permitted all stockholders an appropriate voice in EMAK's future.</u>

21        27.    In response to the DE Litigation and Kurz's continued efforts to control EMAK,

22   Crown and other common stockholders constituting a 60% supermajority acted to amend EMAK's

23   Bylaws to reduce the size of the Board to three members as of EMAK's June 10, 2010 Annual

24   Meeting, two of whom are elected by Crown (although Crown agreed for one year to elect at least

25   one director who is independent of it and of EMAK). Thus, the holders of the EMAK's common

26   stock are in a *worse* position than they were in before the DE Action began from a voting power

27   perspective.

28

1          <u>The Costs of the Derivative Litigation.</u>

2          28.    Legal fees directly related to the Derivative Litigation totaled more than $2.3

3    million in 2009 and $3.3 million in the first six months of 2010, and they continue to mount.  In

4    addition to the July 2010 $2.5 million fee award in the DE Action, the Debtors estimate that

5    continuation of the Derivative Litigation through the second half of 2010 would result in an

6    additional $2.0 million in legal fees, bringing the cumulative legal fees for the Derivative

7    Litigation as of December 31, 2010 to $10.1 million.  Prolonged litigation has had a material

8    adverse effect on EMAK's financial condition and results of operations.  Continued litigation can

9    only be expected to result in the liquidation of the Debtors.

10          <u>Other Litigation.</u>

11          29.    In addition to the Derivative Litigation, EMAK is a party to other litigation, which

12    the Debtors view as ordinary course litigation.  In May 2010, EMAK filed an action against Kurz,

13    TBE and Peter Boutros ("<u>Boutros</u>") in Los Angeles County Superior Court captioned *EMAK*

14    *Worldwide, Inc. v. Kurz, et al.* (the "<u>Boutros Action</u>") alleging claims for breach of contract,

15    intentional interference with contract, conspiracy to interfere with contract and negligent

16    interference with contract arising out of the purported sale of restricted securities of EMAK by

17    Boutros to Kurz.  As indicated above, the transaction between Boutros and Kurz, which resulted in

18    TBE purportedly achieving a slight majority in its efforts to unseat EMAK's directors, was held

19    invalid by the Delaware Supreme Court in the DE Action.  While tangentially related to the

20    Derivative Litigation, the Debtors view the Boutros Action as routine enforcement of EMAK's

21    contract rights.

22          30.    On July 21, 2010, Kurz filed an action against EMAK in the Delaware Chancery

23    Court seeking advancement of attorneys' fees and indemnification as a director of EMAK in

24    connection with the Boutros Action (the "<u>Advancement Action</u>").  The Advancement Action also

25    seeks advancement of fees and indemnification in connection with the Advancement Action itself,

26    as well as advancement of fees and indemnification in connection with counterclaims filed by

27    EMAK in the DE Action.

28

2297193.5  03

1      31.    In January 2010, Wells Fargo Securities, LLC (as successor to Barrington

2 Associates) ("Wells Fargo") commenced an arbitration action against EMAK alleging that a $1

3 million contingent fee was owed to Wells Fargo in connection with the Exchange Transaction.

4 Wells Fargo originally was engaged by EMAK following an unsolicited indication of interest in

5 the Companies from Marlin Capital in June 2008 sponsored by Kurz. EMAK has vigorously

6 defended this action.

7      32.    Finally, on July 15, 2010, EMAK was served with a writ of summons filed in The

8 Netherlands on behalf of a former employee of EMAK's Dutch subsidiary Megapromotions B.V.,

9 which was placed in bankruptcy liquidation in February 2009 (the "Employment Action"). The

10 Employment Action asserts claims for in excess of 500,000 Euros consisting of contractual

11 severance relating to an employment agreement terminated by the bankruptcy trustee of

12 Megapromotions B.V., as well employee expenses, contractual bonuses and overdue pension

13 contributions. The Employment Action alleges that EMAK is obligated as the guarantor of

14 Megapromotions B.V. despite the intervening bankruptcy liquidation and actions of the trustee.

15 EMAK intends to vigorously defend this action.

16 **C.**     **What the Debtors Hope to Accomplish in these Chapter 11 Cases**

17      33.    Since the beginning of their Chapter 11 cases, the Debtors have focused on

18 complying with various deadlines set by the U.S. Trustee, filing their Schedules and Statements of

19 Financial Affairs, and filing a motion to establish a bar date. All of the deadlines have been met

20 without extension. The Debtors are currently evaluating their operations and completing their

21 decentralization plan, and intend to continue to transition their operations into the more profitable

22 marketing services business. The Debtors also hope to resolve the claims affecting them and to

23 propose an confirm a plan of reorganization that will allow emergency from Chapter 11 with a

24 practical claims paying mechanism. To that end, the Debtors have attempted to establish a

25 dialogue with several of their principal claimants.

26

27

28

1  **D.      Principal Disputes or Problems Likely to be Encountered During These Cases and**

2         **How Debtors Recommend Such Disputes Will be Resolved**

3        34.      The commencement of the bankruptcy case has provided the Debtors with a

4  breathing spell from the various litigations that were placing a strain on the Debtors' finances.  The

5  Debtors intend to continue to reach out to the other parties to these litigations in an effort to

6  resolve these matters as expeditiously as possible, preferably through settlement or mediation

7  rather than continued litigation.

8  **E.      Compliance with the Duties set forth in Sections 521 and 1107 of the Bankruptcy**

9        **Code and Federal Rule of Bankruptcy Procedure 1007**

10        35.      The Debtors have timely complied with the requirements set forth in the

11  Bankruptcy Code and Bankruptcy Rules, including filing their Schedules and Statements of

12  Financial Affairs on August 19, 2010.  The Debtors have also timely complied with all

13  requirements imposed by the Office of the United States Trustee.

14  **F.      Professionals Retained or to be Retained by the Estates**

15        36.      On August 24, 2010, the Debtors filed their Application to Employ Irell & Manella

16  LLP as reorganization counsel.  Additionally, EMAK has filed or anticipate shortly filing

17  applications to employ the following as special litigation counsel, all of which represented EMAK

18  prior to the Petition Date:

19       •   Latham & Watkins, a California law firm, represents EMAK in connection with the

20         Derivative Litigations and the Boutros Action.

21       •   Morris Nichols Arsht & Tunnell, a Delaware law firm, represents EMAK in

22         connection with the DE Action.

23       •   Gallo and Associates, a California law firm, represents EMAK in connection with

24         the arbitration involving Wells Fargo.

25       •   Loyens & Loeff N.V., a Dutch law firm, represents EMAK in connection with the

26         Employment Action.

27        37.      The Debtors also expect to file an application to employ J.H. Cohn LLP, an

28  accounting firm, to assist the Debtors in preparing financial statements.

2297193.5 03

1    38.    The Debtors anticipate that the monthly cost of professional fees and costs,

2  excluding the fees and costs payable to Irell & Manella that will be funded from the $1.1 million

3  retainer paid by the Debtors pre-petition, will be, on average, approximately $125,000 if the

4  Pending Litigations are resolved consensually through mediation or otherwise and at least

5  $333,000 per month if the Pending Litigations are completely reactivated.

6  **G.    Projected Income and Expenses for the First Six Months of this Case**

7    39.    Attached hereto as <u>Exhibit B</u> is a budget showing projected income, expenses and

8  cash flow for the first five months of these Chapter 11 cases, from August 2010 to December 2010

9  on a month by month basis (the "<u>Budget</u>") (the same as previously filed by the Debtors on August

10  19, 2010 [Docket No. 38]), as well as a comparative historical statement of actual income,

11  expenses and cash flow for the twelve months preceding the Petition Date (August 2009 to July

12  2010) on a month by month basis.  The Companies' actual cash flow for August 2010, as had been

13  projected by the Debtors in the Budget as originally filed on August 19, 2010, was $1.8 million

14  (net of the Debtors' operating expenses), and includes approximately $700,000 of cash received

15  prior to the Petition Date.

16    40.    The Debtors are unable to provide a six-month budget at this time due to the fact

17  that the Debtors have not yet prepared a budget for fiscal 2011.  The Debtors anticipate that a

18  January 2011 budget, which is currently being prepared for presentation to the Debtors' Board of

19  Directors at its quarterly meeting scheduled for September 28, 2010, can be made available to the

20  Court no later than October 1, 2010.  It is not anticipated that the Debtors' January 2011 income,

21  expenses and cash flow will vary materially from the historical amounts, with the exceptions of

22  the decrease in Products Segment revenues and the extraordinary legal fees incurred in the prior

23  year period.

24  **H.    The Debtors' Intent to Use Cash Collateral**

25    41.    The Debtors do not intend to use any cash collateral.

26

27

28

2297193.5 03

1    **I.    Proposed Deadlines for the Filing of Claims, Objections to Claims, and a Plan and**

2    **Disclosure Statement**

3        42.    On September 1, 2010, the Debtor served and filed with this Court their Motion for

4    Order Establishing a Bar Date for Filing Claims.  By the Motion, the Debtors are requesting that

5    the Court establish a date sixty (60) days following service of the notice as the last day to file

6    claims against the Debtors' estates.

7        43.    The Debtors currently anticipate filing a plan and disclosure statement within 180

8    days after the commencement of these Chapter 11 cases.

9    **J.    Payments or Other Issues Related to Adequately Protecting the Providers of Utilities.**

10        44.    On August 9, 2010, the Debtors filed the Emergency Motion for Order (A)

11    Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; and (B) Deeming Utilities

12    Adequate Assured of Future Performance Pursuant to 11 U.S.C. § 366.  In the motion, the Debtors

13    proposed making a cash deposit to each utility company in the amount equal to one month's

14    average historical invoice amount, within twenty (20) days after the entry of an Order granting the

15    motion, for the purpose of providing each utility company with adequate assurance of payment of

16    its post-petition date services to the Debtors.  On August 19, 2010, the Bankruptcy Court entered

17    its order granting the motion.

18        45.    The Debtors have now provided deposits to all of the utility companies in the

19    required amounts.

20    **K.    Debtors' Unexpired Leases and Executory Contracts and Debtors' Intentions**

21        46.    The Debtors currently are analyzing their unexpired leases and executory contracts

22    and considering their options.  The lease for the Debtors' office space in Los Angeles will expire

23    on December 31, 2010 without extension.  In connection with the Debtors' decentralization and

24    restructuring plan implemented in 2009, it is anticipated that any corporate personnel remaining

25    after December 31, 2010 will be absorbed into office space occupied by the Debtors' operating

26

27

28

2297193.5 03

1   subsidiaries in Santa Monica, California and Chicago, Illinois, absent a suitable extension of the
2   current leased space.
3       I declare under penalty of perjury under the laws of the United States of America that the
4   foregoing is true and correct.
5       Executed this 2nd day of September, 2010, at *Newport Beach* California.

6

7                                            Teresa L. Tormey

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2297193.5 03

- 30 -



EMAK Worldwide, Inc.
Organizational Chart
October 2009

Entities with an asterisk (*) commenced
voluntary liquidation in February 2009.

**EMAK Worldwide, Inc.**
**August - December 2010 Budget**

| Income Statement | Products Aug-10 Fcst | Products Sep-10 Fcst | Products Oct-10 Fcst | Products Nov-10 Fcst | Products Dec-10 Fcst | Products Total Fcst | Upshot Aug-10 Fcst | Upshot Sep-10 Fcst | Upshot Oct-10 Fcst | Upshot Nov-10 Fcst | Upshot Dec-10 Fcst | Upshot Total Fcst | Neighbor Aug-10 Fcst | Neighbor Sep-10 Fcst | Neighbor Oct-10 Fcst | Neighbor Nov-10 Fcst | Neighbor Dec-10 Fcst | Neighbor Total Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | 7,070 | 11,767 | 2,618 | 2,792 | 1,078 | 25,325 | 3,124 | 2,500 | 2,260 | 2,377 | 2,526 | 12,787 | 342 | 343 | 328 | 328 | 330 | 1,672 |
| Net Sales | 7,110 | 11,834 | 2,633 | 2,808 | 1,084 | 25,469 | 3,120 | 2,496 | 2,257 | 2,374 | 2,522 | 12,770 | 342 | 343 | 328 | 328 | 330 | 1,672 |
| S&B Reclass | (0) | (0) | (0) | (0) | (0) | (0) | (1,002) | (1,022) | (1,019) | (1,007) | (1,002) | (5,052) | (177) | (161) | (159) | (159) | (159) | (814) |
| Cost of Sales | (6,031) | (10,066) | (2,226) | (2,382) | (927) | (21,633) | (410) | (338) | (311) | (325) | (341) | (1,726) | (73) | (73) | (67) | (67) | (68) | (349) |
| Gross Margin (excl. HK) | 1,079 | 1,768 | 407 | 426 | 157 | 3,836 | 1,708 | 1,136 | 927 | 1,042 | 1,179 | 5,992 | 92 | 110 | 102 | 102 | 104 | 509 |
| % of Net Sales | 15.2% | 14.9% | 15.4% | 15.2% | 14.5% | 15.1% | 54.7% | 45.5% | 41.1% | 43.9% | 46.8% | 46.9% | 26.9% | 31.9% | 31.0% | 31.0% | 31.5% | 30.5% |
| Direct Overhead | (20) | (40) | (10) | (10) | (10) | (90) | | | | | | | | | | | | |
| Margin After Direct Overhead | 1,059 | 1,728 | 397 | 416 | 147 | 3,746 | 1,708 | 1,136 | 927 | 1,042 | 1,179 | 5,992 | 92 | 110 | 102 | 102 | 104 | 509 |
| % MADO | 14.9% | 14.6% | 15.1% | 14.8% | 13.6% | 14.7% | 54.7% | 45.5% | 41.1% | 43.9% | 46.8% | 46.9% | 26.9% | 31.9% | 31.0% | 31.0% | 31.5% | 30.5% |
| S&B, net | (172) | (172) | (138) | (137) | (137) | (756) | (311) | (311) | (311) | (310) | (308) | (1,550) | (38) | (38) | (30) | (30) | (30) | (166) |
| Operating Expenses | (55) | (55) | (55) | (55) | (55) | (275) | (250) | (250) | (232) | (232) | (232) | (1,195) | (16) | (16) | (30) | (30) | (30) | (123) |
| Operating Margin | 832 | 1,501 | 203 | 223 | (45) | 2,715 | 1,148 | 576 | 385 | 500 | 639 | 3,247 | 38 | 55 | 42 | 42 | 44 | 221 |
| **Balance Sheet** | | | | | | | | | | | | | | | | | | |
| Cash | | | | | | | | | | | | | | | | | | |
| Accounts Receivable, net | 5,312 | 11,337 | 8,658 | 3,256 | 2,329 | | 2,624 | 3,917 | 2,589 | 2,838 | 3,001 | | 1,469 | 1,059 | 1,015 | 1,075 | 1,079 | |
| Unbilled Receivable | 1,092 | | | | | | 1,092 | 874 | 790 | 831 | 883 | | 67 | 87 | 83 | 83 | 84 | |
| Inventory, net | 1,943 | 728 | 523 | 514 | 493 | | 119 | 116 | 122 | 85 | 54 | | 14 | 13 | 13 | 44 | 53 | |
| Other Assets | 7 | 7 | 7 | 7 | 7 | | 84 | 84 | 84 | 84 | 84 | | 30 | 30 | 30 | 30 | 30 | |
| AP/Accrued Receipts | (7,244) | (10,024) | (6,843) | (4,208) | (2,086) | | (254) | (197) | (151) | (147) | (188) | | (116) | (88) | (120) | (153) | (140) | |
| Deferred Revenue | (1,733) | (1,733) | (1,733) | (1,733) | (1,733) | | (766) | (679) | (633) | (735) | (355) | | (327) | (328) | (313) | (313) | (315) | |
| Pass Through;Vol Rebate/Creative | (313) | (263) | (213) | (163) | (113) | | | | | | | | (1) | (1) | (1) | (1) | (1) | |
| Restructuring/Non Recurring | | | | | | | | | | | | | | | | | | |
| **Cash Flow** | | | | | | | | | | | | | | | | | | |
| Income | 832 | 1,501 | 203 | 223 | (45) | 2,715 | 1,148 | 576 | 385 | 500 | 639 | 3,247 | 38 | 55 | 42 | 42 | 44 | 221 |
| Change in WC | (385) | (2,081) | 438 | 1,941 | (1,225) | (1,311) | 503 | (136) | 170 | 149 | (542) | 144 | 46 | 107 | 5 | 32 | (21) | 128 |
| Cash Flow (calc.) | 447 | (579) | 641 | 2,165 | (1,270) | 1,404 | 1,650 | 439 | 555 | 649 | 97 | 3,391 | 85 | 162 | 47 | 73 | 23 | 348 |

Exhibit B
Page 32

**EMAK Worldwide, Inc.**
**August - December 2010 Budget**

| | Total Operating Subsidiaries | | | | | | Corporate | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aug-10 Fcst | Sep-10 Fcst | Oct-10 Fcst | Nov-10 Fcst | Dec-10 Fcst | Total Fcst | Aug-10 Fcst | Sep-10 Fcst | Oct-10 Fcst | Nov-10 Fcst | Dec-10 Fcst | Total Fcst |
| **Income Statement** | | | | | | | | | | | | |
| Gross Sales | 10,537 | 14,610 | 5,206 | 5,497 | 3,934 | 39,784 | - | - | - | - | - | - |
| Net Sales | 10,572 | 14,674 | 5,218 | 5,510 | 3,937 | 39,911 | - | - | - | - | - | - |
| S&B Reclass | (1,179) | (1,183) | (1,178) | (1,186) | (1,160) | (5,866) | (0) | (0) | (0) | (0) | (0) | (0) |
| Cost of Sales | (6,514) | (10,478) | (2,805) | (2,774) | (1,336) | (23,707) | - | - | - | - | - | - |
| Gross Margin (excl. HK) | 2,879 | 3,013 | 1,436 | 1,570 | 1,440 | 10,338 | (0) | (0) | (0) | (0) | (0) | (0) |
| % of Net Sales | 27.2% | 20.5% | 27.5% | 28.5% | 36.6% | 25.9% | - | - | - | - | - | - |
| Direct Overhead | (20) | (40) | (10) | (10) | (10) | (90) | 0 | 0 | 0 | 0 | 0 | 0 |
| Margin After Direct Overhead | 2,859 | 2,973 | 1,426 | 1,560 | 1,430 | 10,248 | (0) | (0) | (0) | (0) | (0) | (0) |
| % MADO | 27.0% | 20.3% | 27.3% | 28.3% | 36.3% | 25.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| S&B, net | (520) | (520) | (479) | (477) | (475) | (2,472) | (111) | (102) | (92) | (91) | (91) | (487) |
| Operating Expenses | (320) | (320) | (318) | (318) | (318) | (1,583) | (231) | (230) | (202) | (202) | (202) | (1,067) |
| Operating Margin | 2,018 | 2,132 | 629 | 766 | 638 | 6,183 | (342) | (332) | (294) | (293) | (293) | (1,554) |
| **Balance Sheet** | | | | | | | | | | | | |
| Cash | | | | | | | | | | | | |
| Accounts Receivables, net | 9,405 | 16,313 | 12,261 | 7,169 | 6,409 | | - | - | - | - | - | |
| Unbilled Receivable | 1,179 | 961 | 873 | 914 | 957 | | - | - | - | - | - | |
| Inventory, net | 2,075 | 858 | 658 | 643 | 601 | | - | - | - | - | - | |
| Other Assets | 121 | 121 | 121 | 121 | 121 | | - | - | - | - | - | |
| AP/Accrued Receipts | (7,614) | (10,309) | (7,114) | (4,508) | (2,414) | | - | - | - | - | - | |
| Deferred Revenue | (1,083) | (1,007) | (946) | (1,048) | (670) | | - | - | - | - | - | |
| Pass Through/Vol Rebate/Creative | (1,733) | (1,733) | (1,733) | (1,733) | (1,733) | | - | - | - | - | - | |
| Restructuring/Non Recurring | (314) | (263) | (213) | (163) | (113) | | - | - | - | - | - | |
| **Cash Flow** | | | | | | | | | | | | |
| Income | 2,018 | 2,132 | 629 | 766 | 638 | 6,183 | (342) | (332) | (294) | (293) | (293) | (1,554) |
| Change in W/C | 164 | (2,110) | 572 | 2,122 | (1,788) | (1,040) | - | - | - | - | - | - |
| Cash Flow (calc.) | 2,182 | 22 | 1,201 | 2,887 | (1,150) | 5,143 | (342) | (332) | (294) | (293) | (293) | (1,554) |

Exhibit B
Page 33

**EMAK Worldwide, Inc.**
**August 2009 - July 2010 Actuals**
(Unaudited)

Products Segment

| | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | | | |
| Gross Sales | 8,925 | 11,853 | 10,936 | 7,281 | 6,756 | 6,834 | 7,639 | 5,019 | 4,374 | 795 | 2,780 | 1,912 | 75,103 |
| | | | | | | | | | | | | | |
| Net Sales | 8,616 | 11,463 | 10,470 | 7,008 | 6,511 | 6,564 | 7,184 | 4,573 | 4,117 | 733 | 2,778 | 1,912 | 71,930 |
| S&B Reclass | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cost of Sales | (6,530) | (8,986) | (8,447) | (5,601) | (5,101) | (5,560) | (5,907) | (3,662) | (3,351) | (584) | (2,160) | (1,518) | (57,409) |
| **Gross Margin (excl. HK)** | 2,085 | 2,477 | 2,022 | 1,407 | 1,410 | 1,004 | 1,277 | 912 | 767 | 149 | 618 | 394 | 14,521 |
| | | | | | | | | | | | | | |
| % of Net Sales | 24.2% | 21.6% | 19.3% | 20.1% | 21.7% | 15.3% | 17.8% | 19.9% | 18.6% | 20.3% | 22.2% | 20.6% | 20.2% |
| | | | | | | | | | | | | | |
| Direct Overhead | (41) | (19) | (44) | (32) | (22) | (45) | (3) | (11) | (34) | (15) | (52) | (51) | (368) |
| | | | | | | | | | | | | | |
| **Margin After Direct Overhead** | 2,044 | 2,458 | 1,979 | 1,375 | 1,388 | 959 | 1,274 | 901 | 732 | 134 | 566 | 343 | 14,153 |
| | | | | | | | | | | | | | |
| % MADO | 23.7% | 21.4% | 18.9% | 19.6% | 21.3% | 14.6% | 17.7% | 19.7% | 17.8% | 18.3% | 20.4% | 17.9% | 19.7% |
| | | | | | | | | | | | | | |
| S&B, net | (407) | (484) | (394) | (624) | (524) | (301) | (230) | (293) | (149) | (156) | (134) | (145) | (3,841) |
| Operating Expenses | (92) | (115) | (70) | (96) | (2,614) | (517) | (161) | (200) | (67) | (31) | (64) | (55) | (4,084) |
| | | | | | | | | | | | | | |
| **Operating Margin** | 1,545 | 1,859 | 1,514 | 654 | (1,750) | 140 | 883 | 409 | 517 | (53) | 368 | 143 | 6,228 |
| | | | | | | | | | | | | | |
| **Balance Sheet** | | | | | | | | | | | | | |
| Cash | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | 1 | 1 | |
| Accounts Receivables, net | 10,383 | 10,479 | 12,246 | 8,192 | 5,898 | 7,904 | 8,245 | 6,237 | 7,194 | 3,689 | 3,129 | 1,617 | |
| Unbilled Receivable | - | - | - | - | - | - | - | - | - | - | - | - | |
| Inventory, net | 4,278 | 4,664 | 3,918 | 3,377 | 2,990 | 4,242 | 3,138 | 2,350 | 643 | 2,013 | 1,111 | 1,340 | |
| Other Assets | 207 | 606 | 596 | 585 | 8 | 10 | 6 | 5 | 3 | 2 | 51 | 471 | |
| | | | | | | | | | | | | | |
| AP/Accrued Receipts | (10,279) | (12,211) | (8,867) | (8,218) | (7,005) | (8,549) | (7,468) | (7,447) | (6,082) | (5,125) | (3,077) | (3,577) | |
| Deferred Revenue | (475) | (184) | (116) | (41) | (19) | (103) | (246) | (304) | (146) | (148) | 0 | 13 | |
| Pass Through/Vol Rebate/Creative | (2,941) | (3,600) | (3,779) | (3,009) | (3,397) | (3,702) | (3,883) | (2,597) | (2,851) | (2,158) | (1,732) | (1,732) | |
| Restructuring/Non Recurring | (171) | (137) | (103) | (70) | (5) | (431) | (530) | (603) | (511) | (459) | (411) | (363) | |
| Accrued Liabilities | (1,204) | (1,482) | (1,567) | (1,698) | (1,779) | (1,688) | (1,627) | (631) | (556) | (525) | (496) | (532) | |
| | | | | | | | | | | | | | |
| **Cash Flow** | | | | | | | | | | | | | |
| Income (loss) | 1,545 | 1,859 | 1,514 | 654 | (1,750) | 140 | 883 | 409 | 517 | (53) | 368 | 143 | 6,228 |
| Change in W/C | 873 | 1,662 | (4,193) | 3,209 | 2,427 | (991) | 47 | 626 | (684) | 404 | (1,285) | 1,339 | 3,434 |
| **Cash Flow (calc.)** | 2,418 | 3,521 | (2,679) | 3,863 | 677 | (851) | 930 | 1,035 | (167) | 351 | (917) | 1,482 | 9,662 |

Exhibit _B_
Page _34_

**EMAK Worldwide, Inc.**
**August 2009 - July 2010 Actuals**
(Unaudited)

|  | | | | | | Upshot | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Total |
| **Income Statement** | | | | | | | | | | | | | |
| Gross Sales | 1,639 | 2,330 | 2,145 | 2,664 | 2,363 | 1,240 | 1,334 | 2,992 | 2,490 | 1,406 | 2,852 | 1,480 | 24,937 |
| Net Sales | 1,639 | 2,330 | 2,145 | 2,664 | 2,324 | 1,240 | 1,334 | 2,992 | 2,490 | 1,445 | 2,852 | 1,480 | 24,937 |
| S&B Reclass | (813) | (808) | (789) | (809) | (849) | (884) | (913) | (1,038) | (993) | (986) | (945) | (945) | (10,771) |
| Cost of Sales | (246) | (686) | (776) | (881) | (323) | (132) | (153) | (436) | (754) | (218) | (504) | (227) | (5,338) |
| **Gross Margin (excl. HK)** | **579** | **835** | **580** | **974** | **1,152** | **224** | **269** | **1,519** | **743** | **241** | **1,403** | **309** | **8,828** |
| % of Net Sales | 35.3% | 35.8% | 27.0% | 36.6% | 49.6% | 18.1% | 20.2% | 50.7% | 29.8% | 16.7% | 49.2% | 20.8% | 35.4% |
| Direct Overhead | 35 | (0) | (0) | - | (0) | (0) | (0) | - | - | - | - | - | 34 |
| **Margin After Direct Overhead** | **614** | **835** | **580** | **974** | **1,152** | **224** | **269** | **1,519** | **743** | **241** | **1,403** | **309** | **8,862** |
| % MADO | 37.5% | 35.8% | 27.0% | 36.6% | 49.6% | 18.1% | 20.1% | 50.7% | 29.8% | 16.7% | 49.2% | 20.8% | 35.5% |
| S&B, net | (139) | (141) | (182) | (223) | (411) | (230) | (189) | (63) | (191) | (183) | (191) | (192) | (2,337) |
| Operating Expenses | (186) | (221) | (211) | (245) | (370) | (173) | (203) | (251) | (198) | (296) | (313) | (262) | (2,930) |
| **Operating Margin** | **290** | **473** | **186** | **506** | **371** | **(179)** | **(124)** | **1,204** | **355** | **(239)** | **898** | **(145)** | **3,596** |
| **Balance Sheet** | | | | | | | | | | | | | |
| Cash | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | |
| Accounts Receivables, net | 2,542 | 3,287 | 3,349 | 2,380 | 3,456 | 2,746 | 2,075 | 3,314 | 3,671 | 3,206 | 3,477 | 4,135 | |
| Unbilled Receivable | 553 | 699 | 894 | 755 | 362 | 692 | 1,124 | 769 | 875 | 505 | 113 | 103 | |
| Inventory, net | 148 | 158 | 308 | 255 | 46 | 277 | 380 | 166 | 299 | 294 | 169 | 207 | |
| Other Assets | 31 | 28 | 25 | 15 | 84 | 87 | 11 | 8 | 7 | 4 | 4 | 5 | |
| AP/Accrued Receipts | (111) | (120) | (656) | (104) | (135) | (218) | (139) | (134) | (226) | (170) | (109) | (125) | |
| Deferred Revenue | (1,331) | (1,532) | (1,989) | (638) | (863) | (906) | (842) | (789) | (701) | (927) | (596) | (601) | |
| Pass Through Vol Rebate/Creative | - | - | - | - | - | - | - | - | - | - | - | - | |
| Restructuring/Non Recurring | (14) | (7) | (2) | 0 | - | - | - | - | - | - | - | - | |
| Accrued Liabilities | (394) | (412) | (338) | (373) | (736) | (669) | (629) | (520) | (585) | (221) | (539) | (497) | |
| **Cash Flow** | | | | | | | | | | | | | |
| Income (loss) | 290 | 473 | 186 | 506 | 371 | (179) | (124) | 1,204 | 355 | (239) | 898 | (145) | 3,596 |
| Change in W/C | (588) | (677) | 508 | (192) | 76 | 206 | 30 | (836) | (525) | 648 | 172 | (706) | (2,389) |
| **Cash Flow (calc.)** | **(298)** | **(204)** | **694** | **314** | **448** | **26** | **(94)** | **369** | **(170)** | **409** | **1,070** | **(852)** | **1,207** |

Exhibit ___B___
Page ___35___

**EMAK Worldwide, Inc.**
**August 2009 - July 2010 Actuals**
*(Unaudited)*

| | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Neighbor | | | | | | |
| **Income Statement** | | | | | | | | | | | | | |
| Gross Sales | 463 | 700 | 1,100 | 456 | 548 | 492 | 324 | 791 | 779 | 1,075 | 385 | 476 | 7,588 |
| | | | | | | | | | | | | | |
| Net Sales | 463 | 700 | 1,100 | 456 | 548 | 492 | 324 | 791 | 779 | 1,075 | 385 | 476 | 7,588 |
| S&B Reclass | (111) | (145) | (152) | (163) | (192) | (179) | (175) | (158) | (170) | (167) | (170) | (183) | (1,965) |
| Cost of Sales | (344) | (545) | (922) | (258) | (382) | (395) | (140) | (508) | (550) | (552) | (471) | (389) | (5,456) |
| Gross Margin (excl. HK) | 8 | 10 | 26 | 35 | (26) | (82) | 9 | 125 | 59 | 356 | (256) | (96) | 167 |
| | | | | | | | | | | | | | |
| % of Net Sales | 1.8% | 1.4% | 2.3% | 7.6% | -4.8% | -16.7% | 2.6% | 15.8% | 7.6% | 33.1% | -66.5% | -20.2% | 2.2% |
| | | | | | | | | | | | | | |
| Direct Overhead | - | - | - | - | (0) | (0) | - | - | - | - | - | - | (0) |
| | | | | | | | | | | | | | |
| Margin After Direct Overhead | 8 | 10 | 26 | 35 | (26) | (82) | 9 | 125 | 59 | 356 | (256) | (96) | 167 |
| | | | | | | | | | | | | | |
| % MADO | 1.8% | 1.4% | 2.3% | 7.6% | -4.8% | -16.7% | 2.6% | 15.8% | 7.6% | 33.1% | -66.5% | -20.2% | 2.2% |
| | | | | | | | | | | | | | |
| S&B, net | (39) | (9) | (11) | (9) | (10) | (26) | (19) | (15) | (11) | (12) | (10) | (15) | (186) |
| Operating Expenses | (95) | (52) | (19) | (48) | (46) | (61) | (34) | (42) | (27) | (43) | (49) | (64) | (581) |
| | | | | | | | | | | | | | |
| Operating Margin | (126) | (52) | (4) | (22) | (83) | (169) | (44) | 69 | 22 | 301 | (316) | (176) | (600) |
| | | | | | | | | | | | | | |
| **Balance Sheet** | | | | | | | | | | | | | |
| Cash | - | - | - | - | - | 2 | 2 | 2 | 2 | 2 | 2 | 2 | |
| Accounts Receivables, net | 486 | 1,004 | 1,069 | 913 | 778 | 981 | 935 | 1,296 | 1,389 | 1,492 | 1,278 | 1,181 | |
| Unbilled Receivable | 717 | 21 | 100 | 100 | - | - | 100 | 87 | 42 | 27 | 0 | 0 | |
| Inventory, net | 11 | 5 | 14 | 9 | 8 | 172 | 148 | 188 | 319 | 88 | 76 | 105 | |
| Other Assets | 23 | 40 | 36 | 34 | 66 | 68 | 70 | 63 | 57 | 52 | 46 | 41 | |
| | | | | | | | | | | | | | |
| AP/Accrued Receipts | (281) | (440) | (177) | (84) | (28) | (186) | (49) | (116) | (139) | (36) | (55) | (73) | |
| Deferred Revenue | (1,298) | (895) | (528) | (601) | (402) | (392) | (706) | (815) | (636) | (330) | (482) | (443) | |
| Pass Through\Vol Rebate/Creative | (83) | (57) | (39) | (26) | (12) | (17) | (7) | (7) | (7) | (1) | (1) | (1) | |
| Restructuring/Non Recurring | (23) | (26) | (25) | (28) | (62) | (60) | (53) | (65) | (63) | (83) | (57) | (52) | |
| Accrued Liabilities | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Cash Flow** | | | | | | | | | | | | | |
| Income (loss) | (126) | (52) | (4) | (22) | (83) | (169) | (44) | 69 | 22 | 301 | (316) | (176) | (600) |
| Change in W/C | 958 | (101) | (797) | 133 | (32) | (219) | 130 | (194) | (331) | (249) | 403 | 47 | (252) |
| Cash Flow (calc.) | 832 | (153) | (801) | 111 | (115) | (388) | 86 | (125) | (309) | 52 | 88 | (129) | (852) |

Exhibit _____B_____
Page _____36_____

**EMAK Worldwide, Inc.**
**August 2009 - July 2010 Actuals**
**(Unaudited)**

| | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Operating Subsidiaries | | | | | | |
| **Income Statement** | | | | | | | | | | | | | |
| Gross Sales | 11,027 | 14,883 | 14,182 | 10,401 | 9,667 | 8,566 | 9,297 | 8,802 | 7,643 | 3,276 | 6,018 | 3,868 | 107,629 |
| | | | | | | | | | | | | | |
| Net Sales | 10,718 | 14,493 | 13,715 | 10,128 | 9,383 | 8,296 | 8,841 | 8,357 | 7,387 | 3,253 | 6,015 | 3,868 | 104,456 |
| S&B Reclass | (925) | (954) | (941) | (972) | (1,040) | (1,062) | (1,088) | (1,195) | (1,163) | (1,153) | (1,115) | (1,128) | (12,737) |
| Cost of Sales | (7,120) | (10,218) | (10,146) | (6,740) | (5,807) | (6,088) | (6,199) | (4,606) | (4,655) | (1,354) | (3,136) | (2,133) | (68,204) |
| Gross Margin (excl. HK) | 2,673 | 3,321 | 2,628 | 2,416 | 2,536 | 1,146 | 1,554 | 2,555 | 1,569 | 746 | 1,765 | 606 | 23,516 |
| | | | | | | | | | | | | | |
| % of Net Sales | 24.9% | 22.9% | 19.2% | 23.9% | 27.0% | 13.8% | 17.6% | 30.6% | 21.2% | 22.9% | 29.3% | 15.7% | 22.5% |
| | | | | | | | | | | | | | |
| Direct Overhead | (6) | (19) | (44) | (32) | (22) | (46) | (3) | (11) | (34) | (15) | (52) | (51) | (334) |
| | | | | | | | | | | | | | |
| Margin After Direct Overhead | 2,667 | 3,302 | 2,584 | 2,384 | 2,514 | 1,100 | 1,551 | 2,545 | 1,535 | 731 | 1,713 | 556 | 23,182 |
| | | | | | | | | | | | | | |
| % MADO | 24.9% | 22.8% | 18.8% | 23.5% | 26.8% | 13.3% | 17.5% | 30.5% | 20.8% | 22.5% | 28.5% | 14.4% | 22.2% |
| | | | | | | | | | | | | | |
| S&B, net | (585) | (634) | (587) | (857) | (945) | (558) | (437) | (370) | (351) | (351) | (335) | (353) | (6,364) |
| Operating Expenses | (373) | (389) | (301) | (389) | (3,030) | (751) | (399) | (493) | (291) | (371) | (427) | (381) | (7,594) |
| | | | | | | | | | | | | | |
| Operating Margin | 1,709 | 2,280 | 1,696 | 1,138 | (1,462) | (208) | 715 | 1,682 | 893 | 8 | 951 | (178) | 9,223 |
| | | | | | | | | | | | | | |
| **Balance Sheet** | | | | | | | | | | | | | |
| Cash | (2) | (2) | (2) | (2) | (2) | (0) | (0) | (0) | (0) | (0) | 0 | 0 | |
| Accounts Receivables, net | 13,411 | 14,771 | 16,664 | 11,485 | 10,132 | 11,631 | 11,255 | 10,847 | 12,254 | 8,386 | 7,884 | 6,933 | |
| Unbilled Receivable | 1,269 | 721 | 994 | 855 | 362 | 692 | 1,224 | 856 | 917 | 532 | 113 | 103 | |
| Inventory, net | 4,437 | 4,826 | 4,241 | 3,641 | 3,044 | 4,691 | 3,665 | 2,704 | 1,260 | 2,395 | 1,356 | 1,652 | |
| Other Assets | 260 | 673 | 657 | 633 | 159 | 165 | 87 | 76 | 67 | 59 | 101 | 516 | |
| | | | | | | | | | | | | | |
| AP/Accrued Receipts | (10,671) | (12,770) | (9,700) | (8,406) | (7,167) | (8,953) | (7,657) | (7,698) | (6,447) | (5,331) | (3,241) | (3,775) | |
| Deferred Revenue | (3,104) | (2,611) | (2,633) | (1,280) | (1,283) | (1,401) | (1,794) | (1,908) | (1,483) | (1,405) | (1,078) | (1,031) | |
| Pass Through\Vol Rebate/Creative | (2,941) | (3,600) | (3,779) | (3,009) | (3,397) | (3,702) | (3,883) | (2,597) | (2,851) | (2,158) | (1,732) | (1,732) | |
| Restructuring/Non Recurring | (268) | (200) | (144) | (96) | (18) | (448) | (537) | (611) | (518) | (460) | (412) | (364) | |
| Accrued Liabilities | (1,621) | (1,921) | (1,930) | (2,099) | (2,577) | (2,417) | (2,309) | (1,216) | (1,205) | (828) | (1,092) | (1,082) | |
| | | | | | | | | | | | | | |
| **Cash Flow** | | | | | | | | | | | | | |
| Income (loss) | 1,709 | 2,280 | 1,696 | 1,138 | (1,462) | (208) | 715 | 1,682 | 893 | 8 | 951 | (178) | 9,223 |
| Change in W/C | 1,243 | 884 | (4,482) | 2,644 | 2,472 | 1,005 | 207 | (404) | (1,540) | 804 | (710) | 679 | 794 |
| Cash Flow (calc.) | 2,952 | 3,164 | (2,785) | 3,782 | 1,010 | (1,213) | 922 | 1,278 | (647) | 813 | 241 | 501 | 10,017 |

Exhibit _____ B
Page _____ 37

**EMAK Worldwide, Inc.**
**August 2009 - July 2010 Actuals**
(Unaudited)

|  | | | | | | Corporate | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Income Statement | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Total |
| Gross Sales | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Sales | (2) | (3) | (2) | (4) | - | - | - | - | - | - | - | - | (11) |
| S&B Reclass | 4 | 5 | 3 | 6 | - | - | - | - | - | - | - | - | 18 |
| Cost of Sales | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gross Margin (excl. HK) | 2 | 2 | 1 | 2 | - | - | - | - | - | - | - | - | 7 |
| % of Net Sales | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Direct Overhead | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Margin After Direct Overhead | 2 | 2 | 1 | 2 | - | - | - | - | - | - | - | - | 7 |
| % MADO | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| S&B, net | (603) | (981) | (698) | (806) | (497) | (569) | (566) | (591) | (433) | (320) | (315) | (247) | (6,626) |
| Operating Expenses | (547) | (559) | (577) | (1,670) | (4,593) | (1,667) | (1,693) | (1,854) | (1,292) | (557) | (1,140) | (777) | (16,925) |
| Operating Margin | (1,148) | (1,538) | (1,274) | (2,474) | (5,091) | (2,236) | (2,259) | (2,445) | (1,725) | (876) | (1,455) | (1,023) | (23,544) |
| Balance Sheet | | | | | | | | | | | | | |
| Cash | 11,070 | 13,688 | 9,899 | 12,829 | 13,024 | 10,222 | 9,965 | 10,148 | 7,883 | 7,609 | 6,632 | 5,999 | |
| Accounts Receivables, net | 1,060 | 934 | 901 | 935 | 901 | 899 | 899 | 236 | 236 | 236 | 236 | 236 | |
| Unbilled Receivable | - | - | - | - | - | - | - | - | - | - | - | - | |
| Inventory, net | - | - | - | - | - | - | - | - | - | - | - | - | |
| Other Assets | 789 | 619 | 655 | 500 | 406 | 521 | 544 | 491 | 470 | 486 | 467 | 480 | |
| AP/Accrued Receipts | (283) | (465) | (488) | (1,510) | (1,108) | (1,491) | (1,871) | (503) | (222) | (2,122) | (2,022) | (1,760) | |
| Deferred Revenue | - | - | (33) | - | - | - | - | - | - | (22) | - | - | |
| Pass Through\Vol Rebate/Creative | - | - | - | - | - | - | - | - | - | - | - | - | |
| Restructuring/Non Recurring | - | - | - | (123) | (626) | (1,127) | (1,616) | (1,653) | (1,556) | (1,469) | (1,376) | (1,307) | |
| Accrued Liabilities | (1,869) | (2,318) | (2,452) | (2,753) | (4,284) | (4,058) | (4,104) | (5,869) | (6,261) | (4,060) | (4,356) | (4,497) | |
| Cash Flow | | | | | | | | | | | | | |
| Income (loss) | (1,148) | (1,538) | (1,274) | (2,474) | (5,091) | (2,236) | (2,259) | (2,445) | (1,725) | (876) | (1,455) | (1,023) | (23,544) |
| Change in W/C | (1,975) | (1,696) | 3,980 | (1,395) | 1,564 | 3,347 | 1,149 | 967 | 2,301 | (109) | 1,077 | 429 | 9,640 |
| Cash Flow (calc.) | (3,123) | (3,233) | 2,706 | (3,868) | (3,527) | 1,112 | (1,110) | (1,478) | 576 | (985) | (377) | (594) | (13,904) |

Page 5 of 5

Exhibit _B_
Page _38_

1

**PROOF OF SERVICE OF DOCUMENT**

2

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business
address is: 840 Newport Center Drive, Suite 400, Newport Beach, CA 92660-6324

3

4

The foregoing document described as **DEBTORS' CHAPTER 11 STATUS REPORT;
DECLARATION OF TERESA L. TORMEY IN SUPPORT THEREOF** will be served or was
served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in
the manner indicated below:

5

6

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF") –**
Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document
will be served by the court via NEF and hyperlink to the document. September 2, 2010, I checked the
CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following
person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es)
indicated below:

7

8

9

☒ Service information continued on attached page

10

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity
served):**
On September 2, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in
this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed
envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service
addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be
completed no later than 24 hours after the document is filed.*

11

12

13

14

☒Service information continued on attached page

15

16

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate
method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on  September
2, 2010,  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who
consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing
the judge here constitutes a declaration that personal delivery on the judge will be completed no later than
24 hours after the document is filed.*

17

18

19

Caused to be Served via Personal Delivery/Messenger:
Chambers of the Honorable Richard Neiter
Edward R. Roybal Federal Bldg., Courtroom 1645
255 E. Temple Street
Los Angeles, CA 90012

20

21

22

☐ Service information continued on attached page

23

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true
and correct.

24

25

| 9/2/2010 | Lori Gauthier | /s/ Lori Gauthier |
| --- | --- | --- |
| *Date* | *Type Name* | *Signature* |

26

27

28

2297193.5

1  **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

2

3  • Ron Bender    rb@lnbrb.com

4  • Russell Clementson    russell.clementson@usdoj.gov

5  • Daniel Denny    ddenny@gibsondunn.com

6  • Joseph A Eisenberg    jae@jmbm.com

7  • John-patrick M Fritz    jpf@lnbrb.com

8  • Irving M Gross    img@lnbrb.com, angela@lnbrb.com

9  • Kerri A Lyman    klyman@irell.com

10  • David L. Neale    dln@lnbrb.com

11  • Justin E Rawlins    jrawlins@winston.com, docketla@winston.com

12  • Jeffrey M. Reisner    jreisner@irell.com

13  • Jeffrey Rosenfeld    jeffrey.rosenfeld@bingham.com

14  • United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

15

16  **SERVED VIA FIRST-CLASS MAIL**

17

18  REFER TO ATTACHED SERVICE LIST.

19

20

21

22

23

24

25

26

27

28

2297193.5

Debtor
EMAK Worldwide, Inc.
c/o Teresa Tormey, Esq.
6330 San Vicente Blvd.
Los Angeles, CA 90048

~~Counsel for Debtor~~
~~Jeffrey M. Reisner, Esq.~~
~~Irell & Manella LLP~~
~~840 Newport Center Drive, #400~~
~~Newport Beach, CA 92660~~

Russell Clementson, Esq.
c/o Office of the U.S. Trustee
725 S. Figueroa Street, Suite 2600
Los Angeles, CA 90017-5413

Secured Creditor
Bank of America
[Mail Code: CA9-513-09-01]
Attn: Monirah J. Masud, SVP
55 S. Lake Ave
Pasadena, CA 91101-2627

Secured Creditor
Bank of America, N.A.
Attn: Robert Dalton, VP
600 Peachtree St, 10th Fl
Atlanta, GA 30308

Secured Creditor
Flat Iron Capital
Attn: Authorized Agent
950 17th St., Ste 1300
Denver, CO 80202


**COMMITTEE MEMBERS**


Committee Member
Donald Kurz
c/o Diamond Capital Ptrs
2049 Century Park East, Suite 350
Los Angeles, CA 90067

Committee Member
Bouchard Margules & Friedlander PA
Attn: J. Friedlander, Esq.
222 Delaware Ave, Suite 1400
Wilmington, DE 19801

Committee Member
Steven J. Vallen
18666 Ravenwood Drive
Saratoga, CA 95070

Committee Member
Luce Forward Hamilton, et al
Attn: John C. Kirkland, Partner
601 S. Figueroa St., Suite 3900
Los Angeles, CA 90017

Committee Member
Michael Sanders
1281 Keats Street
Manhattan Beach, CA 90266


**Request for Notice:**


~~John C. Kirkland, Esq.~~
~~Luce Forward Hamilton, et al~~
~~601 So. Figueroa St., Suite 3900~~
~~Los Angeles, CA 90017-5728~~
[Under Committee Member]

Wells Fargo Securities, LLC
(as successor to Barrington Associates)
c/o Michael Gold, Esq.
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Counsel for Bouchard, Margules, et al.
Ron Bender, Esq/David Neale, Esq. and
Irv Gross, Esq/John-Patrick Fritz, Esq.
Levene, Neale, Bender, Yoo & Brill
10250 Constellation Blvd., Ste. 1700
Los Angeles, CA 90067

Daniel B. Denny, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071

Counsel for Rob Dar, Duane Johnson and
Mike Sanders
Justin Rawlins, Esq/Rolf Woolner, Esq.
Winston & Strawn LLP
333 S. Grand Ave
Los Angeles, CA 90071-1543

Joseph A. Eisenberg, Esq.
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Donald A. Kurz
c/o Stephen C. Norman, Esq./Abigail M.
LeGrow, Esq.
Potter Anderson & Corroon
1313 N. Market St., 6th Floor
Wilmington, DE 19889

**20 Largest:**

Jose Figueroa
1508 Sinaloa Ave
Pasadena, CA 91104

Ashby & Geddes
Attn: Steve Jenkins, Esq.
500 Delaware Avenue
Wilmington, DE 19801-1490

Duane Johnson
3166 Butler Ave
Los Angeles, CA 90066-1302

Latham & Watkins
Attn: Russ Sauer, Esq.
355 South Grand Avenue
Los Angeles CA 90071-1560

Mui Klein
1716 Havenmeyer Lane
Redondo Beach, CA 90278-4717

Martha Roberts
15650 Meadow Dr
Canyon Country, CA 91387-4440

~~Jose Figueroa~~
~~529 S. El Molino Ave., Unit 8~~
~~Pasadena, CA 91101-4208~~
[address change 8/13/10]

~~Secured Creditor~~
~~Bank of America~~
~~Attn: Hermann Schutterie, VP~~
~~1000 W. Temple Street, 7th Fl~~
~~Los Angeles, CA 90012-1514~~
[address change 8/13/10]

~~Bouchard Margules & Friedlander~~
~~Attn: J. Friedlander, Esq.~~
~~222 Delaware Ave, Suite 1400~~
~~Wilmington, DE 19801~~
[Under Committee Member]

Gibson, Dunn & Crutcher LLP
Attn: Steve Talley, Esq.
1801 California Street, Suite 4200
Denver, CO 80202-2694

Morris Nichols Arsht & Tunnell
Attn: Ken Nachbar
1201 N. Market Street
Wilmington, DE 19901-1147

Christie Monacos
426 E. Marigold St.
Altadena, CA 91001-1908

JH Cohn LLP
Attn: Mark Nunis
4 Becker Farm Road, #302
Roseland, NJ 07068-1780

Ellen Francisco
17522 Grayland Ave
Artesia, CA 90701-4023

Patrick Hanrahan
1783 Rose Villa
Pasadena, CA 91106-3565

David Hurst, Esq.
Young, Conaway, et al
The Brandywine Bldg.
1000 West Street, 17th Floor
Wilmington, DE 19801-1053

Ropes & Gray LLP
Attn: Thad Davis, Esq.
Three Embarcadero Center
San Francisco, CA 94111-4006

~~Michael Sanders~~
~~1281 Keats Street~~
~~Manhattan Beach, CA 90266-6811~~
[Under Committee Member]

Roy Dar
6470 Gaynor Avenue
Van Nuys, CA 91406-6434

Carillo Foster LLC
Attn: Authorized Agent
PO Box 8259
Pasadena, CA 91109

~~City of Los Angeles~~
~~Attn: Authorized Agent~~
~~File 57065~~
~~Los Angeles, CA 90074-7065~~
**RETURNED/NO FORWARD ADDRESS**

~~Steven J. Vallen~~
~~18666 Ravenwood Drive~~
~~Saratoga, CA 95070-5652~~
[Under Committee Member]

Connolly Bove Lodge
Attn: C.J. Seitz, Esq.
1007 North Orange St
Wilimington, DE 19801-1239

**Mr. A.C. Verbruggen**
**c/o Bronsgeest Deur Advocaten**
**Attn: H.J. Wiarda**
**De Lairessestraat 137-143**
**1075 HJ Amsterdam**
**The Netherlands**