1  DAVID L. NEALE (State Bar No. 141225)
2  J.P. FRITZ (SBN 245240)
   GWENDOLEN D. LONG (CA Admission Pending)
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
5  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
6  Email: dln@lnbyb.com, jpf@lnbyb.com, gdl@lnbyb.com

7  Counsel for the Official Committee of Unsecured Creditors

8              **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10                    **LOS ANGELES DIVISION**

11 | In re | ) Case No. 2:10-bk-42779-RN
12 |       | )
   | ⊠ EMAK WORLDWIDE, INC., a Delaware | ) Chapter 11
13 | corporation, | )
   |              | ) SECOND DECLARATION OF JOEL
14 | ⊠ EMAK WORLDWIDE SERVICE CORP., a | ) FRIEDLANDER
15 | Delaware corporation, | )
   |                       | ) DATE: [ To Be Set by Court]
16 |                       | ) TIME:  [To Be Set by Court]
   |          Debtors and Debtors-in- | ) PLACE: Courtroom 1645
17 |          Possession. | )        255 E. Temple St.
18 |          | )        Los Angeles, CA
   |          | )
19 |          | )
   |          | )
20 |_____| )

21        Joel Friedlander hereby declares as follows:

22        1.    I am a partner in the law firm of Bouchard Margules & Friedlander, P.A.

23 ("BMF").  BMF is the largest unsecured creditor of EMAK Worldwide, Inc. ("EMAK"), by

24 virtue of a July 29, 2010 Order entered by Vice Chancellor J. Travis Laster of the Delaware

25 Court of Chancery requiring EMAK to pay BMF a $2.5 million fee award (the "Fee Award") in

26 the shareholder derivative action styled *Donald A. Kurz and Sems Diversified Value, LP v. James*

27 *K. Holbrook, Jr. et al.*, Civil Action No. 5019-VCL (the "Delaware Action").  BMF is counsel to

28 {BMF-W0211789.}

the shareholder plaintiffs in the Delaware Action.  BMF is a member of the Official Committee of Unsecured Creditors (the "Committee"), and I am the Chairman of the Committee.

2.      I make this Declaration (A) in support of the Committee's to-be-filed motion in support of conversion to a Chapter 7 liquidation or, in the alternative, the appointment of a Chapter 11 trustee, (B) in support of the Committee's to-be-filed opposition to the application of EMAK to employ Latham & Watkins LLP ("Latham") as special litigation counsel, (C) in support of the Committee's opposition to the setting of insider compensation for James L. Holbrook, Jr. and Teresa L. Tormey.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## A.      EVIDENCE OF WRONGDOING AGAINST EMAK INSIDERS

3.      As counsel to the shareholder plaintiffs in the Delaware Action, I helped build a factual record respecting alleged misconduct by, among other people, the persons who constitute the Board of Directors of EMAK.  Based on publicly disclosed information, I understand that the current directors of EMAK are: (i) James Holbrook, who is EMAK's Chief Executive Officer; (ii) Jeffrey Deutschman, who is the manager of Crown EMAK Partners, Inc. ("Crown"), the sole preferred stockholder of EMAK; and (iii) Jordan Rednor, an appointee of Crown.

4.      The Delaware Action is a shareholder derivative action in which the plaintiffs allege that in the fall of 2009, the then-directors of EMAK, aided and abetted by Crown, breached their fiduciary duties to EMAK and its common stockholders by taking measures to defeat a consent solicitation by Take Back EMAK LLC ("TBE"), which was soliciting votes to remove Holbrook, Rednor and Chairman Stephen Robeck and elect three new directors.  In the first phase of the Delaware Action, plaintiffs sought to enjoin a transaction whereby EMAK's Board of Directors granted Crown the right to cast 28% of the voting power in the election of directors (the "Exchange Transaction").  On the literal eve of a preliminary injunction hearing,
{BMF-W0211789.1}

1

2

3

4

5

6

7

8

9

10

11

12

after numerous depositions, briefing, and the submission of expert reports, the defendants rescinded the Exchange Transaction. Several days later, Crown, Holbrook and subordinate members of the EMAK management team consented to the adoption of a bylaw amendment that purported to give Crown the power to appoint a majority of a shrunken Board (the "Bylaw Amendment"). Plaintiffs challenged the validity of the Bylaw Amendment, as well as the outcome of the TBE consent solicitation. Plaintiffs established after trial in the Court of Chancery and on appeal in the Delaware Supreme Court that the Bylaw Amendment was invalid under Delaware law. Although the Court of Chancery seated the TBE nominees, the Delaware Supreme Court ruled on appeal that the TBE nominees had not obtained a majority of the valid votes.

13

14

15

16

17

18

19

20

21

22

5.       On February 24, 2010, during the pendency of the appeal, BMF filed a fee application seeking $2.4 million for having secured the corporate benefit of causing the rescission of the Exchange Transaction. On March 2, 2010, the Court of Chancery determined that it was appropriate to adjudicate the fee application prior to the conclusion of the Delaware Action, because "it will be helpful to have quantified the fee award so that the parties can address concretely whether the amount should be incorporated in the calculation of damages suffered by the Company." (Ex. A at 1). On May 3, 2010, following the Delaware Supreme Court's affirmance of the invalidation of the Bylaw Amendment, BMF filed an amended fee application seeking $2.85 million.

23

24

25

26

27

28

6.       On July 19, 2009, the Court of Chancery exercised its discretion in granting the Fee Award, noting that plaintiffs' counsel had expended 1,587 hours of compensable attorney time on a fully contingent basis, that the "contingency risk was enhanced" because BMF "went all-in on a concentrated bet, where they invested a material amount of their firm's resources to get an outcome," brought forward "real evidence of loyalty breaches," obtained results that

{BMF-W0211789.}

1

2

3

4

5

6

"fundamentally changed the corporate governance landscape," and also "corrected what were false and misleading solicitation materials." (Ex. B at 104, 105, 107). The Court of Chancery determined the fee award appropriate for each of three distinct corporate benefits created by plaintiffs, stating, "I think there may be different arguments for the degree to which they could be included in damages later." (*Id.* at 106).

7

8

9

10

11

12

13

14

7. The only remaining phase of the Delaware Action would be a trial in which plaintiffs would seek to establish that the director defendants and Crown are required to pay back to EMAK millions of dollars in legal fees that EMAK paid relating to the rescinded Exchange Transaction and the invalidated Bylaw Amendment. The legal fees in question include several million dollars spent by law firms representing EMAK, the director defendants and Crown, as well as recovery of the $2.5 million Fee Award. This damages claim against Holbrook, Deutschman, Rednor, certain prior directors of EMAK, and Crown is an asset of EMAK.

15

16

17

18

19

20

8. During the pendency of the appeal in the Delaware Supreme Court, BMF was counsel to EMAK's Board of Directors and its Personnel Review Committee. At that time, I assisted the law firm of Fox, Wang & Morgan P.C. ("FW&M") in its investigation on behalf of the Personnel Review Committee into whether grounds existed to terminate James Holbrook for "cause" under his employment agreement with EMAK.

21

22

23

24

25

26

9. Assembled below is a summary of evidence of disloyalty, fraud, dishonesty and gross mismanagement by Holbrook, Deutschman, Rednor, Crown, and EMAK Secretary Teresa Tormey within the past year, including observations by Vice Chancellor Laster in his ruling on the Fee Award and conclusions reached by FW&M. The evidence falls into nine separate categories:

27

28

      i. disloyalty, dishonesty and gross mismanagement by Holbrook relating to the loss of EMAK's largest customer, Burger King Corporation

{BMF-W0211789.}

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

("Burger King"), which contributed over 50% of EMAK's revenue in recent years;

ii. disloyalty by Holbrook, Deutschman, Rednor and Crown relating to the negotiation and approval of the Exchange Transaction, which conferred new voting rights on Crown and would have foreclosed TBE's consent solicitation, if not for the Delaware Action;

iii. fraud and dishonesty by Holbrook, Deutschman and Rednor in seeking stockholder ratification of the Exchange Transaction;

iv. disloyalty by Holbrook, Deutschman, Rednor and Crown relating to the adoption of the Bylaw Amendment, which would have given Crown control of EMAK's Board and foreclosed the TBE consent solicitation, if not for the Delaware Action;

v. disloyalty by Holbrook and Tormey in conferring benefits upon employees amidst the TBE consent solicitation for the apparent purpose of buying their votes;

vi. dishonesty and gross mismanagement by Holbrook during the Personnel Review Committee's investigation into his conduct;

vii. gross mismanagement and dishonesty by Holbrook in not replacing EMAK's $7.5 million credit facility in April 2010 and then publicly misrepresenting EMAK's liquidity position;

viii. dishonesty by Holbrook, Deutschman, and Rednor in connection with the filing of the bankruptcy petition; and

ix. disloyalty by Holbrook, Deutschman, Rednor and Tormey in connection with EMAK's filings in this Court.

{BMF-W0211789.}

I.      **Holbrook's Dishonesty, Disloyalty and Gross Mismanagement Regarding Burger King**

10.     In the July 19, 2010 transcript ruling granting the Fee Award to BMF, Vice Chancellor Laster discussed evidence that James Holbrook misled the Board of Directors of EMAK when he was confronted with information that EMAK was on the verge of losing its contract with its largest customer, Burger King:

> *I think there is substantial and credible evidence that Mr. Holbrook misled the board and/or withheld material information in connection with the events leading up to the exchange transaction.*
>
> ...
> Then we come to the Burger King events. What happened there was in early August, Mr. Kurz got word that Burger King was actively considering using EMAK's competitor as its sole source and that Holbrook had a bad relationship with Burger King. Kurz advised the independent directors on the board of this, but unfortunately, they interpreted Kurz's information as a play for Holbrook's job....
> In September, however, Burger King terminated EMAK's contract, and regrettably proved Kurz right. At that point, though, rather than trying to consider what to do about this revelation, the primary action that [EMAK's outside counsel] and Holbrook took was to attack Kurz. What Holbrook also did at this point was to enlist Crown as his ally....
>
> ...
> *And as I've said before, I also questioned whether the board got full information from Holbrook about the events leading up to the Burger King transaction.* And its quite unclear to me whether [had they] had full information about the Burger King transaction, whether they might have done something differently.

(Ex. B at 80, 89-91) (emphasis added).

11.     In making these observations, the Vice Chancellor had the benefit of a discovery record and trial testimony. For example, EMAK director Jordan Rednor sent a contemporaneous August 21, 2009 email to fellow directors Stephen Robeck and Howard Bland, which states:

> *I'm disappointed that Jim [Holbrook] hasn't alerted us to the sequence of events that have been transpiring with BK for*

{BMF-W0211789.}

1

2

3

> ***months.*** The answer that there have always been rumors doesn't do it for me, there's been too much there. Even the positive comments that Jon complimented us feels like it should have been followed up and used to our advantage.

4

(Ex. C) (emphasis added).

5

6

7

8

     12.     In a September 7, 2009 email to Rednor, director Don Kurz referred to a presentation by line managers responsible for the Burger King account, who had come forward with information about Holbrook:

9

10

11

> Compounding this issue is the very real risk of losing the BK business. We heard from our management team in no uncertain terms that Jim [Holbrook] is not welcome at BK Marketing, who ultimately drives the promotion and premium agency decisions....

12

(Ex. D). Similarly, in a September 13, 2009 letter to the full Board, Kurz wrote:

13

14

15

16

17

18

19

20

21

> On August 4, I received a call from a knowledgeable service provider who stated in confidence that he had heard from three different areas of Burger King Corp. that they were planning on going sole source premiums supply with Premium Surge, our competitor.... This [led] to a full Board conference call where the CEO invited our BK management team to participate. On that call, the management team stated they believed the situation was indeed perilous and summarized some of the previous warnings that were conveyed to EMAK from sources such as STR and Wunderman going back 18 months or so. ***Jim [Holbrook] claimed to be involved with the BK situation and that he visited Miami quarterly (a statement we now know to be a lie), but failed to explain why he either had no inkling of how bad things were or had failed to meet his obligation to promptly advise the Board of such a serious problem....***

22

(Ex. E at 2-3) (emphasis added).

23

24

25

26

27

28

     13.     Vice Chancellor Laster also had the benefit of a report prepared by FW&M following an investigation undertaken at the behest of the Personnel Review Committee of EMAK's Board of Directors. In that report, FW&M concluded that Holbrook was subject to termination for "cause" under his employment agreement on six separate grounds. One of those grounds was Holbrook's failure "to timely inform the Board of the fracture in his relationship

{BMF-W0211789.}

with Burger King and the deteriorating business relationship with Burger King and the enterprise-threatening result to EMAK that fracture and deterioration portended." (Ex. F at 4) (without attachments). The report explains:

> *Yet, despite all these warnings, and Mr. Holbrook's own knowledge of the deteriorating situation, at no point did Mr. Holbrook inform the EMAK Board, let alone seek the EMAK Board's advice or counsel.* At no point did Mr. Holbrook provide notice to the EMAK Board so that EMAK could prepare to respond to Burger King's concerns, or manage business at EMAK in anticipation of such revenue loss. In fact, EMAK's Board did not become aware of concerns with the Burger King account until after Mr. Kurz brought them up following a conversation he had on August 4, 2009 with Leeton Lee, an employee of a Burger King vendor that supplies market testing services to Burger King. *It would appear that Mr. Holbrook's attempts to keep the Burger King situation secret was for no other purpose than to hide his mismanagement of the account.*

(*Id.* at 9-10) (emphasis added). The FW&M report elaborates on Holbrook's cover-up of his gross mismanagement of EMAK's most critical account:

> Mr. Holbrook knew that his efforts, or lack thereof, would result in serious harm and injury to EMAK because he knew he was the issue with the Burger King account, yet did nothing to address Burger King's concerns either by removing himself from the account or addressing whatever issues Burger King had with his service. By failing to address the very issue Burger King had with EMAK, Mr. Holbrook's intentional inaction appears to have played a major role in EMAK's loss of the Burger King account. Indeed, evidence of the half-hearted effort Mr. Holbrook mounted to save the Burger King business, even after he was aware that business was in jeopardy, is that he visited Burger King in Miami on only four occasions in 2008 and 2009 (before the loss of the business in the Fall of 2009). Indeed, the frequency of his previously (quarterly) trips decreased markedly as his relationship with Burger King soured in 2007 and 2008. Rather than drawing the customer closer, Mr. Holbrook stayed away and distanced himself from Burger King, eventually leading to a 9 month hiatus in visits to Burger King at the critical period of time between August of 2007 and March of 2008 and at a time he was representing to the Board that he traveled "quarterly" to Miami.

(Ex. F at 10-11).

{BMF-W0211789.}

14.     Holbrook's conduct in connection with the loss of the Burger King account is the

subject of Count IV of a shareholder derivative complaint filed in the Superior Court of the State

of California County of Los Angeles styled *Robert J. Farina et al. v. Stephen P. Robeck et al.*,

Case No. BC 422808 (the "California Action") (Ex. G) (without exhibits), which seeks to

recover millions of dollars from EMAK directors Holbrook, Rednor and Deutschman, among

others.

## II.     Holbrook's, the Board's, and Crown's Disloyalty in Arranging the Exchange Transaction

15.     In the aftermath of the loss of the Burger King account, Holbrook engineered the

Exchange Transaction, which gave Crown 28% of the total voting power in director elections.

They did so just after the initiation of a consent solicitation by TBE to remove Holbrook, Rednor

and Chairman Stephen Robeck and elect new directors.    If not eliminated, the Exchange

Transaction would have foreclosed a contested election.    Vice Chancellor Laster observed:

"Prior to the mooting of the exchange transaction, a consent solicitation was effectively, if not

mathematically, impossible, at least realistically unattainable." (Ex. B at 92).

16.     Vice Chancellor Laster discussed the evidence that Holbrook acted disloyally in

arranging the Exchange Transaction and that he was aided and abetted by Crown:

> There were substantial claims for breach of fiduciary duty
> challenged in the exchange transaction.... It was a plain example
> of conduct that's actionable as a straightforward duty of loyalty
> violation.
>
> ...
> ... *I think there is substantial and credible evidence that
> Mr. Holbrook breached his duty of loyalty in connection with the
> exchange transaction*....
>
> ...
> Now, what seems at least a strong inference from the
> record, as described to date, is that *by the middle of 2009,
> Holbrook saw [Peter Ackerman of Crown] as his potential
> benefactor*....
>
> ...

{BMF-W0211789.}

1

2           ... What Holbrook also did at this point was to enlist Crown as his ally. And in particular, at a September meeting with Crown, Holbrook essentially cut a deal with Crown whereby, according to his e-mail, he and Ackerman became partners.

3

4    ...
       What's clear from the record is that Holbrook was working this angle [with Crown] from long before. And *there is powerful evidence that Holbrook's primary reasons for doing so were his desire to keep his job.*

5

6

7    ...
       So this leads us to what happened in the exchange transaction. The exchange transaction converted Crown's preferred from something that didn't vote in the election of directors into a new security that had 28 percent of the voting power in the election of directors. It also provided Crown with [other] rights ....

8

9

10

11    ...
       ... What is suggested by the e-mail record, however, at least Mr. Holbrook's side of it ..., is that *[Mr. Ackerman of Crown] was deeply aware of the conflicts on the board, deeply aware of Mr. Holbrook's insecurities, and used them to his advantage*.
       So all of this to say that I think it's highly likely that I would have enjoined the exchange transaction.

12

13

14

15    ...
...

16           ... This was a strong challenge brought to a transaction where there was, as I've already discussed, real evidence of loyalty breaches; and rescinding the transaction fundamentally changed the corporate governance landscape.

17

18

19    (Ex. B at 79, 80, 87, 90, 92, 107) (emphasis added).

20    17.    Abundant record evidence supported the Vice Chancellor's observations. For

21    example, in a September 7, 2009 email, Holbrook outlined what later became the Exchange

22    Transaction:

23           What Peter [Ackerman of Crown] wants to do is to be able to not let Don [Kurz] get control of the board... So we could do something like he proposed, or do something simple like giving him voting rights in return for a standstill...

24

25

26    (Ex. H at EMK013933).

27

28

{BMF-W0211789.}

18.     On the morning of September 24, 2009, shortly after Burger King's termination of

its contract with EMAK, Holbrook sent an email to Chief Administrative Officer Teresa Tormey,

directors Deutschman and Rednor and others, in which he expressed concern that TBE would

prevail in an election contest by capitalizing on public announcement of the loss of Burger King:

> I suspect that Don's group [TBE] may buy shares after any BKC
> announcement, assuming the price drop.... They are at roughly
> 2.6M shares or 37% of voting (for the board)... So they need an
> additional million shares to get to 51%....

(Ex. I). Later that morning, Holbrook drafted a press release that he circulated to Crown director

designee Deutschman, Rednor, Tormey and others, describing his ideal solution:

> EMAK today announces a new strategic direction for the company,
> including the following:
> - the board has approved full voting rights for the preferred
> ...

(Ex. J). In an email the following day, Holbrook wrote that "Ackerman is now my partner."

(Ex. K). Knowing that Holbrook was motivated to grant Crown "full voting rights" for its

preferred stock, Crown obtained that voting power (and other rights) from EMAK without being

asked to give the standstill Holbrook initially contemplated.

### III.    Holbrook's, Deutschman's and Rednor's Dishonesty Respecting the Exchange Transaction

19.     Vice Chancellor Laster was blunt in describing the public disclosures by which

Holbrook and the other director defendants attempted to obtain stockholder ratification of the

Exchange Transaction:

> ...     *The disclosures were false and misleading.*    When you
> compared the disclosures to what was written in the briefs and
> when you compared the disclosures to what was in the e-mails,
> there was absolutely no way that they could be squared.
> ...
> [T]he idea that the consent solicitation materials that were put out
> for the ratification statement are accurate is just not one that I can
> agree with....

{BMF-W0211789.}

(Ex. B at 96) (emphasis added).

20.    The Vice Chancellor had the benefit of an abundant factual record to evaluate EMAK's public disclosures respecting the Exchange Transaction.  One of the challenged public statements was Holbrook's description of EMAK's relationship with Crown:

> In EMAK's press release about the transaction, Jim Holbrook stated that: "Over the years Crown has been diligent in working with us as a partner implementing our long-term strategic plans...."

(Ex. L at 5).  Simultaneously, Holbrook and the other director defendants (including Rednor and Deutschman) stated in a sealed brief in the Court of Chancery that Crown had been threatening EMAK:

> Crown was threatening to pursue a variety of options through which it would recoup most or all of its \$25 million liquidation preference, which would clearly harm the common stockholders.

\* \* \*

> the Board of Directors perceived a danger from Crown based upon Crown's repeated statements that it would force EMAK to honor its liquidation preference despite the effect it would have on the value of the common shares.

\* \* \*

> Crown was threatening to take draconian measures to ensure it received its liquidation preference, irrespective of the effect such measures would have on the value of the common stock or the future of EMAK.

\* \* \*

> if the Exchange Transaction were not consummated, the Preferred Stockholder could, and was threatening to, take unilateral actions – including purchase of additional shares, partnering with existing holders to assume control of the company, seeking to buy the company, or initiation of litigation – that could have far more severe consequences for the common stockholders.

{BMF-W0211789.}

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(Ex. M at 16, 34, 41, 43-44). Deutschman admitted at trial that Crown made those threats. (Ex. N at 249-51, 253, 255).

21. EMAK's public disclosures also touted that "there is no effort to entrench the Board," that "there is no voting agreement with Crown" and that "Crown is free to vote its shares as it sees fit" (Ex. L at 4, 5), without mentioning how Holbrook and Ackerman had reached an understanding, discussed in paragraphs 16-18 above, that Crown would vote its new 28% voting power in opposition to TBE's nominees, thereby entrenching the incumbents.

22. EMAK's public disclosures also falsely touted that the "Board thought very carefully about the Exchange Transaction" (Ex. L at 5), without mentioning any facts about the Board's deliberative process, such as (i) the Board meeting respecting the Exchange Transaction had been called on a Sunday morning with less than 24 hours notice, (ii) the Board was not advised by Delaware counsel or any counsel knowledgeable about applicable Delaware law, or (iii) the Board received no advice from any proxy solicitor about the effect of the Exchange Transaction on the practical ability of common stockholders to remove incumbent directors and elect new directors in the TBE consent solicitation. (Ex. O; Ex. P at 9, 14-26, 34).

23. EMAK's solicitation materials also falsely denied that the Exchange Transaction was "effected in response to TBE's current consent solicitation seeking to change control of EMAK's board of directors" and falsely stated that "the Exchange Transaction was under discussion by the Board and Crown long before the October 12, 2009 notice from TBE of its intention to solicit written consents from stockholders." (Ex. L at 5). In fact, the record showed that the Exchange Transaction was considered by EMAK's Board for the first time on October 19, 2009, and it was approved just in time for Crown to exercise 28% of the voting power in the TBE consent solicitation. (Ex. O) Moreover, as Vice Chancellor Laster observed, when Holbrook and Crown agreed upon the outline of the Exchange Transaction in September 2009, {BMF-W0211789.}

"Kurz was calling for [Holbrook's] head" and "was making louder noises about a proxy contest."

(Ex. B at 87, 90). That background was misleadingly omitted from EMAK's disclosures.

## IV. Holbrook's, the Board's, and Crown's Disloyalty in Arranging the Bylaw Amendment

24.     On December 3, 2009, the day before a scheduled preliminary injunction hearing, EMAK's Board of Directors and Crown rescinded the Exchange Transaction. Immediately after voting to rescind the Exchange Transaction, EMAK's Board of Directors purported to authorize reimbursement of Crown's legal fees relating to the Exchange Transaction, even though only three of the six directors present voted in favor of the resolution, less than the majority required by Section 141(b) of the Delaware General Corporation Law. (Ex. Q at 2).

25.     Over the next few days, Crown became concerned that TBE would prevail in its consent solicitation and install Don Kurz as EMAK's CEO. Vice Chancellor Laster stated: "I also think, as Mr. Deutschman testified part of the reasons why they did the Crown consent [*i.e.*, the Bylaw Amendment] was because they were worried that Kurz [*i.e.*, TBE] might win." (Ex. B at 93). Indeed, the person who controls Crown, Peter Ackerman, later wrote that "Crown agreed to rescind [the Exchange Transaction] so it could file a stockholder consent to shrink the board, giving its two directors a majority of EMAK's Board [*i.e.*, the Bylaw Amendment]." (Ex. R at 2).

26.     When dissident director Don Kurz learned about Crown's proposed Bylaw Amendment, he urged the other directors to take defensive action so that the Bylaw Amendment would not be implemented. (Ex. S at 3). The Board took no defensive action. The Board's inaction allowed Crown to deliver immediately consents that purported to give Crown control of the Company and foreclose TBE's consent solicitation.

{BMF-W0211789.}

27.     As noted above, plaintiffs in the Delaware Action argued that the Bylaw Amendment was invalid as contrary to Delaware law and, alternatively, that the Board's failure to defend against Crown and its Bylaw Amendment was a breach of the duty of loyalty. The two rationales for plaintiffs' duty of loyalty claim were that EMAK's Board was obliged (i) to respond to the threat posed by Crown, which threat the Board had previously documented (*see* *supra* paragraph 20), and (ii) not to foreclose the TBE consent solicitation.

28.     Vice Chancellor Laster found the Bylaw Amendment to be contrary to Delaware law and chose not to adjudicate the duty of loyalty issue. The Vice Chancellor recently explained when granting the Fee Award: "I didn't feel that I should reach duty of loyalty issues with potential personal liability implications unless it was absolutely necessary.... And so, believing that I had an independent legal basis to adjudicate the [Bylaw Amendment and the composition of the Board of Directors], I didn't reach and did not make any duty of loyalty issues." (Ex. B at 80).

29.     Later in his ruling on the Fee Award, Vice Chancellor noted two reasons why it was important to invalidate the Bylaw Amendment: "[Y]ou needed to get the [Bylaw Amendment] invalidated to have the free election and the potential for a different outcome [in the TBE consent solicitation]. I also agree with Mr. Friedlander that one of the benefits of invalidating the [Bylaw Amendment] and invalidating the original exchange transaction was to give the board a window in which it could act, if it wanted to, to address the Crown threat." (Ex. B at 95).

30.     Holbrook not only failed to defend against the Bylaw Amendment, he was one of the Board members who executed a written consent for his own shares in support of the Bylaw Amendment. As noted above, Vice Chancellor Laster observed that there was "substantial and credible evidence that Mr. Holbrook breached his duty of loyalty in connection with the
{BMF-W0211789.}

1  exchange transaction," Holbrook inferably "saw [Crown's Peter] Ackerman as his potential
2  benefactor," and there was "powerful evidence that Holbrook's primary reasons for [entering
3  into a deal with Crown] were his desire to keep his job." (Ex. B at 80, 87, 90).
4
5  31.   Deutschman not only failed to defend against the Bylaw Amendment, as Crown's
6  manager member, he voted Crown's shares in support of the Bylaw Amendment.[1]

7  **V.   Holbrook's and Tormey's Disloyalty in Conferring Benefits on Employees with Votes**
8
9  32.   In the Delaware Action, plaintiffs presented evidence of how in late 2009,
10 Holbrook committed EMAK to pay hundreds of thousands of dollars in bonuses plus severance
11 benefits to four EMAK managers, including Teresa Tormey (collectively, the "Executives"),
12 who held pivotal votes in TBE's consent solicitation to elect new directors, Crown's December
13 2009 consent solicitation to adopt the Bylaw Amendment, and Crown's February 2010 consent
14 solicitation to adopt a revised bylaw amendment that would similarly transfer control of EMAK
15 to Crown.
16

17 33.   In particular, on September 9, 2009, when the loss of the Burger King account
18 was imminent and Donald Kurz was agitating for Holbrook's termination, Holbrook executed
19 amended employment agreements with the Executives that set the terms for a 2009 bonus that
20 would be payable to the Executives in January 2010, and also provided for enhanced severance
21 upon termination, as well as a 2010 bonus within 30 days of termination.  (Ex. T).  When
22 director Kurz submitted an affidavit saying that he had not been made aware of the amended
23 employment agreements, Holbrook submitted an affidavit in which he did not specifically state
24
25

26 [1] In a case involving Peter Ackerman's taxes, the United States Tax Court recently "found the testimony of Mr. Deutschman to be in certain material respects vague, ambiguous, questionable, and/or serving the interests of his longtime associate Mr. Ackerman, who played a significant role in enabling Mr. Deutschman to be employed by Crown Capital." *Ackerman v. Comm'r of Internal Revenue*, 2009 Tax. Ct. Memo LEXIS 81, *68 (T.C. Apr. 15, 2009).
27
28 {BMF-W0211789.}

that the Board had approved either (i) the bonus formula for 2009, (ii) payment of the 2009 bonus in January 2010, or (iii) payment of a 2010 bonus within 30 days of a termination in 2010. (Ex. U ¶¶ 14-15).

34.     In late 2009, the four Executives were slated for termination as of March 31, 2010, thereby triggering over \$1.5 million in severance payments, including \$545,970 for Tormey, plus a bonus for 2010.

35.     In addition to creating and/or triggering the Executives' entitlement to a 2009 bonus, an early 2010 bonus and severance benefits, Holbrook signed consulting contracts with the Executives (without Board approval) that provided for additional compensation post-termination.

36.     Additionally, Holbrook and Tormey worked together on a plan to pay money to sixteen management employees who were being issued a total of 250,000 shares upon the vesting of their restricted stock units on November 7, 2009. In an October 28, 2009 email to Holbrook, Tormey discussed the number of votes held by officers and directors and "Friends." (Ex. V at EMK017907). She also discussed the 250,000 shares that were about to be issued to employees and stated: **"It will be important to keep this block 'in the fold' for voting purposes.** I'm working on a few strategies with Duane [Johnson] to address the typical pattern of folks selling all or part to cover taxes ...." (*Id.*) (emphasis added). EMAK promptly entered into contracts providing for payment of a "cash bonus" to the employees in exchange for them agreeing not to sell their newly issued shares. (Ex. W).

37.     Immediately after those 250,000 shares were issued and the contracts for the "cash bonus" were signed, Tormey coordinated the solicitation of written consents in favor of the ratification of the Exchange Transaction. (Ex. X ¶ 13).

{BMF-W0211789.}

1    38.    Vice Chancellor Laster took note of the payments to senior managers amidst the

2    ongoing control contest and stated with apparent reference to Tormey:

3

4         For its part, EMAK has not hesitated to pay its own counsel and
          Crown's counsel over $5 million to litigate against the plaintiffs.
5         **EMAK has also paid significant bonuses to senior management
          during this corporate control dispute, including to individuals
6         whose loyalty to the corporation has been called into question
          by the considerable evidentiary record developed by the**
7         **plaintiffs.**

8    (Ex. Y at 4) (emphasis added).

9         **VI.    Holbrook's Dishonesty and Gross Mismanagement During the Personnel**
10              **Review Committee Investigation**

11    39.    The FM&W report discussed how, in an apparent effort to forestall FM&W's

12    interview of Holbrook respecting his handling of the Burger King account, Holbrook sent an

13    email to director Philip Kleweno of the Personnel Review Committee that contained numerous

14    factual misrepresentations:

15

16         • Mr. Holbrook's statement that he did not know who Mr. Fox or
           Mr. Wang were, despite Mr. Kleweno's prior voicemail
17         instructing him to speak to Mr. Fox, Mr. Fox's explanation to
           Mr. Holbrook while on the phone and Mr. Holbrook's previous
18         Google search concerning Mr. Fox;

19         • Mr. Holbrook's statement to Mr. Kleweno that Mr. Fox had
20         forbidden him (Mr. Holbrook) to bring his lawyers to the
           interview, even though Mr. Fox had specifically repeatedly
21         explained to Mr. Holbrook on the call that while he had no
           legal right for counsel to be present, Mr. Fox would extend
22         professional courtesy to Mr. Holbrook and his two lawyers to
           permit them to attend with the proviso that they not interfere
23         with the interview[;]

24         • Mr. Holbrook's statement that he did not know who retained
25         Fox, Wang & Morgan P.C., despite Mr. Kleweno's voicemail
           to Mr. Holbrook so advising and Mr. Fox's statement to Mr.
26         Holbrook that the Personnel Review Committee had retained
           Fox, Wang & Morgan P.C. to undertake an investigation of his
27         conduct;

28    {BMF-W0211789.}

- Mr. Holbrook's representation that Mr. Fox indicated he would inform the Board that Mr. Holbrook "will never be cooperative" if he did not respond to questioning despite the fact no such statement was ever made;

- Mr. Holbrook's assertion that he was being accused of criminal conduct and that his refusal to respond to questioning would result in a report to the Committee that Mr. Holbrook had committed some crime, even though the phrase "criminal" or "crime" was never mentioned nor ever broached on the call with Mr. Holbrook;

- Mr. Holbrook's statement to Mr. Kleweno that he would have to walk out of business obligations to respond to questioning, contrary to precisely the opposite information he supplied Messrs. Fox and Wang, who asked Mr. Holbrook when it would be convenient to speak and not interfere with his business activities and who set "time-calls" with Mr. Holbrook at the precise times Mr. Holbrook suggested were available to him free from client obligations[.]

(Ex. F at 6-7).

40.    Additionally, the FM&W report recorded Holbrook's "extremely poor judgment to involve EMAK clients in his dispute with the Personnel Review Committee undertaking its investigation of his handling of the Burger King account. Specifically, Mr. Holbrook took Mr. Fox's call in Dallas on the evening of Wednesday February 17, as scheduled, but at a time Mr. Holbrook was sitting with EMAK clients (unbeknownst to Mssrs. Fox and Wang, even after Mr. Fox began the call by asking Mr. Holbrook 'Is this still a good time to talk as we discussed earlier today'?). Eventually, Mr. Holbrook revealed the presence of the clients listening to his (Mr. Holbrook's) half of the conversation in Dallas by suddenly and ruefully offering in jest to go forward at that time with the interview if he were to put his cell phone on 'speakerphone' and 'let the clients sitting here with me hear how you are destroying the company.'" (*Id.* at 7-8)

{BMF-W0211789.}

**VII. Holbrook's Gross Mismanagement and Dishonesty in Failing to Replace the Credit Line and Publicly Misrepresenting the Company's Lack of Liquidity**

41.    As recently as October 29, 2009, EMAK publicly announced that its "unused \$7.5 million credit facility provides the Company with adequate liquidity." (Ex. Z at 5).

42.    On March 25, 2010, Holbrook filed an affidavit in the Delaware Action which he stated that EMAK had "a process for replacing EMAK's bank line, and plan on continuing to follow that process." (Ex. AA ¶ 6). Holbrook submitted that affidavit in support of a failed effort by him, Crown and Deutschman to limit the oversight authority of the TBE nominees and Kurz during the pendency of Crown's and Holbrook's appeal to the Delaware Supreme Court.

43.    Holbrook did not replace the \$7.5 million credit facility when it expired in April 2010, thereby creating a situation in which EMAK would resort to filing for bankruptcy upon the Court of Chancery granting the pending fee application in the Delaware Action.

44.    In a June 9, 2010 press release, EMAK misleadingly presented its liquidity situation, stating that it "has sufficient liquidity on-hand" even though its "credit facility expired in April 2010," and that it had cash and cash equivalents of \$10.1 million as of March 31, 2010. (Ex. BB at 4). That same day, Teresa Tormey filed a declaration in the Delaware Action in which she stated that EMAK had only "\$3.2 million of unrestricted cash," net of certain current obligations, and that "plaintiffs' fee application, if granted, would represent 87% of the Company's unrestricted cash." (Ex. CC ¶ 3).

45.    EMAK filed for bankruptcy on August 5, 2010, the day EMAK was required to pay the \$2.5 million Fee Award.

**VIII. Dishonesty of Holbrook, Deutschman, Rednor in Connection with the Filing of the Bankruptcy Petitions**

46.    Upon filing for bankruptcy, EMAK issued a press release stating that "[t]he voluntary bankruptcy petitions result from protracted litigation at the EMAK corporate level and

{BMF-W0211789.}

1
2
3
4
5

an interim award from Chancery Court of Delaware against EMAK for which it was not permitted to immediately appeal." (Ex. DD at 1). The press release further stated that "EMAK intends to seek reversal of the interim award and to permanently resolve the litigation that has disrupted the holding company for some time." (*Id.* at 2)

6
7
8
9
10
11
12

47.    Both of the above statements are false and misleading. First, EMAK turned down the opportunity to immediately appeal the Fee Award. Second, by foregoing the opportunity to immediately appeal the Fee Award, EMAK likely will never be able to appeal the Fee Award, since no appeal of the Fee Award can occur until after post-trial proceedings in the Delaware Action, and EMAK cannot appeal a final order that incorporates the Fee Award into the damages recoverable by EMAK and payable by any of the individual defendants or Crown.

13
14
15
16

48.    Immediately upon Vice Chancellor Laster's ruling granting the Fee Award, EMAK's counsel asked the Vice Chancellor if EMAK could immediately appeal it pursuant to Court of Chancery Rule 54(b). (Ex. B at 108). The Vice Chancellor suggested that he had "no objection to it being certified as a Rule 54(b) ... if the parties agree to it[.]" (*Id.* at 110).

17
18
19
20
21
22
23
24

49.    The following day, I sent EMAK's counsel a proposed Order that would allow EMAK to immediately appeal the Vice Chancellor's ruling pursuant to Rule 54(b). (Ex. EE). EMAK did not accept BMF's invitation to immediately appeal the Vice Chancellor's ruling. Instead, EMAK argued that the Fee Award was not immediately appealable because "there is no hardship at this stage in the proceedings that merits the entry of a Rule 54(b) order." (Ex. FF at 3). The Court of Chancery ordered that the Fee Award be paid within five business days from July 29, 2010.

25
26
27
28

50.    By not seeking to immediately appeal the Fee Award, EMAK likely forfeited any appeal of the Fee Award. The time for reargument of the Fee Award has lapsed. There can be no appeal of the Fee Award until after the conclusion of post-trial proceedings. Even if the

{BMF-W0211789.}

Delaware Action goes forward and is litigated through trial and entry of a final judgment in the Delaware Court of Chancery, EMAK would only be able to appeal the Fee Award to the extent it is not incorporated into a damages award payable by any of the individual defendants or Crown. To the extent any of the defendants is ordered to reimburse EMAK for the cost of the Fee Award, then those defendants, not EMAK, could appeal from the final order. EMAK would have no ground to appeal the Fee Award if a defendant in the Delaware Action must bear its cost.

## IX. Disloyalty of Holbrook, Deutschman, Rednor and Tormey in Connection with EMAK's Filings in this Court

51. The list of unsecured creditors filed with the bankruptcy petitions states that the second-largest unsecured creditor is Ropes & Gray LLP ("Ropes"), which is reportedly owed $411,027.52. Ropes represents Holbrook and Rednor in the Delaware Action and it previously also represented Deutschman and EMAK in the Delaware Action. Ropes also served as outside counsel to EMAK in connection with the Exchange Transaction. EMAK's petitions do not mention that any claim by Ropes is subject to setoff in light of EMAK's potential claim against Ropes for professional malpractice in connection with the Exchange Transaction.

52. The corporate partner from Ropes testified in the Delaware Action that (i) he was not admitted to practice law in Delaware and had not consulted with Delaware counsel prior to advising the Board respecting the Exchange Transaction, (ii) he had never previously advised a board of directors respecting a transaction that impacted voting rights in the midst of an election contest, (iii) he was unfamiliar with a leading precedent under Delaware law about director fiduciary duties during an election contest (*Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 561 (Del. Ch. 1988)), and (iv) he was vacationing in Turkey the day he advised the EMAK Board respecting the Exchange Transaction and had not closely read an email from Kurz challenging

{BMF-W0211789.}

1

2

3

4

the legality of the Exchange Transaction under *Blasius*. (Ex. P 16-26). The same corporate partner at Ropes is identified in the EMAK solicitation document that Vice Chancellor Laster described as "false and misleading." (Ex. L at 1; Ex. B at 96).

5

6

7

8

9

53.     The third- and fourth-largest listed unsecured creditors in the bankruptcy petitions are two law firms that represent Crown in the Delaware Action, Ashby & Geddes ("A&G") and Gibson, Dunn & Crutcher LLP ("GD&C"), which are reportedly owed $404,172.76 and $368,333.20, respectively. EMAK's petition does not mention that EMAK could dispute these claims and seek to recoup legal fees paid to Crown's law firms.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

54.     EMAK has taken the position in the Delaware Action that it is contractually obliged to pay approximately $2.2 million of invoices from A&G and GD&C relating to Crown's role in the Exchange Transaction and the Bylaw Amendment, and all other litigation efforts of Crown in the Delaware Action. The supposed source of this contractual obligation is the Securities Purchase Agreement, dated March 29, 2000, pursuant to which Crown invested in EMAK (the "SPA"). The operative provision in the SPA states that EMAK shall bear Crown's expenses incurred "in connection with the negotiation, preparation, execution, delivery and performance of [the SPA] and the Contemplated Transactions[.]"   (Ex. GG § 9.5). "Contemplated Transactions" is defined as "all of the transactions contemplated by this Agreement, including, without limitation, (i) the sale by [EMAK] of the Series A Preferred Stock and the Warrants to [Crown], (ii) the execution, delivery, and performance of the Registration Rights Agreement and the Voting Agreements, (iii) the performance by [Crown] and [EMAK] of their respective covenants and obligations under this Agreement and (iv) [Crown's] acquisition and ownership of the Purchased Securities." (*Id.* § 1.1)

27

28

55.     EMAK could contest the proposition that the SPA obligates EMAK to pay Crown on a current basis for its legal fees in defense of claims that Crown has aided and abetted
{BMF-W0211789.}

PRINTED ON
RECYCLED PAPER

-23-

breaches of fiduciary duty by fiduciaries of EMAK, or for any other aspect of the Delaware Action, such as Crown's unsuccessful effort to establish the validity of the Bylaw Amendment, or Crown's unsuccessful challenge to the oversight authority of the directors seated during the pendency of Crown's appeal.

56. EMAK filed a putative "emergency motion" in this case, supported by a declaration of Teresa Tormey, in which Tormey represented that EMAK required the part-time consulting services of the four Executives (including Tormey) and further represented that the four Executives (including Tormey) would not perform those part-time consulting services unless they were each paid severance benefits owed them pre-petition under their consulting agreements. (Tormey Decl. of 8/9/10 ¶ 112) In the face of the objection of the U.S. Trustee and BMF, EMAK agreed to amend its motion dropping the request to pay the Executives the pre-petition severance benefits and dropping Tormey from the motion.

## B. LATHAM'S CONFLICTS OF INTEREST

57. EMAK seeks to retain Latham at rates of up to $1,050 an hour for purposes of, among other things, acting as coordinating counsel in the Delaware Action and other litigation (including litigation against Donald Kurz, one of the two plaintiffs in the Delaware Action) and analyzing the conduct of EMAK's directors and officers as alleged in the Delaware Action, and potentially settling those claims. EMAK is not seeking to retain Latham for the express purpose of litigating the claims asserted on EMAK's behalf in the Delaware Action.

58. In addition to the inherent conflict of EMAK's Board retaining counsel to settle substantial duty of loyalty claims asserted against themselves and Crown and others, Latham acknowledges that it currently represents Jeffrey Deutschman and has represented Crown's principal, Peter Ackerman, in "various matters." (Sauer Decl. of 8/26/10 ¶¶ 31, 32) Deutschman and Crown are two principal defendants in the Delaware Action.

{BMF-W0211789.}

59.     Latham acknowledges having represented Ackerman in connection with Crown's original investment in EMAK. (*Id.*) Testimony from Latham concerning the negotiation of the SPA could be critical for purposes of determining the appropriateness of EMAK paying over $2 million in legal fees to Crown's law firms. Latham also acknowledges that GD&C is a Latham client, creating an additional conflict for purposes of recovering or not paying legal fees billed by GD&C. (*Id.* ¶ 31)

60.     Latham further acknowledges that Ropes is a client, a conflict for purposes of EMAK pressing a malpractice claim against Ropes. (*Id.* ¶ 31)

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of September, 2010, in Wilmington, Delaware.

JOEL FRIEDLANDER

{BMF-W0211789.}