DAVID L. NEALE (SBN 141225)
J.P. FRITZ (SBN 245240)
GWENDOLYN D. LONG (CA Admission Pending)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dln@lnbyb.com, jpf@lnbyb.com, gdl@lnbyb.com

[Proposed] Counsel for Official Committee of Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>☒ EMAK WORLDWIDE, INC., a Delaware corporation,<br><br>☒ EMAK WORLDWIDE SERVICE CORP., a Delaware corporation,<br><br>            Debtors and Debtors-in-Possession. | ) Case No. 2:10-bk-42779-RN<br>) Jointly Administered with<br>) Case No. 2:10-bk-42784-RN<br>)<br>) Chapter 11<br>)<br>) **MOTION BY THE OFFICAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER CONVERTING CASES TO CHAPTER 7, OR, IN THE ALTERNATIVE, APPOINTING CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES**<br>)<br>) DATE:  October 21, 2010<br>) TIME:   2:00 p.m.<br>) PLACE: Courtroom 1645<br>)           255 E. Temple St.<br>)           Los Angeles, CA |

**TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY JUDGE, THE DEBTORS, THEIR COUNSEL, THE OFFICE OF THE UNITED STATES TRUSTEE, AND THOSE PARTIES REQUESTING SPECIAL NOTICE:**

**PLEASE TAKE NOTICE** that a hearing will be held on October 21, 2010, at 2:00 p.m. before the Honorable Richard M. Neiter, United States Bankruptcy Judge for the Central District of California (the "Court"), in courtroom 1645 located at 255 East Temple Street, Los Angeles, California, to consider this notice of motion and motion (the "Motion") by the official committee of unsecured creditors (the "Committee") for entry of an order converting these cases to Chapter 7, or, in the alternative, appointing a Chapter 11 trustee.

The Committee submits that conversion of these cases to Chapter 7 or appointment of a Chapter 11 trustee is necessary to protect the assets of the estates and all parties in interest, including both creditors and equity holders, from the continued mismanagement and self-dealing by the Debtors' insiders. A substantial evidentiary record of breach of fiduciary duty, dishonesty, and gross mismanagement, including the loss of the companies' largest business account, show that the Debtors cannot reorganize in the hands of current management.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based upon these moving papers, the accompanying memorandum of points and authorities, the declaration of Joel Friedlander (the "Friedlander Declaration") filed on September 7, 2010, and all exhibits attached thereto. The Motion is brought pursuant to sections 105, 1104, and 1112 of title 11, sections 101 *et seq.* of the United States Code (the "Bankruptcy Code"), Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Rules").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Rule 9013-1(f), any opposition to the Motion must be filed with the clerk of the Court and served upon the Office of the United States Trustee, as well as proposed counsel for the Committee, whose address appears in the top left corner of the first page of this Notice, at least fourteen (14) days prior to the hearing date. Pursuant to Local Rule 9013-1(h), the failure to file timely an opposition to the Motion may be deemed by the Court to be consent to the granting of the relief requested in the Motion.

**WHEREFORE**, the Committee respectfully requests that the Court enter an order converting the case to one under Chapter 7 of the Bankruptcy Code, or, alternatively, appointing a Chapter 11 trustee, and granting such additional relief as the Court deems just and proper under the circumstances.

Dated: September 9, 2010                   Official Committee of Unsecured Creditors

By:  /s/ David L. Neale
     David L. Neale
     John-Patrick M. Fritz
     Gwendolyn Long
     LEVENE, NEALE, BENDER,
     YOO & BRILL L.L.P.
     Proposed Attorneys for Official
     Committee of Unsecured Creditors

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.
## STATEMENT OF FACTS

### A.    Filing of the Bankruptcy Cases

1.    On August 5, 2010 (the "Petition Date"), EMAK Worldwide, Inc., a Delaware corporation and EMAK Worldwide Service Corp., a Delaware corporation (collectively referred to as the "Debtors" or "EMAK") filed petitions for protection under Chapter 11 of the Bankruptcy Code.    The Debtors continue to operate and manage their affairs as debtors in possessions pursuant to 11 U.S.C. §§ 1107 and 1108.    The cases were jointly administered by order of the Court on August 11, 2010 [docket entry no. 18].    On August 31, 2010, the Office of the United States Trustee formed the Committee [docket entry no. 62].

### B.    Evidence of Wrongdoing Against EMAK Insiders

2.    Based on publicly disclosed information, the Committee understands that the current directors of EMAK are: (i) James Holbrook, who is EMAK's Chief Executive Officer; (ii) Jeffrey Deutschman, who is the manager of Crown EMAK Partners, Inc. ("Crown"), the sole preferred stockholder of EMAK; and (iii) Jordan Rednor, an appointee of Crown.

3.    Prior to the Petition Date, the Debtors were engaged in a lawsuit in Delaware styled *Donald A. Kurz and Sems Diversified Value, LP v. James K. Holbrook, Jr. et al.*, Civil Action No. 5019-VCL (the "Delaware Action").    The Delaware Action is a shareholder derivative action in which the plaintiffs allege that in the fall of 2009, the then-directors of EMAK, aided and abetted by Crown, breached their fiduciary duties to EMAK and its common stockholders by taking measures to defeat a consent solicitation by Take Back EMAK LLC ("TBE"), which was soliciting votes to remove Holbrook, Rednor and Chairman Stephen Robeck and elect three new directors.    In the first phase of the Delaware Action, plaintiffs sought to

1

enjoin a transaction whereby EMAK's Board of Directors granted Crown the right to cast 28%

2

of the voting power in the election of directors (the "Exchange Transaction"). On the literal eve

3

4

of a preliminary injunction hearing, after numerous depositions, briefing, and the submission of

5

expert reports, the defendants rescinded the Exchange Transaction. Several days later, Crown,

6

Holbrook and subordinate members of the EMAK management team consented to the adoption

7

of a bylaw amendment that purported to give Crown the power to appoint a majority of a

8

shrunken Board (the "Bylaw Amendment"). Plaintiffs challenged the validity of the Bylaw

9

Amendment, as well as the outcome of the TBE consent solicitation. Plaintiffs established after

10

11

trial in the Court of Chancery and on appeal in the Delaware Supreme Court that the Bylaw

12

Amendment was invalid under Delaware law. Although the Court of Chancery seated the TBE

13

nominees, the Delaware Supreme Court ruled on appeal that the TBE nominees had not obtained

14

a majority of the valid votes.

15

4.        On February 24, 2010, during the pendency of the appeal, Bouchard Margules &

16

Friedlander, P.A. ("BMF"), the law firm representing the plaintiffs in the Delaware Action, filed

17

a fee application seeking \$2.4 million for having secured the corporate benefit of causing the

18

19

rescission of the Exchange Transaction. On March 2, 2010, the Court of Chancery determined

20

that it was appropriate to adjudicate the fee application prior to the conclusion of the Delaware

21

Action, because "it will be helpful to have quantified the fee award [(the "Fee Award")] so that

22

the parties can address concretely whether the amount should be incorporated in the calculation

23

of damages suffered by the Company." (Ex. A at 1).[1] On May 3, 2010, following the Delaware

24

Supreme Court's affirmance of the invalidation of the Bylaw Amendment, BMF filed an

25

amended fee application seeking \$2.85 million.

26

27

28

---

[1] All exhibit references are to the exhibits attached to the Second Declaration of Joel Friedlander [docket entry no. 68], filed on September 7, 2010.

5.    On July 19, 2009, the Court of Chancery exercised its discretion in granting the Fee Award, noting that plaintiffs' counsel had expended 1,587 hours of compensable attorney time on a fully contingent basis, that the "contingency risk was enhanced" because BMF "went all-in on a concentrated bet, where they invested a material amount of their firm's resources to get an outcome," brought forward "real evidence of loyalty breaches," obtained results that "fundamentally changed the corporate governance landscape," and also "corrected what were false and misleading solicitation materials." (Ex. B at 104, 105, 107). The Court of Chancery determined the fee award appropriate for each of three distinct corporate benefits created by plaintiffs, stating, "I think there may be different arguments for the degree to which they could be included in damages later." (*Id.* at 106).

6.    The only remaining phase of the Delaware Action would be a trial in which plaintiffs would seek to establish that the director defendants and Crown are required to pay back to EMAK millions of dollars in legal fees that EMAK paid relating to the rescinded Exchange Transaction and the invalidated Bylaw Amendment. The legal fees in question include several million dollars spent by law firms representing EMAK, the director defendants and Crown, as well as recovery of the $2.5 million Fee Award. This damages claim against Holbrook, Deutschman, Rednor, certain prior directors of EMAK, and Crown is an asset of EMAK. In connection with the Delaware Action, BMF assembled a substantial record of evidence of disloyalty, fraud, dishonesty and gross mismanagement by Holbrook, Deutschman, Rednor, Crown, and EMAK Secretary Teresa Tormey in the year leading up to these bankruptcy petitions, as detailed below.

## C. **Holbrook's Dishonesty, Disloyalty and Gross Mismanagement Regarding Burger King**

7. In the July 19, 2010 transcript ruling granting the Fee Award to BMF, Vice Chancellor Laster discussed evidence that James Holbrook misled the Board of Directors of EMAK when he was confronted with information that EMAK was on the verge of losing its contract with its largest customer, Burger King:

> *I think there is substantial and credible evidence that Mr. Holbrook misled the board and/or withheld material information in connection with the events leading up to the exchange transaction.*
>
> ...
>
> Then we come to the Burger King events. What happened there was in early August, Mr. Kurz got word that Burger King was actively considering using EMAK's competitor as its sole source and that Holbrook had a bad relationship with Burger King. Kurz advised the independent directors on the board of this, but unfortunately, they interpreted Kurz's information as a play for Holbrook's job....
>
> In September, however, Burger King terminated EMAK's contract, and regrettably proved Kurz right. At that point, though, rather than trying to consider what to do about this revelation, the primary action that [EMAK's outside counsel] and Holbrook took was to attack Kurz. What Holbrook also did at this point was to enlist Crown as his ally....
>
> ...
>
> *And as I've said before, I also questioned whether the board got full information from Holbrook about the events leading up to the Burger King transaction.* And its quite unclear to me whether [had they] had full information about the Burger King transaction, whether they might have done something differently.

(Ex. B at 80, 89-91) (emphasis added).

8. In making these observations, the Vice Chancellor had the benefit of a discovery record and trial testimony. For example, EMAK director Jordan Rednor sent a contemporaneous August 21, 2009 email to fellow directors Stephen Robeck and Howard Bland, which states:

> 1. *I'm disappointed that Jim [Holbrook] hasn't alerted us to the sequence of events that have been transpiring with BK for months.* The answer that there have always been rumors doesn't do it for me, there's been too much there. Even the positive comments that Jon complimented us feels like it should have been followed up and used to our advantage.

(Ex. C) (emphasis added).

9.      In a September 7, 2009 email to Rednor, director Don Kurz referred to a

presentation by line managers responsible for the Burger King account, who had come forward

with information about Holbrook:

> Compounding this issue is the very real risk of losing the BK business.  We heard
> from our management team in no uncertain terms that Jim [Holbrook] is not
> welcome at BK Marketing, who ultimately drives the promotion and premium
> agency decisions....

(Ex. D).  Similarly, in a September 13, 2009 letter to the full Board, Kurz wrote:

> On August 4, I received a call from a knowledgeable service provider who stated
> in confidence that he had heard from three different areas of Burger King Corp.
> that they were planning on going sole source premiums supply with Premium
> Surge, our competitor....  This [led] to a full Board conference call where the
> CEO invited our BK management team to participate.   On that call, the
> management team stated they believed the situation was indeed perilous and
> summarized some of the previous warnings that were conveyed to EMAK from
> sources such as STR and Wunderman going back 18 months or so.  *Jim
> [Holbrook] claimed to be involved with the BK situation and that he visited
> Miami quarterly (a statement we now know to be a lie), but failed to explain
> why he either had no inkling of how bad things were or had failed to meet his
> obligation to promptly advise the Board of such a serious problem....*

(Ex. E at 2-3) (emphasis added).

10.      Vice Chancellor Laster also had the benefit of a report prepared by FW&M

following an investigation undertaken at the behest of the Personnel Review Committee of

EMAK's Board of Directors.  In that report, FW&M concluded that Holbrook was subject to

termination for "cause" under his employment agreement on six separate grounds.  One of those

grounds was Holbrook's failure "to timely inform the Board of the fracture in his relationship

with Burger King and the deteriorating business relationship with Burger King and the

enterprise-threatening result to EMAK that fracture and deterioration portended."  (Ex. F at 4)

(without attachments).  The report explains:

> *Yet, despite all these warnings, and Mr. Holbrook's own knowledge of the deteriorating situation, at no point did Mr. Holbrook inform the EMAK Board, let alone seek the EMAK Board's advice or counsel.* At no point did Mr. Holbrook provide notice to the EMAK Board so that EMAK could prepare to respond to Burger King's concerns, or manage business at EMAK in anticipation of such revenue loss.  In fact, EMAK's Board did not become aware of concerns with the Burger King account until after Mr. Kurz brought them up following a conversation he had on August 4, 2009 with Leeton Lee, an employee of a Burger King vendor that supplies market testing services to Burger King. *It would appear that Mr. Holbrook's attempts to keep the Burger King situation secret was for no other purpose than to hide his mismanagement of the account.*

(*Id.* at 9-10) (emphasis added).  The FW&M report elaborates on Holbrook's cover-up of his gross mismanagement of EMAK's most critical account:

> Mr. Holbrook knew that his efforts, or lack thereof, would result in serious harm and injury to EMAK because he knew he was the issue with the Burger King account, yet did nothing to address Burger King's concerns either by removing himself from the account or addressing whatever issues Burger King had with his service.  By failing to address the very issue Burger King had with EMAK, Mr. Holbrook's intentional inaction appears to have played a major role in EMAK's loss of the Burger King account. Indeed, evidence of the half-hearted effort Mr. Holbrook mounted to save the Burger King business, even after he was aware that business was in jeopardy, is that he visited Burger King in Miami on only four occasions in 2008 and 2009 (before the loss of the business in the Fall of 2009).  Indeed, the frequency of his previously (quarterly) trips decreased markedly as his relationship with Burger King soured in 2007 and 2008.  Rather than drawing the customer closer, Mr. Holbrook stayed away and distanced himself from Burger King, eventually leading to a 9 month hiatus in visits to Burger King at the critical period of time between August of 2007 and March of 2008 and at a time he was representing to the Board that he traveled "quarterly" to Miami.

(Ex. F at 10-11).

11.    Holbrook's conduct in connection with the loss of the Burger King account is the subject of Count IV of a shareholder derivative complaint filed in the Superior Court of the State of California County of Los Angeles styled *Robert J. Farina et al. v. Stephen P. Robeck et al.,* Case No. BC 422808 (the "California Action") (Ex. G) (without exhibits), which seeks to recover millions of dollars from EMAK directors Holbrook, Rednor and Deutschman, among others.

**D.    Holbrook's, the Board's, and Crown's Disloyalty in Arranging the Exchange
Transaction**

12.    In the aftermath of the loss of the Burger King account, Holbrook engineered the
Exchange Transaction, which gave Crown 28% of the total voting power in director elections.
They did so just after the initiation of a consent solicitation by TBE to remove Holbrook, Rednor
and Chairman Stephen Robeck and elect new directors.   If not eliminated, the Exchange
Transaction would have foreclosed a contested election.   Vice Chancellor Laster observed:
"Prior to the mooting of the exchange transaction, a consent solicitation was effectively, if not
mathematically, impossible, at least realistically unattainable." (Ex. B at 92).

13.    Vice Chancellor Laster discussed the evidence that Holbrook acted disloyally in
arranging the Exchange Transaction and that he was aided and abetted by Crown:

> There were substantial claims for breach of fiduciary duty challenged in the
> exchange transaction…. It was a plain example of conduct that's actionable as a
> straightforward duty of loyalty violation.
> …
> … *I think there is substantial and credible evidence that Mr. Holbrook
> breached his duty of loyalty in connection with the exchange transaction*….
> …
> Now, what seems at least a strong inference from the record, as described
> to date, is that *by the middle of 2009, Holbrook saw [Peter Ackerman of Crown]
> as his potential benefactor*….
> …
> … What Holbrook also did at this point was to enlist Crown as his ally.
> And in particular, at a September meeting with Crown, Holbrook essentially cut a
> deal with Crown whereby, according to his e-mail, he and Ackerman became
> partners.
> …
> What's clear from the record is that Holbrook was working this angle
> [with Crown] from long before. And *there is powerful evidence that Holbrook's
> primary reasons for doing so were his desire to keep his job.*
> …
> So this leads us to what happened in the exchange transaction.   The
> exchange transaction converted Crown's preferred from something that didn't
> vote in the election of directors into a new security that had 28 percent of the
> voting power in the election of directors.   It also provided Crown with [other]
> rights ….
> …

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

... What is suggested by the e-mail record, however, at least Mr. Holbrook's side of it ..., is that *[Mr. Ackerman of Crown] was deeply aware of the conflicts on the board, deeply aware of Mr. Holbrook's insecurities, and used them to his advantage*.

So all of this to say that I think it's highly likely that I would have enjoined the exchange transaction.

...
...

... This was a strong challenge brought to a transaction where there was, as I've already discussed, real evidence of loyalty breaches; and rescinding the transaction fundamentally changed the corporate governance landscape.

(Ex. B at 79, 80, 87, 90, 92, 107) (emphasis added).

14.     Abundant record evidence supported the Vice Chancellor's observations.  For example, in a September 7, 2009 email, Holbrook outlined what later became the Exchange Transaction:

What Peter [Ackerman of Crown] wants to do is to be able to not let Don [Kurz] get control of the board... So we could do something like he proposed, or do something simple like giving him voting rights in return for a standstill...

(Ex. H at EMK013933).

15.     On the morning of September 24, 2009, shortly after Burger King's termination of its contract with EMAK, Holbrook sent an email to Chief Administrative Officer Teresa Tormey, directors Deutschman and Rednor and others, in which he expressed concern that TBE would prevail in an election contest by capitalizing on public announcement of the loss of Burger King:

I suspect that Don's group [TBE] may buy shares after any BKC announcement, assuming the price drop.... They are at roughly 2.6M shares or 37% of voting (for the board)... So they need an additional million shares to get to 51%....

(Ex. I).  Later that morning, Holbrook drafted a press release that he circulated to Crown director designee Deutschman, Rednor, Tormey and others, describing his ideal solution:

EMAK today announces a new strategic direction for the company, including the following:
-     the board has approved full voting rights for the preferred
...

-11-

(Ex. J). In an email the following day, Holbrook wrote that "Ackerman is now my partner."

(Ex. K). Knowing that Holbrook was motivated to grant Crown "full voting rights" for its

preferred stock, Crown obtained that voting power (and other rights) from EMAK without being

asked to give the standstill Holbrook initially contemplated.

**E.      Holbrook's, Deutschman's and Rednor's Dishonesty Respecting the Exchange Transaction**

16.      Vice Chancellor Laster was blunt in describing the public disclosures by which

Holbrook and the other director defendants attempted to obtain stockholder ratification of the

Exchange Transaction:

> ... *The disclosures were false and misleading*. When you compared the disclosures to what was written in the briefs and when you compared the disclosures to what was in the e-mails, there was absolutely no way that they could be squared.
>
> ...
>
> [T]he idea that the consent solicitation materials that were put out for the ratification statement are accurate is just not one that I can agree with....

(Ex. B at 96) (emphasis added).

17.      The Vice Chancellor had the benefit of an abundant factual record to evaluate

EMAK's public disclosures respecting the Exchange Transaction. One of the challenged public

statements was Holbrook's description of EMAK's relationship with Crown:

> In EMAK's press release about the transaction, Jim Holbrook stated that: "Over the years Crown has been diligent in working with us as a partner implementing our long-term strategic plans...."

(Ex. L at 5). Simultaneously, Holbrook and the other director defendants (including Rednor and

Deutschman) stated in a sealed brief in the Court of Chancery that Crown had been threatening

EMAK:

> Crown was threatening to pursue a variety of options through which it would recoup most or all of its $25 million liquidation preference, which would clearly harm the common stockholders.

1                                              * * *

2
          the Board of Directors perceived a danger from Crown based upon Crown's
3         repeated statements that it would force EMAK to honor its liquidation preference
          despite the effect it would have on the value of the common shares.
4
                                               * * *
5

6         Crown was threatening to take draconian measures to ensure it received its
          liquidation preference, irrespective of the effect such measures would have on the
7         value of the common stock or the future of EMAK.

8                                              * * *

9
          if the Exchange Transaction were not consummated, the Preferred Stockholder
10        could, and was threatening to, take unilateral actions – including purchase of
          additional shares, partnering with existing holders to assume control of the
11        company, seeking to buy the company, or initiation of litigation – that could have
          far more severe consequences for the common stockholders.
12

13   (Ex. M at 16, 34, 41, 43-44).  Deutschman admitted at trial that Crown made those threats.  (Ex.

14   N at 249-51, 253, 255).

15        18.    EMAK's public disclosures also touted that "there is no effort to entrench the

16   Board," that "there is no voting agreement with Crown" and that "Crown is free to vote its shares

17   as it sees fit" (Ex. L at 4, 5), without mentioning how Holbrook and Ackerman had reached an

18
     understanding, discussed above, that Crown would vote its new 28% voting power in opposition
19
     to TBE's nominees, thereby entrenching the incumbents.
20

21        19.    EMAK's public disclosures also falsely touted that the "Board thought very

22   carefully about the Exchange Transaction" (Ex. L at 5), without mentioning any facts about the

23   Board's deliberative process, such as (i) the Board meeting respecting the Exchange Transaction

24   had been called on a Sunday morning with less than 24 hours notice, (ii) the Board was not

25
     advised by Delaware counsel or any counsel knowledgeable about applicable Delaware law, or
26
     (iii) the Board received no advice from any proxy solicitor about the effect of the Exchange
27

28

                                            -13-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Transaction on the practical ability of common stockholders to remove incumbent directors and elect new directors in the TBE consent solicitation. (Ex. O; Ex. P at 9, 14-26, 34).

20.    EMAK's solicitation materials also falsely denied that the Exchange Transaction was "effected in response to TBE's current consent solicitation seeking to change control of EMAK's board of directors" and falsely stated that "the Exchange Transaction was under discussion by the Board and Crown long before the October 12, 2009 notice from TBE of its intention to solicit written consents from stockholders." (Ex. L at 5). In fact, the record showed that the Exchange Transaction was considered by EMAK's Board for the first time on October 19, 2009, and it was approved just in time for Crown to exercise 28% of the voting power in the TBE consent solicitation. (Ex. O)  Moreover, as Vice Chancellor Laster observed, when Holbrook and Crown agreed upon the outline of the Exchange Transaction in September 2009, "Kurz was calling for [Holbrook's] head" and "was making louder noises about a proxy contest." (Ex. B at 87, 90). That background was misleadingly omitted from EMAK's disclosures.

F.    **Holbrook's, the Board's, and Crown's Disloyalty in Arranging the Bylaw Amendment**

21.    On December 3, 2009, the day before a scheduled preliminary injunction hearing, EMAK's Board of Directors and Crown rescinded the Exchange Transaction. Immediately after voting to rescind the Exchange Transaction, EMAK's Board of Directors purported to authorize reimbursement of Crown's legal fees relating to the Exchange Transaction, even though only three of the six directors present voted in favor of the resolution, less than the majority required by Section 141(b) of the Delaware General Corporation Law. (Ex. Q at 2).

22.    Over the next few days, Crown became concerned that TBE would prevail in its consent solicitation and install Don Kurz as EMAK's CEO. Vice Chancellor Laster stated: "I also think, as Mr. Deutschman testified part of the reasons why they did the Crown consent [*i.e.*,

-14-

the Bylaw Amendment] was because they were worried that Kurz [*i.e.*, TBE] might win." (Ex. B at 93). Indeed, the person who controls Crown, Peter Ackerman, later wrote that "Crown agreed to rescind [the Exchange Transaction] so it could file a stockholder consent to shrink the board, giving its two directors a majority of EMAK's Board [*i.e.*, the Bylaw Amendment]." (Ex. R at 2).

23.     When dissident director Don Kurz learned about Crown's proposed Bylaw Amendment, he urged the other directors to take defensive action so that the Bylaw Amendment would not be implemented. (Ex. S at 3). The Board took no defensive action. The Board's inaction allowed Crown to deliver immediately consents that purported to give Crown control of the Company and foreclose TBE's consent solicitation.

24.     As noted above, plaintiffs in the Delaware Action argued that the Bylaw Amendment was invalid as contrary to Delaware law and, alternatively, that the Board's failure to defend against Crown and its Bylaw Amendment was a breach of the duty of loyalty. The two rationales for plaintiffs' duty of loyalty claim were that EMAK's Board was obliged (i) to respond to the threat posed by Crown, which threat the Board had previously documented (*see supra* paragraph 17), and (ii) not to foreclose the TBE consent solicitation.

25.     Vice Chancellor Laster found the Bylaw Amendment to be contrary to Delaware law and chose not to adjudicate the duty of loyalty issue. The Vice Chancellor recently explained when granting the Fee Award: "I didn't feel that I should reach duty of loyalty issues with potential personal liability implications unless it was absolutely necessary.... And so, believing that I had an independent legal basis to adjudicate the [Bylaw Amendment and the composition of the Board of Directors], I didn't reach and did not make any duty of loyalty issues." (Ex. B at 80).

26.    Later in his ruling on the Fee Award, Vice Chancellor noted two reasons why it was important to invalidate the Bylaw Amendment:    "[Y]ou needed to get the [Bylaw Amendment] invalidated to have the free election and the potential for a different outcome [in the TBE consent solicitation]. I also agree with Mr. Friedlander that one of the benefits of invalidating the [Bylaw Amendment] and invalidating the original exchange transaction was to give the board a window in which it could act, if it wanted to, to address the Crown threat." (Ex. B at 95).

27.    Holbrook not only failed to defend against the Bylaw Amendment, he was one of the Board members who executed a written consent for his own shares in support of the Bylaw Amendment. As noted above, Vice Chancellor Laster observed that there was "substantial and credible evidence that Mr. Holbrook breached his duty of loyalty in connection with the exchange transaction," Holbrook inferably "saw [Crown's Peter] Ackerman as his potential benefactor," and there was "powerful evidence that Holbrook's primary reasons for [entering into a deal with Crown] were his desire to keep his job." (Ex. B at 80, 87, 90).

28.    Deutschman not only failed to defend against the Bylaw Amendment, as Crown's manager member, he voted Crown's shares in support of the Bylaw Amendment.[2]

## G.    Holbrook's and Tormey's Disloyalty in Conferring Benefits on Employees with Votes

29.    In the Delaware Action, plaintiffs presented evidence of how in late 2009, Holbrook committed EMAK to pay hundreds of thousands of dollars in bonuses plus severance benefits to four EMAK managers, including Teresa Tormey (collectively, the "Executives"),

---

[2] In a case involving Peter Ackerman's taxes, the United States Tax Court recently "found the testimony of Mr. Deutschman to be in certain material respects vague, ambiguous, questionable, and/or serving the interests of his longtime associate Mr. Ackerman, who played a significant role in enabling Mr. Deutschman to be employed by Crown Capital." *Ackerman v. Comm'r of Internal Revenue*, 2009 Tax. Ct. Memo LEXIS 81, *68 (T.C. Apr. 15, 2009).

who held pivotal votes in TBE's consent solicitation to elect new directors, Crown's December 2009 consent solicitation to adopt the Bylaw Amendment, and Crown's February 2010 consent solicitation to adopt a revised bylaw amendment that would similarly transfer control of EMAK to Crown.

30.     In particular, on September 9, 2009, when the loss of the Burger King account was imminent and Donald Kurz was agitating for Holbrook's termination, Holbrook executed amended employment agreements with the Executives that set the terms for a 2009 bonus that would be payable to the Executives in January 2010, and also provided for enhanced severance upon termination, as well as a 2010 bonus within 30 days of termination. (Ex. T). When director Kurz submitted an affidavit saying that he had not been made aware of the amended employment agreements, Holbrook submitted an affidavit in which he did not specifically state that the Board had approved either (i) the bonus formula for 2009, (ii) payment of the 2009 bonus in January 2010, or (iii) payment of a 2010 bonus within 30 days of a termination in 2010. (Ex. U ¶¶ 14-15).

31.     In late 2009, the four Executives were slated for termination as of March 31, 2010, thereby triggering over $1.5 million in severance payments, including $545,970 for Tormey, plus a bonus for 2010.

32.     In addition to creating and/or triggering the Executives' entitlement to a 2009 bonus, an early 2010 bonus and large severance benefits, Holbrook signed consulting contracts with the Executives (without Board approval) that provided for additional compensation post-termination.

33.     Additionally, Holbrook and Tormey worked together on a plan to pay money to sixteen management employees who were issued a total of 250,000 shares upon the vesting of their restricted stock units on November 7, 2009. In an October 28, 2009 email to Holbrook,

Tormey discussed the number of votes held by officers and directors and "Friends." (Ex. V at EMK017907). She also discussed the 250,000 shares that were about to be issued to employees and stated: **"It will be important to keep this block 'in the fold' for voting purposes.** I'm working on a few strategies with Duane [Johnson] to address the typical pattern of folks selling all or part to cover taxes ...." (*Id.*) (emphasis added). EMAK promptly entered into contracts providing for payment of a "cash bonus" to the employees in exchange for them agreeing not to sell their newly issued shares. (Ex. W).

34. Immediately after those 250,000 shares were issued and the contracts for the "cash bonus" were signed, Tormey coordinated the solicitation of written consents in favor of the ratification of the Exchange Transaction. (Ex. X ¶ 13).

35. Vice Chancellor Laster took note of the payments to senior managers amidst the ongoing control contest and stated with apparent reference to Tormey:

> For its part, EMAK has not hesitated to pay its own counsel and Crown's counsel over $5 million to litigate against the plaintiffs. **EMAK has also paid significant bonuses to senior management during this corporate control dispute, including to individuals whose loyalty to the corporation has been called into question by the considerable evidentiary record developed by the plaintiffs.**

(Ex. Y at 4) (emphasis added).

## H. Holbrook's Dishonesty and Gross Mismanagement During the Personnel Review Committee Investigation

36. The FM&W report discussed how, in an apparent effort to forestall FM&W's interview of Holbrook respecting his handling of the Burger King account, Holbrook sent an email to director Philip Kleweno of the Personnel Review Committee that contained numerous factual misrepresentations:

- Mr. Holbrook's statement that he did not know who Mr. Fox or Mr. Wang were, despite Mr. Kleweno's prior voicemail instructing him to speak to Mr. Fox, Mr. Fox's explanation to Mr. Holbrook while on the phone and Mr. Holbrook's previous Google search concerning Mr. Fox;

-18-

- Mr. Holbrook's statement to Mr. Kleweno that Mr. Fox had forbidden him (Mr. Holbrook) to bring his lawyers to the interview, even though Mr. Fox had specifically repeatedly explained to Mr. Holbrook on the call that while he had no legal right for counsel to be present, Mr. Fox would extend professional courtesy to Mr. Holbrook and his two lawyers to permit them to attend with the proviso that they not interfere with the interview[;]

- Mr. Holbrook's statement that he did not know who retained Fox, Wang & Morgan P.C., despite Mr. Kleweno's voicemail to Mr. Holbrook so advising and Mr. Fox's statement to Mr. Holbrook that the Personnel Review Committee had retained Fox, Wang & Morgan P.C. to undertake an investigation of his conduct;

- Mr. Holbrook's representation that Mr. Fox indicated he would inform the Board that Mr. Holbrook "will never be cooperative" if he did not respond to questioning despite the fact no such statement was ever made;

- Mr. Holbrook's assertion that he was being accused of criminal conduct and that his refusal to respond to questioning would result in a report to the Committee that Mr. Holbrook had committed some crime, even though the phrase "criminal" or "crime" was never mentioned nor ever broached on the call with Mr. Holbrook;

- Mr. Holbrook's statement to Mr. Kleweno that he would have to walk out of business obligations to respond to questioning, contrary to precisely the opposite information he supplied Messrs. Fox and Wang, who asked Mr. Holbrook when it would be convenient to speak and not interfere with his business activities and who set "time-calls" with Mr. Holbrook at the precise times Mr. Holbrook suggested were available to him free from client obligations[.]

(Ex. F at 6-7).

37.     Additionally, the FM&W report recorded Holbrook's "extremely poor judgment to involve EMAK clients in his dispute with the Personnel Review Committee undertaking its investigation of his handling of the Burger King account. Specifically, Mr. Holbrook took Mr. Fox's call in Dallas on the evening of Wednesday February 17, as scheduled, but at a time Mr. Holbrook was sitting with EMAK clients (unbeknownst to Mssrs. Fox and Wang, even after Mr. Fox began the call by asking Mr. Holbrook 'Is this still a good time to talk as we discussed

earlier today'?). Eventually, Mr. Holbrook revealed the presence of the clients listening to his (Mr. Holbrook's) half of the conversation in Dallas by suddenly and ruefully offering in jest to go forward at that time with the interview if he were to put his cell phone on 'speakerphone' and 'let the clients sitting here with me hear how you are destroying the company.'" (*Id.* at 7-8)

I.    **Holbrook's Gross Mismanagement and Dishonesty in Failing to Replace the Credit Line and Publicly Misrepresenting the Company's Lack of Liquidity**

38.    As recently as October 29, 2009, EMAK publicly announced that its "unused $7.5 million credit facility provides the Company with adequate liquidity." (Ex. Z at 5).

39.    On March 25, 2010, Holbrook filed an affidavit in the Delaware Action which he stated that EMAK had "a process for replacing EMAK's bank line, and plan on continuing to follow that process." (Ex. AA ¶ 6). Holbrook submitted that affidavit in support of a failed effort by him, Crown and Deutschman to limit the oversight authority of the TBE nominees and Kurz during the pendency of Crown's and Holbrook's appeal to the Delaware Supreme Court.

40.    Holbrook did not replace the $7.5 million credit facility when it expired in April 2010, thereby creating a situation in which EMAK would resort to filing for bankruptcy upon the Court of Chancery granting the pending fee application in the Delaware Action.

41.    In a June 9, 2010 press release, EMAK misleadingly presented its liquidity situation, stating that it "has sufficient liquidity on-hand" even though its "credit facility expired in April 2010," and that it had cash and cash equivalents of $10.1 million as of March 31, 2010. (Ex. BB at 4). That same day, Teresa Tormey filed a declaration in the Delaware Action in which she stated that EMAK had only "$3.2 million of unrestricted cash," net of certain current obligations, and that "plaintiffs' fee application, if granted, would represent 87% of the Company's unrestricted cash." (Ex. CC ¶ 3).

42.    EMAK filed for bankruptcy on August 5, 2010, the day EMAK was required to pay the $2.5 million Fee Award.

**J.    Dishonesty of Holhrook, Deutschman, Rednor in Connection with the Filing of the Bankruptcy Petitions**

43.    Upon filing for bankruptcy, EMAK issued a press release stating that "[t]he voluntary bankruptcy petitions result from protracted litigation at the EMAK corporate level and an interim award from Chancery Court of Delaware against EMAK for which it was not permitted to immediately appeal." (Ex. DD at 1). The press release further stated that "EMAK intends to seek reversal of the interim award and to permanently resolve the litigation that has disrupted the holding company for some time." (*Id.* at 2)

44.    Both of the above statements are false and misleading. <u>First</u>, EMAK turned down the opportunity to immediately appeal the Fee Award. <u>Second</u>, by foregoing the opportunity to immediately appeal the Fee Award, EMAK likely will never be able to appeal the Fee Award, since no appeal of the Fee Award can occur until after post-trial proceedings in the Delaware Action, and EMAK cannot appeal a final order that incorporates the Fee Award into the damages recoverable by EMAK and payable by any of the individual defendants or Crown.

45.    Immediately upon Vice Chancellor Laster's ruling granting the Fee Award, EMAK's counsel asked the Vice Chancellor if EMAK could immediately appeal it pursuant to Court of Chancery Rule 54(b). (Ex. B at 108). The Vice Chancellor suggested that he had "no objection to it being certified as a Rule 54(b) ... if the parties agree to it[.]" (*Id.* at 110).

46.    The following day, BMF sent EMAK's counsel a proposed Order that would allow EMAK to immediately appeal the Vice Chancellor's ruling pursuant to Rule 54(b). (Ex. EE). EMAK did not accept BMF's invitation to immediately appeal the Vice Chancellor's ruling. Instead, EMAK argued that the Fee Award was not immediately appealable because

"there is no hardship at this stage in the proceedings that merits the entry of a Rule 54(b) order." (Ex. FF at 3). The Court of Chancery ordered that the Fee Award be paid within five business days from July 29, 2010.

47.     By not seeking to immediately appeal the Fee Award, EMAK likely forfeited any appeal of the Fee Award. The time for reargument of the Fee Award has lapsed. There can be no appeal of the Fee Award until after the conclusion of post-trial proceedings. Even if the Delaware Action goes forward and is litigated through trial and entry of a final judgment in the Delaware Court of Chancery, EMAK would only be able to appeal the Fee Award to the extent it is not incorporated into a damages award payable by any of the individual defendants or Crown. To the extent any of the defendants is ordered to reimburse EMAK for the cost of the Fee Award, then those defendants, not EMAK, could appeal from the final order. EMAK would have no ground to appeal the Fee Award if a defendant in the Delaware Action must bear its cost.

## K.     Disloyalty of Holbrook, Deutschman, Rednor and Tormey in Connection with EMAK's Filings in this Court

48.     The list of unsecured creditors filed with the bankruptcy petitions states that the second-largest unsecured creditor is Ropes & Gray LLP ("Ropes"), which is reportedly owed $411,027.52. Ropes represents Holbrook and Rednor in the Delaware Action and it previously also represented Deutschman and EMAK in the Delaware Action. Ropes also served as outside counsel to EMAK in connection with the Exchange Transaction. EMAK's petitions do not mention that any claim by Ropes is subject to setoff in light of EMAK's potential claim against Ropes for professional malpractice in connection with the Exchange Transaction.

49.     The corporate partner from Ropes testified in the Delaware Action that (i) he was not admitted to practice law in Delaware and had not consulted with Delaware counsel prior to

-22-

1

2

3

4

5

6

7

8

9

10

11

advising the Board respecting the Exchange Transaction, (ii) he had never previously advised a board of directors respecting a transaction that impacted voting rights in the midst of an election contest, (iii) he was unfamiliar with a leading precedent under Delaware law about director fiduciary duties during an election contest (*Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 561 (Del. Ch. 1988)), and (iv) he was vacationing in Turkey the day he advised the EMAK Board respecting the Exchange Transaction and had not closely read an email from Kurz challenging the legality of the Exchange Transaction under *Blasius*. (Ex. P 16-26). The same corporate partner at Ropes is identified in the EMAK solicitation document that Vice Chancellor Laster described as "false and misleading." (Ex. L at 1; Ex. B at 96).

12

13

14

15

16

50.    The fifth- and sixth-largest listed unsecured creditors in the bankruptcy schedules are two law firms that represent Crown in the Delaware Action, Ashby & Geddes ("A&G") and Gibson, Dunn & Crutcher LLP ("GD&C"), which are reportedly owed $404,172.76 and $368,333.20, respectively. EMAK's petition does not mention that EMAK could dispute these claims and seek to recoup legal fees paid to Crown's law firms.

17

18

19

20

21

22

23

24

25

26

27

28

51.    EMAK has taken the position in the Delaware Action that it is contractually obliged to pay approximately $2.2 million of invoices from A&G and GD&C relating to Crown's role in the Exchange Transaction and the Bylaw Amendment, and all other litigation efforts of Crown in the Delaware Action. The supposed source of this contractual obligation is the Securities Purchase Agreement, dated March 29, 2000, pursuant to which Crown invested in EMAK (the "SPA"). The operative provision in the SPA states that EMAK shall bear Crown's expenses incurred "in connection with the negotiation, preparation, execution, delivery and performance of [the SPA] and the Contemplated Transactions[.]"    (Ex. GG § 9.5). "Contemplated Transactions" is defined as "all of the transactions contemplated by this Agreement, including, without limitation, (i) the sale by [EMAK] of the Series A Preferred Stock

and the Warrants to [Crown], (ii) the execution, delivery, and performance of the Registration Rights Agreement and the Voting Agreements, (iii) the performance by [Crown] and [EMAK] of their respective covenants and obligations under this Agreement and (iv) [Crown's] acquisition and ownership of the Purchased Securities." (*Id.* § 1.1)

52.     EMAK could contest the proposition that the SPA obligates EMAK to pay Crown on a current basis for its legal fees in defense of claims that Crown has aided and abetted breaches of fiduciary duty by fiduciaries of EMAK, or for any other aspect of the Delaware Action, such as Crown's unsuccessful effort to establish the validity of the Bylaw Amendment, or Crown's unsuccessful challenge to the oversight authority of the directors seated during the pendency of Crown's appeal.

53.     EMAK filed a putative "emergency motion" in this case, supported by a declaration of Teresa Tormey, in which Tormey represented that EMAK required the part-time consulting services of the four Executives (including Tormey) and further represented that the four Executives (including Tormey) would not perform those part-time consulting services unless they were each paid severance benefits owed them pre-petition under their consulting agreements. (Tormey Decl. of 8/9/10 ¶ 112) In the face of the objection of the U.S. Trustee and BMF, EMAK agreed to amend its motion dropping the request to pay the Executives the pre-petition severance benefits and dropping Tormey from the motion.

## II.

## DISCUSSION

### A.     The Court May Convert These Cases to Chapter 7 Because Cause Exists Pursuant to 11 U.S.C. § 1112

Section 1112 of the Bankruptcy Code provides, in relevant part, as follows:

> … [O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the

> court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this Chapter to a case under Chapter 7 or dismiss a case under this Chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1). Section 1112(b) does not define what constitutes "cause" warranting conversion of a Chapter 11 case to one under Chapter 7, although Section 1112(b) does contain examples of what could constitute "cause" under appropriate circumstances. The list of factors that a Court can consider for purposes of finding "cause" is not exhaustive. As set forth in the legislative history of Section 1112, "The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H. Rep. 595, 95th Cong., 1st Sess. 406 (1977); see also Koerner v. Colonial Bank (In re Koerner), 800 F.2d 1358, 1367-1368 (5th Cir. 1986); In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999). As one commentator has stated, "section 1112(b) was designed to provide the court with a powerful tool to weed out inappropriate Chapter 11 cases at the earliest possible stage." 7 Collier on Bankruptcy ¶ 1112.04[2] at 1112-23 (15th Ed. Rev. 2008).

Lack of good faith may constitute cause under 11 U.S.C. § 1112(b), and courts have identified several factors for determining whether a case has been commenced in "good faith," including, without limitation: (1) the debtor has one asset; (2) there are generally no employees except for the principals; (3) there is little or no cash flow; (4) there are no available sources of income to sustain a plan of reorganization; (5) there are few, if any, unsecured creditors whose claims are relatively small; (6) the debtor and one creditor have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford; and (7) there are allegations of wrongdoing by the debtor. Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1073 (5th Cir. 1986); see also Matter of Namer, 141 B.R. 603, 607-608 (Bankr. E.D. La. 1992).

Here, the final two factors are most relevant and determinative of a finding of cause requiring conversion to Chapter 7. Prior to the bankruptcy filings, the Debtors' management was involved in a contentious control dispute and shareholder derivative suits in Delaware and California. After evaluating a substantial evidentiary record showing breach of fiduciary duty and disloyalty, the Delaware court entered a judgment for $2.5 million to be paid by EMAK, and noted that the $2.5 million is potentially recoverably by EMAK from the current directors and other defendants. Rather than pay the judgment and allow the Delaware plaintiffs to seek recovery of it (and additional millions of dollars) on EMAK's behalf, the conflicted Board of Directors chose to file for bankruptcy. The Debtors' improper motivation for filing their bankruptcy petitions is further shown by the fact that neither the loss of 50% of their business with the Burger King account in September 2009 nor the loss of the $7.5 million credit line in April 2010 caused the Debtors to file bankruptcy. It was only in the face of paying the $2.5 million judgment (a liability that might very well be upon current directors, management and Crown instead of the Debtors had the Delaware Action been allowed to continue) to one single creditor that the Debtors filed for bankruptcy. This alone strongly militates in favor of finding cause for conversion under section 1112(b).

The recovery of millions of dollars from the Debtors' directors on derivative suits in California and Delaware is a tremendous asset of the estates. However, the current board and management cannot be trusted to pursue these assets when they are the ones who could be held personally liable for payment of these millions of dollars. The failure of a debtor in possession to pursue valuable claims against insiders is grounds for appointment of a trustee. In re Microwave Products of America, Inc., 102 B.R. 666, 674 (Bankr.W.D.Tenn.1989). The current directors and officers -- Holbrook, Deutschman, Rednor and Tormey -- and EMAK's controlling stockholder, Crown, which appoints two of EMAK's three directors, are inherently conflicted n

in pursuing the derivative claims. They cannot reasonably be expected to exercise proper discretion in the best interests of the estates on this matter. The Court should appoint a Trustee to neutralize this conflict of interest and ensure that these assets are recovered for the benefit of the estates.

Cause for conversion to Chapter 7 is further buttressed by substantial wrongdoing by the Debtors' current board and management. The underlying Delaware Action provided a formidable evidentiary record of self-dealing and breach of fiduciary duty by EMAK's former and current board and management. As explained in the Friedlander Declaration and analyzed in this Motion above, Holbrook, Tormey, Deutschman, Rednor and Crown have been implicated in serious wrongdoing that compromise the Debtors' ability to reorganize as a debtor in possession. Therefore, the Court should convert these cases to Chapter 7.

In addition, the recent Chapter 11 Status Report filed by the Debtors (docket entry no. 64) further establishes cause for conversion of these cases to Chapter 7. Attached as Exhibit "B" to the Declaration of Teresa L. Tormey in support of the Status Report is an August – December 2010 Budget (the "Budget"). The Budget reflects the income and expenses of all of the Debtors' operating subsidiaries; the last column of the Budget reflects the projected income and expenses of the Debtors themselves (under the heading "Corporate"). On a stand-alone basis, the Debtors' own projections show that the Debtors will suffer a net **loss** of almost $1.6 million during the period covered by the Budget. The Debtors have attempted to divert the Court's attention from this fact by focusing their discussion of the Debtors' business upon the operations of the subsidiaries, none of which are currently in bankruptcy. The Debtors have not identified any legal or contractual basis upon which the cash of the subsidiaries must be up-streamed to the Debtors. As such, the Debtors can provide no assurance that any of the subsidiaries' resources will be available to fund a plan or plans of reorganization. What creditors are thus faced with is

the prospect of a substantial loss in value through year-end, with no means by which the Debtors can independently cover that loss.

Once the Court finds, as the Court here should find, that there is "cause" under Section 1112(b) of the Bankruptcy Code, the Court must then choose between dismissing the case or converting it to Chapter 7.  Conversion is more appropriate than dismissal here because conversion is the creditors' preference.  See Arkansas, Inc. v. United States Trustee (In re Camden Ordnance Mfg. Co. of Arkansas, Inc.), 245 B.R. 794, 802 (E.D. Pa. 2000) (approving conversion over dismissal, stating, "the creditors favored conversion and the creditors are the best judge of their own best interests."). Courts have identified several factors in determining the appropriateness of conversion over dismissal:

> (1)   whether some creditors received preferential transfers that could be avoided in a Chapter 7 but would be lost if the case were dismissed, Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.), 14 F.3d 240 (4th Cir. 1994);

> (2)   whether the debtor would simply file a further case upon dismissal, In re Staff Inv. Co., 146 B.R. 256 (Bankr. E.D. Cal. 1992);

> (3)   the ability of a trustee in a Chapter 7 case to reach assets for the benefit of creditors, In re BTS, Inc., 247 B.R. 301 (Bankr. N.D. Okla. 2000); and

> (4)   whether the debtor had engaged in misconduct and whether creditors are in need of a Chapter 7 case to protect their interests, In re Mobile Freezers, Inc., 146 B.R. 1000 (S.D. Ala. 1992), aff'd, Mobile Freezers, Inc. v. United States, 14 F.3d 57 (11th Cir.), cert. denied, 115 S.Ct. 55, 130 L.Ed.2d 14 (1994).

The fundamental problem with these bankruptcy cases is the abuse and mismanagement by the current Board and management; dismissal of these cases will leave the creditors of these estates unprotected.    Simply put, the estates cannot trust current management to pursue preference claims, investigate fraudulent transfers, or refrain from self-dealing at the expense of the estates, in or out of bankruptcy.  For example, as described above, prepetition, Holbrook committed the Debtors to pay millions of dollars in new bonuses, severance packages, and incentives to insiders in the one year period prior to the Petition Date.  Tormey was a recipient of these payments.  These transfers may be avoided as fraudulent or preferential, but the estates cannot rely upon the Debtors to pursue them while the current management, which both gave and received these transfers, remains in control the Debtors.  Conversion, not dismissal, is the appropriate course of action when a debtor in possession fails to meet its fiduciary obligations to other parties in interest.  In re Texasoil Enterprises, Inc., 296 B.R. 431 (Bankr. N.D. Tex. 2003).  If the cases were dismissed, then the Debtors would still be in the hands of management that lost the Burger King account, lost a $7.5 million line of credit, spent millions of dollars in bonuses and expenses to preserve their positions, and filed for bankruptcy to forestall a determination of their personal liabilities.  Given the absence of any real prospect of reorganization, the abuses of the current management and Board and the anticipated loss of almost $1.6 million by year-end, the Court should convert these cases to Chapter 7.

**B.** **If The Court Does Not Convert These Cases, The Court Should Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a).**

In the event the Court concludes that conversion is unwarranted (which it should not), as an alternative, the Court should appoint a Chapter 11 trustee to these bankruptcy cases because current management's conduct has been riddled with fraud, dishonesty, incompetence, and gross mismanagement of the Debtors' affairs both pre-petition and post-petition in an unending series

of self-dealing over the interests of the companies and the estates. The appointment of a Chapter

11 trustee will protect the estates, their assets, the creditors, and the corporate Debtors

themselves from continued self-dealing and mismanagement of the current officers and directors.

Section 1104(a) of the Bankruptcy Code provides in pertinent part, as follows:

> (a)     At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest . . . and
> after notice and a hearing, the court *shall order* the appointment of
> a trustee –

>> (1)     for     cause,     including     fraud,     dishonesty,
>> incompetence, or gross mismanagement of the
>> affairs of the debtor by current management either
>> before or after commencement of the case, or
>> similar cause . . . ;

>> (2)     if such appointment is in the interest of creditors,
>> any equity security holders and other interests of the
>> estate …; or

>> (3)     if grounds exist to convert or dismiss the case under
>> section 1112, but the court determines that the
>> appointment of a trustee … is in the best interests of
>> creditors and the estate.

11 U.S.C. Section 1104(a) (emphasis added).

Section 1104(a) is phrased in the disjunctive, meaning that there are three discrete

predicates for the appointment of a reorganization trustee. Once the court has found that cause

exists under Section 1104(a)(1), there is no discretion, and an independent trustee must be

appointed. In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518 (Bankr. E.D. N.Y. 1989) (citing

In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir. 1988)); In re Deena Packaging

Industries, Inc., 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983).

### 1.     Cause Exists to Appoint a Trustee Under 1104(a)(1)

The "concepts of incompetence, dishonesty, gross mismanagement and even fraud all

cover a wide range of conduct," and courts must be given the discretion necessary to determine if

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the debtor-in-possession's "conduct shown rises to a level sufficient to warrant the appointment of a trustee." In re Marvel Entertainment Group, Inc., 140 F.3d 463 (3rd Cir. 1998); quoting, Committee of Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir. 1987). "This discretionary authority is consistent with a 'policy of flexibility' permeating the Bankruptcy Code's overall aim of protecting creditors while giving debtors a second chance." Id.

Here, the Debtors current officers and directors -- Holbrook, Rednor, Deutschman, and Tormey -- have mismanaged the Debtors both pre-petition and post-petition by marked self-dealing to improve their personal positions at the expense of the companies. Holbrook's mismanagement of the Debtors led to the complete loss of the Burger King account, the most important piece of the Debtors' business, representing over 50% of revenue for 20 straight years. This failure was brought on not only by his inability to manage the account through preservation and promotion of business relationships with Burger King, but through his lies, deception, and misrepresentation of these failings to the board of directors. To preserve his title and all its financial trappings in the wake of the Burger King fiasco, Holbrook then orchestrated both the Exchange Transaction and the Bylaw Amendment to favor his new ally, Crown, and to prevent TBE from having any opportunity to gain the support of an absolute majority of common stockholders in electing new directors.

Crown, for its part, was not a friend of the EMAK, but an ally for Holbrook, as Crown was threatening to trigger a $25 million claim against EMAK that would have been disastrous to the company. To solidify support from his subordinate employees during the contest for control over EMAK, Holbrook committed over $2 million in new bonus, severance pay, and consulting agreements for Tormey, three other managers, and sixteen management employees with voting stock. The Delaware Court of Chancery observed that it was "highly likely" that the Court would have enjoined the Exchange Transaction as the product of a breach of fiduciary duty had it

not been rescinded on the eve of the injunction hearing, and the Bylaw Amendment was ruled invalid under Delaware law. Holbrook, for his part, has mismanaged the Debtors and engaged in serious breaches of fiduciary duty, yet he remains on the Debtors' board.

Deutschman also sits on the board, but he serves for the benefit of Crown, not the Debtors, and he helped negotiate the Exchange Transaction on behalf of Crown. When the Exchange Transaction failed, Deutschman then voted Crown's shares in favor of the unlawful Bylaw Amendment, again favoring Crown's and Holbrook's self-dealing at the expense of EMAK, its shareholders, and their best interests.

Rednor also failed to protect the interests of EMAK and its shareholders. Despite his correspondence to fellow EMAK directors on August 21, 2009, stating his disappointment in Holbrook's concealment of the Burger King failings from the board, Rednor supported Holbrook in both the Exchange Transaction and the Bylaw Amendment. Rednor also joined in approving misleading and untruthful disclosures to EMAK shareholders to garner support for the Exchange Transaction. The Delaware Court of Chancery would later find these disclosures to the shareholders to be false and misleading, as they failed to convey the reality of the Exchange Transaction as a means of entrenching the incumbent directors: "When you compared the disclosures to what was written in the briefs and when you compared the disclosures to what was in the emails, there was absolutely no way that they could be squared." (Ex. B at 96.)

Mismanagement and self-dealing did not stop with the bankruptcy filings. At the very outset of the case, in a purported emergency motion on shortened notice, Tormey and Holbrook caused the Debtors to request payment of hundreds of thousands of dollars of prepetition debt to current and former management under the guise of consulting agreements. Fortunately, based upon the objections of creditors and the Office of the United States Trustee, the Debtors withdrew their request to pay pre-petition severance benefits. Nonetheless, the very fact that

management caused the Debtors to make such a request shows continued mismanagement of the Debtors for self-gain at the expense of the creditors and contrary to the best interests of the estates.

**2.    Cause Exists to Appoint a Trustee Under 1104(a)(2)**

A court's analysis of the grounds for the appointment of a trustee under section (a)(2) is different from that in Section (a)(1).    This "flexible standard for ... appointment" entails "the exercise of a spectrum of discretionary powers and equitable considerations." Savino Oil, 99 B.R. at 525.    Therefore, courts must determine on a case-by-case basis whether the circumstances of each bankruptcy require the appointment of a trustee under subsection (a)(2). In re Sharon Steel, 871 F.2d 1217, 1226 (3rd Cir. 1989).    Courts also have the discretion under subsection (a)(3) to order the appointment of a trustee where there has been a showing of "cause" under Section 1112, but the court elects not to dismiss or convert the case.

Courts have considered the following factors in determining whether the appointment of a trustee pursuant to Section 1104(a) was warranted:

> (1)    overall management of debtor, both past and present, In re Rivermeadows Associates, Ltd., 185 B.R. 615 (Bankr. D. Wy. 1995);
>
> (2)    trustworthiness of the debtor's management, Id.;
>
> (3)    failure of debtor to commence an avoidance action against an insider or other interested entity, In re William H. Vaughan & Co. Inc., 40 B.R. 524, 526 (Bankr. E.D.Pa. 1984);
>
> (4)    the filing of inaccurate schedules and/or the failure to disclose material and relevant information to the Court and creditors, Deena Packaging Industries, 29 B.R. at 706-708; Savino Oil, 99 B.R. at 526;

1
2
3
4

(5)     the inability of management to resolve conflicts with creditors and
        acrimony between the debtor and creditors. Marvel Entertainment Group,
        140 F.3d at 471-472.

5

6

7

8

9

10

11

12

13

Under Section 1104(a)(2) the Court is allowed to exercise its equitable powers to appoint a trustee to protect the interests of creditors, equity security holders and other interests in the debtor's estate. 11 U.S.C. § 1104(a)(2). The voluntary commencement of a case under Chapter 11 of the Bankruptcy Code vests the debtor in possession with specific duties and obligations. See 11 U.S.C. §§ 1106 and 1107. Chief among these is that the debtor in possession is a fiduciary to all of its creditors and equity security holders. Id.; United States v. Whiting Pools, Inc., 462 U.S. 198, 200 n.3, 103 S.Ct. 2309 (1983) (the debtor in possession occupies the shoes of a trustee in every major way).

14

15

16

17

18

19

20

21

22

23

24

25

26

The nature of the fiduciary duty owed by a debtor in possession to its creditors is analogous to the corporate fiduciary duties owed by directors to shareholders under state law and includes the duties of care and loyalty. In re Schipper, 933 F.2d 513, 525 (7th Cir. 1991). The duty of loyalty includes the duty not to engage in self-dealing. Id.; In re Concord Coal Corp., 11 B.R. 552 (Bankr. S.D. W. Va 1981). This means that a fiduciary – the debtor in possession – is proscribed from acting solely in its self interest to the exclusion of other interests which the debtor in possession has the fiduciary obligation to protect. Id. The debtor in possession also has the fiduciary duty to preserve estate assets for the benefit of creditors. When a debtor in possession is incapable of performing these duties, a trustee is properly appointed. In re McCorhill Publishing, Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987); In re Nautilus of New Mexico, Inc., fka Fitness Services, 83 B.R. at 789; Cardinal Industries, 109 B.R. at 759.

27

28

Here, the overall management capability, trustworthiness, and loyalty of the current officers and directors is in substantial doubt. The Debtors' current management has proven itself

-34-

wholly incapable of being trusted to avoid self-dealing at the expense of the estates, even in the filing of these bankruptcy cases. Indeed, current management caused the Debtors to file for bankruptcy to protect themselves personally rather than to protect the best interests of the Debtors and their creditors.

The Debtors' bankruptcy filings stayed not only payment of the $2.5 million fee award, it also stayed the final stage of the Delaware Action, where the Delaware Court of Chancery would determine whether the Debtors' directors and Crown personally would have to pay millions of dollars to EMAK for the Fee Award and the Debtors' own legal costs associated therein. The Debtors experienced serious financial hardships in the year preceding the Petition Date, including the loss of the all-important Burger King account representing 50% of the Debtors' business in September 2009, and the loss of the $7.5 million credit line in April 2010, yet neither of these business-related setbacks caused the Debtors to file for bankruptcy. Instead, management caused the Debtors to file for bankruptcy protection only in August 2010 when Vice Chancellor Laster required prompt payment of the Fee Award and noted that the directors could be personally liable in the Delaware Action, observing that "there is substantial and credible evidence that Mr. Holbrook breached his duty of loyalty in connection with the exchange transaction." (Ex. B at 80).

There is an inherent conflict of interest between the Debtors and the current Board and management because of the potential that the directors and Crown will be responsible for payment of millions of dollars of legal fees and liabilities associated with the Delaware Action. Even the bankruptcy filings themselves are acts of self-preservation and self-dealing for the current Board and management. If the stay were lifted as to the Delaware Action, it might be found that the current directors and Crown must pay EMAK millions of dollars, a great asset to the estates. However, it is unfathomable that current management would direct the Debtors to

-35-

seek such a course when they are personally at risk. When a debtor's management cannot properly distance themselves from the matter to competently consider their obligations to the estate and creditors, then the court must appoint a trustee to act in their stead. In re Emerging Communications, Inc., 2007 Bankr. LEXIS 4763 *22 (Bankr.D.V.I.) (appointing chapter 11 trustee where debtor in possession could not distance himself from negotiations sufficiently to consider obligations owed to creditors before his own interests); In re New Orleans Paddlewheels, Inc., 350 B.R. 667, 692 (Bankr.E.D.La.2006) (appointing chapter 11 trustee where debtor in possession was so entrenched in acrimonious dispute with other parties in case, that prospects for reorganization would be lost to infighting). Accordingly, the Court should find that the current management's conflicts of interest and questionable loyalty warrant appointment of a Chapter 11 trustee.

Numerous courts have held that failure to pursue avoidance causes of action is grounds for appointment of a trustee. See, In re Catherine Duffy Petit v. New England Mortgage Services, Inc., 182 B.R. 64 (U.S.D.C. Maine 1995). As set forth by the court in Petit, where the District Court upheld the Bankruptcy Court's appointment of a Chapter 11 trustee:

> "It is entirely reasonable, and expected, that the bankruptcy court held serious concerns regarding whether the Debtor could be relied upon to pursue and recover any fraudulent transfers on behalf of the remaining creditors. See Sharon Steel Corp., 871 F.2d at 1220-21 (noting, among reasons why the bankruptcy court's appointment of a trustee was appropriate, that the Debtor had failed to sue to recover prepetition transfers that amounted "at best to voidable preferences and at worst to fraudulent conveyances.")."

182 B.R., at 70. A Debtor's inability to fulfill his fiduciary duties is sufficient cause for appointment of a trustee. In late 2009, in the midst of a contest for corporate control, and within one year preceding the filing of the bankruptcy petitions, Holbrook caused the Debtors to pay over \$2 million to insider officers and management who held voting stock. These transfers may

1

2

3

4

5

be subject to avoidance causes of actions implicating Holbrook, Tormey, Rednor, Deutschman, and others. Current management cannot be trusted to defend the Debtors' interests when those interests require the pursuit of claims on behalf of the Debtors' estates against management personally.

6

7

8

9

10

11

12

13

14

15

Likewise, acrimony between the debtor and its creditors is yet another grounds for appointment of a trustee. The Third Circuit Court of Appeals found that where "the parties seem to be unable to reach a consensus," and "the Debtors and the Lenders have flung accusations at each other and have failed to demonstrate any ability to resolve matters cooperatively" and "there is no reasonable likelihood of any cooperation in the near future" a trustee was necessary, both for cause and to protect the best interests of creditors.  Marvel Entertainment Group, 140 F.3d at 474.  Similarly, the Court in In re The Bible Speaks, 74 B.R. 511 (Bankr. D. Mass 1987), found cause for appointment of a trustee based upon the intensity of battles between the Debtor and the Committee of Unsecured Creditors:

16

17

18

19

20

21

22

> "Friction, however, has developed between the Debtor and the Creditors' Committee which threatens to engulf this estate in costly and legalistic bickering over the entire range of the reorganization process … [R]esolution [of the issues in this case] will require a spirit of cooperation between the Committee and the representatives of the Debtor, a spirit that is unlikely to be present if the Debtor remains as a debtor in possession. The need for a neutral party to mediate disputes between the debtor and its creditors is ground for a trustee's appointment. In re Bonded Mailings, Inc., 20 B.R. 781 (E.D.N.Y.1982)."

23

24

25

26

27

28

74 B.R. at 512-513.  See also Savino Oil, 99 B.R. at 526 at n. 11; In re Colorado-Ute Electric Ass'n, 120 B.R. 164, 175 (Bankr.D.Colo.1990) (deep seeded animosity between debtor and creditors is basis for appointment of trustee).  EMAK's bankruptcy filings come in the immediate aftermath of a corporate control contest, where the current Board caused the filings to stay the Delaware Action, in which EMAK stands to recover a multi-million dollar judgment

against the current directors and Crown. The Committee finds current management to be self-interested, self-dealing, and untrustworthy with respect to the assets and management of the estates, based on the evidentiary record formed in the Delaware Action, and current management's continuous self-dealing at the Debtors' expense. The Committee is concerned that continued self-dealing will preclude any workable restructuring plan, and that demands made to current management to pursue the various claims and causes of action which comprise some of the most valuable assets of these estates would be fruitless.

Further cause warranting the appointment of a trustee exists in this case given the Debtor's misleading, inaccurate and inconsistent Schedules and Statement of Financial Affairs. As set forth by the Court in Petit, "As a result of [the debtor's] fiduciary role, 'one of the most fundamental and crucial duties of a debtor-in-possession … is to keep the Court and the creditors informed about the nature, status and condition of the business undergoing reorganization … Open, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process.'" 182 B.R. at 69, citing Savino Oil, 99 B.R. at 526. Therefore, when "the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 Trustee is required." Id. Even on the Debtors' amended list of top 20 unsecured creditors, the Debtors fail to indicate that the fourth-largest debt of $411,027.52 owed to Ropes & Gray LLP (counsel to Holbrook and Rednor and former outside counsel to EMAK) could be contested on the grounds of a setoff for malpractice respecting the Exchange Transaction), and the fifth-largest debt of $404,172.76 owed to Ashby & Geddes and the sixth largest-debt of $368,333.20 owed to Gibson, Dunn & Crutcher LLP (both of whom are counsel to Crown) could be contested on the grounds that EMAK has no obligation to pay Crown's legal fees. Once again, though, the self-dealing between Holbrook and Crown have put management's interests ahead of the estates, even in basic administrative matters such as reporting of liabilities. The

-38-

1

2

3

Committee cannot defend the interests of creditors when it cannot rely on the Debtors' management for full and accurate disclosure. Accordingly, the Court should appoint a trustee.

4

### 3.    Cause Exists to Appoint a Trustee Under 1104(a)(3)

5

6

7

8

9

10

11

12

Where cause exists to convert a case to one under Chapter 7, the Court must inquire whether it is in the best interest of the estate to convert or instead appoint a Chapter 11 trustee. As explained in detail above, the Committee believes that there is substantial cause to convert these cases to Chapter 7 cases. However, should the Court determine that conversion to Chapter 7 is unwarranted, the Committee respectfully requests that the Court order the immediate appointment of a Chapter 11 trustee; absent such a result, the interests of creditors and these estates are in jeopardy.

13

### III.

14

### CONCLUSION

15

16

17

18

19

**WHEREFORE**, the Committee respectfully requests that the Court enter an order converting the case to one under Chapter 7 of the Bankruptcy Code, or, in the alternative, appointing a Chapter 11 trustee, and granting such additional relief as the Court deems just and proper under the circumstances.

20

Dated: September 9, 2010                    Official Committee of Unsecured Creditors

21

22

23

24

25

By:___/s/ David L. Neale_____
    David L. Neale
    John-Patrick M. Fritz
    Gwendolyn Long
    LEVENE, NEALE, BENDER,
    YOO & BRILL L.L.P.
    Proposed Attorneys for Official
    Committee of Unsecured Creditors

26

27

28

| In re EMAK WORLDWIDE, INC.<br>In re EMAK WORLDWIDE SERVICE CORP.<br><div align="right">Debtor(s).</div> | CHAPTER  11<br>CASE NO 2:10-bk-42779-RN<br>Jointly Administered with<br>Case No. 2:10-bk-42784-RN |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067 **MOTION BY THE OFFICAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER CONVERTING CASES TO CHAPTER 7, OR, IN THE ALTERNATIVE, APPOINTING CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 9, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Ron Bender    rb@lnbrb.com
- Russell Clementson    russell.clementson@usdoj.gov
- Daniel Denny    ddenny@gibsondunn.com
- Joseph A Eisenberg    jae@jmbm.com
- John-patrick M Fritz    jpf@lnbrb.com
- Irving M Gross    img@lnbrb.com, angela@lnbrb.com
- Kerri A Lyman    klyman@irell.com
- David L. Neale    dln@lnbrb.com
- Justin E Rawlins    jrawlins@winston.com, docketla@winston.com
- Jeffrey M. Reisner    jreisner@irell.com
- Jeffrey Rosenfeld    jeffrey.rosenfeld@bingham.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐    Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served): On **September 9, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Service via U.S. Mail

☒    Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 9, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.   Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

1 | Service via Email:

2 | Donald Kurz
Email: dkurz@diamondcapitalpartners.com

3 |
Joel Friedlander, Esq.
4 | Email: jfriedlander@bmf-law.com

5 | Attn: John C. Kirkland, Esq.
Email: jkirkland@luce.com

6 |
Michael Sanders
7 | Email: mikew.sanders@gmail.com

8 |
Via Attorney Service
9 | Hon. Richard M. Neiter
United States Bankruptcy Court
10 | Courtroom 1645
255 East Temple Street
11 | Los Angeles, CA 90012

12 | ☐ Service information continued on attached page

13 | I declare under penalty of perjury under the laws of the United States of America that the foregoing is true
and correct

14 |

| **September 9, 2010** | Jason Klassi | */s/ Jason Klassi* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

15 |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
16 | *January 2009*                                                                                            **F9013-3.1**

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

2

**Emak**
**SECURED CREDITORS**

*Debtor*
EMAK Worldwide, Inc.,
6330 San Vicente Blvd
Los Angeles, CA 90048

City of Los Angeles
Attn: Authorized Agent
File 57065
Los Angeles, CA 90074

Elena (Ellen) Francisco
17522 Grayland Ave
Artesia, CA 90701

Mui Klein
1716 Havemeyer Lane
Redondo Beach, CA
90278

Rusola Atienza
12807 Chandler Blvd
Valley Village, CA 91607

Jose Figueroa
1508 Sinaloa Ave
Pasadena, CA 91104

Patrick Hanrahan
1783 Rose Villa
Pasadena, CA 91106-3565

Christie Monacos
426 E. Marigold St.
Altadena, CA 91001

Martha Roberts
15650 Meadow Dr.
Canyon Country, CA 91387

Roy Dar
6470 Gaynor Avenue
Van Nuys, CA 91406

Duane Johnson
3166 Butler Ave
Los Angeles, CA 90066

Michael Sanders
1281 Keats Street
Manhattan Beach, CA
.90266

Teresa Tormey
13700 Marina Pointe Dr.
Suite 1214
Marina del Rey, CA 90292

Dorothy DeSilva
6186 Mesa Ave
Los Angeles, CA 90042

Edgar (Edgardo) Arevalo
17133 Mapes Avenue
Cerritos, CA 90703

Internal Revenue Service
Attn: Authorized Agent
PO Box 21126
Philadelphia, PA 19114

Franchise Tax Board
Bankruptcy Unit
PO Box 2952
Sacramento, CA 95812

Employment Dev. Dept.
Bankr. Group MIC 92E
PO Box 826880
Sacramento, CA 94280

Securities & Exchange
Commission
5670 Wilshire Blvd 11th Fl.
Los Angeles, CA 90036