IRELL & MANELLA LLP
Jeffrey M. Reisner (State Bar No. 143715)
jreisner@irell.com
Michael H. Strub, Jr. (State Bar No. 153828)
mstrub@irell.com
Kerri A. Lyman (State Bar No. 241615)
klyman@irell.com
840 Newport Center Drive, Suite 400
Newport Beach, California 92660
Telephone: (949) 760-0991
Telecopier: (949) 760-5200

Reorganization Counsel for the
Debtors and Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 10-bk-42779-RN |
| | Jointly Administered With<br>Case No. 2:10-bk-42784-RN |
| ☒ EMAK WORLDWIDE, INC., a Delaware corporation, | Chapter 11 Proceeding |
| ☒ EMAK WORLDWIDE SERVICE CORP., a Delaware corporation, | DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTORS' JOINT PLAN OF REORGANIZATION (DATED FEBRUARY 28, 2011) |
|           Debtors and Debtors-in-Possession. | |

2337206.16

# TABLE OF CONTENTS

Page

I. IMPORTANT DATES ...................................................................................... 2

II. INTRODUCTION ........................................................................................... 2

    A.   Purpose of this Document ...................................................................... 7

    B.   Deadlines for Voting and Objecting; Date of Plan Confirmation
        Hearing ................................................................................................ 8

        1.   Time and Place of the Confirmation Hearing ........................... 10

        2.   Deadline for Voting to Accept or Reject the Plan .................... 10

        3.   Deadline for Accepting the Crown EMAK Settlement .............. 10

        4.   Deadline for Objecting to the Confirmation of the Plan ........... 10

        5.   Identity of Person to Contact for More Information
            Regarding the Plan .................................................................. 11

III. DISCLAIMER .............................................................................................. 11

IV. BACKGROUND ........................................................................................... 13

    A.   Description and History of the Debtors' Businesses ............................. 13

        1.   Debtors' History ....................................................................... 13

        2.   The Debtors' Business Operations ........................................... 13

        3.   Debtors' Corporate Structure ................................................... 15

            a.   EMAK ........................................................................... 15

            b.   EMAK Service .............................................................. 15

        4.   Events Leading to Debtors' Bankruptcies ................................ 15

            a.   Declines in Revenue .................................................... 16

            b.   Restructuring Costs ...................................................... 16

            c.   Pre-Petition Litigation .................................................. 17

                (i)   TBE Files the California Derivative Action ...................... 19

                (ii)   Kurz Files the Delaware Derivative Action .................... 19

                (iii)   The Interim Fee Award ................................................. 21

                (iv)   The Boutros Action ...................................................... 21

Page

(v)      The Advancement Action.................................................22

(vi)     Other Developments in the Pre-Petition
         Litigation and Related Matters.........................................22

(vii)    The Arbitration.................................................................23

(viii)   Employment Action.........................................................23

(ix)     Legal Fees.......................................................................23

d.   Loss of EMAK's Line of Credit.............................................24

B.   Management of the Debtors Before and After the Petition Date..........................24

1.   Pre-Petition Management.........................................................24

2.   Post-Petition Management.......................................................25

a.   Debtors' Directors and Officers.........................................25

b.   Upshot's Officers................................................................27

3.   Post Confirmation Management.............................................28

C.   Significant Events in the Bankruptcy Case Through the Date of
     Filing of Disclosure Statement.............................................................28

1.   The Debtors' "First Day" Motions.........................................28

a.   The Cash Management Motion...........................................29

b.   The Employee Wage and Benefits Motion.........................29

c.   The Utilities Motion...........................................................30

d.   Motion for Joint Administration.........................................30

e.   Motion for Limited Notice..................................................30

f.   Consulting Motion..............................................................30

2.   Schedules..................................................................................31

3.   Appointment of the Official Committee of Unsecured
     Creditors....................................................................................31

4.   Initial Meeting of Creditors.....................................................32

5.   The Claims Bar Date.................................................................32

Page

6.    Appointment of John Brincko and the Designation of the
      Special Litigation Committee.................................................................32

7.    The Committee's Motion to Convert or in the Alternative to
      Appoint a Trustee ...................................................................................35

8.    Notices of Insider Compensation ............................................................35

      a.    Insider Compensation Request for Holbrook.................................35

      b.    Insider Compensation Request for Tormey ...................................36

      c.    Insider Compensation Request for Rednor .....................................37

9.    Employment Applications.........................................................................37

      a.    Application to Employ Irell as General Insolvency
            Counsel.......................................................................................37

      b.    Application to Employ Latham & Watkins....................................38

      c.    Application to Employ Morris Nichols...........................................38

      d.    Application to Employ Loyens .......................................................39

      e.    Application to Employ Gallo ..........................................................39

      f.    Application to Employ Accountants ..............................................40

      g.    Application to Employ Sitrick Brincko...........................................40

      h.    Application to Employ Buchalter Nemer .......................................41

      i.    Application to Employ Levene .......................................................41

10.   EMAK's Potential Claims against Ropes & Gray LLP and
      Christopher Austin ..................................................................................41

11.   Removal of the California Derivative Action ..........................................42

12.   The Motions to Extend Time to Remove Actions.....................................42

13.   The San Vicente Lease.............................................................................43

14.   The Motions to Extend the Debtors' Exclusive Periods to File
      a Plan and Disclosure Statement .............................................................44

15.   The Motion to Enter into Insurance Premium Financing..........................45

16.   The Motion to Sell the Products Subsidiaries ...........................................45

17.   Interim Fee Applications..........................................................................47

Page

18. Examinations Pursuant to Federal Rule of Bankruptcy
    Procedure 2004...................................................................47

19. Motion to Advance Defense Costs and Motion for Relief
    from Stay ..........................................................................48

D. The Findings and Conclusions of the Special Litigation Committee –
   the Derivative Litigation ...........................................................49

   1. Introductory Remarks...........................................................49

   2. The California Derivative Action............................................51

      a. Pleading and Proof Problems ..........................................51

         (i)   Standing..................................................................52

         (ii)  Business Judgment Rule............................................53

         (iii) Statute of Limitations...............................................54

      b. Recoverability, Cost and Indemnity Issues ...................55

      c. Conclusion........................................................................55

   3. The Delaware Derivative Action............................................56

      a. Description of Case .........................................................56

      b. Procedural History...........................................................57

      c. Discussion ........................................................................58

         (i)   Breach of Duty of Loyalty Based on
               Exchange Transaction ..............................................58

         (ii)  Breach of Duty of Care Based on Crown
               Consent....................................................................60

         (iii) False and Misleading Disclosures ...........................60

         (iv)  Aiding and abetting by Crown EMAK ...................60

         (v)   Likely Outcome.......................................................61

      d. Costs of Further Litigation and Damages .....................62

      e. Recoverability and Indemnity Issues .............................62

      f. Conclusion........................................................................63

Page

E. The Findings and Conclusions of the Special Litigation Committee – Other Claims Against the Debtors .................................................. 64

   1. Specific Findings and Conclusions – the Advancement Action ............................................................................................. 64

      a. Background .................................................................. 64

      b. Liability and Likelihood of Success ........................... 64

      c. Damages ...................................................................... 65

      d. Conclusion .................................................................. 65

   2. The Kurz Proof of Claim ................................................... 65

      a. Description of Proof of Claim ..................................... 65

         (i) Indemnification ............................................. 66

         (ii) Attorneys' Fees ............................................. 66

         (iii) Miscellaneous Other Expenses ..................... 66

         (iv) Potential Claims Against Other Directors and Officers ........................................................... 66

         (v) Interest and attorneys' fees on the foregoing ...... 66

      b. Discussion and Resolution .......................................... 66

   3. The Luce Proof of Claim .................................................... 67

      a. Description of Proof of Claim ..................................... 67

      b. Evaluation ................................................................... 67

         (i) Board Services ............................................... 67

         (ii) Kurz Services ............................................... 69

         (iii) California Derivative Action Services ............ 69

         (iv) Delaware Derivative Action Services ............ 69

      c. Resolution ................................................................... 69

   4. The Bouchard Proof of Claim ............................................ 70

      a. Description of Proof of Claim ..................................... 70

      b. Legal and Factual Basis of Fee Award ....................... 70

                                                                                    Page

        c.      Evaluation...................................................................................70

        d.      Resolution....................................................................................71

    5.  The Wells Fargo Proof of Claim ..............................................72

    6.  Other Proofs of Claim ..............................................................73

F.  The Findings and Conclusions of the Special Litigation Committee –
    Claims In Favor of the Debtors ........................................................73

    1.  The Boutros Action ..................................................................73

        a.      Description of Case .....................................................73

        b.      Legal Theories.............................................................74

        c.      Evaluation....................................................................75

                (i)     Anti-SLAPP Appeal ......................................75

                (ii)    Liability ..........................................................75

                (iii)   Damages .........................................................76

                (iv)    Recoverability, Cost, and Indemnity Issues.....76

                (v)     Resolution.......................................................77

    2.  Ropes & Gray ...........................................................................77

        a.      Description of Potential Claims ..................................77

        b.      Liability and Likelihood of Success............................78

        c.      Conclusion....................................................................78

G.  Claims Estimation .............................................................................79

H.  Procedures Implemented to Resolve Financial Problems ...................79

    1.  Completing the Pre-Petition Decentralization Plan ..................79

    2.  Selling the Promotional Products Business................................80

    3.  The Pre-Petition Litigation.......................................................80

I.  Post-Confirmation Operations...........................................................80

V. ITEMIZATION OF DEBTORS' ASSETS.................................................81

A.  Cash on Hand ...................................................................................82

Page

B.    Accounts Receivable ............................................................... 82

C.    Inventory ................................................................................. 82

D.    Other Assets ........................................................................... 82

E.    Litigation Claims .................................................................... 82

  1.    Preferential or Fraudulent Transfers.................................. 82

  2.    Claims against Other Parties .............................................. 82

VI. SUMMARY OF THE PLAN OF REORGANIZATION ................................... 83

A.    Administrative and Priority Tax Claims ................................. 83

  1.    General .............................................................................. 83

  2.    Administrative Claims........................................................ 83

    a.    Description ...................................................... 83

    b.    Treatment ........................................................ 83

    c.    Bar Date for Administrative Claims................. 84

    d.    Professional Compensation and Reimbursement
     Claims............................................................. 84

  3.    Priority Tax Claims ........................................................... 85

    a.    Description ...................................................... 85

    b.    Treatment ........................................................ 85

B.    Classification and Treatment of Classified Claims and Equity
 Interests ................................................................................. 86

  1.    Summary ............................................................................ 86

  2.    Classification and Treatment of Claims and Equity Interests .................. 87

    a.    Classes 1-A.1 and 1-B – Other Priority Claims
     against EMAK and EMAK Service ............................................. 87

     (i)    Classification ................................................................. 87

     (ii)    Description .................................................................... 88

     (iii)    Treatment ...................................................................... 88

     (iv)    Voting............................................................................ 88

Page

b.    Class 2-A.1 – Secured Claims of Bank of America
against EMAK ..................................................................89

(i)    Classification ........................................................89

(ii)    Description ...........................................................89

(iii)    Treatment ...........................................................89

(iv)    Voting .................................................................89

c.    Classes 2-A.2 and 2-B – Other Secured Claims
against EMAK and EMAK Service ..................................89

(i)    Classification ........................................................89

(ii)    Treatment ...........................................................89

(iii)    Voting .................................................................90

d.    Classes 3-A and 3-B – General Unsecured Claims
against EMAK and EMAK Service ..................................90

(i)    Classification ........................................................90

(ii)    Description ...........................................................90

(iii)    Treatment ...........................................................90

(iv)    Voting .................................................................91

e.    Classes 4-A and 4-B – Intercompany Claims against
EMAK and EMAK Service................................................91

(i)    Classification ........................................................91

(ii)    Treatment ...........................................................91

(iii)    Voting .................................................................91

f.    Class 5-A – Preferred Equity Interests in EMAK ..........91

(i)    Classification ........................................................91

(ii)    Treatment ...........................................................91

(iii)    Voting .................................................................93

g.    Class 6-A – Common Equity Interests ............................93

(i)    Classification ........................................................93

Page

(ii)    Treatment ...................................................... 93

(iii)    Voting...................................................... 94

h.    Class 6-B – Equity Interests in EMAK Service ........................... 94

(i)    Classification .................................................. 94

(ii)    Treatment ...................................................... 94

(iii)    Voting...................................................... 95

3.    Special Provision Governing Unimpaired Claims ................................ 95

4.    Discharge of Claims ........................................................ 95

C.    Acceptance or Rejection of the Plan ............................................... 96

1.    Presumed Acceptance of Plan ................................................ 96

2.    Voting Classes.............................................................. 96

3.    Acceptance by Impaired Classes of Claims and Equity
Interests ................................................................... 96

4.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy
Code ...................................................................... 96

D.    Means for Implementation of the Plan ............................................. 96

1.    General Settlement of Claims ................................................ 96

2.    Substantive Consolidation of Other Priority Claims and
General Unsecured Claims against Debtors for Plan Purposes
Only ...................................................................... 97

3.    Corporate Existence ........................................................ 97

4.    Certificate of Incorporation and Bylaws ...................................... 98

5.    Directors and Officers of Reorganized EMAK ............................... 98

6.    Corporate Action ........................................................... 98

7.    Vesting of Assets in the Reorganized Debtors................................ 100

8.    Exit Facility and Sources of Cash for Plan Distributions...................... 100

9.    Crown EMAK Settlement .................................................. 101

10.    Funding of Plan: Term Loan and Revolving Loan ............................ 102

Page

a.   Term Loan ........................................................................... 102

b.   Revolving Loan .................................................................. 103

11.   Release of Liens, Claims and Equity Interests ......................... 104

E.   Treatment of Executory Contracts and Unexpired Leases ....................... 104

1.   Assumption and Rejection of Executory Contracts and
Unexpired Leases .................................................................. 104

2.   Cure of Defaults for Assumed Executory Contracts and
Unexpired Leases .................................................................. 105

3.   Claims on Account of the Rejection of Executory Contracts
or Unexpired Leases ............................................................. 106

4.   Assumption of Director and Officer Insurance Policies ......... 107

5.   Indemnification Provisions ................................................... 107

6.   Compensation and Benefit Programs ..................................... 107

F.   Provisions Governing Distributions ................................................... 108

1.   Distributions for Claims and Equity Interests Allowed as of
the Effective Date ................................................................. 108

2.   Post-petition Interest on Allowed General Unsecured Claims ............... 108

3.   Distributions by Reorganized EMAK or Other Applicable
Distribution Agent ............................................................... 109

4.   Delivery and Distributions and Undeliverable or Unclaimed
Distributions ........................................................................ 109

a.   Record Date for Distributions ...................................... 109

b.   Delivery of Distributions in General ............................ 109

c.   Distributions for the Benefit of Disputed Claims.......... 110

d.   Minimum Distributions ................................................ 110

e.   Undeliverable Distributions ......................................... 110

(i)   Holding of Certain Undeliverable
Distributions .................................................. 110

(ii)   Failure to Claim Undeliverable Distributions ................. 111

(iii)   Failure to Present Checks ............................... 111

Page

5.  Compliance with Tax Requirements/Allocations ...................................112

6.  Means of Cash Payment.........................................................................112

7.  Timing and Calculation of Amounts to Be Distributed .........................112

8.  Setoffs....................................................................................................113

9.  Finality of Distributions ........................................................................113

G.  Procedure for Resolving Contingent, Unliquidated and Disputed
Claims and Equity Interests.........................................................................114

1.  Resolution of Disputed Claims and Equity Interests .............................114

a.  Allowance of Claims and Equity Interests...................................114

b.  Prosecution of Objections to Claims and Equity
Interests ........................................................................................114

c.  Estimation.....................................................................................114

d.  Deadline to File Objections to Claims and Equity
Interests ........................................................................................115

2.  No Distributions Pending Allowance.....................................................115

3.  Distributions on Account of Disputed Claims and Equity
Interests Once They Are Allowed ..........................................................116

H.  Litigation ....................................................................................................116

1.  Preservation of Rights of Action...........................................................116

a.  Maintenance of Causes of Action ...............................................116

b.  Preservation of All Causes of Action Not Expressly
Settled or Released .......................................................................116

I.  Confirmation and Consummation of the Plan.............................................118

1.  Conditions Precedent to Confirmation...................................................118

2.  Conditions Precedent to Consummation ................................................119

3.  Waiver of Conditions .............................................................................120

4.  Effect of Non Occurrence of Conditions to Consummation ..................120

J.  Release, Injunction and Related Provisions ...............................................120

1.  Discharge of Claims ..............................................................................120

Page

2. Release ................................................................................................ 122

    a. Release by Debtors ........................................................................ 122

    b. Release by the Crown Released Parties ........................................ 125

    c. Release by Holders of Common Equity Interests
    Participating in the Crown EMAK Settlement ............................. 125

3. Exculpation .......................................................................................... 127

4. Injunction ............................................................................................ 127

5. Binding Nature Of Plan ....................................................................... 128

VII. FINANCIAL INFORMATION CONCERNING THE DEBTORS'
OPERATIONS ................................................................................................. 129

  A. Historical Financial Information ................................................................ 129

  B. Financial Information from the Petition Date through January 31,
  2011 .......................................................................................................... 129

  C. Debtors' Projected Financial Performance under the Plan ......................... 129

    1. Financial Projections ........................................................................... 129

      a. Scope of Financial Projections ...................................................... 131

      b. Summary of Significant Assumptions ........................................... 132

    2. Valuation of the Reorganized Debtors ................................................ 133

VIII. RISK FACTORS ......................................................................................... 133

  A. Projected Financial Information ................................................................. 133

  B. Risks Related to the Debtors' Business and Operations ............................. 134

    1. Performance of Non-Debtor Subsidiaries ........................................... 134

    2. Performance of Product Subsidiary Assets ......................................... 135

    3. Claims Resolution ............................................................................... 135

    4. Availability of Insurance Proceeds ...................................................... 136

    5. Post-Petition Litigation ....................................................................... 136

    6. Government Regulations and Potential Product Liability
    Claims .................................................................................................. 136

|  |  |  | Page |
|---|---|---|---|
| C. | Liquidity | | 137 |
| D. | Certain Bankruptcy Law Considerations | | 137 |
| | 1. | Objection to Classifications | 137 |
| | 2. | Risk of Non-Confirmation of the Plan | 137 |
| | 3. | Risk of Non-Occurrence of the Effective Date | 138 |
| E. | No Committee Oversight | | 138 |
| F. | Certain Risks Relating to the Equity Securities under the Plan | | 138 |
| | 1. | Equity Interests not listed | 138 |
| | 2. | Lack of Publicly Available Information about the Reorganized Debtors | 139 |

IX. SUMMARY OF CERTAIN FEDERAL TAX CONSEQUENCES ..... 139

| | | | |
|---|---|---|---|
| A. | Withholding Applicable to all Holders of Equity Interests or Claims | | 141 |
| B. | Tax Consequences to Holders of Allowed General Unsecured Claims | | 141 |
| C. | Tax Consequences for Holders of Common Equity Interests in EMAK | | 141 |
| D. | Tax Consequences for the Debtors | | 142 |
| | 1. | The Merger into EMAK Holdings | 142 |
| | 2. | Reduction of Indebtedness | 142 |
| | 3. | Net Operating Losses | 142 |
| E. | General Disclaimer | | 144 |

X. CONDITIONS TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ..... 145

| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation | 145 |
| B. | The Effective Date | 145 |
| C. | Effect of Non-Occurrence of Conditions to Consummation | 145 |
| D. | Confirmation Request | 146 |

XI. CONFIRMATION REQUIREMENTS AND PROCEDURES ..... 146

Page

A. Who May Vote or Object .................................................................................. 146

  1. Who May Object to Confirmation of the Plan ...................................... 146

  2. Who May Vote to Accept/Reject the Plan ............................................ 146

    a. What Is an Allowed Claim/Interest .............................................. 146

    b. What Is an Impaired Claim/Interest ............................................ 147

  3. Who is Not Entitled to Vote ................................................................. 147

  4. Who Can Vote in More Than One Class................................................ 148

  5. Votes Necessary to Confirm the Plan ................................................... 148

  6. Votes Necessary for a Class to Accept the Plan.................................... 148

  7. Treatment of Non-Accepting Classes ................................................... 148

  8. Request for Confirmation Despite Rejection of the Plan by
     Impaired Class(es).............................................................................. 149

B. Unfair Discrimination and Fair and Equitable Tests........................................... 149

C. Liquidation Analysis ......................................................................................... 149

D. Feasibility ........................................................................................................ 153

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ..................................................................................................................... 154

XIII. RECOMMENDATION...................................................................................... 155

# I.

## IMPORTANT DATES

Deadline by which Ballots and the Designation and Release Form for Common Shareholders to Elect to Receive Common Stock (the "Designation and Release Form") must be received: _____, at 5:00 p.m. (Pacific Time).

Deadline by which objections to Confirmation of the Plan must be filed and served: _____, at 5:00 p.m. (Pacific Time).

Hearing regarding Confirmation of the Plan: _____, at _____ (Pacific Time).

# II.

## INTRODUCTION

The Debtors and Crown EMAK Partners, LLC ("Crown EMAK" and, collectively with the Debtors, the "Plan Proponents"), the pre-petition Holder of EMAK's preferred stock, File this Disclosure Statement in Support of the Debtors' Joint Plan of Reorganization (Dated February 28, 2011) (as may be amended, the "Disclosure Statement"), which describes how Claims against and Interests in the Debtors will be treated under the Joint Plan of Reorganization (Dated February 28, 2011) (as may be amended, the "Plan").[1] The Plan is a reorganization plan. In other words, the Plan restructures the Debtors' secured, priority, and unsecured debt, and their ownership structure. The Plan provides for the substantive consolidation of the Debtors solely for purposes of distributions under the Plan which means that, as of the Effective Date, the assets, claims, and affairs of the Debtors shall be substantively consolidated and the Debtors' Estates shall be deemed pooled for purposes of allowance, treatment, and distributions under the Plan (except to the extent they secure any Allowed Secured Claim).

The Debtors propose to make the following payments to creditors under the Plan:

- Priority Claims. Creditors holding Allowed Priority Claims against each Debtor shall receive Cash in an amount equal to such Allowed Priority Claim on the later

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth in Section I.B of the Plan.

of the Effective Date or the date upon which such Priority Claim becomes an Allowed Priority Claim.

- <u>Secured Claim of Bank of America</u>.  Unimpaired.  Bank of America shall be paid the unpaid portion of its Allowed Secured Claim in full, in Cash, on the Effective Date.

- <u>Other Secured Claims</u>.  Unimpaired.  Except to the extent that the Holder of an Allowed Other Secured Claim agrees to a different treatment, the Holder of an Allowed Other Secured Claim shall, at the sole election of the Debtors (made prior to the Effective Date), receive one of the following treatments: (a) the Allowed Other Secured Claim shall be cured and reinstated pursuant to section 1124(2) of the Bankruptcy Code, and the Debtors shall fund all amounts and take all actions otherwise necessary to reinstate such Allowed Secured Claim, on or prior to the tenth (10th) Business Day following the Effective Date; or (b) the legal, equitable and contractual rights to which the Holder of such Allowed Secured Claim is entitled shall remain unaltered.  Notwithstanding the foregoing, alternatively, the Debtors may elect to satisfy an Allowed Other Secured Claim by one of the following treatments: (x) the surrender to the Holder of the Allowed Secured Claim of such property of the applicable Estate as may be security and collateral for its Claim, or (y) the payment in Cash of the amount of such Allowed Secured Claim, as set forth in the Confirmation Order or other Final Order.

- <u>General Unsecured Claims</u>.  The Holders of Allowed General Unsecured Claims shall receive one of the following treatments: (i) the payment in Cash of the amount of such Allowed General Unsecured Claim, on the later of the Effective Date or the date upon which such General Unsecured Claim becomes an Allowed General Unsecured Claim; or (ii) such other treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder.  Allowed General Unsecured Claims shall be entitled to receive interest from the Petition Date to the Confirmation Date calculated at the Federal Judgment Rate.

- Preferred Equity Interests in EMAK.  Preferred Equity Interests in EMAK, which are owned 100% by Crown EMAK, will be converted into $10.625MM of Series A Stock of Reorganized EMAK ("New Series A Preferred Stock"), $15MM of Series B Convertible Preferred Stock of Reorganized EMAK ("New Series B Preferred Stock") and 100% of the Common Stock of Reorganized EMAK ("New Common Stock"), comprised of 7,243,018 shares[2] of Common Stock of Reorganized EMAK. Reorganized EMAK will establish a management incentive plan as described below.

- Common Equity Interests in EMAK.  Common Equity Interests in EMAK shall be cancelled as of the Effective Date and the Holders of Common Equity Interests in EMAK shall receive no distribution on account of their Common Equity Interests. In exchange for a release of all claims against (i) the Debtors;  (ii) the Non-Debtor Subsidiaries;  (iii) the Crown Released Parties;[3] (iv) the Director and Officer Released Parties;[4] and (v) the Related Persons of each of the foregoing, as discussed in greater detail below, (a) Holders of Common Equity Interests in EMAK holding more than 150,000 shares of Common Equity Interests in EMAK as of the Voting Record Date that make typical private placement representations[5] shall have the option to receive one share of New Common Stock in Reorganized EMAK (an Illinois corporation to be known as EMAK Holdings, Inc.) from Crown EMAK for each share of common stock of EMAK held; and (b) Holders of Common Equity Interests in EMAK holding 150,000 or fewer shares of Common

---

[2] This equals the total of the currently outstanding Common Equity Interests such that existing Common Interest Holders will maintain their current percentage ownership of common stock in the Debtors. This total includes 775,000 restricted shares of Common Equity Interests issued under EMAK's stock-based compensation plans, but excludes 353,081 shares of Common Equity Interests reserved for issuance pursuant to awards granted under such plans.

[3] The Crown Released Parties consist, Crown EMAK, Crown, Jeffrey Deutschman, Jason Ackerman and Peter Ackerman.

[4] The Director and Officer Released Parties consist of all current and former directors and officers of EMAK and EMAK Service, and expressly excludes all Non-Released Parties.

[5] A list of accreditation requirements will be attached to the Plan as Exhibit "8" or Filed with the Plan Supplement.

2337206.16

Equity Interests in EMAK as of the Voting Record Date shall have the option to receive $0.10 per share from Crown EMAK. Holders of Common Equity Interests in EMAK may elect this optional treatment by returning the enclosed Designation and Release Form [by ____, 2011].

- Equity Interest in EMAK Service. EMAK is the 100% Holder of Equity Interests in EMAK Service. Reorganized EMAK shall retain its Equity Interests in Reorganized EMAK Service.

The Plan constitutes a good faith compromise and settlement that has been negotiated between the Debtors, their Estates and Crown EMAK of the Derivative Litigation[6] and of all claims brought, or that could have been brought, by the Debtors, their Estates and their Non-Debtor Subsidiaries against Crown EMAK, the other Crown Released Parties, and the Directors and Officers Released Parties, and Related Persons, and all of the claims that could have been brought by Crown EMAK against the Debtors, their Estates and their Non-Debtor Subsidiaries, and all Related Persons, in all events excluding any Non-Released Party. In connection with the compromise embodied in the Plan, Crown EMAK will loan funds to the Debtors pursuant to two two-year secured facilities in the form of a term loan in the approximate amount of $2.2 million and a revolving loan in the approximate amount of $2.3 million to be used exclusively for the payment of Allowed Claims. Without this financing, it would be impossible for the Debtors to pay all Allowed Priority, Administrative and General Unsecured Claims in full on the Effective Date and, as a result, payments might be delayed for a substantial period of time. In addition, Crown EMAK's claim against the Debtors, except as specifically agreed to by Crown EMAK in the Plan, shall be deemed allowed.

Crown EMAK also has agreed to accept New Series A Preferred Stock, New Series B Preferred Stock and New Common Stock in exchange for its Preferred Equity Interests in EMAK (with a liquidation preference of $25 million). Crown EMAK has agreed that up to 15% of the

---

[6] Pre-petition, certain Holders of Common Equity Interests in EMAK initiated two derivative lawsuits, purportedly on EMAK's behalf, alleging that certain of EMAK's current and former directors and officers had harmed EMAK. The term Derivative Litigation is defined in Section I.B of the Plan and the Derivative Litigation is discussed in greater detail in Section IV.A.4.c of the Disclosure Statement.

1   fully diluted common Equity Interests in Reorganized EMAK (approximately 1,086,453 shares)

2   shall be reserved for a management incentive plan to be implemented by Reorganized EMAK.

3   Crown EMAK has also agreed to waive its change of control put right, which Crown asserted

4   entitled it to an immediate payment of $25.625 million.  Crown EMAK will also offer Holders of

5   Common Equity Interests in EMAK, who otherwise are receiving nothing in return for their

6   interests, the option to receive a Cash payment (for each Holder that own 150,000 or fewer shares

7   Common Equity Interests in EMAK) from Crown EMAK or New Common Stock (for each

8   Holder that owns more than  150,000 shares of Common Equity Interest in EMAK) from Crown

9   EMAK in exchange for a release of all claims against the Crown Released Parties, the Officer and

10  Director Released Parties, the Debtors, the Non-Debtor Subsidiaries and the Related Persons of

11  each of the foregoing  (the "Crown EMAK Settlement").

12          After a careful review of the Debtors' businesses and their prospects for reorganization, as

13  well as the risks and costs associated with the Derivative Litigation, the Debtors and the Special

14  Litigation Committee of EMAK's Board of Directors (the "Special Litigation Committee"), in

15  consultation with their legal and financial advisors, concluded that recoveries to Holders of Equity

16  Interests in EMAK would be maximized and accelerated, and payment risk diminished, by settling

17  their claims against Crown EMAK as provided in the Plan.  The Debtors believe that the value to

18  be distributed to the Debtors' creditors and equity holders under the Plan exceeds any value to be

19  distributed if the Debtors' assets were to be liquidated.

20          Further, it is the judgment of the Debtors and the Special Litigation Committee that, given

21  their analysis of the positions articulated in the Derivative Litigation and the substantial

22  uncertainty and expense surrounding the ultimate outcome of the Derivative Litigation, it is highly

23  likely that a final adjudication of the Derivative Litigation, when finally resolved (which could

24  take years and multiple millions of dollars), would not result in distributions that are greater than

25  (and may be far less) than the amounts made available under the Plan.

26          The Effective Date of the proposed Plan is the later of: (a) the first (1st) business day after

27  the fourteenth (14th) day following the Confirmation Date; and (b) the first business day after such

28  date under clause (a) on which there is not in force any stay or injunction against the enforcement

2337206.16

- 6 -

1    of the Plan or the Confirmation Order. The Debtors expect that the Effective Date will be on or

2    about June 1, 2011.

3    **A.**    **Purpose of this Document**

4       This Disclosure Statement summarizes what is in the Plan, and tells you certain

5    information relating to the Plan and the process the Bankruptcy Court will follow in determining

6    whether or not to confirm the Plan.

7       READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW

8    ABOUT:

9       (1)      WHO CAN VOTE ON OR OBJECT TO THE PLAN,

10       (2)      WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what you will receive if

11    the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU

12    WOULD RECEIVE IN LIQUIDATION,

13       (3)      THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING

14    THE CASES,

15       (4)      WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE

16    WHETHER OR NOT TO CONFIRM THE PLAN,

17       (5)      THE EFFECT OF CONFIRMATION OF THE PLAN, AND

18       (6)      WHETHER THE PLAN IS FEASIBLE.

19       This Disclosure Statement cannot tell you everything about your rights. You should

20    consider consulting your own lawyer to obtain more specific advice on how the Plan will affect

21    you and what is the best course of action for you.

22       Be sure to read the Plan as well as this Disclosure Statement. If there are any

23    inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

24       The Bankruptcy Code requires that this Disclosure Statement contain "adequate

25    information" concerning the Plan such that a hypothetical investor typical of the Holders of

26    Claims or Interests in the Cases will be able to make an informed judgment about the Plan. [The

27    Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing

28    enough information to enable parties affected by the Plan to make an informed judgment about the

1  Plan. Any party can now solicit votes for or against the Plan using the information contained in

2  this Disclosure Statement.]

3  **B.**      **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

4         THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED

5  IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN

6  ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT

7  LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS

8  AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CHAPTER 11 CASES.

9         Class 5, Preferred Equity Interests in EMAK, is entitled to vote on whether to accept or

10  reject the Plan.[7] If you are a Holder of a Claim or Interest in a Class which is entitled to vote to

11  accept or reject the Plan, accompanying this Disclosure Statement is a Ballot for casting your

12  vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot.  BALLOTS FOR

13  ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO

14  HOLDERS OF CLAIMS IN CLASSES WHICH ARE ENTITLED TO VOTE TO ACCEPT OR

15  REJECT THE PLAN. If you are the Holder of a Claim in a Class entitled to vote on the Plan, and

16  (i) did not receive a Ballot, (ii) received a damaged or illegible Ballot, (iii) lost your Ballot, or (iv)

17  if you are a party in interest and have any questions concerning the Disclosure Statement, any of

18  the Exhibits hereto, the Plan, or the voting procedures in respect thereof, please contact the

19  Debtors' counsel Jeffrey M. Reisner, Esq., or Kerri A. Lyman, Esq., Irell & Manella LLP ("Irell"),

20  840 Newport Center Drive, Suite 400, Newport Beach, California 92660; Telephone: (949) 760-

21  0991; e-mail: jreisner@irell.com or klyman@irell.com.

22        THE DEBTORS RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL

23  CLASSES ENTITLED TO VOTE SUBMIT A VOTE TO ACCEPT THE PLAN.

24

25

---

26        [7] All other classes of claims or equity interests are deemed to either accept or reject the
Plan. The Plan leaves all classes of creditors holding claims against the Debtors unimpaired and
27  these classes are conclusively presumed to accept their treatment under the Plan.  11 U.S.C.
§ 1126(f).  The Plan provides that Holders of Common Equity Interests in EMAK receive nothing
28  on account of their Common Equity Interests, and this class is therefore conclusively presumed to
reject the Plan. 11 U.S.C. § 1126(g).

1        VOTING ON THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE IS

2   IMPORTANT.    EACH SUCH CLAIM HOLDER SHOULD READ THIS DISCLOSURE

3   STATEMENT WITH ITS EXHIBITS, INCLUDING THE PLAN, IN ITS ENTIRETY.  AFTER

4   CAREFULLY REVIEWING THESE DOCUMENTS, PLEASE FOLLOW THE DIRECTIONS

5   FOR VOTING CONTAINED ON THE BALLOT, AND RETURN THE BALLOT IN THE

6   ENVELOPE PROVIDED. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY

7   [___], AT 5:00 P.M. (PACIFIC TIME) (THE "VOTING DEADLINE") AT THE ADDRESS SET

8   FORTH ON THE ENCLOSED PRE-ADDRESSED ENVELOPE/ IN YOUR BALLOT.

9        Votes cannot be transmitted orally and Ballots cannot be transmitted by facsimile or by e-

10  mail. Accordingly, you are urged to return your signed and completed Ballot promptly.  Ballots

11  not received by the Voting Deadline and unsigned Ballots will not be counted.  Any executed

12  Ballots that are timely received, but which do not indicate either an acceptance or rejection of the

13  Plan, shall not be counted as a vote either to accept or reject the Plan.

14       If you are a Holder of Common Equity Interests in EMAK, accompanying this Disclosure

15  Statement is a Designation and Release Form and a pre-addressed envelope for the return of the

16  Designation and Release Form.  By signing and returning the Designation and Release Form, you

17  are agreeing to participate in the Crown EMAK Settlement and provide a release that includes a

18  release of all the Crown Released Parties, the Director and Officer Released Parties, Debtors, the

19  Non-Debtor Subsidiaries and the Related Persons of each of the foregoing from all claims, direct

20  and derivative, that you may hold against them and to receive New Common Stock or Cash as

21  described above and herein.   TO PARTICIPATE IN THE CROWN EMAK SETTLEMENT, A

22  HOLDER OF COMMON EQUITY INTERESTS IN EMAK MUST FILL OUT AND SIGN THE

23  DESIGNATION AND RELEASE FORM.    THE DESIGNATION AND RELEASE FORM

24  MUST BE RECEIVED AT THE ADDRESS SET FORTH ON THE ENCLOSED PRE-

25  ADDRESSED ENVELOPE BY [___], AT 5:00 P.M. (PACIFIC TIME) (THE "SETTLEMENT

26  DEADLINE").

27       Designation and Release Forms cannot be transmitted orally or by facsimile or e-mail.

28  Accordingly, you are urged to return your signed and completed Designation and Release Form

2337206.16

- 9 -

1   promptly.  Holders of Common Equity Interests in EMAK whose Designation and Release Forms

2   are not received by the Settlement Deadline or who do not sign or properly fill out their

3   Designation and Release Form will not be eligible to participate in the Crown EMAK Settlement.

4         THE DEBTORS RECOMMEND THAT THE HOLDERS OF COMMON EQUITY

5   INTERESTS IN EMAK ELECT TO PARTICIPATE IN THE CROWN EMAK SETTLEMENT.

6         **1.    Time and Place of the Confirmation Hearing**

7         The hearing during which the Bankruptcy Court will determine whether or not to confirm

8   the Plan will take place on [_____], prevailing Pacific Time, before the Honorable Richard Neiter,

9   United States Bankruptcy Judge, at the United States Bankruptcy Court, Los Angeles Division,

10  located at 255 East Temple Street, Courtroom 1645, Los Angeles, California.

11        **2.    Deadline for Voting to Accept or Reject the Plan**

12        If you are entitled to vote, it is in your best interest to vote using the enclosed Ballot and to

13  return the Ballot in the enclosed envelope to Lori Gauthier, Irell & Manella LLP, 840 Newport

14  Center Drive, Suite 400, Newport Beach, California 92660.

15        Your Ballot must be received by 5:00 p.m. prevailing Pacific Time on [_____], or it will

16  not be counted.

17        **3.    Deadline for Accepting the Crown EMAK Settlement**

18        If you are entitled to participate in the Crown EMAK Settlement and you want to

19  participate in the Crown EMAK Settlement, you must fill out, sign and return your enclosed

20  Designation and Release Form to Lori Gauthier, Irell & Manella LLP, 840 Newport Center Drive,

21  Suite 400, Newport Beach, California 92660.

22        Your Ballot must be received by 5:00 p.m. prevailing Pacific Time on [_____], or it will

23  not be counted.

24        **4.    Deadline for Objecting to the Confirmation of the Plan**

25        Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and

26  served so as to be received by the following parties on or before [_____]: (a) counsel for the

27  Debtor, Jeffrey M. Reisner, Esq. and Kerri A. Lyman, Esq., Irell & Manella LLP, 840 Newport

28  Center Drive, Suite 400, Newport Beach, California 92660;  (b) counsel for Crown EMAK, Oscar

2337206.16

- 10 -

1  Garza, Esq., Gibson, Dunn & Crutcher LLP, 3161 Michelson Drive, Irvine, CA 92612; (c) counsel

2  for the Official Committee of Unsecured Creditors, David Neale, Esq. and John-Patrick Fritz,

3  Esq., Levene, Neale, Bender, Yoo & Brill LLP ("Levene"), 10250 Constellation Boulevard, Suite

4  1700, Los Angeles, California 90067; and (d) Russell Clementson, Esq., Office of the United

5  States Trustee, 725 S. Figueroa Street, Suite 2600, Los Angeles, CA 90017.

6  **5.   Identity of Person to Contact for More Information Regarding the Plan**

7  Any interested party desiring further information about the Plan should contact counsel for

8  the Debtors, Jeffrey M. Reisner, Esq., or Kerri A. Lyman, Esq., Irell & Manella LLP, at (949) 760-

9  0991.

10  **III.**

11  **DISCLAIMER**

12  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR

13  UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.   PLEASE READ THIS

14  DOCUMENT WITH CARE.   THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO

15  PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS

16  FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY

17  OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS,

18  THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF

19  HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN

20  INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

21  FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

22  SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY

23  SUMMARY.   IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS

24  DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

25  NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FINANCIAL

26  CONDITION, OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS

27  OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   ANY

28  REPRESENTATIONS OR INDUCEMENTS THAT ARE OTHER THAN AS CONTAINED IN

1  OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED

2  UPON BY YOU IN ARRIVING AT YOUR DECISION REGARDING THE PLAN.

3      THE FINANCIAL INFORMATION CONTAINED HEREIN IS NOT AUDITED.   IN

4  ADDITION, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS

5  THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND

6  RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IS

7  BASED IN PART, MAY BE INCOMPLETE OR INACCURATE.   THE DEBTORS AND

8  THEIR FINANCIAL ADVISORS ARE UNABLE TO WARRANT OR REPRESENT THAT

9  THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. EFFORTS

10 HAVE BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY

11 PRESENTED.   WITH RESPECT TO THE FINANCIAL PROJECTIONS, THESE SIMPLY

12 REPRESENT THE DEBTORS' AND THEIR FINANCIAL ADVISORS' BEST ESTIMATES OF

13 THE REORGANIZED DEBTORS' PERFORMANCE UNDER THE PLAN. NONETHELESS,

14 THERE ARE UNCERTAINTIES ASSOCIATED WITH ANY PROJECTIONS, AND THEY

15 SHOULD NOT BE CONSIDERED WARRANTIES OR GUARANTIES OF THE

16 REORGANIZED DEBTORS' PERFORMANCE HEREUNDER.     THESE RISKS ARE

17 FURTHER DESCRIBED IN SECTION VIII OF THIS DISCLOSURE STATEMENT.

18     ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED

19 ON THE SECURITIES AND EXCHANGE COMMISSION (the "SEC") AND THE SEC HAS

20 BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE

21 DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT HAS NOT BEEN

22 REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE

23 STATE SECURITIES LAWS.    NEITHER THE SEC NOR ANY STATE REGULATORY

24 AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS

25 DISCLOSURE STATEMENT, THE EXHIBITS HERETO, OR THE STATEMENTS

26 CONTAINED HEREIN.

27     THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

28 CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR OR INTEREST

1  HOLDER SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND

2  ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING HIS, HER

3  OR ITS CLAIM.

4                                    IV.

5                              **BACKGROUND**

6  A.    **Description and History of the Debtors' Businesses**

7         1.    **Debtors' History**

8         EMAK, through its wholly-owned subsidiaries, is in the business of providing marketing

9  services.[8]  EMAK Service is the corporate "back-office" for EMAK, providing centralized

10 services to EMAK and all of its subsidiaries.

11        EMAK was formed in 1983 as Marketing Equities in New York City.  In 1991,

12 Marketing Equities was renamed Equity Marketing.  In 1993, Equity Marketing opened an office

13 in Hong Kong, and in 1994, relocated its headquarters from New York to Los Angeles.

14        In 1994, Equity Marketing went public and its stock traded on NASDAQ under the

15 symbol EMAK.  In 2004, Equity Marketing changed its name to EMAK Worldwide, Inc.

16 EMAK's common shares traded on NASDAQ from 1994 until April 14, 2008, when trading was

17 suspended.  On June 17, 2008, NASDAQ delisted EMAK.  EMAK subsequently deregistered

18 with the Securities and Exchange Commission ending its status as a reporting public company,

19 although its common shares continue to trade on the pink sheets.

20        2.    **The Debtors' Business Operations**

21        EMAK is the parent company of a number of entities (the "Non-Debtor Subsidiaries"

22 and, collectively with EMAK and EMAK Service, the "Companies").[9]  Prior to the Petition Date,

23 the Companies maintained operations in two primary sectors – marketing services and

24 promotional products.  The promotional products business included planning and implementing

25 promotional programs using licensed popular characters from studios such as Warner Bros. and

26 ─────────────────────

27        [8] Prior to the Petition Date, certain of EMAK's subsidiaries were also in the business of
providing promotional products.  As discussion in Section IV.C.16 below, following the
bankruptcy filing, these subsidiaries sold their assets and are no longer operating.

28        [9] A chart illustrating the Companies' organizational structure is attached as Exhibit "A."

1  Universal.  The Companies also designed and arranged for the manufacture of a variety of items,

2  such as figurines and plush toys, for their clients' campaigns.  The Companies also provided

3  marketing services, which included event and collaborative marketing, as well as retail and

4  environmental design services

5      EMAK's subsidiaries specialized in various areas of marketing services and promotional

6  products as follows:

7      • Equity Marketing, Inc. ("EMI") was a Los Angeles based company that

8          leveraged entertainment properties to build brand value for its clients,

9          provided entertainment marketing and promotion custom premiums.  Equity

10         Marketing, Inc. designed and contracted for the manufacture of promotional

11         products that were used as free premiums or sold in conjunction with the

12         purchase of other items at a retailer or quick service restaurant.  These

13         promotional products were used for marketing purposes by the companies

14         sponsoring the promotions and the licensors of the entertainment properties.

15         Prior to 2009, Burger King Corporation was essentially the only client of

16         Equity Marketing, Inc. and the largest client of the Companies on an aggregate

17         basis.

18     • Logistix Marketing, Inc. and Logistix Inc. ("Logistix") also developed

19         promotional products and programs with a focus on marketing to family-

20         focused brands.  Logistix Marketing, Inc. and Logistix Inc. specialized in

21         family insight, promotional marketing, 2-D and 3-D premium design and

22         production, licensing consultancy and consumer products.

23     • Upshot, Inc. ("Upshot") is a Chicago-based agency that provides clients with

24         non-traditional marketing services by challenging customer indifference.

25         Upshot provides integrated marketing services to its clients, including

26         strategic planning and research, promotion, event, collaborative marketing,

27         retail and environmental design.

28

2337206.16

1      •   Neighbor, Inc. ("Neighbor") also offers full-service, strategic marketing

2          services.   Neighbor, Inc. focuses its marketing services on environmental

3          branding, community building, movements and experiences.

4      The Companies' blue-chip clients have included Kellogg, Kohl's, Kraft, Macy's, Procter

5 & Gamble and Safeway, among others.

6      EMAK Service was formed in 2004.   EMAK Service provides corporate and support

7 services to the Companies. EMAK Service has no independent operations or source of income

8 other than funds received in connection with the services provided to the Non-Debtor Subsidiaries.

9      **3.**    **Debtors' Corporate Structure**

10          *a.*     *EMAK*

11      EMAK is a Delaware corporation based in Los Angeles, California. EMAK's headquarters

12 are located at 6330 San Vicente Blvd., Los Angeles, California. EMAK has two classes of stock:

13 Common Equity Interests and Preferred Equity Interests. EMAK has issued and outstanding

14 7,243,018 shares of the Common Equity Interests. EMAK has issued and outstanding 25,000

15 shares of the Preferred Equity Interests, all held by Crown EMAK. Pursuant to EMAK's

16 certificate of incorporation and bylaws, EMAK's Board of Directors (the "Board") consists of

17 three directors. One director is elected by the Holders of Common Equity Interests, and two

18 directors are elected by the Holders of the Preferred Equity Interests.

19      Immediately prior to the Petition Date, the Board was comprised of three members: Jordan

20 Rednor ("Rednor"), Jeffrey Deutschman ("Deutschman") and James L. Holbrook, Jr.

21 ("Holbrook"). Rednor was the Chairman of the Board.

22          *b.*     *EMAK Service*

23      EMAK Service is a wholly owned subsidiary of EMAK. Immediately prior to the Petition

24 Date, EMAK Service's Board of Directors was comprised of two members: Holbrook and Teresa

25 L. Tormey ("Tormey").

26      **4.**    **Events Leading to Debtors' Bankruptcies**

27      A number of factors contributed to the Debtors' need to commence these bankruptcy

28 proceedings.

*a.*    *Declines in Revenue*

One critical factor leading to the Debtors' current financial position was the decline in revenue from the promotional products business. Historically, the promotional products business was a major strength for the Debtors, providing more than 50% of the Companies' consolidated revenue in 2007, 2008 and 2009. In recent years, however, the promotional products market changed significantly. Regulators, particularly in Europe, took steps to limit promotional products campaigns focused on children. This increased regulation caused many traditional clients to cease using promotional products for marketing. Further, many of the major companies that continue to use promotional products now contract directly with promotional products manufacturers, cutting out companies like EMAK. These market changes caused the Companies to close their European based operations in February of 2009. Three of the Companies' European subsidiaries are now in liquidation proceedings in Europe – Megapromotions B.V., Logistix Marketing GmbH and Logistix Limited.

The loss of Debtors' biggest account only compounded these problems. Until 2009, EMI's primary and the Companies' largest client was Burger King Corporation (including its franchise purchasing cooperative Restaurant Services, Inc. and various distribution companies), a company with whom EMI had a twenty-five year relationship. However, in September 2009, Burger King terminated its relationship with EMI. EMI continued to provide transitional services to Burger King through May 2010. Burger King accounted for approximately 54%, 53% and 51% of the Companies' total revenues for the years ended December 31, 2007, 2008 and 2009, respectively, and the loss of this client had a significant impact on the Companies' finances.

*b.*    *Restructuring Costs*

The foregoing business challenges caused the Companies to rethink the benefits of their centralized business model. Historically the Debtors provided human resources, payroll, and accounting services to all of the Non-Debtor Subsidiaries. This centralized "back office" benefited the Companies because the products subsidiaries (*i.e.* EMI and Logistix) had complex accounting and payroll needs and combining the back office services for all subsidiaries provided economies

1    of scale. However, the decline in the products business reduced the efficiencies of the centralized

2    back office model.

3         The Debtors responded to the changed circumstances by implementing a restructuring and

4    decentralization plan that provided for the transfer of most "back office" services to the Non-

5    Debtor Subsidiaries. The Debtors determined that transferring most of the "back office" services

6    would reduce overhead and increase efficiencies. As part of the transition, the Debtors planned to

7    transition the majority of the services provided by the Debtors to the Non-Debtor Subsidiaries,

8    terminate the majority of the Debtors' employees, end their office space lease, and move their IT

9    infrastructure to the Chicago office of Upshot by the end of 2010.

10         The Debtors required the assistance of their employees, including senior management, to

11    complete the proposed decentralization plan. However, the majority of these employees would be

12    terminated upon the successful completion of the decentralization. Recognizing the need to

13    incentivize these employees and prevent the premature departure of key employees, following

14    numerous discussions, the Debtors approved various bonuses and severance packages for

15    employees and management that remained at the Debtors through specific pre-set departure dates.

16    Employees received severance based on a number of factors, including their positions, the length

17    of time the individual had been employed by the Debtors, and the proposed departure date. These

18    restructuring and severance expenses increased the Debtors' near term expenses.

19         c.     *Pre-Petition Litigation*[10]

20         In 2009, a series of events occurred that ultimately combined into the perfect storm that

21    sunk the Companies, led to a proliferation of litigation and became a significant, perhaps the most

22    significant, reason for the commencement of the Bankruptcy Cases.

23         The first was that in addition to implementing a decentralization plan, the Debtors

24    considered ways to modify the Companies' corporate structure for the stated purpose of fostering

25    new investment. Among other options, the Debtors considered: (i) selling all or parts of the

26    Companies to a group of outside investors; (ii) splitting the Companies and transferring Upshot to

27

28      [10] The Pre-Petition Litigation is discussed in greater length in Section IV.D-F of this
Disclosure Statement.

1   Crown EMAK; and (iii) recapitalizing the Companies. Some of these discussions involved

2   Donald Kurz ("Kurz"), the former Chief Executive Officer of EMAK who had rejoined the board

3   after an absence of some years, others involved Kurz and the principals of Crown EMAK, others

4   involved Crown EMAK and EMAK's management.

5         On or about July 16, 2008, after the Board received an unsolicited offer from Marlin and

6   Kurz to purchase the company, EMAK retained Barrington Associates ("Barrington"), an

7   investment banking firm, to serve as its financial advisor in connection with its evaluation of that

8   offer and various strategic alternatives. This relationship was formalized in an engagement

9   agreement (the "Engagement Agreement") that provided for EMAK to pay a contingency fee to

10   Barrington on any qualifying transaction (a "Transaction"). The contingency fee was set at 3.25%

11   of the value of a Transaction's "Transaction Value" as defined in that agreement. Transaction was

12   defined to include any issuance of securities. A minimum contingency fee was set at one million

13   dollars. EMAK's outside counsel, Ropes & Gray LLP ("Ropes & Gray"), negotiated for and

14   advised EMAK in connection with the Engagement Agreement.

15         Unfortunately, Barrington (now Wells Fargo Securities "Wells Fargo") was unable to sell

16   the company or otherwise dispose of its assets in the adverse financial market conditions of 2008-

17   2009. Unable to sell the company or its assets, in August of 2009 EMAK's management came to

18   an agreement in principal with Crown EMAK, pursuant to which Crown EMAK would exchange

19   its Preferred Equity Interests (which voted with the common shareholders on all matters but the

20   election of directors but had the contractual right to appoint at least two of the directors) for

21   different preferred stock that would not have the right to appoint any directors and instead would

22   vote with common on all matters, including the election of directors (the "Exchange Transaction").

23         Meanwhile, Kurz, who had long been critical of EMAK's management and had for a

24   number of years championed efforts to sell EMAK to investors, and other shareholders formed

25   Take Back EMAK, LLC ("TBE"), which initiated a consent solicitation through which TBE

26   sought to replace a majority of the members of the Board with TBE members or individuals

27   aligned with it (the "TBE Consent Solicitation").

28

2337206.16

1             (i)    <u>TBE Files the California Derivative Action</u>

2        While the Exchange Transaction and the TBE Consent Solicitation were unfolding, in

3 September of 2009, TBE filed an action against EMAK in the Los Angeles County Superior

4 Court originally captioned Take Back EMAK, LLC, et al. v. Robeck et al. (the "<u>California</u>

5 <u>Derivative Action</u>") asserting derivative and non-derivative claims for breach of fiduciary duty,

6 gross mismanagement, and unlawful, unfair and fraudulent business practices against EMAK as

7 well as certain current and former directors of EMAK for events that had occurred as much as

8 four years earlier.  Those events, as alleged in the Derivative Litigation, included:

9       –     The Board's failure to investigate, reasonably consider, and pursue a purchase offer

10 from Zelnick Media in April 2005 for "up to $15 a share," at a time when the Company's shares

11 were trading at $10;

12                 •   The Board's refusal to engage in due diligence in connection with a possible sale to

13                     a buyer backing Kurz in November of 2005;

14                 •   The defendants' failure to monitor and maintain relationships with Burger King and

15                     other key clients;

16                 •   The Board's approval of a grant of 925,000 shares of restricted common stock –

17                     with full voting rights - to seven senior executives in March 2008; and

18                 •   The Board's failure to investigate, reasonably consider, and pursue offers to

19                     purchase the Company's shares by Marlin Equity, ComVest Group, and Housatonic

20                     Partners in 2008, for approximately $1.25 to $1.75 a share, when the Company's

21                     shares were trading at $.20 to $.90 a share.

22            (ii)    <u>Kurz Files the Delaware Derivative Action</u>

23        In October, the Board, advised by the law firm of Ropes & Gray, approved the Exchange

24 Transaction (over the objection of Kurz) and set various record dates for the TBE Consent

25 Solicitation, the result of which was that TBE would need more shares to have the TBE Consent

26 Solicitation approved because, for the first time, Crown EMAK would be voting for the election of

27 all directors with the common instead of having the right to elect two directors on its own.

28

1      In response, Kurz and others filed an action against EMAK and its officers and directors

2  in the Delaware Chancery Court captioned Kurz, et al. v. Holbrook, et al., (the "Delaware

3  Derivative Action" and, together with the California Derivative Action, the "Derivative

4  Litigation") seeking, among other relief, to enjoin the Exchange Transaction.

5      Meanwhile, Crown EMAK commenced its own consent solicitation to amend EMAK's by-

6  laws to reduce the size of the Board to three members (the "Crown Consent Solicitation").  If that

7  by-law amendment was adopted and the Exchange Transaction was not effective, Crown EMAK

8  would control the Board by virtue of its contractual right to designate two Board members.

9      Following the filing of the Delaware Derivative Action, EMAK decided to seek the

10  consent of the Common Equity Interest Holders to the Exchange Transaction (the "EMAK

11  Consent Solicitation").    TBE responded by adding claims to the Delaware Derivative Action

12  alleging that the solicitation materials distributed for the EMAK Consent Solicitation false and

13  misleading.  On December 3, 2009, the Board, upon the advice of counsel, rescinded the Exchange

14  Transaction and the EMAK Consent Solicitation.

15      If matters were not sufficiently complicated, in December 2009, Kurz – purportedly -

16  seeing that TBE was falling short of the shares it needed for the TBE Consent Solicitation to be

17  approved even at the pre-Exchange Transaction level – attempted to purchase from Peter Boutros

18  ("Boutros") – a former officer of EMAK –shares of stock he held.  The shares were governed by

19  two agreements that prohibited Boutros from selling or transferring any shares at that time.  In an

20  effort to avoid the transfer restrictions, Kurz and Boutros crafted a purchase agreement that

21  purported to transfer to Kurz any shares he was "entitled or permitted to sell, transfer or assign,"

22  such that Kurz would own the economic and voting rights of the stock. Following the transaction,

23  the Boutros shares were voted in favor of the TBE Consent Solicitation just before the December

24  21, 2009 deadline.  Those votes were critical in nudging the final vote count to just over 50% in

25  favor of TBE.

26      Following voting, the Crown Consent Solicitation obtained the required majority approval

27  but the TBE Consent Solicitation ended inconclusively due to EMAK's refusal to recognize Kurz's

28  acquisition of any interest in the Boutros shares and Kurz's failure to obtain a required proxy for

1   the shares held by the Depository Trust Company.   In response, Kurz and his co-plaintiffs

2   amended the complaint in the Delaware Derivative Action and sought a declaration that TBE

3   successfully had elected new directors to the Board and that the Crown Consent Solicitation was

4   invalid.

5        On February 9, 2010, the Delaware Chancery Court ruled that TBE had successfully

6   elected its slate of directors, and that the Crown Consent Solicitations was not permitted under

7   Delaware law because the reduction in the size of the Board was not in connection with an annual

8   meeting.  As a result of this decision, the TBE slate of directors (the "TBE Board"), joined Crown

9   EMAK's appointees on the Board.  An accelerated appeal was filed however, and on April 21,

10  2010, the Delaware Supreme Court ruled that the Kurz and Boutros agreement was void and TBE

11  had not successfully elected its slate of directors.  The Delaware Supreme Court also affirmed the

12  invalidation of the Crown Consent Solicitation.

13                    (iii)    The Interim Fee Award

14       On February 24, 2010 (as amended on May 3, 2010), the law firm of Bouchard Margules

15  & Friedlander ("Bouchard"), counsel for the plaintiffs in the Delaware Derivative Action, filed an

16  interim fee application seeking $2.85 million in attorneys fees and expenses to litigate claims in

17  the Delaware Derivative Action based upon the "significant benefits" of their services to EMAK

18  and its shareholders.  Although EMAK opposed the fee application, on July 19, 2010, the

19  Delaware Court of Chancery issued an interim order awarding counsel to the plaintiffs $2.5

20  million, payable within five business days.

21                    (iv)    The Boutros Action

22       In May 2010, EMAK filed an action against Kurz, TBE and Boutros in Los Angeles

23  County Superior Court captioned EMAK Worldwide, Inc. v. Kurz, et al. (the "Boutros Action")

24  alleging claims for breach of contract, intentional interference with contract, conspiracy to

25  interfere with contract and negligent interference with contract arising out of the purported sale of

26  restricted securities by Boutros to Kurz.  EMAK alleges that as a consequence of Kurz's invalid

27  effort to purchase the Boutros shares, it incurred substantial legal fees and costs associated with

28

1    having the Kurz/Boutros transaction overturned.  EMAK also alleges that it suffered harm as a

2    consequence of the conduct of the TBE Board during its ten-week tenure.

3           On June 24, 2010, Kurz filed a motion to strike various causes of action of the complaint

4    alleging that they violated California's SLAPP statute which protects litigants from being sued for

5    exercising their constitutional right to free speech in connection with issues of public interest.  On

6    August 19, 2010, the Superior Court denied Kurz' anti-SLAPP motion and Kurz appealed.  He

7    also filed a cross complaint against Boutros for breach of contract and rescission based on failure

8    to deliver any shares and refusal to return the $225,000 purchase price.

9                          (v)     The Advancement Action

10          On July 21, 2010, Kurz filed an action against EMAK in the Delaware Chancery Court

11   alleging that he is entitled to advancement under his indemnification agreement with EMAK for

12   the fees and expenses he has incurred (1) defending against counterclaims filed against him in the

13   Delaware Derivative Action, (2) defending against the claims alleged against him in the Boutros

14   Action, and (3) for the advancement action itself (the "Advancement Action").

15                         (vi)    Other Developments in the Pre-Petition Litigation and Related

16                                 Matters

17          In June 2010, Kurz and the other plaintiffs in the California Derivative Action filed a first

18   amended complaint, which eliminated non-derivative claims, named additional defendants,

19   eliminated all original plaintiffs other than Robert J. Farina, and added Gryphon Promotions, Inc.

20   as a plaintiff.  On June 20, 2010, the California Superior Court sustained the demurrers filed by

21   EMAK and the individual director defendants to the first amended complaint but allowed the

22   plaintiffs ten days leave to amend their complaint.  A second amended complaint was filed on July

23   30, 2010.  Prior to the filing of a responsive pleading to that complaint, the Bankruptcy Cases

24   were filed.  On September 24, 2010, the plaintiffs removed the California Derivative Action to the

25   Bankruptcy Court.

26          Also, Crown EMAK renewed its efforts to amend the by-laws of EMAK to reduce the size

27   of the Board to three members, two of which would be designees of the Preferred Equity Interests.

28   That by-law amendment obtained a super-majority of 60% (which requirement was imposed by

2337206.16                                    - 22 -

1  the TBE Board after Crown EMAK had submitted consents from holders of over 50% of the

2  Equity Interests) of the Equity Interests.

3                    (vii)    The Arbitration

4        In January of 2010, after the Board rescinded the Exchange Transaction, Wells Fargo

5  initiated arbitration proceedings against EMAK claiming the right to a $1 million fee under the

6  Engagement Agreement (the "Arbitration"). Wells Fargo argues that the Exchange Transaction is

7  a qualifying Transaction under the Engagement Agreement, which EMAK disputes.

8        EMAK has vigorously defended the Arbitration, which was scheduled for hearing in

9  September 2010 until stayed by these bankruptcy proceedings.  EMAK is now discussing with

10  Wells Fargo a stipulation granting Wells Fargo relief from stay for the sole purpose of proceeding

11  with arbitration to liquidate Wells Fargo's claim.

12                    (viii)    Employment Action

13        Finally, on July 15, 2010, EMAK was served with a writ of summons filed in the

14  Netherlands on behalf of a former employee of EMAK's Dutch subsidiary Megapromotions B.V.,

15  which was placed in bankruptcy liquidation in February 2009 (the "Employment Action").  The

16  Employment Action asserts claims in excess of 500,000 Euros consisting of contractual severance

17  relating to an employment agreement terminated by the bankruptcy trustee of Megapromotions

18  B.V., as well employee expenses, contractual bonuses and overdue pension contributions.  The

19  Employment Action alleges that EMAK is obligated as the guarantor of Megapromotions B.V.

20  despite the intervening bankruptcy liquidation and actions of the trustee.

21                    (ix)    Legal Fees

22        Legal fees directly related to the foregoing lawsuits and the consent solicitation totaled

23  more than $2.3 million in 2009 and $3.3 million in the first six months of 2010, and continued to

24  mount.  They put a tremendous strain on the Debtors' working capital.  As a result, the Delaware

25  Chancery Court's order requiring EMAK to pay the Interim Award within five business days was a

26  critical factor in the Debtors' decision to file for bankruptcy.

27

28

1              *d.*        *Loss of EMAK's Line of Credit*

2          Another factor in the Debtors' decision to file for bankruptcy was the fact that Bank of

3    America declined to renew EMAK's revolving line of credit in April 2010. For many years,

4    EMAK maintained a multi-million dollar revolving credit facility with Bank of America. In April

5    of 2010, Bank of America, citing EMAK's smaller size and the uncertainty caused by the Pre-

6    Petition Litigation, declined to renew the credit facility.

7    **B.      Management of the Debtors Before and After the Petition Date**

8            **1.      Pre-Petition Management**

9          Prior to the Petition Date, Holbrook served as CEO of EMAK and Tormey served as

10   EMAK's corporate secretary. The Board was comprised of Holbrook, Deutschman, and Rednor,

11   the Chairman of the Board. Holbrook was elected as a director by the Holders of Common Equity

12   Interests in May 2010. Deutschman and Rednor were both appointed to the Board by Crown

13   EMAK.

14         Prior to the Petition Date, EMAK Service's Board of Directors was comprised of Holbrook

15   and Tormey. As of the Petition Date, EMAK Service employed six (6) full-time salaried

16   employees. Holbrook is the CEO and Treasurer of EMAK Service. The other five employees

17   include two in finance (controller and accounts receivable), one in IT, one in administration and

18   one managing the Companies' Hong Kong operations. These employees provided services to the

19   Debtors and the Non-Debtor Subsidiaries.

20         Prior to the Petition Date, EMAK Service also employed a number of consultants to

21   provide management services, including Roy Dar, Michael Sanders, and Duane Johnson (the

22   "Consultants").[11] Until March 31, 2010, the Consultants had been the Debtors' Controller, Chief

23   Financial Officer, and Senior Vice President of Human Resources respectively. As part of the

24   decentralization plan discussed above, the Debtors terminated the Consultants' employment on

25   March 31, 2010, but continued to pay the Consultants for necessary services provided on an

26

27         [11] Tormey, who served as the Debtors' Executive Vice President and General Counsel prior

28   to March 31, 2010, served in a similar capacity. Tormey's employment is discussed in greater
     detail in Section IV.C.8.b below.

2337206.16                                    - 24 -

1   hourly basis.  The Debtors employed the Consultants because the Debtors needed their services,

2   on a part time basis, to complete the corporate decentralization.

3        **2.**    **Post-Petition Management**

4            *a.*    *Debtors' Directors and Officers*

5       The following table sets forth the most recent information concerning the Debtors' current

6   directors and officers.

7

| Name | Title |
| --- | --- |
| Jordan Rednor .................... | Chairman of EMAK's Board of Directors |
| James Holbrook, Jr. ............ | Director and CEO for EMAK; Director of EMAK Service |
| John Brincko[12].................... | Director of EMAK, Chairman of the Special Litigation Committee |
| Teresa Tormey.................... | Corporate Secretary for EMAK; Director of EMAK Service |

**Jordan Rednor** has served as EMAK's Chairman since June of 2010 and has served as a

Director of EMAK since June of 2008.  Rednor is the president of the Rednor Group Limited

("RGL"), an international management consulting and merchant banking firm that he founded in

1995.  As President of RGL, Rednor has regularly advised advertising and marketing firms and

has extensive experience in the marketing industry.  Rednor is a partner in Protagonist LLC, a

boutique creative agency that provides advertising and brand strategy to major advertisers.

Rednor is currently a general partner in the Mentor Fund, a partnership that provides intellectual

and financial support to emerging marketing and communications companies.  Since January

2005, Rednor has served as the Chairman of Mr. Youth, a social media marketing agency that

helps companies reach "Millenials."  Between 1997 and 2003, Rednor led the transformation of

Draft Worldwide into the leading integrated global marketing agency.  Prior to starting RGL,

Rednor worked as an investment banker with a focus on the advertising industry.  Rednor

---

[12] On October 7, 2010 Deutschman, a Crown EMAK appointee, resigned as a member of the Board.  In his place, Crown EMAK appointed John Brincko as a director.  Also on October 7, 2010 the Board designated a Special Litigation Committee to investigate, evaluate, manage, prosecute, and settle the Pre-Petition Litigation.  The Board appointed Brincko as the sole member of the Special Litigation Committee.  The circumstances surrounding Brincko's appointment and the Board's designation of the Special Litigation Committee are addressed in more detail in Section IV.C.6.

1    graduated from Fordham University with an MBA and Pennsylvania State University with a

2    Bachelor of Science.

3        **James Holbrook** has been the CEO of EMAK Worldwide, a family of marketing agencies

4    including Upshot, Equity Marketing, and Neighbor since November, 2005.   He was formerly

5    president of Zipatoni, an independent agency that was sold to IPG, and was subsequently a group

6    head of several agencies while at IPG.   Prior to Zipatoni, Holbrook worked for Ralston Purina

7    (now NestlePurina), in senior marketing and sales roles, then as chief executive of the BeechNut

8    Babyfood subsidiary, and as assistant to the chairman of the board.   He began his career in

9    marketing at Procter & Gamble in 1981.   Holbrook graduated from Washington University with

10   an MBA and Vanderbilt University with an Economics and Philosophy double major.

11       **John Brincko** has served as the sole member of EMAK's Special Litigation Committee

12   and as a Director of EMAK since October 7, 2010.   Brincko is the President of Sitrick Brincko

13   Group, LLC.   Brincko has more than 40 years of executive, financial and operational management

14   experience.   Brincko has served as president and chief executive officer of over fifty companies,

15   ranging in sales from $50 million to over $3 billion.   His experience encompasses turnarounds,

16   mergers and acquisitions, investment feasibility, plans of reorganization, cost reduction programs,

17   litigation evaluation and support, receiverships and trusteeships and expert witness testimony.

18   Brincko has provided services to many companies undergoing chapter 11 reorganization or

19   liquidation.   Most recently, he served as Chief Restructuring Officer ("CRO") and, following

20   confirmation, the Liquidating Trustee, for Franchise Pictures, LLC, a case pending in the Central

21   District of California.   In these roles, Brincko conducted claims analysis, objected to claims,

22   authorized litigation on behalf of the Liquidating Trust, and settled litigation.   Brincko also

23   recently served as CRO for Spansion, Inc., a flash memory maker that recently reorganized in the

24   Delaware Bankruptcy Court. As Spansion's CRO, Brincko managed complex intellectual property

25   litigation and resolved a significant preference and claims litigation dispute between Spansion and

26   a major creditor, Spansion Japan.   Brincko graduated from Bernard Baruch School of Business

27   Administration of the City University of New York with a Bachelor of Business Administration in

28   accounting.

2337206.16