1  IRELL & MANELLA LLP
Jeffrey M. Reisner (State Bar No. 143715)
2  jreisner@irell.com
Michael H. Strub, Jr. (State Bar No. 153828)
3  mstrub@irell.com
Kerri A. Lyman (State Bar No. 241615)
4  klyman@irell.com
840 Newport Center Drive, Suite 400
5  Newport Beach, California 92660
Telephone: (949) 760-0991
6  Telecopier: (949) 760-5200

7  Reorganization Counsel for the
Debtors and Debtors-in-Possession

8                    UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        LOS ANGELES DIVISION

11  In re                              Case No. 2:10-bk-42779-RN

12                                     Jointly Administered With
                                       Case No. 2:10-bk-42784-RN
13
    ☒  EMAK WORLDWIDE, INC., a Delaware   Chapter 11 Proceeding
14  corporation,
                                       FIRST AMENDED DISCLOSURE
15  ☒  EMAK WORLDWIDE SERVICE CORP., a  STATEMENT IN SUPPORT OF THE
    Delaware corporation,              DEBTORS' FIRST AMENDED JOINT PLAN
16                                     OF REORGANIZATION (DATED
                Debtors and Debtors-in-  APRIL 11, 2011)
17              Possession.

18

19

20

21

22

23

24

25

26

27

28

2397670.6

# TABLE OF CONTENTS

Page

I. IMPORTANT DATES .................................................................................................... 2

II. INTRODUCTION ...................................................................................................... 2

    A.    Purpose of this Document ................................................................ 7

    B.    Deadlines for Voting and Objecting; Date of Plan Confirmation
        Hearing ............................................................................................ 8

        1.    Time and Place of the Confirmation Hearing ........................... 10

        2.    Deadline for Voting to Accept or Reject the Plan..................... 10

        3.    Deadline for Accepting the Crown EMAK Settlement............... 10

        4.    Deadline for Objecting to the Confirmation of the Plan ........... 11

        5.    Identity of Person to Contact for More Information
            Regarding the Plan .................................................................. 11

III. DISCLAIMER ........................................................................................................ 11

IV. BACKGROUND ....................................................................................................... 13

    A.    Description and History of the Debtors' Businesses ............................ 13

        1.    Debtors' History........................................................................ 13

        2.    The Debtors' Business Operations............................................. 14

        3.    Debtors' Corporate Structure ................................................... 15

            a.    EMAK ............................................................................ 15

            b.    EMAK Service ............................................................... 16

        4.    Events Leading to Debtors' Bankruptcies ................................. 16

            a.    Declines in Revenue ...................................................... 16

            b.    Restructuring Costs ....................................................... 17

            c.    Pre-Petition Litigation ................................................... 18

                (i)    TBE Files the California Derivative Action.................... 19

                (ii)    Kurz Files the Delaware Derivative Action ................... 20

                (iii)    The Interim Fee Award ................................................ 21

                (iv)    The Boutros Action ...................................................... 22

Page

    (v)  The Advancement Action.................................................22

    (vi)  Other Developments in the Pre-Petition
       Litigation and Related Matters.............................22

    (vii)  The Arbitration..................................................23

    (viii) Employment Action ..........................................23

    (ix)  Legal Fees .......................................................24

   d.  Loss of EMAK's Line of Credit ..................................24

B.  Management of the Debtors Before and After the Petition Date ...........24

  1.  Pre-Petition Management.........................................................24

  2.  Post-Petition Management.......................................................25

   a.  Debtors' Directors and Officers...................................25

   b.  Upshot's Officers .......................................................27

  3.  Post Confirmation Management................................................28

C.  Significant Events in the Bankruptcy Case Through the Date of
  Filing of Disclosure Statement.........................................................29

  1.  The Debtors' "First Day" Motions.............................................29

   a.  The Cash Management Motion.....................................29

   b.  The Employee Wage and Benefits Motion ....................30

   c.  The Utilities Motion....................................................30

   d.  Motion for Joint Administration ...................................30

   e.  Motion for Limited Notice ..........................................30

   f.  Consulting Motion......................................................31

  2.  Schedules.............................................................................31

  3.  Appointment of the Official Committee of Unsecured
    Creditors ..............................................................................31

  4.  Initial Meeting of Creditors.....................................................32

  5.  The Claims Bar Date ..............................................................32

Page

6.    Appointment of John Brincko and the Designation of the
      Special Litigation Committee.................................................................32

7.    The Committee's Motion to Convert or in the Alternative to
      Appoint a Trustee ..................................................................................35

8.    Notices of Insider Compensation ...........................................................35

      a.    Insider Compensation Request for Holbrook..............................35

      b.    Insider Compensation Request for Tormey .................................37

      c.    Insider Compensation Request for Rednor ..................................37

9.    Employment Applications........................................................................38

      a.    Application to Employ Irell as General Insolvency
            Counsel........................................................................................38

      b.    Application to Employ Latham & Watkins...................................38

      c.    Application to Employ Morris Nichols ........................................39

      d.    Application to Employ Loyens .....................................................39

      e.    Application to Employ Gallo .......................................................40

      f.    Application to Employ Accountants .............................................40

      g.    Application to Employ Sitrick Brincko........................................41

      h.    Application to Employ Buchalter Nemer ......................................42

      i.    Application to Employ Levene ....................................................42

10.   EMAK's Potential Claims against Ropes & Gray LLP and
      Christopher Austin ..................................................................................42

11.   Removal of the California Derivative Action ...........................................43

12.   The Motions to Extend Time to Remove Actions.....................................43

13.   The San Vicente Lease............................................................................44

14.   The Motions to Extend the Debtors' Exclusive Periods to File
      a Plan and Disclosure Statement .............................................................45

15.   The Motion to Enter into Insurance Premium Financing.........................46

16.   The Motion to Sell the Products Subsidiaries ..........................................47

17.   Interim Fee Applications.........................................................................48

Page

18.  Examinations Pursuant to Federal Rule of Bankruptcy
     Procedure 2004 ...........................................................................49

19.  Motion to Advance Defense Costs and Motion for Relief
     from Stay ...................................................................................50

D.  The Findings and Conclusions of the Special Litigation Committee –
    the Derivative Litigation ....................................................................52

    1.  Introductory Remarks...................................................................52

    2.  The California Derivative Action....................................................54

        a.  Pleading and Proof Problems ................................................54

            (i)    Standing.................................................................55

            (ii)   Business Judgment Rule..........................................56

            (iii)  Statute of Limitations ............................................58

        b.  Recoverability, Cost and Indemnity Issues .............................58

        c.  Conclusion.......................................................................59

    3.  The Delaware Derivative Action....................................................59

        a.  Description of Case ............................................................59

        b.  Procedural History.............................................................60

        c.  Discussion .......................................................................61

            (i)    Breach of Duty of Loyalty Based on
                   Exchange Transaction .............................................61

            (ii)   Breach of Duty of Care Based on Crown
                   Consent ...............................................................63

            (iii)  False and Misleading Disclosures .............................63

            (iv)   Aiding and abetting by Crown EMAK .........................63

            (v)    Likely Outcome.....................................................64

        d.  Costs of Further Litigation and Damages .................................65

        e.  Recoverability and Indemnity Issues .....................................65

        f.  Conclusion.......................................................................66

Page

E.   The Findings and Conclusions of the Special Litigation Committee –
Other Claims Against the Debtors .................................................................. 67

1.   Specific Findings and Conclusions – the Advancement
Action ............................................................................................. 67

a.   Background ......................................................................... 67

b.   Liability and Likelihood of Success ................................. 67

c.   Damages ............................................................................. 68

d.   Conclusion .......................................................................... 68

2.   The Kurz Proof of Claim ............................................................... 69

a.   Description of Proof of Claim ........................................... 69

(i)   Indemnification ....................................................... 69

(ii)   Attorneys' Fees ....................................................... 69

(iii)   Miscellaneous Other Expenses .............................. 69

(iv)   Potential Claims Against Other Directors and
Officers ................................................................... 69

(v)   Interest and attorneys' fees on the foregoing ........ 70

b.   Discussion and Resolution ................................................ 70

3.   The Luce Proof of Claim ............................................................... 70

a.   Description of Proof of Claim ........................................... 70

b.   Evaluation ........................................................................... 71

(i)   Board Services ........................................................ 71

(ii)   Kurz Services ......................................................... 72

(iii)   California Derivative Action Services .................... 72

(iv)   Delaware Derivative Action Services .................... 72

c.   Resolution ........................................................................... 72

4.   The Bouchard Proof of Claim ........................................................ 72

a.   Description of Proof of Claim ........................................... 72

b.   Legal and Factual Basis of Fee Award ............................. 73

|  |  |  |  | Page |
|---|---|---|---|---|
|  |  | c. | Evaluation | 73 |
|  |  | d. | Resolution | 74 |
|  | 5. | The Wells Fargo Proof of Claim | | 76 |
|  | 6. | Other Proofs of Claim | | 76 |
| F. | The Findings and Conclusions of the Special Litigation Committee – Claims In Favor of the Debtors | | | 77 |
|  | 1. | The Boutros Action | | 77 |
|  |  | a. | Description of Case | 77 |
|  |  | b. | Legal Theories | 78 |
|  |  | c. | Evaluation | 78 |
|  |  |  | (i) Anti-SLAPP Appeal | 78 |
|  |  |  | (ii) Liability | 79 |
|  |  |  | (iii) Damages | 80 |
|  |  |  | (iv) Recoverability, Cost, and Indemnity Issues | 80 |
|  |  |  | (v) Resolution | 81 |
|  | 2. | Ropes & Gray | | 81 |
|  |  | a. | Description of Potential Claims | 81 |
|  |  | b. | Liability and Likelihood of Success | 82 |
|  |  | c. | Conclusion | 82 |
| G. | Claims Estimation | | | 82 |
| H. | Procedures Implemented to Resolve Financial Problems | | | 83 |
|  | 1. | Completing the Pre-Petition Decentralization Plan | | 83 |
|  | 2. | Selling the Promotional Products Business | | 83 |
|  | 3. | The Pre-Petition Litigation | | 84 |
| I. | Post-Confirmation Operations | | | 84 |
| V. ITEMIZATION OF DEBTORS' ASSETS | | | | 85 |
|  | A. | Cash on Hand | | 85 |

|  | | | | Page |
|---|---|---|---|---|
| B. | Accounts Receivable | | | 85 |
| C. | Inventory | | | 85 |
| D. | Other Assets | | | 86 |
| E. | Litigation Claims | | | 86 |
| | 1. | Preferential or Fraudulent Transfers | | 86 |
| | 2. | Claims against Other Parties | | 86 |

VI. SUMMARY OF THE PLAN OF REORGANIZATION ........................ 86

| A. | Administrative and Priority Tax Claims | | | 86 |
|---|---|---|---|---|
| | 1. | General | | 86 |
| | 2. | Administrative Claims | | 86 |
| | | a. | Description | 86 |
| | | b. | Treatment | 87 |
| | | c. | Bar Date for Administrative Claims | 87 |
| | | d. | Professional Compensation and Reimbursement Claims | 88 |
| | 3. | Priority Tax Claims | | 88 |
| | | a. | Description | 88 |
| | | b. | Treatment | 89 |
| B. | Classification and Treatment of Classified Claims and Equity Interests | | | 90 |
| | 1. | Summary | | 90 |
| | 2. | Classification and Treatment of Claims and Equity Interests | | 91 |
| | | a. | Classes 1-A.1 and 1-B – Other Priority Claims against EMAK and EMAK Service | 91 |
| | | | (i) Classification | 91 |
| | | | (ii) Description | 91 |
| | | | (iii) Treatment | 91 |
| | | | (iv) Voting | 92 |

Page

b. Class 2-A.1 – Secured Claims of Bank of America against EMAK ..................................................................92

    (i) Classification ..................................................................92

    (ii) Description ..................................................................92

    (iii) Treatment ..................................................................92

    (iv) Voting ..................................................................93

c. Classes 2-A.2 and 2-B – Other Secured Claims against EMAK and EMAK Service ..................................................................93

    (i) Classification ..................................................................93

    (ii) Treatment ..................................................................93

    (iii) Voting ..................................................................93

d. Classes 3-A and 3-B – General Unsecured Claims against EMAK and EMAK Service ..................................................................94

    (i) Classification ..................................................................94

    (ii) Description ..................................................................94

    (iii) Treatment ..................................................................94

    (iv) Voting ..................................................................94

e. Classes 4-A and 4-B – Intercompany Claims against EMAK and EMAK Service ..................................................................94

    (i) Classification ..................................................................94

    (ii) Treatment ..................................................................94

    (iii) Voting ..................................................................95

f. Class 5-A – Preferred Equity Interests in EMAK ..................................................................95

    (i) Classification ..................................................................95

    (ii) Treatment ..................................................................95

    (iii) Voting ..................................................................97

g. Class 6-A – Common Equity Interests ..................................................................97

    (i) Classification ..................................................................97

| | | | Page |
|---|---|---|---|
| | (ii) | Treatment | 97 |
| | (iii) | Voting | 98 |
| h. | Class 6-B – Equity Interests in EMAK Service | | 98 |
| | (i) | Classification | 98 |
| | (ii) | Treatment | 98 |
| | (iii) | Voting | 98 |
| 3. | Special Provision Governing Unimpaired Claims | | 98 |
| 4. | Discharge of Claims | | 98 |
| C. | Acceptance or Rejection of the Plan | | 99 |
| 1. | Presumed Acceptance of Plan | | 99 |
| 2. | Voting Classes | | 99 |
| 3. | Acceptance by Impaired Classes of Claims and Equity Interests | | 99 |
| 4. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | | 100 |
| D. | Means for Implementation of the Plan | | 100 |
| 1. | General Settlement of Claims | | 100 |
| 2. | Substantive Consolidation of Other Priority Claims and General Unsecured Claims against Debtors for Plan Purposes Only | | 100 |
| 3. | Corporate Existence | | 101 |
| 4. | Certificate of Incorporation and Bylaws | | 101 |
| 5. | Directors and Officers of Reorganized EMAK | | 102 |
| 6. | Corporate Action | | 102 |
| 7. | Vesting of Assets in the Reorganized Debtors | | 103 |
| 8. | Exit Facility and Sources of Cash for Plan Distributions | | 104 |
| 9. | Crown EMAK Settlement | | 104 |
| 10. | Funding of Plan: Term Loan and Revolving Loan | | 105 |

2397670.6 06

Page

a. Term Loan ...................................................................... 106

b. Revolving Loan .............................................................. 106

11. Release of Liens, Claims and Equity Interests ........................................ 107

E. Treatment of Executory Contracts and Unexpired Leases ................................ 108

1. Assumption and Rejection of Executory Contracts and
Unexpired Leases .......................................................................... 108

2. Cure of Defaults for Assumed Executory Contracts and
Unexpired Leases .......................................................................... 109

3. Claims on Account of the Rejection of Executory Contracts
or Unexpired Leases ...................................................................... 110

4. Assumption of Director and Officer Insurance Policies ......................... 110

5. Indemnification Provisions ............................................................ 111

6. Compensation and Benefit Programs ................................................ 111

F. Provisions Governing Distributions ......................................................... 112

1. Distributions for Claims and Equity Interests Allowed as of
the Effective Date ......................................................................... 112

2. Post-petition Interest on Allowed General Unsecured Claims ................ 112

3. Distributions by Reorganized EMAK or Other Applicable
Distribution Agent ........................................................................ 112

4. Delivery and Distributions and Undeliverable or Unclaimed
Distributions ............................................................................... 112

a. Record Date for Distributions ..................................... 112

b. Delivery of Distributions in General ............................. 113

c. Distributions for the Benefit of Disputed Claims ............. 113

d. Minimum Distributions ............................................. 114

e. Undeliverable Distributions ........................................ 114

(i) Holding of Certain Undeliverable
Distributions ................................................ 114

(ii) Failure to Claim Undeliverable Distributions ..... 114

(iii) Failure to Present Checks .............................. 115

Page

5. Compliance with Tax Requirements/Allocations ....................................115

6. Means of Cash Payment.........................................................................116

7. Timing and Calculation of Amounts to Be Distributed .........................116

8. Setoffs.....................................................................................................116

9. Finality of Distributions ........................................................................117

G. Procedure for Resolving Contingent, Unliquidated and Disputed
Claims and Equity Interests...............................................................................117

1. Resolution of Disputed Claims and Equity Interests ..............................117

a. Allowance of Claims and Equity Interests....................................117

b. Prosecution of Objections to Claims and Equity
Interests .........................................................................................118

c. Estimation......................................................................................118

d. Deadline to File Objections to Claims and Equity
Interests .........................................................................................118

2. No Distributions Pending Allowance......................................................119

3. Distributions on Account of Disputed Claims and Equity
Interests Once They Are Allowed ...........................................................119

H. Litigation ..........................................................................................................120

1. Preservation of Rights of Action ............................................................120

a. Maintenance of Causes of Action .................................................120

b. Preservation of All Causes of Action Not Expressly
Settled or Released ........................................................................120

I. Confirmation and Consummation of the Plan...................................................122

1. Conditions Precedent to Confirmation....................................................122

2. Conditions Precedent to Consummation .................................................122

3. Waiver of Conditions ..............................................................................123

4. Effect of Non Occurrence of Conditions to Consummation...................124

J. Release, Injunction and Related Provisions .....................................................124

1. Discharge of Claims ................................................................................124

Page

2.    Release ............................................................................... 125

    a.    Release by Debtors ...................................................... 125

    b.    Release by the Crown Released Parties ....................... 128

    c.    Release by Holders of Common Equity Interests
    Participating in the Crown EMAK Settlement ............. 129

3.    Exculpation ........................................................................ 130

4.    Injunction .......................................................................... 131

5.    Binding Nature Of Plan ..................................................... 132

VII. FINANCIAL INFORMATION CONCERNING THE DEBTORS'
OPERATIONS ..................................................................................... 132

A.    Historical Financial Information .................................................. 132

B.    Financial Information from the Petition Date through January 31,
2011 ............................................................................................. 132

C.    Debtors' Projected Financial Performance under the Plan ................. 132

1.    Financial Projections ......................................................... 133

    a.    Scope of Financial Projections .................................... 135

    b.    Summary of Significant Assumptions .......................... 135

2.    Valuation of the Reorganized Debtors ............................... 136

VIII. RISK FACTORS ................................................................................... 137

A.    Projected Financial Information .................................................. 137

B.    Risks Related to the Debtors' Business and Operations ................... 138

1.    Performance of Non-Debtor Subsidiaries ........................... 138

2.    Performance of Product Subsidiary Assets ......................... 138

3.    Claims Resolution ............................................................. 139

4.    Availability of Insurance Proceeds ..................................... 139

5.    Post-Petition Litigation ..................................................... 139

6.    Government Regulations and Potential Product Liability
Claims ............................................................................... 140

|   |   |   | Page |
|---|---|---|---|
| C. | Liquidity | ......................................................................... | 140 |
| D. | Certain Bankruptcy Law Considerations | ......................................... | 141 |
|   | 1. | Objection to Classifications ............................................. | 141 |
|   | 2. | Risk of Non-Confirmation of the Plan ................................ | 141 |
|   | 3. | Risk of Non-Occurrence of the Effective Date ..................... | 141 |
| E. | No Committee Oversight | ................................................................ | 141 |
| F. | Certain Risks Relating to the Equity Securities under the Plan | ........... | 142 |
|   | 1. | Equity Interests not listed ............................................... | 142 |
|   | 2. | Lack of Publicly Available Information about the Reorganized Debtors .................................................. | 142 |

IX. SUMMARY OF CERTAIN FEDERAL TAX CONSEQUENCES ...................................... 143

| A. | Withholding Applicable to all Holders of Equity Interests or Claims ............... | 144 |
|---|---|---|
| B. | Tax Consequences to Holders of Allowed General Unsecured Claims ................. | 145 |
| C. | Tax Consequences for Holders of Common Equity Interests in EMAK ............... | 145 |
| D. | Tax Consequences for the Debtors ................................................. | 145 |

|   | 1. | The Merger into EMAK Holdings .......................................... | 145 |
|---|---|---|---|
|   | 2. | Reduction of Indebtedness .................................................. | 145 |
|   | 3. | Net Operating Losses ....................................................... | 146 |

| E. | General Disclaimer ..................................................................... | 148 |
|---|---|---|

X. CONDITIONS TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ......................................................................... 148

| A. | Conditions Precedent to Confirmation .................................................. | 148 |
|---|---|---|
| B. | The Effective Date .................................................................... | 149 |
| C. | Effect of Non-Occurrence of Conditions to Consummation ............................ | 149 |
| D. | Confirmation Request ................................................................. | 149 |

XI. CONFIRMATION REQUIREMENTS AND PROCEDURES ............................................. 149

Page

A.    Who May Vote or Object ................................................................. 150

    1.    Who May Object to Confirmation of the Plan ......................... 150

    2.    Who May Vote to Accept/Reject the Plan .............................. 150

        a.    What Is an Allowed Claim/Interest ............................... 150

        b.    What Is an Impaired Claim/Interest ............................. 150

    3.    Who is Not Entitled to Vote ................................................... 151

    4.    Who Can Vote in More Than One Class................................. 151

    5.    Votes Necessary to Confirm the Plan ..................................... 151

    6.    Votes Necessary for a Class to Accept the Plan...................... 151

    7.    Treatment of Non-Accepting Classes ..................................... 152

    8.    Request for Confirmation Despite Rejection of the Plan by
Impaired Class(es)................................................................ 152

B.    Unfair Discrimination and Fair and Equitable Tests........................... 152

C.    Liquidation Analysis ....................................................................... 153

D.    Feasibility ...................................................................................... 156

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN .................................................................................................. 157

XIII. RECOMMENDATION............................................................................ 159

# I.

## IMPORTANT DATES

Deadline by which Ballots and the Designation and Release Form for Common Shareholders to Elect to Receive Common Stock (the "Designation and Release Form") must be received: _____, at 5:00 p.m. (Pacific Time).

Deadline by which objections to Confirmation of the Plan must be filed and served: _____, at 5:00 p.m. (Pacific Time).

Hearing regarding Confirmation of the Plan: _____, at _____ (Pacific Time).

# II.

## INTRODUCTION

The Debtors and Crown EMAK Partners, LLC ("Crown EMAK" and, collectively with the Debtors, the "Plan Proponents"), the pre-petition Holder of EMAK's preferred stock, File this *First Amended Disclosure Statement in Support of the Debtors' First Amended Joint Plan of Reorganization (Dated April 11, 2011)* (as may be amended, the "Disclosure Statement"), which describes how Claims against and Interests in the Debtors will be treated under the *First Amended Joint Plan of Reorganization for EMAK Worldwide, Inc. and EMAK Worldwide Service Cop. (Dated April 11, 2011)* (as may be amended, the "Plan").[1] The Plan is a reorganization plan. In other words, the Plan restructures the Debtors' secured, priority, and unsecured debt, and their ownership structure. The Plan provides for the substantive consolidation of the Debtors solely for purposes of distributions under the Plan which means that, as of the Effective Date, the assets, claims, and affairs of the Debtors shall be substantively consolidated and the Debtors' Estates shall be deemed pooled for purposes of allowance, treatment, and distributions under the Plan (except to the extent they secure any Allowed Secured Claim).

The Debtors propose to make the following payments to creditors under the Plan:

- Priority Claims.  Creditors holding Allowed Priority Claims against each Debtor shall receive Cash in an amount equal to such Allowed Priority Claim on the later

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth in Section I.B of the Plan.

of the Effective Date or the date upon which such Priority Claim becomes an Allowed Priority Claim.

- Secured Claim of Bank of America. Unimpaired. Bank of America shall be paid the unpaid portion of its Allowed Secured Claim in full, in Cash, on the Effective Date.

- Other Secured Claims. Unimpaired. Except to the extent that the Holder of an Allowed Other Secured Claim agrees to a different treatment, the Holder of an Allowed Other Secured Claim shall, at the sole election of the Debtors (made prior to the Effective Date), receive one of the following treatments: (a) the Allowed Other Secured Claim shall be cured and reinstated pursuant to section 1124(2) of the Bankruptcy Code, and the Debtors shall fund all amounts and take all actions otherwise necessary to reinstate such Allowed Secured Claim, on or prior to the tenth (10th) Business Day following the Effective Date; or (b) the legal, equitable and contractual rights to which the Holder of such Allowed Secured Claim is entitled shall remain unaltered. Notwithstanding the foregoing, alternatively, the Debtors may elect to satisfy an Allowed Other Secured Claim by one of the following treatments: (x) the surrender to the Holder of the Allowed Secured Claim of such property of the applicable Estate as may be security and collateral for its Claim, or (y) the payment in Cash of the amount of such Allowed Secured Claim, as set forth in the Confirmation Order or other Final Order.

- General Unsecured Claims. The Holders of Allowed General Unsecured Claims shall receive one of the following treatments: (i) the payment in Cash of the amount of such Allowed General Unsecured Claim, on the later of the Effective Date or the date upon which such General Unsecured Claim becomes an Allowed General Unsecured Claim; or (ii) such other treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder. Allowed General Unsecured Claims shall be entitled to receive interest from the Petition Date until

1    the Allowed General Unsecured Claim is paid calculated at the Federal Judgment

2    Rate.

3    • Preferred Equity Interests in EMAK. Preferred Equity Interests in EMAK, which

4    are owned 100% by Crown EMAK, will be converted into $10.625MM of Series

5    AAA Senior Cumulative Preferred Stock of EMAK ("New Series A Preferred

6    Stock"), $15MM of Series BBB Senior Cumulative Convertible Preferred Stock of

7    EMAK ("New Series B Preferred Stock") and 100% of the Common Stock of

8    EMAK ("New Common Stock"), comprised of 7,243,018 shares[2] of New Common

9    Stock of EMAK.  Following the Effective Date, EMAK shall be merged with and

10    into Newco, which shall be an Illinois corporation, and shall be known as EMAK

11    Holdings, Inc.  Pursuant to the Crown EMAK Settlement, discussed in greater

12    detail below, Crown EMAK will transfer shares of Common Stock of Newco to

13    qualifying Holders of Common Equity Interests in EMAK as discussed in greater

14    detail below.  Newco will establish a management incentive plan as described

15    below.

16    • Common Equity Interests in EMAK. Common Equity Interests in EMAK shall be

17    cancelled as of the Effective Date and the Holders of Common Equity Interests in

18    EMAK shall receive no distribution on account of their Common Equity Interests.

19    In exchange for a release of all claims against (i) the Debtors;  (ii) the Non-Debtor

20    Subsidiaries;   (iii) the Crown Released Parties;[3] (iv) the Director and Officer

21    Released Parties;[4] and (v) the Related Persons of each of the foregoing, as

22    discussed in greater detail below, (a) Holders of Common Equity Interests in

---

[2] This equals the total of the currently outstanding Common Equity Interests such that
existing Common Interest Holders will maintain their current percentage ownership of common
stock in the Debtors.  This total includes 775,000 restricted shares of Common Equity Interests
issued under EMAK's stock-based compensation plans, but excludes 353,081 shares of Common
Equity Interests reserved for issuance pursuant to awards granted under such plans.

[3] The Crown Released Parties consist of Crown EMAK, Crown, Jeffrey Deutschman,
Jason Ackerman and Peter Ackerman.

[4] The Director and Officer Released Parties consist of all current and former directors and
officers of EMAK and EMAK Service, and expressly excludes all Non-Released Parties.

1       EMAK holding more than 150,000 shares of Common Equity Interests in EMAK

2       as of the Voting Record Date that make typical private placement representations[5]

3       shall have the option to receive one share of New Common Stock in Newco (an

4       Illinois corporation to be known as EMAK Holdings, Inc.) from Crown EMAK for

5       each share of common stock of EMAK held; and (b) Holders of Common Equity

6       Interests in EMAK holding 150,000 or fewer shares of Common Equity Interests in

7       EMAK as of the Voting Record Date shall have the option to receive $0.10 per

8       share from Crown EMAK.  Holders of Common Equity Interests in EMAK may

9       elect this optional treatment by returning the enclosed Designation and Release

10      Form [by ____, 2011].

11      • Equity Interest in EMAK Service.  EMAK is the 100% Holder of Equity Interests

12        in EMAK Service.  Reorganized EMAK shall retain its Equity Interests in

13        Reorganized EMAK Service.

14      The Plan constitutes a good faith compromise and settlement that has been negotiated

15 between the Debtors, their Estates and Crown EMAK of the Derivative Litigation[6] and of all

16 claims brought, or that could have been brought, by the Debtors, their Estates and their Non-

17 Debtor Subsidiaries against Crown EMAK, the other Crown Released Parties, and the Director

18 and Officer Released Parties, and Related Persons, and all of the claims that could have been

19 brought by Crown EMAK against the Debtors, their Estates and their Non-Debtor Subsidiaries,

20 and all Related Persons, in all events excluding any Non-Released Party.  In connection with the

21 compromise embodied in the Plan, Crown EMAK will loan funds to the Debtors pursuant to two

22 two-year secured facilities in the form of a term loan in the approximate amount of $2.2 million

23 and a revolving loan in the approximate amount of $2.3 million to be used for the payment of

---

25      [5] A list of accreditation requirements will be attached to the Plan as Exhibit "8" or Filed
with the Plan Supplement.

26      [6] Pre-petition, certain Holders of Common Equity Interests in EMAK initiated two
27 derivative lawsuits, purportedly on EMAK's behalf, alleging that certain of EMAK's current and
former directors and officers had harmed EMAK.  The term Derivative Litigation is defined in
28 Section I.B(40) of the Plan and the Derivative Litigation is discussed in greater detail in Section
IV.A.4.c of the Disclosure Statement.

1   Allowed Claims.   Without this financing, it would be impossible for the Debtors to pay all

2   Allowed Priority, Administrative and General Unsecured Claims in full on the Effective Date and,

3   as a result, payments might be delayed for a substantial period of time.   In addition, Crown

4   EMAK's General Unsecured Claim against the Debtors, except as specifically agreed to by Crown

5   EMAK in the Plan, shall be deemed Allowed.

6          Crown EMAK also has agreed to accept New Series A Preferred Stock, New Series B

7   Preferred Stock and New Common Stock in exchange for its Preferred Equity Interests in EMAK

8   (with a liquidation preference of $25 million).   Crown EMAK has agreed that up to 15% of the

9   fully diluted common Equity Interests in Newco (approximately 1,086,453 shares) shall be

10  reserved for a management incentive plan to be implemented by Newco.   Crown EMAK has also

11  agreed to waive its change of control put right, which Crown asserted entitled it to an immediate

12  payment of $25.625 million.   Crown EMAK will also offer Holders of Common Equity Interests

13  in EMAK, who otherwise are receiving nothing in return for their interests, the option to receive a

14  Cash payment (for each Holder that owns 150,000 or fewer shares Common Equity Interests in

15  EMAK) from Crown EMAK or New Common Stock of Newco (for each Holder that owns more

16  than 150,000 shares of Common Equity Interests in EMAK) from Crown EMAK in exchange for

17  a release of all claims against the Crown Released Parties, the Director and Officer Released

18  Parties, the Debtors, the Non-Debtor Subsidiaries and the Related Persons of each of the foregoing

19  (the "Crown EMAK Settlement").

20         After a careful review of the Debtors' businesses and their prospects for reorganization, as

21  well as the risks and costs associated with the Derivative Litigation, the Debtors and the Special

22  Litigation Committee of EMAK's Board of Directors (the "Special Litigation Committee"), in

23  consultation with their legal and financial advisors, concluded that recoveries to Holders of Equity

24  Interests in EMAK would be maximized and accelerated, and payment risk diminished, by settling

25  their claims against Crown EMAK as provided in the Plan.   Crown EMAK has agreed to provide

26  post-Effective Date financing to the Reorganized Debtors.   The Debtors believe that the value to

27  be distributed to the Debtors' creditors and equity holders under the Plan exceeds any value to be

28  distributed if the Debtors' assets were to be liquidated.

1    Further, it is the judgment of the Debtors and the Special Litigation Committee that, given

2    their analysis of the positions articulated in the Derivative Litigation and the substantial

3    uncertainty and expense surrounding the ultimate outcome of the Derivative Litigation, it is highly

4    likely that a final adjudication of the Derivative Litigation, when finally resolved (which could

5    take years and multiple millions of dollars), would not result in distributions that are far less than

6    the amounts made available under the Plan.

7    The proposed Effective Date of the Plan is the later of: (a) the first (1st) business day after

8    the fourteenth (14th) day following the Confirmation Date; and (b) the first business day after such

9    date under clause (a) on which there is not in force any stay or injunction against the enforcement

10    of the Plan or the Confirmation Order.  The Debtors expect that the Effective Date will be on or

11    about June 1, 2011.

12    **A.    <u>Purpose of this Document</u>**

13    This Disclosure Statement summarizes what is in the Plan, and tells you certain

14    information relating to the Plan and the process the Bankruptcy Court will follow in determining

15    whether or not to confirm the Plan.

16    READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW

17    ABOUT:

18    (1)    WHO CAN VOTE ON OR OBJECT TO THE PLAN,

19    (2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what you will receive if

20    the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU

21    WOULD RECEIVE IN LIQUIDATION,

22    (3)    THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING

23    THE CASES,

24    (4)    WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE

25    WHETHER OR NOT TO CONFIRM THE PLAN,

26    (5)    THE EFFECT OF CONFIRMATION OF THE PLAN, AND

27    (6)    WHETHER THE PLAN IS FEASIBLE.

28

2397670.6

1    This Disclosure Statement cannot tell you everything about your rights. You should

2    consider consulting your own lawyer to obtain more specific advice on how the Plan will affect

3    you and what is the best course of action for you.

4    Be sure to read the Plan as well as this Disclosure Statement. If there are any

5    inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

6    The Bankruptcy Code requires that this Disclosure Statement contain "adequate

7    information" concerning the Plan such that a hypothetical investor typical of the Holders of

8    Claims or Interests in the Cases will be able to make an informed judgment about the Plan. [The

9    Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing

10   enough information to enable parties affected by the Plan to make an informed judgment about the

11   Plan. Any party can now solicit votes for or against the Plan using the information contained in

12   this Disclosure Statement.]

13   **B.**    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

14   THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED

15   IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN

16   ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT

17   LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS

18   AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CHAPTER 11 CASES.

19   Class 5-A, Preferred Equity Interests in EMAK, is entitled to vote on whether to accept or

20   reject the Plan.[7] If you are a Holder of a Claim or Interest in a Class which is entitled to vote to

21   accept or reject the Plan, accompanying this Disclosure Statement is a Ballot for casting your

22   vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot. BALLOTS FOR

23   ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO

24   HOLDERS OF CLAIMS IN CLASSES WHICH ARE ENTITLED TO VOTE TO ACCEPT OR

25

26   [7] All other classes of claims or equity interests are deemed to either accept or reject the
     Plan. The Plan leaves all classes of creditors holding claims against the Debtors unimpaired and

27   these classes are conclusively presumed to accept their treatment under the Plan. 11 U.S.C.
     § 1126(f). The Plan provides that Holders of Common Equity Interests in EMAK receive nothing

28   on account of their Common Equity Interests, and this class is therefore conclusively presumed to
     reject the Plan. 11 U.S.C. § 1126(g).

1  REJECT THE PLAN. If you are the Holder of a Claim in a Class entitled to vote on the Plan, and

2  (i) did not receive a Ballot, (ii) received a damaged or illegible Ballot, (iii) lost your Ballot, or (iv)

3  if you are a party in interest and have any questions concerning the Disclosure Statement, any of

4  the Exhibits hereto, the Plan, or the voting procedures in respect thereof, please contact the

5  Debtors' counsel Jeffrey M. Reisner, Esq., or Kerri A. Lyman, Esq., Irell & Manella LLP ("Irell"),

6  840 Newport Center Drive, Suite 400, Newport Beach, California 92660; Telephone: (949) 760-

7  0991; e-mail: jreisner@irell.com or klyman@irell.com.

8      THE DEBTORS RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL

9  CLASSES ENTITLED TO VOTE SUBMIT A VOTE TO ACCEPT THE PLAN.

10      VOTING ON THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE IS

11  IMPORTANT.   EACH SUCH CLAIM HOLDER SHOULD READ THIS DISCLOSURE

12  STATEMENT WITH ITS EXHIBITS, INCLUDING THE PLAN, IN ITS ENTIRETY.  AFTER

13  CAREFULLY REVIEWING THESE DOCUMENTS, PLEASE FOLLOW THE DIRECTIONS

14  FOR VOTING CONTAINED ON THE BALLOT, AND RETURN THE BALLOT IN THE

15  ENVELOPE PROVIDED. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY

16  [___], AT 5:00 P.M. (PACIFIC TIME) (THE "VOTING DEADLINE") AT THE ADDRESS SET

17  FORTH ON THE ENCLOSED PRE-ADDRESSED ENVELOPE/ IN YOUR BALLOT.

18      Votes cannot be transmitted orally and Ballots cannot be transmitted by facsimile or by e-

19  mail. Accordingly, you are urged to return your signed and completed Ballot promptly.  Ballots

20  not received by the Voting Deadline and unsigned Ballots will not be counted.  Any executed

21  Ballots that are timely received, but which do not indicate either an acceptance or rejection of the

22  Plan, shall not be counted as a vote either to accept or reject the Plan.

23      If you are a Holder of Common Equity Interests in EMAK, accompanying this Disclosure

24  Statement is a Designation and Release Form and a pre-addressed envelope for the return of the

25  Designation and Release Form to Gibson, Dunn & Crutcher LLP, Attn: Daniel B. Denny, Esq.,

26  333 South Grand Avenue, Los Angeles, California 90071-3197.  By signing and returning the

27  Designation and Release Form, you are agreeing to participate in the Crown EMAK Settlement

28  and provide a release that includes a release of all the Crown Released Parties, the Director and

1  Officer Released Parties, Debtors, the Non-Debtor Subsidiaries and the Related Persons of each of

2  the foregoing from all claims, direct and derivative, that you may hold against them and to receive

3  New Common Stock or Cash as described above and herein.    TO PARTICIPATE IN THE

4  CROWN EMAK SETTLEMENT, A HOLDER OF COMMON EQUITY INTERESTS IN EMAK

5  MUST FILL OUT AND SIGN THE DESIGNATION AND RELEASE FORM.    THE

6  DESIGNATION AND RELEASE FORM MUST BE RECEIVED AT THE ADDRESS SET

7  FORTH ON THE ENCLOSED PRE-ADDRESSED ENVELOPE BY [___], AT 5:00 P.M.

8  (PACIFIC TIME) (THE "SETTLEMENT DEADLINE").

9       Designation and Release Forms cannot be transmitted orally or by facsimile or e-mail.

10  Accordingly, you are urged to return your signed and completed Designation and Release Form

11  promptly.  Holders of Common Equity Interests in EMAK whose Designation and Release Forms

12  are not received by the Settlement Deadline or who do not sign or properly fill out their

13  Designation and Release Form will not be eligible to participate in the Crown EMAK Settlement.

14       THE DEBTORS RECOMMEND THAT THE HOLDERS OF COMMON EQUITY

15  INTERESTS IN EMAK ELECT TO PARTICIPATE IN THE CROWN EMAK SETTLEMENT.

16      **1.**    **Time and Place of the Confirmation Hearing**

17       The hearing during which the Bankruptcy Court will determine whether or not to confirm

18  the Plan will take place on [_____], prevailing Pacific Time, before the Honorable Richard Neiter,

19  United States Bankruptcy Judge, at the United States Bankruptcy Court, Los Angeles Division,

20  located at 255 East Temple Street, Courtroom 1645, Los Angeles, California.

21      **2.**    **Deadline for Voting to Accept or Reject the Plan**

22       If you are entitled to vote, it is in your best interest to vote using the enclosed Ballot and to

23  return the Ballot in the enclosed envelope to Lori Gauthier, Irell & Manella LLP, 840 Newport

24  Center Drive Ste. 400, Newport Beach, CA 92660.  Your Ballot must be received by 5:00 p.m.

25  prevailing Pacific Time on [_____], or it will not be counted.

26      **3.**    **Deadline for Accepting the Crown EMAK Settlement**

27       If you are entitled to participate in the Crown EMAK Settlement and you want to

28  participate in the Crown EMAK Settlement, you must fill out, sign and return your enclosed

1    Designation and Release Form to Gibson, Dunn & Crutcher LLP, Attn: Daniel B. Denny, Esq.,

2    333 South Grand Avenue, Los Angeles, California 90071-3197.

3        Your Designation and Release Form must be received by 5:00 p.m. prevailing Pacific

4    Time on [_____], or it will not be effective.

5        **4.**    **Deadline for Objecting to the Confirmation of the Plan**

6        Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and

7    served so as to be received by the following parties on or before [_____]: (a) counsel for the

8    Debtor, Jeffrey M. Reisner, Esq. and Kerri A. Lyman, Esq., Irell & Manella LLP, 840 Newport

9    Center Drive, Suite 400, Newport Beach, California 92660; (b) counsel for Crown EMAK, Oscar

10   Garza, Esq., Gibson, Dunn & Crutcher LLP, 3161 Michelson Drive, Irvine, CA 92612; (c) counsel

11   for the Official Committee of Unsecured Creditors, David Neale, Esq. and John-Patrick Fritz,

12   Esq., Levene, Neale, Bender, Yoo & Brill LLP ("Levene"), 10250 Constellation Boulevard, Suite

13   1700, Los Angeles, California 90067; and (d) Russell Clementson, Esq., Office of the United

14   States Trustee, 725 S. Figueroa Street, Suite 2600, Los Angeles, CA 90017.

15       **5.**    **Identity of Person to Contact for More Information Regarding the Plan**

16       Any interested party desiring further information about the Plan should contact counsel for

17   the Debtors, Jeffrey M. Reisner, Esq., or Kerri A. Lyman, Esq., Irell & Manella LLP, at (949) 760-

18   0991.

19                                    **III.**

20                                **DISCLAIMER**

21       THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR

22   UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.   PLEASE READ THIS

23   DOCUMENT WITH CARE.   THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO

24   PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS

25   FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY

26   OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS,

27   THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF

28

2397670.6                                - 11 -

1  HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN
2  INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

3      FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT
4  SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY
5  SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS
6  DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

7      NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FINANCIAL
8  CONDITION, OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS
9  OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY
10 REPRESENTATIONS OR INDUCEMENTS THAT ARE OTHER THAN AS CONTAINED IN
11 OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED
12 UPON BY YOU IN ARRIVING AT YOUR DECISION REGARDING THE PLAN.

13     THE FINANCIAL INFORMATION CONTAINED HEREIN IS NOT AUDITED.  IN
14 ADDITION, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS
15 THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND
16 RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IS
17 BASED IN PART, MAY BE INCOMPLETE OR INACCURATE.  THE DEBTORS AND
18 THEIR FINANCIAL ADVISORS ARE UNABLE TO WARRANT OR REPRESENT THAT
19 THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. EFFORTS
20 HAVE BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY
21 PRESENTED.  WITH RESPECT TO THE FINANCIAL PROJECTIONS, THESE SIMPLY
22 REPRESENT THE DEBTORS' AND THEIR FINANCIAL ADVISORS' BEST ESTIMATES OF
23 THE REORGANIZED DEBTORS' PERFORMANCE UNDER THE PLAN.  NONETHELESS,
24 THERE ARE UNCERTAINTIES ASSOCIATED WITH ANY PROJECTIONS, AND THEY
25 SHOULD NOT BE CONSIDERED WARRANTIES OR GUARANTIES OF THE
26 REORGANIZED DEBTORS' PERFORMANCE HEREUNDER.  THESE RISKS ARE
27 FURTHER DESCRIBED IN SECTION VIII OF THIS DISCLOSURE STATEMENT.

28

ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON THE SECURITIES AND EXCHANGE COMMISSION (the "SEC") AND THE SEC HAS BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.    NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS HERETO, OR THE STATEMENTS CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING HIS, HER OR ITS CLAIM.

## IV.

## BACKGROUND

A.    **Description and History of the Debtors' Businesses**

   1.    **Debtors' History**

EMAK, through its wholly-owned subsidiaries, is in the business of providing marketing services.[8]    EMAK Service is the corporate "back-office" for EMAK, providing centralized services to EMAK and all of its subsidiaries.

EMAK was formed in 1983 as Marketing Equities in New York City.    In 1991, Marketing Equities was renamed Equity Marketing.  In 1993, Equity Marketing opened an office in Hong Kong, and in 1994, relocated its headquarters from New York to Los Angeles.

In 1994, Equity Marketing went public and its stock traded on NASDAQ under the symbol EMAK.    In 2004, Equity Marketing changed its name to EMAK Worldwide, Inc.

---

[8] Prior to the Petition Date, certain of EMAK's subsidiaries were also in the business of providing promotional products.    As discussed in Section IV.C.16 below, following the bankruptcy filing, these subsidiaries sold their assets and are no longer operating.

1  EMAK's common shares traded on NASDAQ from 1994 until April 14, 2008, when trading was

2  suspended.  On June 17, 2008, NASDAQ delisted EMAK.  EMAK subsequently deregistered

3  with the Securities and Exchange Commission ending its status as a reporting public company,

4  although its common shares continue to trade on the pink sheets.

5       **2.**    **The Debtors' Business Operations**

6       EMAK is the parent company of a number of entities (the "Non-Debtor Subsidiaries"

7  and, collectively with EMAK and EMAK Service, the "Companies").[9]  Prior to the Petition Date,

8  the Companies maintained operations in two primary sectors – marketing services and

9  promotional products.  The promotional products business included planning and implementing

10  promotional programs using licensed popular characters from studios such as Warner Bros. and

11  Universal.  The Companies also designed and arranged for the manufacture of a variety of items,

12  such as figurines and plush toys, for their clients' campaigns.  The Companies also provided

13  marketing services, which included event and collaborative marketing, as well as retail and

14  environmental design services.

15       EMAK's subsidiaries specialized in various areas of marketing services and promotional

16  products as follows:

17         • Equity Marketing, Inc. ("EMI") was a Los Angeles based company that

18         leveraged entertainment properties to build brand value for its clients,

19         provided entertainment marketing and promotion custom premiums.  Equity

20         Marketing, Inc. designed and contracted for the manufacture of promotional

21         products that were used as free premiums or sold in conjunction with the

22         purchase of other items at a retailer or quick service restaurant.  These

23         promotional products were used for marketing purposes by the companies

24         sponsoring the promotions and the licensors of the entertainment properties.

25         Prior to 2009, Burger King Corporation was essentially the only client of

26         Equity Marketing, Inc. and the largest client of the Companies on an aggregate

27         basis.

28

---

[9] A chart illustrating the Companies' organizational structure is attached as Exhibit "A."

- Logistix Marketing, Inc. and Logistix Inc. ("Logistix") also developed promotional products and programs with a focus on marketing to family-focused brands. Logistix Marketing, Inc. and Logistix Inc. specialized in family insight, promotional marketing, 2-D and 3-D premium design and production, licensing consultancy and consumer products.

- Upshot, Inc. ("Upshot") is a Chicago-based agency that provides clients with non-traditional marketing services by challenging customer indifference. Upshot provides integrated marketing services to its clients, including strategic planning and research, promotion, event, collaborative marketing, retail and environmental design.

- Neighbor, Inc. ("Neighbor") also offers full-service, strategic marketing services. Neighbor, Inc. focuses its marketing services on environmental branding, community building, movements and experiences.

The Companies' blue-chip clients have included Kellogg, Kohl's, Kraft, Macy's, Procter & Gamble and Safeway, among others.

EMAK Service was formed in 2004. EMAK Service provides corporate and support services to the Companies. EMAK Service has no independent operations or source of income other than funds received in connection with the services provided to the Non-Debtor Subsidiaries.

### 3. **Debtors' Corporate Structure**

     *a.    EMAK*

EMAK is a Delaware corporation based in Los Angeles, California. EMAK's headquarters are located at 350 N. Orleans St., 5th Floor, Chicago, IL 60654. EMAK has two classes of stock: Common Equity Interests and Preferred Equity Interests. EMAK has issued and outstanding 7,243,018 shares of the Common Equity Interests. EMAK has issued and outstanding 25,000 shares of the Preferred Equity Interests, all held by Crown EMAK. Pursuant to EMAK's certificate of incorporation and bylaws, EMAK's Board of Directors (the "Board") consists of three directors. One director is elected by the Holders of Common Equity Interests, and two directors are elected by the Holders of the Preferred Equity Interests.

1    Immediately prior to the Petition Date, the Board was comprised of three members: Jordan

2    Rednor ("Rednor"), Jeffrey Deutschman ("Deutschman") and James L. Holbrook, Jr.

3    ("Holbrook"). Rednor was the Chairman of the Board.

4              b.    *EMAK Service*

5    EMAK Service is a wholly owned subsidiary of EMAK. Immediately prior to the Petition

6    Date, EMAK Service's Board of Directors was comprised of two members: Holbrook and Teresa

7    L. Tormey ("Tormey").

8         **4.    Events Leading to Debtors' Bankruptcies**

9    A number of factors contributed to the Debtors' need to commence these bankruptcy

10   proceedings.

11             a.    *Declines in Revenue*

12   One critical factor leading to the Debtors' current financial position was the decline in

13   revenue from the promotional products business. Historically, the promotional products business

14   was a major strength for the Debtors, providing more than 50% of the Companies' consolidated

15   revenue in 2007, 2008 and 2009. In recent years, however, the promotional products market

16   changed significantly. Regulators, particularly in Europe, took steps to limit promotional

17   products campaigns focused on children. This increased regulation caused many traditional

18   clients to cease using promotional products for marketing. Further, many of the major

19   companies that continue to use promotional products now contract directly with promotional

20   products manufacturers, cutting out companies like EMAK. These market changes caused the

21   Companies to close their European based operations in February of 2009. Three of the

22   Companies' European subsidiaries are now in liquidation proceedings in Europe –

23   Megapromotions B.V., Logistix Marketing GmbH and Logistix Limited.

24   The loss of Debtors' biggest account only compounded these problems. Until 2009,

25   EMI's primary and the Companies' largest client was Burger King Corporation (including its

26   franchise purchasing cooperative Restaurant Services, Inc. and various distribution companies), a

27   company with whom EMI had a twenty-five year relationship. However, in September 2009,

28   Burger King terminated its relationship with EMI. EMI continued to provide transitional

1    services to Burger King through May 2010.  Burger King accounted for approximately 54%,

2    53% and 51% of the Companies' total revenues for the years ended December 31, 2007, 2008

3    and 2009, respectively, and the loss of this client had a significant impact on the Companies'

4    finances.

5              b.       *Restructuring Costs*

6         The foregoing business challenges caused the Companies to rethink the benefits of their

7    centralized business model.  Historically the Debtors provided human resources, payroll, and

8    accounting services to all of the Non-Debtor Subsidiaries.  This centralized "back office" benefited

9    the Companies because the products subsidiaries (*i.e.* EMI and Logistix) had complex accounting

10   and payroll needs and combining the back office services for all subsidiaries provided economies

11   of scale.  However, the decline in the products business reduced the efficiencies of the centralized

12   back office model.

13        The Debtors responded to the changed circumstances by implementing a restructuring and

14   decentralization plan that provided for the transfer of most "back office" services to the Non-

15   Debtor Subsidiaries.  The Debtors determined that transferring most of the "back office" services

16   would reduce overhead and increase efficiencies.  As part of the transition, the Debtors planned to

17   transition the majority of the services provided by the Debtors to the Non-Debtor Subsidiaries,

18   terminate the majority of the Debtors' employees, end their office space lease, and move their IT

19   infrastructure to the Chicago office of Upshot by the end of 2010.

20        The Debtors required the assistance of their employees, including senior management, to

21   complete the proposed decentralization plan.  However, the majority of these employees would be

22   terminated upon the successful completion of the decentralization.  Recognizing the need to

23   incentivize these employees and prevent the premature departure of key employees, following

24   numerous discussions, the Debtors approved various bonuses and severance packages for

25   employees and management that remained at the Debtors through specific pre-set departure dates.

26   Employees received severance based on a number of factors, including their positions, the length

27   of time the individual had been employed by the Debtors, and the proposed departure date.  These

28   restructuring and severance expenses increased the Debtors' near term expenses.

*c.*     *Pre-Petition Litigation*[10]

In 2009, a series of events occurred that ultimately combined into the perfect storm that sunk the Companies, led to a proliferation of litigation and became a significant, perhaps the most significant, reason for the commencement of the Bankruptcy Cases.

The first was that in addition to implementing a decentralization plan, the Debtors considered ways to modify the Companies' corporate structure for the stated purpose of fostering new investment. Among other options, the Debtors considered: (i) selling all or parts of the Companies to a group of outside investors; (ii) splitting the Companies and transferring Upshot to Crown EMAK; and (iii) recapitalizing the Companies. Some of these discussions involved Donald Kurz ("Kurz"), the former Chief Executive Officer of EMAK who had rejoined the board after an absence of some years, others involved Kurz and the principals of Crown EMAK, others involved Crown EMAK and EMAK's management.

On or about July 16, 2008, after the Board received an unsolicited offer from Marlin and Kurz to purchase the company, EMAK retained Barrington Associates ("Barrington"), an investment banking firm, to serve as its financial advisor in connection with its evaluation of that offer and various strategic alternatives. This relationship was formalized in an engagement agreement (the "Engagement Agreement") that provided for EMAK to pay a contingency fee to Barrington on any qualifying transaction (a "Transaction"). The contingency fee was set at 3.25% of the value of a Transaction's "Transaction Value" as defined in that agreement. Transaction was defined to include any issuance of securities. A minimum contingency fee was set at one million dollars. EMAK's outside counsel, Ropes & Gray LLP ("Ropes & Gray"), negotiated for and advised EMAK in connection with the Engagement Agreement.

Unfortunately, Barrington (now Wells Fargo Securities "Wells Fargo") was unable to sell the company or otherwise dispose of its assets in the adverse financial market conditions of 2008-2009. Unable to sell the company or its assets, in August of 2009 EMAK's management came to an agreement in principal with Crown EMAK, pursuant to which Crown EMAK would exchange

---

[10] The Pre-Petition Litigation is discussed in greater length in Section IV.D-F of this Disclosure Statement.

1    its Preferred Equity Interests (which voted with the common shareholders on all matters but the

2    election of directors but had the contractual right to appoint at least two of the directors) for

3    different preferred stock that would not have the right to appoint any directors and instead would

4    vote with common on all matters, including the election of directors (the "Exchange Transaction").

5            Meanwhile, Kurz, who had long been critical of EMAK's management and had for a

6    number of years championed efforts to sell EMAK to investors, and other shareholders formed

7    Take Back EMAK, LLC ("TBE"), which initiated a consent solicitation through which TBE

8    sought to replace a majority of the members of the Board with TBE members or individuals

9    aligned with it (the "TBE Consent Solicitation").

10                    (i)        TBE Files the California Derivative Action

11           While the Exchange Transaction and the TBE Consent Solicitation were unfolding, in

12   September of 2009, TBE filed an action against EMAK in the Los Angeles County Superior

13   Court originally captioned Take Back EMAK, LLC, et al. v. Robeck et al. (the "California

14   Derivative Action") asserting derivative and non-derivative claims for breach of fiduciary duty,

15   gross mismanagement, and unlawful, unfair and fraudulent business practices against EMAK as

16   well as certain current and former directors of EMAK for events that had occurred as much as

17   four years earlier.  Those events, as alleged in the Derivative Litigation, included:

18        •   The Board's failure to investigate, reasonably consider, and pursue a purchase offer

19            from Zelnick Media in April 2005 for "up to $15 a share," at a time when the

20            Company's shares were trading at $10;

21        •   The Board's refusal to engage in due diligence in connection with a possible sale to

22            a buyer backing Kurz in November of 2005;

23        •   The defendants' failure to monitor and maintain relationships with Burger King and

24            other key clients;

25        •   The Board's approval of a grant of 925,000 shares of restricted common stock –

26            with full voting rights - to seven senior executives in March 2008; and

27        •   The Board's failure to investigate, reasonably consider, and pursue offers to

28            purchase the Company's shares by Marlin Equity, ComVest Group, and Housatonic

1   Partners in 2008, for approximately $1.25 to $1.75 a share, when the Company's

2   shares were trading at $.20 to $.90 a share.

3   (ii)   Kurz Files the Delaware Derivative Action

4   In October, the Board, advised by the law firm of Ropes & Gray, approved the Exchange

5   Transaction (over the objection of Kurz) and set various record dates for the TBE Consent

6   Solicitation, the result of which was that TBE would need more shares to have the TBE Consent

7   Solicitation approved because, for the first time, Crown EMAK would be voting for the election of

8   all directors with Common Equity Interests in EMAK instead of having the right to elect two

9   directors on its own.

10   In response, Kurz and others filed an action against EMAK and its officers and directors

11   in the Delaware Chancery Court captioned Kurz, et al. v. Holbrook, et al., (the "Delaware

12   Derivative Action" and, together with the California Derivative Action, the "Derivative

13   Litigation") seeking, among other relief, to enjoin the Exchange Transaction.

14   Meanwhile, Crown EMAK commenced its own consent solicitation to amend EMAK's by-

15   laws to reduce the size of the Board to three members (the "Crown Consent Solicitation"). If that

16   by-law amendment was adopted and the Exchange Transaction was not effective, Crown EMAK

17   would control the Board by virtue of its contractual right to designate two Board members.

18   Following the filing of the Delaware Derivative Action, EMAK decided to seek the

19   consent of the Common Equity Interest Holders to the Exchange Transaction (the "EMAK

20   Consent Solicitation").   TBE responded by adding claims to the Delaware Derivative Action

21   alleging that the solicitation materials distributed for the EMAK Consent Solicitation were false

22   and misleading.   On December 3, 2009, the Board, upon the advice of counsel, rescinded the

23   Exchange Transaction and the EMAK Consent Solicitation.

24   If matters were not sufficiently complicated, in December 2009, Kurz – purportedly -

25   seeing that TBE was falling short of the shares it needed for the TBE Consent Solicitation to be

26   approved even at the pre-Exchange Transaction level – attempted to purchase from Peter Boutros

27   ("Boutros") – a former officer of EMAK –shares of stock he held.   The shares were governed by

28   two agreements that prohibited Boutros from selling or transferring any shares at that time.   In an

1  effort to avoid the transfer restrictions, Kurz and Boutros crafted a purchase agreement that

2  purported to transfer to Kurz any shares he was "entitled or permitted to sell, transfer or assign,"

3  such that Kurz would own the economic and voting rights of the stock. Following the transaction,

4  the Boutros shares were voted in favor of the TBE Consent Solicitation just before the December

5  21, 2009 deadline.  Those votes were critical in nudging the final vote count to just over 50% in

6  favor of TBE.

7       Following voting, the Crown Consent Solicitation obtained the required majority approval

8  but the TBE Consent Solicitation ended inconclusively due to EMAK's refusal to recognize Kurz's

9  acquisition of any interest in the Boutros shares and Kurz's failure to obtain a required proxy for

10  the shares held by the Depository Trust Company.   In response, Kurz and his co-plaintiffs

11  amended the complaint in the Delaware Derivative Action and sought a declaration that TBE

12  successfully had elected new directors to the Board and that the Crown Consent Solicitation was

13  invalid.

14       On February 9, 2010, the Delaware Chancery Court ruled that TBE had successfully

15  elected its slate of directors, and that the Crown Consent Solicitation was not permitted under

16  Delaware law because the reduction in the size of the Board was not in connection with an annual

17  meeting.  As a result of this decision, the TBE slate of directors (the "TBE Board"), joined Crown

18  EMAK's appointees on the Board.  An accelerated appeal was filed however, and on April 21,

19  2010, the Delaware Supreme Court ruled that the Kurz and Boutros agreement was void and TBE

20  had not successfully elected its slate of directors.  The Delaware Supreme Court also affirmed the

21  invalidation of the Crown Consent Solicitation.

22              (iii)    The Interim Fee Award

23       On February 24, 2010 (as amended on May 3, 2010), the law firm of Bouchard Margules

24  & Friedlander ("Bouchard"), counsel for the plaintiffs in the Delaware Derivative Action, filed an

25  interim fee application seeking $2.85 million in attorneys fees and expenses to litigate claims in

26  the Delaware Derivative Action based upon the "significant benefits" of their services to EMAK

27  and its shareholders.  Although EMAK opposed the fee application, on July 19, 2010, the

28

1    Delaware Court of Chancery issued an interim order awarding counsel to the plaintiffs $2.5

2    million, payable within five business days.

3                              (iv)    The Boutros Action

4          In May 2010, EMAK filed an action against Kurz, TBE and Boutros in Los Angeles

5    County Superior Court captioned EMAK Worldwide, Inc. v. Kurz, et al. (the "Boutros Action")

6    alleging claims for breach of contract, intentional interference with contract, conspiracy to

7    interfere with contract and negligent interference with contract arising out of the purported sale of

8    restricted securities by Boutros to Kurz.  EMAK alleges that as a consequence of Kurz's invalid

9    effort to purchase the Boutros shares, it incurred substantial legal fees and costs associated with

10   having the Kurz/Boutros transaction overturned.  EMAK also alleges that it suffered harm as a

11   consequence of the conduct of the TBE Board during its ten-week tenure.

12         On June 24, 2010, Kurz filed a motion to strike various causes of action of the complaint

13   alleging that they violated California's SLAPP statute which protects litigants from being sued for

14   exercising their constitutional right to free speech in connection with issues of public interest.  On

15   August 19, 2010, the Superior Court denied Kurz' anti-SLAPP motion and Kurz appealed.  He

16   also filed a cross complaint against Boutros for breach of contract and rescission based on failure

17   to deliver any shares and refusal to return the $225,000 purchase price.

18                             (v)     The Advancement Action

19         On July 21, 2010, Kurz filed an action against EMAK in the Delaware Chancery Court

20   alleging that he is entitled to advancement under his indemnification agreement with EMAK for

21   the fees and expenses he has incurred (1) defending against counterclaims filed against him in the

22   Delaware Derivative Action, (2) defending against the claims alleged against him in the Boutros

23   Action, and (3) for the advancement action itself (the "Advancement Action").

24                             (vi)    Other Developments in the Pre-Petition Litigation and Related

25                                     Matters

26         In June 2010, Kurz and the other plaintiffs in the California Derivative Action filed a first

27   amended complaint, which eliminated non-derivative claims, named additional defendants,

28   eliminated all original plaintiffs other than Robert J. Farina, and added Gryphon Promotions, Inc.

1   as a plaintiff.  On June 20, 2010, the California Superior Court sustained the demurrers filed by

2   EMAK and the individual director defendants to the first amended complaint but allowed the

3   plaintiffs ten days leave to amend their complaint.  A second amended complaint was filed on July

4   30, 2010.  Prior to the filing of a responsive pleading to that complaint, the Bankruptcy Cases

5   were filed.  On September 24, 2010, the plaintiffs removed the California Derivative Action to the

6   Bankruptcy Court.

7        Also, Crown EMAK renewed its efforts to amend the by-laws of EMAK to reduce the size

8   of the Board to three members, two of which would be designees of the Preferred Equity Interests.

9   That by-law amendment obtained a super-majority of 60% (which requirement was imposed by

10  the TBE Board after Crown EMAK had submitted consents from holders of over 50% of the

11  Equity Interests) of the Equity Interests.

12              (vii)    The Arbitration

13       In January of 2010, after the Board rescinded the Exchange Transaction, Wells Fargo

14  initiated arbitration proceedings against EMAK claiming the right to a $1 million fee under the

15  Engagement Agreement (the "Arbitration").  Wells Fargo argues that the Exchange Transaction is

16  a qualifying Transaction under the Engagement Agreement, which EMAK disputes.

17       EMAK has vigorously defended the Arbitration, which was scheduled for hearing in

18  September 2010 until stayed by these bankruptcy proceedings.  EMAK is now discussing with

19  Wells Fargo a stipulation granting Wells Fargo relief from stay for the sole purpose of proceeding

20  with arbitration to liquidate Wells Fargo's claim.

21              (viii)    Employment Action

22       Finally, on July 15, 2010, EMAK was served with a writ of summons filed in the

23  Netherlands on behalf of a former employee of EMAK's Dutch subsidiary Megapromotions B.V.,

24  which was placed in bankruptcy liquidation in February 2009 (the "Employment Action").  The

25  Employment Action asserts claims in excess of 500,000 Euros consisting of contractual severance

26  relating to an employment agreement terminated by the bankruptcy trustee of Megapromotions

27  B.V., as well as employee expenses, contractual bonuses and overdue pension contributions.  The

28

2397670.6

1    Employment Action alleges that EMAK is obligated as the guarantor of Megapromotions B.V.

2    despite the intervening bankruptcy liquidation and actions of the trustee.

3                        (ix)    <u>Legal Fees</u>

4        Legal fees directly related to the foregoing lawsuits and the consent solicitation totaled

5    more than $2.3 million in 2009 and $3.3 million in the first six months of 2010, and continued to

6    mount. They put a tremendous strain on the Debtors' working capital. As a result, the Delaware

7    Chancery Court's order requiring EMAK to pay the Interim Award within five business days was a

8    critical factor in the Debtors' decision to file for bankruptcy.

9                    *d.*    *Loss of EMAK's Line of Credit*

10       Another factor in the Debtors' decision to file for bankruptcy was the fact that Bank of

11   America declined to renew EMAK's revolving line of credit in April 2010. For many years,

12   EMAK maintained a multi-million dollar revolving credit facility with Bank of America. In April

13   of 2010, Bank of America, citing EMAK's smaller size and the uncertainty caused by the Pre-

14   Petition Litigation, declined to renew the credit facility.

15   **B.    <u>Management of the Debtors Before and After the Petition Date</u>**

16       **1.    <u>Pre-Petition Management</u>**

17       Prior to the Petition Date, Holbrook served as CEO of EMAK and Tormey served as

18   EMAK's corporate secretary. The Board was comprised of Holbrook, Deutschman, and Rednor,

19   the Chairman of the Board. Holbrook was elected as a director by the Holders of Common Equity

20   Interests in May 2010. Deutschman and Rednor were both appointed to the Board by Crown

21   EMAK.

22       Prior to the Petition Date, EMAK Service's Board of Directors was comprised of Holbrook

23   and Tormey. As of the Petition Date, EMAK Service employed six (6) full-time salaried

24   employees. Holbrook is the CEO and Treasurer of EMAK Service. The other five employees

25   include two in finance (controller and accounts receivable), one in IT, one in administration and

26   one managing the Companies' Hong Kong operations. These employees provided services to the

27   Debtors and the Non-Debtor Subsidiaries.

28

2397670.6

1    Prior to the Petition Date, EMAK Service also employed a number of consultants to

2  provide management services, including Roy Dar, Michael Sanders, and Duane Johnson (the

3  "Consultants").[11]  Until March 31, 2010, the Consultants had been the Debtors' Controller, Chief

4  Financial Officer, and Senior Vice President of Human Resources respectively.  As part of the

5  decentralization plan discussed above, the Debtors terminated the Consultants' employment on

6  March 31, 2010, but continued to pay the Consultants for necessary services provided on an

7  hourly basis.  The Debtors employed the Consultants because the Debtors needed their services,

8  on a part time basis, to complete the corporate decentralization.

9    **2.    Post-Petition Management**

10    *a.    Debtors' Directors and Officers*

11    The following table sets forth the most recent information concerning the Debtors' current

12  directors and officers.

| Name | Title |
|------|-------|
| Jordan Rednor ..................... | Chairman of EMAK's Board of Directors |
| James Holbrook, Jr. ............. | Director and CEO for EMAK; Director of EMAK Service |
| John Brincko[12]..................... | Director of EMAK, Chairman of the Special Litigation Committee |
| Teresa Tormey..................... | Corporate Secretary for EMAK; Director of EMAK Service |

18    **Jordan Rednor** has served as EMAK's Chairman since June of 2010 and has served as a

19  Director of EMAK since June of 2008.  Rednor is the president of the Rednor Group Limited

20  ("RGL"), an international management consulting and merchant banking firm that he founded in

21  1995.  As President of RGL, Rednor has regularly advised advertising and marketing firms and

22  has extensive experience in the marketing industry.  Rednor is a partner in Protagonist LLC, a

---

[11] Tormey, who served as the Debtors' Executive Vice President and General Counsel prior to March 31, 2010, served in a similar capacity.  Tormey's employment is discussed in greater detail in Section IV.C.8.b below.

[12] On October 7, 2010 Deutschman, a Crown EMAK appointee, resigned as a member of the Board.  In his place, Crown EMAK appointed John Brincko as a director.  Also on October 7, 2010 the Board designated a Special Litigation Committee to investigate, evaluate, manage, prosecute, and settle the Pre-Petition Litigation.  The Board appointed Brincko as the sole member of the Special Litigation Committee.  The circumstances surrounding Brincko's appointment and the Board's designation of the Special Litigation Committee are addressed in more detail in Section IV.C.6.

1   boutique creative agency that provides advertising and brand strategy to major advertisers.

2   Rednor is currently a general partner in the Mentor Fund, a partnership that provides intellectual

3   and financial support to emerging marketing and communications companies.  Since January

4   2005, Rednor has served as the Chairman of Mr. Youth, a social media marketing agency that

5   helps companies reach "Millenials."  Between 1997 and 2003, Rednor led the transformation of

6   Draft Worldwide into the leading integrated global marketing agency.  Prior to starting RGL,

7   Rednor worked as an investment banker with a focus on the advertising industry.  Rednor

8   graduated from Fordham University with an MBA and Pennsylvania State University with a

9   Bachelor of Science.

10  **James Holbrook** has been the CEO of EMAK Worldwide, a family of marketing agencies

11  including Upshot, Equity Marketing, and Neighbor since November, 2005.  He was formerly

12  president of Zipatoni, an independent agency that was sold to IPG, and was subsequently a group

13  head of several agencies while at IPG.  Prior to Zipatoni, Holbrook worked for Ralston Purina

14  (now NestlePurina), in senior marketing and sales roles, then as chief executive of the BeechNut

15  Babyfood subsidiary, and as assistant to the chairman of the board.  He began his career in

16  marketing at Procter & Gamble in 1981.  Holbrook graduated from Washington University with

17  an MBA and Vanderbilt University with an Economics and Philosophy double major.

18  **John Brincko** has served as the sole member of EMAK's Special Litigation Committee

19  and as a Director of EMAK since October 7, 2010.  Brincko is the President of Sitrick Brincko

20  Group, LLC.  Brincko has more than 40 years of executive, financial and operational management

21  experience.  Brincko has served as president and chief executive officer of over fifty companies,

22  ranging in sales from $50 million to over $3 billion.  His experience encompasses turnarounds,

23  mergers and acquisitions, investment feasibility, plans of reorganization, cost reduction programs,

24  litigation evaluation and support, receiverships and trusteeships and expert witness testimony.

25  Brincko has provided services to many companies undergoing chapter 11 reorganization or

26  liquidation.  Most recently, he served as Chief Restructuring Officer ("CRO") and, following

27  confirmation, the Liquidating Trustee, for Franchise Pictures, LLC, a case pending in the Central

28  District of California.  In these roles, Brincko conducted claims analysis, objected to claims,

1    authorized litigation on behalf of the Liquidating Trust, and settled litigation.    Brincko also

2    recently served as CRO for Spansion, Inc., a flash memory maker that recently reorganized in the

3    Delaware Bankruptcy Court.    As Spansion's CRO, Brincko managed complex intellectual property

4    litigation and resolved a significant preference and claims litigation dispute between Spansion and

5    a major creditor, Spansion Japan.    Brincko graduated from Bernard Baruch School of Business

6    Administration of the City University of New York with a Bachelor of Business Administration in

7    accounting.

8         **Teresa Tormey** serves as the Corporate Secretary to the Debtors.    Tormey was employed

9    by EMAK, most recently, as Chief Administrative Officer (following a promotion from Executive

10   Vice President in 2006 and from Senior Vice President in 2004), General Counsel and Corporate

11   Secretary from November 1, 2002 until March 31, 2010.    Since March 31, 2010, Tormey has

12   continued to serve EMAK, pursuant to a consulting agreement, as its chief in-house counsel and

13   Corporate Secretary.    Tormey also holds the position of Corporate Secretary and Director with

14   each of EMAK's wholly-owned subsidiaries.    Prior to joining EMAK, Tormey was a partner in the

15   law firm of Oppenheimer Wolff & Donnelly LLP specializing in corporate and securities law as

16   well as mergers & acquisitions.    Tormey graduated from Pepperdine University School of Law

17   with a JD, cum laude, and UC Davis with a Bachelor's degree in economics.

18         *b.    Upshot's Officers*

19         As discussed in greater detail below, following the Debtors' exit from bankruptcy, Upshot,

20   one of EMAK's wholly owned subsidiaries, will generate most of the Reorganized Debtors'

21   revenue.    The following table sets forth the most recent information concerning Upshot's current

22   Directors and management.

23

| Name | Title |
|---|---|
| James Holbrook, Jr. ............. | Director |
| Teresa Tormey.................... | Director |
| Brian Kristofek. ................. | President & CEO |
| Ellen Slauson...................... | Executive Vice President, Account Management |
| Brock Montgomery ............. | Executive Vice President, Creative Services |
| Kate May ............................ | Senior Vice President, Finance and Administration |

1      **Brian Kristofek** is CEO and President of Upshot.  Kristofek joined Upshot in 1996.

2   Kristofek became President of Upshot in 2002 and he was promoted to CEO in 2007.  As

3   President and CEO, Kristofek has grown Upshot's integrated marketing capabilities and led its

4   client development efforts.  Kristofek has directed programs for Crown Imports, Kraft, Disney

5   Vacation Club and Proctor and Gamble, some of Upshot's largest clients.  Kristofek is an expert in

6   the growing field of in-store marketing and he currently serves as a faculty member of the In-Store

7   Marketing Institute.

8      **Ellen Slauson** is Executive Vice President of Account Management.  Slauson joined

9   Upshot in 1996.  As EVP, Slauson has built and maintained long term relationships between

10  Upshot and some of its key clients, including Kraft, Proctor & Gamble, Hilton and Crown

11  Imports.  Slauson has played an integral role in some of Upshot's most challenging accounts,

12  including Sony, E*TRADE, Business.com, Microsoft, MasterCard, Mirage, Absolut and Diageo.

13  Slauson has also played a critical role in making sure that Upshot continues to meet its clients'

14  needs.

15     **Brock Montgomery** is Executive Vice President of Creative Services.  Montgomery

16  joined Upshot in 1997 and has served as EVP since 2001.  As EVP, Montgomery has led the

17  creative direction for many of Upshot's largest accounts, including Business.com, Coca-Cola,

18  Proctor & Gamble and Kraft.  Montgomery's focus on broad-based marketing and integrated

19  solutions has been a great asset to Upshot's clients.

20     **Kate May** is Senior Vice President for Finance & Administration.  May joined Upshot in

21  2004. As SVP, May has provided Upshot's senior management with timely and accurate financial

22  information that allows senior management to make the best business decisions for both the clients

23  and Upshot.  Prior to joining Upshot, May served as the Director of Financial Operations for

24  Skidmore, Owings & Merrill, one of the world's leading architecture firms.  Prior to that, she spent

25  over fifteen years at Foote, Cone & Belding, becoming its finance director.

26     **3.    Post Confirmation Management**

27     A list of the Debtors' post-confirmation Board and management will be filed with the Plan

28  Supplement.

1  **C.    Significant Events in the Bankruptcy Case Through the Date of Filing of Disclosure**

2  **Statement**

3      **1.    The Debtors' "First Day" Motions**

4      On August 6-9, 2010, the Debtors filed six motions on shortened time (the "First Day

5  Motions") seeking relief that they deemed necessary in order to continue operating the Companies'

6  operations without serious and detrimental interruption immediately after the Petition Date.  The

7  Bankruptcy Court scheduled first day hearings for August 12, 2010.  A summary of the First Day

8  Motions, objections filed in connection therewith and the relief that the Bankruptcy Court granted

9  is provided below:

10          *a.    The Cash Management Motion*

11      The Debtors filed the *Emergency Motion for Order under 11 U.S.C. §§ 105, 345, 363, 364:*

12  *(A) Authorizing (i) Maintenance of Existing Bank Accounts, (ii) Continued Use of Existing*

13  *Business Forms, and (iii) Continued use of Existing Cash Management System; (B) Authorizing*

14  *Certain Intercompany Transactions; (C) Excusing the 11 U.S.C. § 345(b) Deposit and Investment*

15  *Guidelines; and (D) Providing Other Related Relief* (the "Cash Management Motion").  By the

16  Cash Management Motion the Debtors sought to preserve their pre-petition cash management

17  system in which the Non-Debtor Subsidiaries deposited most revenue into a centralized account

18  controlled by EMAK Service.  EMAK Service then distributed the money to payroll and operating

19  accounts that were used to pay the Companies' obligations.   Because modifying the cash

20  management system would have severely damaged the Debtors' operations, the Debtors sought

21  leave of the Bankruptcy Court to continue to utilize this system.

22      Objections were filed to the Cash Management Motion on the basis that the Debtors' cash

23  management system improperly intermingled estate and non-estate assets, to the detriment of the

24  Debtors' creditors.  On August 12, 2010, the Bankruptcy Court entered an order: (i) authorizing

25  the Debtors' continued use of their existing business forms; (ii) authorizing the Debtors' continued

26  use of their existing cash management systems; (iii) excusing the Debtors' compliance with 11

27  U.S.C. § 345(b)'s Deposit and Investment Guidelines; and (iv) requiring the Debtors to open

28  debtor-in-possession accounts.

2397670.6

1             *b.*     *The Employee Wage and Benefits Motion*

2             The Debtors filed the *Emergency Motion for Order Authorizing Payment and Honoring of*

3   *Prepetition Payroll Obligations*  (the "Employee Wage and Benefits Motion") seeking authority

4   to: (i) pay the pre-petition wages that they owed to their current, non-insider employees, as well as

5   pre-petition wages owed to the employees of non-debtor subsidiaries; (ii) honor their sick leave

6   and vacation policies, including allowing employees to utilize sick leave and vacation time that

7   had accrued prior to the Petition Date; and (iii) process payroll for the Non-Debtor Subsidiaries in

8   the ordinary course of business.[13]  On August 12, 2010, the Bankruptcy Court entered an order

9   granting the Employee Wage and Benefits Motion.  On August 13, 2010, the Debtors filed a list of

10  all employees owed pre-petition wages and the amount of their outstanding wages.

11            *c.*     *The Utilities Motion*

12            The Debtors filed the *Emergency Motion for Order (a) Prohibiting Utilities from Altering,*

13  *Refusing, or Discontinuing Service, and (b) Determining Adequate Assurance of Payment for*

14  *Future Utility Services 11 U.S.C. §366* (the "Utilities Motion") for authority to satisfy their

15  obligation to provide utility companies with adequate assurance of future performance by

16  providing each utility provider with a deposit equal to one month's average invoice.  On August,

17  19, 2010, the Bankruptcy Court issued an order granting the Utilities Motion.

18            *d.*     *Motion for Joint Administration*

19            The Debtors filed the *Emergency Motion for Order Authorizing Joint Administration of*

20  *Related Cases* (the "Joint Administration Motion").  By the Joint Administration Motion, the

21  Debtors requested that the Bankruptcy Court jointly administer their cases.  On August 11, 2010,

22  the Bankruptcy Court entered an order granting the Joint Administration Motion.

23            *e.*     *Motion for Limited Notice*

24            The Debtors filed the *Emergency Motion for an Order Limiting Notice of Certain Matters*

25  *Requiring Notice to Creditors Pursuant to Rule 2002 and 9007 of the Federal Rules of Bankruptcy*

26  *Procedure* (the "Limited Notice Motion").  By the Limited Notice Motion, the Debtors requested

27  _____

28      [13] None of the requested relief exceeded 11 U.S.C. § 507(b)(4)'s $11,725 cap on priority
claims held by employees.

2397670.6                                              - 30 -

1    that they not have to give all parties notice of non-critical motions.  On August 19, 2010, the

2    Bankruptcy Court entered an order grating the Limited Notice Motion.

3              *f.*    *Consulting Motion*

4          The Debtors filed the *Emergency Motion for Order Authorizing Debtors to Perform*

5    *Consulting Agreements with Teresa Tormey, Roy Dar, Michael Sanders and Duane Johnson in the*

6    *Ordinary Course* ("Consulting Motion")[14] seeking to continue paying the Consultants under the

7    agreements that the parties signed prior to the Petition Date.

8          An objection was filed to the Consulting Motion on the grounds that the motion constituted

9    priority payment of pre-petition unsecured debt.  After discussions with creditors and the United

10   States Trustee, the Debtors withdrew their request to pay pre-petition amounts due under the

11   consulting agreements.  On August 19, 2010, the Bankruptcy Court entered an order authorizing

12   the Debtors to pay the Consultants on a prospective basis.

13         On August 19, 2010, the Consultants filed a motion to amend the Bankruptcy Court's

14   August 19 order, requesting that the order be clarified and specifically preserve the Consultants'

15   ability to enter into new consulting agreements with the Debtors.  On August 31, 2010, the

16   Consultants withdrew their request.  None of the Consultants has provided any services to the

17   Debtors during the post-petition period.

18       **2.    Schedules**

19         The Debtors timely filed their Schedules and Statement of Financial Affairs on August 19,

20   2010, fourteen days after the Petition Date.  On October 28 and December 23, 2010, the Debtors

21   amended their Schedules and Statement of Financial Affairs to reflect final pre-petition bills and

22   other information they received after the original filing on August 19.

23       **3.    Appointment of the Official Committee of Unsecured Creditors**

24         On August 31, 2010, the Office of the United States Trustee formed the Official

25   Committee of Unsecured Creditors (the "Committee").  The Committee is chaired by Bouchard

26

27   _____

     [14] Although Tormey was originally named in the Consulting Motion, the Debtors withdrew

28   the motion with respect to Tormey following discussions with the United States Trustee, and
     retained Tormey on an alternative basis.

2397670.6                                        - 31 -

1  Margules & Friedlander PA ("Bouchard").   Kurz and Michael Sanders also serve on the

2  Committee.[15]  The Committee chose Levene as counsel.

3      **4.    Initial Meeting of Creditors**

4      The meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was held on

5  September 30, 2010.  The United States Trustee conducted the meeting.  Tormey attended the

6  meeting on behalf of the Debtors.  Jeffrey Reisner, Esq. of Irell represented the Debtors.  John-

7  Patrick Fritz, Esq. of Levene attended on behalf of the Committee.

8      **5.    The Claims Bar Date**

9      On September 1, 2010, the Debtors filed a motion seeking to establish a bar date for filing

10  proofs of claim and approving the form and manner of the notice of bar date.  There was no

11  opposition to such motion and on October 8, 2010, the Bankruptcy Court granted the motion.

12      On October 28, 2010, the Debtors served the bar date notice establishing December 27,

13  2010 as the deadline for filing proofs of claims.

14      On January 3, 2011, the Debtors served a supplemental bar date notice on the few parties

15  affected by the Debtors' December 23 amendments to their Schedules, establishing a supplemental

16  bar date of February 2, 2011 for the affected parties.

17      **6.    Appointment of John Brincko and the Designation of the Special Litigation**

18          **Committee**

19      The Derivative Litigation alleged that Holbrook, Deutschman, and Rednor, among other

20  parties, had damaged EMAK.  The actions sought damages on EMAK's behalf.  Because the

21  actions had been filed on EMAK's behalf and sought damages for EMAK, the Derivative

22  Litigation became part of EMAK's Estate upon the bankruptcy filing.  As part of the Estate, the

23  Board took over the prosecution of the Derivative Litigation.

24

25

---

26  [15] Steven J. Vallen was originally a member of the Committee.  Vallen resigned from the
    Committee on September 3, 2010.  The United States Trustee replaced Vallen with the Hudson
27  Group, LLC.  Hudson Group, LLC subsequently resigned from the Committee.

    Luce, Forward, Hamilton & Scripps LLP ("Luce") was also originally a member of the
28  Committee.  Luce resigned from the Committee on March 9, 2011.

2397670.6                                    - 32 -

1    EMAK's directors were aware of their fiduciary obligations and the potential issue that

2    arose by virtue of the fact that EMAK's directors at the time -- Holbrook, Rednor and Deutschman

3    -- were all named defendants in the Derivative Litigation. Therefore, in consultation with counsel,

4    the Board designated the Special Litigation Committee comprised of an independent director to

5    control the Derivative Litigation. The Board instructed Irell to identify and interview restructuring

6    experts that could investigate the Derivative Litigation and serve on the Special Litigation

7    Committee. Irell presented EMAK with two possible candidates. After Tormey and Irell

8    interviewed both candidates, the Board chose Brincko to serve as the sole member of the Special

9    Litigation Committee. The Board chose Brincko because of his extensive experience conducting

10   Chapter 11 reorganizations and resolving contentious litigation.

11   On October 7, 2010, the Board designated the Special Litigation Committee. The Board

12   authorized the Special Litigation Committee to take any necessary actions to manage, investigate,

13   prosecute, or settle the Derivative Litigation. Upon designating the Special Litigation Committee,

14   Deutschman, a Crown EMAK appointee, resigned his seat. Crown EMAK replaced Deutschman

15   with Brincko. The Board immediately appointed Brincko as the sole member of the Special

16   Litigation Committee. On October 31, 2010, the Board voted to give the Special Litigation

17   Committee authority over all the Pre-Petition Litigation, authorized the Special Litigation

18   Committee to manage all claims related to the Pre-Petition Litigation and authorized the Special

19   Litigation Committee to initiate any other actions it believed necessary to recover monies for the

20   benefit of the Debtors' Estates.

21   Shortly after its appointment, the Special Litigation Committee selected Buchalter Nemer,

22   A Professional Corporation ("Buchalter"), as its counsel and began identifying the litigation and

23   claims at issue, as well as the parties, lawyers, and witnesses with knowledge of the key facts and

24   issues giving rise to the various actions pending against, or on behalf of, EMAK. As a result of

25   these discussions and analyses, the Special Litigation Committee created a list of individuals to be

26   interviewed. Over the course of seven weeks in November and December 2010, the Special

27   Litigation Committee conducted in-person and (less frequently) video or telephonic formal

28   interviews with the eighteen principals, witnesses, and attorneys.

Conducting the formal interviews in person allowed the Special Litigation Committee to evaluate the demeanor and credibility of the witnesses and, when appropriate, to drill down on important issues.    In almost all instances, additional, follow-up conversations were had or correspondence was exchanged with each of the interviewees.

As another component of the investigation, the Special Litigation Committee requested, and obtained, copies of the pleadings from the Pre-Petition Litigation.    It obtained the entire pleading file in the Delaware Derivative Action (approximately 5,000 pages), and a full set of twenty-two (22) deposition transcripts in that action.    It obtained key pleadings, motion papers, and court orders in the California Derivative Action.    The Special Litigation Committee also obtained and reviewed the complaint, cross-complaint, and various papers filed in the Boutros Action, and the docket, complaint, and correspondence with the court in the Advancement Action.

In addition to pleadings, transcripts, and court documents, the Special Litigation Committee requested and reviewed copies of the agreements and transactional documents at issue in the pending litigation including, but not limited to, the Securities Purchase Agreement between Crown EMAK and EMAK, various indemnification agreements, the purchase agreement between Kurz and Boutros, correspondence regarding potential stock purchase transactions involving the Company, SEC filings, press releases, and email correspondence.    It also requested, reviewed and analyzed several summaries of the pending disputes and litigation prepared by the various counsel. The Special Litigation Committee also obtained a copy of the relevant insurance policy and consulted with EMAK's insurance counsel with respect to it.

Apart from its factual investigation, counsel for the Special Litigation Committee conducted extensive research into critical legal issues relevant to the Pre-Petition Litigation.    Its work included research into the fiduciary obligations of corporate directors under Delaware and California law, the application of the business judgment rule under Delaware and California law, exceptions to the business judgment rule under Delaware law, standing requirements under Delaware and California law, applicable statutes of limitation, the measure and calculation of damages in shareholder derivative suits, California's anti-SLAPP statute, the elements of a claim for aiding and abetting a breach of fiduciary duty under Delaware and California law, the

2397670.6

1 requirements for appealing interim orders, and claims for intentional interference with contract

2 under California law.  In some cases, the analyses were supplemented with memos from counsel

3 for the parties, and/or telephonic discussions with litigation counsel.

4     A significant portion of the Special Litigation Committee's findings are discussed at length

5 in Section IV.D-F. of this Disclosure Statement.

6     **7.**    **The Committee's Motion to Convert or in the Alternative to Appoint a Trustee**

7     On September 9, 2010, the Committee filed the *Motion for an Order Converting the Cases*

8 *to Chapter 7, or in the Alternative, Appointing a Chapter 11 Trustee*.  The Committee alleged that

9 the Debtors filed the cases in bad faith and that the Debtors' current management had violated its

10 fiduciary duties to the Debtors pre-petition and the Debtors' current management could not

11 impartially evaluate the Derivative Litigation.  The Debtors opposed the Committee's motion on

12 the basis that the Special Litigation Committee controlled the Derivative Litigation, the Debtors'

13 current management was well qualified to lead the Debtors' reorganization, the Debtors had filed

14 their cases in good faith and changing management would harm EMAK's non-debtor subsidiaries.

15 Crown EMAK also opposed the Committee's motion on the basis that the motion was not in the

16 best interests of unsecured creditors or the preferred shareholder.

17     On October 21, 2010, the Bankruptcy Court held a hearing on the Committee's motion.  At

18 the hearing, the Bankruptcy Court denied the Committee's request to convert the case and

19 continued the hearing on the Committee's request to appoint a Chapter 11 Trustee until November

20 16, 2010.

21     Prior to the continued hearing, the Committee and the Debtors agreed to continue the

22 hearing on the Motion to Appoint a Chapter 11 Trustee until May 11, 2011.  As part of the

23 stipulation, the Debtors agreed to provide the Committee with thirty days notice of any decision to

24 terminate Brincko, the sole member of the Special Litigation Committee.

25     **8.**    **Notices of Insider Compensation**

26         *a.*    *Insider Compensation Request for Holbrook*

27     On August 24, 2010, the Debtors filed their *Notice of Intent to Pay Insider Compensation*

28 *to James Holbrook Jr.*  The Debtors sought to compensate Holbrook for his role as a Director and

2397670.6

1  EMAK's CEO.    As EMAK's CEO, Holbrook oversees and manages all of the Companies'

2  operations. The Debtors proposed paying Holbrook his pre-petition salary of $507,000 along with

3  his pre-petition benefits.    The Debtors did not propose assuming Holbrook's employment

4  agreement, which expired as of its own terms on December 31, 2010.

5          On September 7, 2010, the Committee filed an opposition to the Debtors' proposal to pay

6  Holbrook.   The Committee argued that Holbrook should not serve as EMAK's CEO given the

7  allegations made in the Derivative Litigation.  On October 21, 2010, the Bankruptcy Court held a

8  hearing on the proposed compensation.    At the hearing, the Bankruptcy Court requested that

9  Brincko evaluate Holbrook's salary and ordered further briefing on the subject.  The Bankruptcy

10  Court also continued the hearing to November 16, 2010.   On November 4, 2010, Brincko

11  submitted a declaration stating his conclusion that Holbrook's compensation was reasonable and

12  appropriate.    Prior to the continued hearing, the Committee stipulated to the allowance of

13  Holbrook's compensation through December 31, 2010 on the terms set forth in the insider

14  compensation request.

15          On December 21, 2010, the Debtors filed their second *Notice of Intent to Pay Insider*

16  *Compensation to James Holbrook, Jr.*  The Debtors filed a new notice because Holbrook's

17  employment agreement expired on December 31, 2010.  By the new request, the Debtors sought

18  authority to pay Holbrook a reduced compensation of $35,000 per month, plus benefits, through

19  March 31, 2011.  The Debtors did not assume Holbrook's employment agreement.  No party

20  objected to the request.

21          On March 11, 2011, the Debtors filed their third *Notice of Intent to Pay Insider*

22  *Compensation to James Holbrook, Jr.*  The Debtors filed a new notice because the December 21,

23  2010 request sought to pay Holbrook only through March 31, 2011.  By the new request, the

24  Debtors sought authority to pay Holbrook compensation of $35,000 per month, plus benefits,

25  through May 31, 2010. The Debtors did not assume Holbrook's employment agreement.  No party

26  objected to the request.

27

28

b.    *Insider Compensation Request for Tormey*

On August 24, 2010, the Debtors filed their *Notice of Intent to Pay Insider Compensation to Teresa L. Tormey*.    Tormey is the Corporate Secretary of EMAK.    As part of their decentralization plan described in Section IV.A.4.b, prior to the Petition Date, the Debtors terminated Tormey's full-time employment and employed Tormey as a part-time consultant at an hourly rate of $400 per hour.    Since becoming a part time consultant, Tormey has continued to serve the Debtors as their in-house counsel and Corporate Secretary.    As in-house counsel and corporate secretary, Tormey is responsible for the management of all corporate legal matters and she is the principal liaison between counsel and the Debtors in this proceeding.    By the insider compensation request, the Debtors sought to pay Tormey for the services she provided to the Debtors post-petition and anticipated that Tormey would work thirty (30) hours per week.    The Debtors did not propose paying her pre-petition claims.

On September 7, 2010, the Committee filed an opposition to the Debtors' request to compensate Tormey arguing that Tormey was a professional and needed to employed under 11 U.S.C. § 327(a).    On October 21, 2010, the Bankruptcy Court held a hearing on the proposed compensation.    At the hearing, the Bankruptcy Court requested that Brincko evaluate Tormey's compensation and ordered further briefing on the subject.    The Bankruptcy Court also continued the hearing to November 16, 2010.    On November 4, 2010, Brincko submitted a declaration stating his conclusion that Tormey's compensation was reasonable and appropriate.    Prior to the continued hearing, the Committee and Debtors agreed that Tormey would submit her time records to the United States Trustee and that her compensation would be subject to the notice and hearing requirements of section 330 of the Bankruptcy Code, thereby resolving the Committee's objection to the insider compensation request.

c.    *Insider Compensation Request for Rednor*

In November 2010, EMAK filed its *Notice of Intent to Pay Insider Compensation to Jordan Rednor*.    Prior to the Petition Date, Rednor received a stipend of $80,000 a year, plus expenses, to serve as Chairman of the Board.